No. 23-1073

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

APPVION, INC. RETIREMENT SAVINGS
AND EMPLOYEE STOCK OWNERSHIP PLAN,
by and through Grant Lyon in his capacity as
the ESOP Administrative Committee of Appvion, Inc.,

*Plaintiff-Appellant*,

v.

DOUGLAS P. BUTH, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin
Civil Action No. 1:18-cv-01861
The Honorable William C. Griesbach

APPELLANT'S OPENING BRIEF

L. Richard Williams
Jennifer B. Anderson
Abigail M. Terhune
BEUS GILBERT MCGRODER PLLC
701 N. 44th Street
Phoenix, AZ 85008
Telephone: 480-429-3000
rwilliams@beusgilbert.com
janderson@beusgilbert.com
abby.terhune@outlook.com

*Counsel for Plaintiff-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1073

Short Caption: Appvion, Inc. Ret. Savs. Plan & ESOP v. Douglas P. Buth, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Appellant: Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon

in his capacity as the ESOP Administrative Committee of Appvion, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Beus Gilbert McGroder PLLC; The Previant Law Firm, S.C.

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and
N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ L. Richard Williams   Date: January 17, 2023

Attorney's Printed Name: L. Richard Williams

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address: 701 North 44th Street

Phoenix, Arizona 85018

Phone Number: 480-429-3000   Fax Number: 480-429-3100

E-Mail Address: rwilliams@beusgilbert.com

rev. 12/19 AK

**AMENDED**

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __23-1073__

Short Caption: __Appvion, Inc. Ret. Savs. Plan & ESOP v. Douglas P. Buth, et al.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**\*\*** ☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   __Appellant:  Appvion, Inc. Retirment Savings and Employee Stock Ownership Plan, by and through Grant Lyon__

   __in his capacity as the ESOP Administrative Committee of Appvion, Inc.__

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   __Beus Gilbert McGroder PLLC; The Previant Law Firm, S.C.__

(3) If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

         __N/A__

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         __N/A__

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   __N/A__

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   __N/A__

Attorney's Signature: __/s/Jennifer B. Anderson__          Date: __February 13, 2023__

Attorney's Printed Name: __Jennifer B. Anderson__
\*\*Revised Counsel of Record to be Yes.
Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: __701 North 44th Street__

         __Phoenix, Arizona  85018__

Phone Number: __480-429-3000__          Fax Number: __480-429-3100__

E-Mail Address: __janderson@beusgilbert.com__

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1073</u>

Short Caption: <u>Appvion, Inc. Ret. Savs. Plan & ESOP v. Douglas P. Buth, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

         [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Appellant: Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon</u>

    <u>in his capacity as the ESOP Administrative Committee of Appvion, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Beus Gilbert McGroder PLLC; The Previant Law Firm, S.C.</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

            <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Abigail Terhune</u>        Date: <u>January 17, 2023</u>

Attorney's Printed Name: <u>Abigail Terhune</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]  No [ ]

Address: <u>701 North 44th Street</u>

       <u>Phoenix, Arizona 85018</u>

Phone Number: <u>480-429-3000</u>        Fax Number: <u>480-429-3100</u>

E-Mail Address: <u>abby.terhune@outlook.com</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE...................................................................4

I.      Factual Background ........................................................................4

        A.      The Parties .........................................................................4

        B.      The 2001 Transaction Was For More Than Fair Market
                Value.....................................................................................5

        C.      The Ongoing Valuations Overstated the Value of PDC's
                Stock.....................................................................................8

        D.      Lyon Discovered PDC's Stock Valuations Were
                Overvalued. .......................................................................11

II.     The First Amended Complaint .....................................................12

III.    The Second Amended Complaint.................................................13

SUMMARY OF THE ARGUMENT ....................................................17

ARGUMENT ........................................................................................19

I.      Appellate Standards of Review ....................................................19

II.     Lyon Stated Breach of Fiduciary Duty, Prohibited Transactions,
        and Co-Fiduciary Liability Claims Under ERISA. ......................19

        A.      The District Court Erroneously Applied Rule 9(b)'s
                Heightened Pleading Standard to an Overall "Fraudulent
                Scheme" But Failed to Analyze Individual Claims. ...........21

B.   The District Court Erroneously Applied Rule 9(b) to All Aspects of Lyon's Breach of Fiduciary Duty Claims Against the D&O Defendants. ........................................................26

C.   The SAC States Breach of Fiduciary Duty Claims for Violations Within the Six Year Statute of Limitations. .....................30

1.   The SAC contains detailed and plausible allegations that the D&O Defendants breached their fiduciary duties. ...................................................................................30

2.   The SAC contains detailed and plausible allegations that the D&O Defendants engaged in prohibited transactions........................................................................33

3.   The SAC contains detailed and plausible allegations that State Street and Reliance breached their fiduciary duties.................................................................34

D.   The SAC States Claims for Co-Fiduciary Liability. ...........................49

III.  Lyon's ERISA Claims for Violations Predating November 26, 2012, Are Timely..............................................................................52

A.   ERISA's Statute of Repose Bars Claims Brought More than Six Years after the Breach or Violation Except in the Case of Fraud or Concealment. ...........................................52

B.   The District Court Misinterpreted the Fraud or Concealment Exception as Requiring Conduct Separate from the Underlying Wrong. .................................................54

C.   Lyon's ERISA Claims Are Tolled by the Fraud or Concealment Exception.......................................................57

1.   The SAC alleged fraud or concealment in connection with the 2001 Transaction. .....................................58

2.   The SAC alleged fraud or concealment between 2001 and 2012.......................................................62

IV.  Lyon Stated Claims for Securities Fraud.......................................................69

A.    The SAC States a Claim Against the D&O Defendants. ...................69

B.    The SAC States a Claim for Control Person Liability. ......................71

C.    The District Court Erroneously Required Plaintiff to Plead
      Motive...................................................................................................71

V.    ERISA Does Not Preempt Lyon's State Law Claims. .................................73

A.    The State Law Claim against the D&O Defendants is Not
      Preempted...........................................................................................74

B.    The State Law Claims against Houlihan Are Not
      Preempted...........................................................................................76

C.    The State Law Claims Against Stout Are Not Preempted. ................78

CONCLUSION ....................................................................................................80

CERTIFICATE OF COMPLIANCE...................................................................81

CERTFICATE OF SERVICE...............................................................................82

CIRCUIT RULE 30(A) APPENDIX TO APPELLANT'S OPENING
      BRIEF

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004) ...........................................................................79

*Ahrendsen v. Prudent Fiduciary Servs., LLC*,
    No. CV 21-2157, 2022 WL 294394 (E.D. Pa. Feb. 1, 2022)..............51

*Airports Co., Inc. v. Custom Ben. Services of Austin, Inc.*,
    28 F.3d 1062 (10th Cir. 1994)............................................................79

*Allen v. GreatBanc Tr. Co.*,
    835 F.3d 670 (7th Cir. 2016)...................................................... 28, 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................... 19, 22, 23, 50

*Bastian v. Petren Resources Corp*.,
    892 F.2d 680 (7th Cir. 1990)..............................................................13

*Borsellino v. Goldman Sachs Grp., Inc.*,
    477 F.3d 502 (7th Cir. 2007)..............................................................26

*Brundle ex rel. Constellis Emp. Stock Ownership Plan v.*
    *Wilmington Tr. N.A.*,
    241 F. Supp. 3d 610 (E.D. Va. 2017)................................................45

*Brundle ex rel. Constellis Emp. Stock Ownership Plan v.*
    *Wilmington Tr. N.A.*,
    919 F.3d 763 (4th Cir. 2019)..............................................................41

*California Div. of Labor Standards Enf't v.*
    *Dillingham Const., N.A., Inc.*,
    519 U.S. 316 (1997) ...........................................................................74

*Cent. States, Se. & Sw. Areas Pension Fund v.*
    *Transervice Logistics, Inc.*,
    56 F.4th 516 (7th Cir. 2022)..............................................................19

*Chao v. Hall Holding Co.*,
285 F.3d 415 (6th Cir. 2002) .......................................................... 34, 45

*Citizen's State Bank v. Timm, Schmidt & Co., S.C.*,
335 N.W.2d 361 (Wis. 1983) ................................................................78

*Cornielsen v. Infinium Capital Management, LLC*,
916 F.3d 589 (7th Cir. 2019) .......................................................... 50, 72

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) .................................................................20

*Donovan v. Cunningham*,
716 F.2d 1455 (5th Cir. 1983) .............................................................36

*Egelhoff v. Egelhoff*,
532 U.S. 141 (2001) ...................................................................... 73, 74

*Enneking v. Schmidt Builders Supply, Inc.*,
917 F. Supp. 2d 1200 (D. Kan. 2013) ............................................ 57, 80

*Enneking v. Schmidt Builders Supply, Inc.*,
875 F. Supp. 2d 1274 (D. Kan. 2012) ..................................................80

*Fernandez v. KM Indus. Holding Co.*,
585 F.Supp. 2d 1177 (N.D. Cal. 2008) .................................................48

*Fish v. GreatBanc Trust Co.*,
749 F.3d 671 (7th Cir. 2014) .......................................................... 20, 36

*Free v. Briody*,
732 F.2d 1331 (7th Cir. 1984) .............................................................49

*Geller v. County Line Auto Sales, Inc.*,
86 F.3d 18 (2d Cir. 1996) ...................................................................78

*Gerosa v. Savasta & Co.*,
329 F.3d 317 (2d Cir. 2003) .................................................................78

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ............................................................................74

*Haley v. Tchrs. Ins. & Annuity Assoc. of Am.*,
   377 F. Supp. 3d 250 (S.D.N.Y. 2019)....................................................................34

*Halperin v. Richards*,
   7 F.4th 534 (7th Cir. 2021)........................................................................... passim

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
   530 U.S. 238 (2000) ...........................................................................................34

*Hensiek v. Board of Directors of Casino*
*Queen Holding Company, Inc.*,
   No. 3:20-CV-377-DWD, 2022 WL 263321 (S.D. Ill. Jan. 28, 2022).......... 56, 57

*Hernandez v. Illinois Inst. of Tech.*,
   63 F.4th 661 (7th Cir. 2023).................................................................................19

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007)................................................................................72

*Hoeppner v. Jess Howard Elec. Co.*,
   150 Ohio App. 3d 216 (2002) ..............................................................................75

*Housman v. Albright*,
   368 Ill. App. 3d 214 (2006)..................................................................................76

*Howard v. Shay*,
   100 F.3d 1484 (9th Cir. 1996)..............................................................................40

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
   284 F.2d 511 (S.D. Tex. 2003)...................................................................... 49, 79

*Keach v. U.S. Trust Co.*,
   419 F.3d 626 (7th Cir. 2005)........................................................... 34, 36, 40, 47

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ...........................................................................................55

*Kloots v. American Express Tax and Business Services, Inc.*,
   233 Fed. Appx. 485 (6th Cir. 2007).....................................................................79

*Laskin v. Siegel*,
   728 F.3d 731 (7th Cir. 2013)........................................................................ 53, 69

*Leatherman v. Tarrant County Narcotics Intelligence*
  *and Coordination Unit*,
  507 U.S. 163 (1993) ..............................................................26

*LeBlanc v. Cahill*,
  153 F.3d 134 (4th Cir. 1998) ...............................................77

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) ...............................................27

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) .................................................25

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...............................................22

*Martin v. Consultants & Administrators, Inc.*,
  966 F.2d 1078 (7th Cir. 1992) ................................... passim

*Morstein v. Nat'l Ins. Services, Inc.*,
  93 F.3d 715 (11th Cir. 1996) ...............................................77

*Neitzke v. Williams*,
  490 U.S. 319 (1989) .............................................................23

*New Mexico State Investment Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011) ..............................................72

*New York State Conference of Blue Cross & Blue Shield Plans v.*
  *Travelers Ins. Co.*,
  514 U.S. 645 (1995) .............................................................74

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v.*
  *Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) ........................................ 22, 28

*Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*,
  919 F.2d 1216 (7th Cir. 1990) ..............................................53

*Rogers v. Baxter Int'l, Inc.*,
  417 F. Supp. 2d 974 (N.D. Ill. 2006) ...................................26

*Sacerdote v. New York Univ.*,
  9 F.4th 95 (2d Cir. 2021) .............................................................. 39, 44

*Sears v. Likens*,
  912 F.2d 889 (7th Cir. 1990) ...............................................................32

*Sommers Drug Stores Co. Employee Profit Sharing Trust v.*
  *Corrigan Enterprises, Inc.*,
  793 F.2d 1456 (5th Cir. 1986) .............................................................76

*Sweda v. Univ. of Pennsylvania*,
  923 F.3d 320 (3d Cir. 2019) ................................................................45

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ............................................................................71

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) ...............................................................71

*Trustees of AFTRA Health Fund v. Biondi*,
  303 F.3d 765, 775 (7th Cir. 2002)........................................................74

*United States ex rel. Hanna v. City of Chicago*,
  834 F.3d 775 (7th Cir. 2016) ......................................................... 21, 22

*Vess v. Ciba–Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003)....................................................... 27, 28

*W. Bend Mut. Ins. Co. v. Schumacher*,
  844 F.3d 670 (7th Cir. 2016) ...............................................................23

*Walsh v. Vinoskey*,
  19 F.4th 672 (4th Cir. 2021)..................................................... 33, 42, 50

*Wolin v. Smith Barney Inc.*,
  83 F.3d 847 (7th Cir. 1996)..................................................................55

*Wood v. Carpenter*,
  101 U.S. 135, 143 (1879) ....................................................................53

*Zavala v. Kruse-W., Inc.*,
  No. 119CV00239DADSKO, 2021 WL 5883125
  (E.D. Cal. Dec. 13, 2021) ....................................................................50

## <u>Statutes</u>

15 U.S.C. § 78j ........................................................................................1

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1367(a) .................................................................................1

29 U.S.C. § 1002(14)(C) ........................................................................20

29 U.S.C. § 1002(14)(H) ........................................................................20

29 U.S.C. § 1104 ................................................................................1, 34

29 U.S.C. § 1104(a)(1)(A) ................................................................ 19, 20

29 U.S.C. § 1104(a)(1)(B) ................................................................ 19, 20

29 U.S.C. § 1104(a)(1)(D) ......................................................................41

29 U.S.C. § 1105 .....................................................................................1

29 U.S.C. § 1105(a) ...............................................................................20

29 U.S.C. § 1105(a)(1) ...........................................................................49

29 U.S.C. § 1105(a)(2) ...................................................................... 49, 51

29 U.S.C. § 1105(a)(3) ...........................................................................49

29 U.S.C. § 1106 ........................................................................... 1, 33, 34

29 U.S.C. § 1106(a)(1)(A) ................................................................ 20, 33

29 U.S.C. § 1106(a)(1)(D) ......................................................................33

29 U.S.C. § 1108(e)(1) ...........................................................................33

29 U.S.C. § 1109 .....................................................................................1

29 U.S.C. § 1109(a) ...............................................................................20

29 U.S.C. § 1113 .............................................................................. passim

29 U.S.C. § 1113(1) ....................................................................................41

29 U.S.C. § 1132(a)(2) .............................................................................20

29 U.S.C. § 1132(e) ....................................................................................1

29 U.S.C. § 1144 .......................................................................................73

29 U.S.C. § 1144(a) ..................................................................................77

42 U.S.C. § 1983 .......................................................................................26

## Rules

Fed. R. Civ. P. 8(a)......................................................................... passim

Fed. R. Civ. P. 9(b) ......................................................................... passim

Fed. R. Civ. P. 12(b)(6)................................................................. 19, 23

Fed. R. Civ. P. 54(b) ..................................................................1, 16

## Regulations

29 C.F.R. § 2510.3-101.............................................................................77

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiff-Appellant Grant Lyon's claims arising under sections 404, 405, 406, and 409 of the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §§ 1104, 1105, 1106, and 1109) pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). The district court had subject matter jurisdiction over Lyon's claims arising under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, pursuant to 28 U.S.C. § 1331. The district court had jurisdiction over Lyon's related state law claims for fraud, negligent misrepresentation, and breach of fiduciary duty pursuant to 28 U.S.C. § 1367(a).

The district court entered a judgment of dismissal with prejudice on December 16, 2022. [App. A001.[1]] Lyon timely filed his notice of appeal on January 10, 2023. [Dkt. 283.] This Court has jurisdiction under 28 U.S.C. § 1291.

This appeal is from a final judgment entered pursuant to Fed. R. Civ. P. 54(b). [*See* Dkt. 281.] Two claims remain against Defendant Argent Trust Company ("Argent") for breach of fiduciary duty and prohibited transactions under ERISA §§ 404 and 406, §§ 1104 and 1106. Argent was a trustee for the Employee Stock

---

[1] Appendix page numbers beginning with "A" refer to Appellant's Short Appendix attached to this brief pursuant to Circuit Rule 30(a). Appendix page numbers beginning with "B" refer to Appellant's separate Circuit Rule 30(b) Appendix.

Ownership Plan ("ESOP") at issue. It succeeded prior trustees State Street Bank and Trust Company ("State Street") and Reliance Trust Company ("Reliance"). Although the Second Amended Complaint alleges the same legal claims against other Defendants, the facts specific to those claims are different. For example, the claims against former ESOP trustees State Street and Reliance are based on those Defendants' decision-making processes with respect to stock valuations approved and disseminated during their respective tenures, while the claims against Argent are based on its decision-making process with respect to different valuations starting in mid-2014. In addition, the claims against Argent focus on facts unique to Argent: namely, that Argent employee Steve Martin admitted Argent: (1) allowed its stock valuation advisor to base valuations on business projections it knew were inflated; and (2) failed to insist that the advisor subtract certain categories of debt in determining stock value.

## <u>STATEMENT OF THE ISSUES</u>

I.     Whether the district court erred in determining the Second Amended Complaint failed to state any ERISA claims against the Director and Officer Defendants, State Street, and Reliance.

II.     Whether the district court erred in requiring acts of fraud or concealment separate from the underlying ERISA violations to toll the statute of limitations under ERISA § 513, 29 U.S.C. § 1113.

III.     Whether the district court erred in dismissing federal securities fraud claims against the D&O Defendants, Reliance, Argent, and Stout for failure to plead scienter.

IV.     Whether the district court erred in finding that state law claims for fraud, negligent misrepresentation, and breach of fiduciary duty were preempted under ERISA.

## STATEMENT OF THE CASE

This case arises out of the 2001 purchase of Appvion, Inc.[2] ("Appvion") by the Appvion, Inc. Employee Stock Ownership Plan (the "ESOP") in 2001, as well as the ESOP's subsequent purchases of stock in Appvion's parent company, Paperweight Development Corporation's ("PDC"). Lyon, an independent fiduciary with standing to bring this suit, contends that PDC's stock was at all times overvalued and that the ESOP's fiduciaries failed to act prudently and in the best interests of the ESOP. As a result, the ESOP overpaid each time it purchased PDC stock, and the employee participants were left with nothing when Appvion went bankrupt in 2017.

### I.     FACTUAL BACKGROUND

#### A.     The Parties

Plaintiff Grant Lyon was appointed as the sole member of the ESOP Committee in 2017. [App. B096.] Defendants include:

- Former Appvion officers and ESOP Committee members Douglas Buth, Paul Karch, Dale Parker, Rick Fantini, Mark Richards, Tom Ferree, Kerry Arent, Angela Tyczkowski, Kent Willetts, and Kevin Gilligan (collectively the "**ESOP Committee Defendants**") [App. B099-101];

---

[2] Appvion was formerly known as Appleton Papers, Inc.

4

- Former Appvion Board members Stephen Carter, Kathi Seifert, Andrew Reardon, Terry Murphy, Mark Suwyn, Susan Scherbel, and Ronald Pace (collectively the "**Outside Director Defendants**") (together with the ESOP Committee Defendants, the "**D&O Defendants**") [App. B101-02];

- Investment bank Houlihan Lokey Capital, Inc. and Houlihan Lokey Financial Advisors, Inc. (collectively "**Houlihan**") [App. B103];

- Former ESOP trustees State Street Bank and Trust Company ("**State Street**"), Reliance Trust Company ("**Reliance**"), and Argent Trust Company ("**Argent**") (collectively the "**Trustee Defendants**") [App. B103]; and

- Valuation firm Stout Risius Ross, Inc., Stout Risius Ross, LLC, Scott D. Levine, and Aziz El-Tahch (collectively, "**Stout**") [App. B104].

**B.     The 2001 Transaction Was For More Than Fair Market Value.**

In late 2000, Appvion, Inc. ("Appvion") and its parent company Arjo Wiggins Appleton ("AWA") had been trying (unsuccessfully) to sell Appvion for several years. [App. B085, B105-06.] Appvion CEO Buth pitched a plan to sell Appvion to its employees: the ESOP would purchase 100% of PDC's stock and PDC would purchase Appvion from AWA. [App. B085, B105-06.] AWA agreed and signed a letter of intent to pay Buth and senior management a contingent fee of up to $10 million if they sold Appvion to an ESOP or a third-party buyer for at least $700 million. [App. B085, B105-106, B117.] To make the transaction possible, employees

would need to invest at least $100 million from their 401(k) savings in the ESOP and PDC would finance the rest of the purchase [App. B113, B116.]

Buth hired Houlihan to "quarterback" the ESOP process and prepare a fairness opinion regarding the purchase price. [App. B086, B103, B107-10.] In return, Houlihan would receive a contingent fee of 1% of the total sales price and additional compensation. [App. B086, B108, B115.] The transaction closed on November 9, 2001 (the "2001 Transaction") for a total purchase price of $810 million—meaning Houlihan's contingent fee was $8.1 million. [App. B089.]

However, the contingent nature of Houlihan's fee was not disclosed; instead, Houlihan was presented to employees as "independent." [App. B107, B117-18.] Meanwhile, a March 26, 2001, newsletter to employees warned that a party with a contingent fee agreement could not issue a fairness opinion:

**Who is Qualified To Issue ESOP Fairness Opinions?**

\* \* \*

1.      **No conflicts of interest** and/or **fee arrangements based on contingencies**, both of which would **impair the independence of the financial advisor**.

[App. B115 (emphasis added).]

On Houlihan's advice, Buth hired State Street as the ESOP's trustee and Willamette Management Associates, Inc. ("Willamette") to value PDC's stock. [App. B086, B103, B112-13.] Houlihan was responsible for preparing materials for and making presentations to employees about the buyout. [App. B108-10.]

Houlihan's contingent fee created a conflict of interest, motivating Houlihan to persuade employees to use their 401(k) savings to invest in the ESOP at a price that was above fair market value. [App. B111-12.] Nevertheless, Houlihan, State Street, and Appvion senior management controlled all communications with Appvion's employees, including:

- A July 23, 2001, prospectus, which Houlihan, State Street, Buth, Karch, Parker, and Fantini prepared or approved. [App. B099-100, B113-16, B121.] The prospectus described Houlihan's fairness opinion and explained that Houlihan considered the purchase price fair despite management's conflicts of interest but *failed to disclose Houlihan's own conflict*. [App. B117-20.]

- A July 25, 2001, letter to employees and a road show program in which Buth represented that Houlihan and State Street would provide "independent validation" of the deal. [App. B121-23.]

- An August 2, 2001, road show presentation, in which Karch introduced Houlihan's Lou Paone as the ESOP's "independent" investment banker and Paone told employees the transaction was "a good deal." [App. B118-20, B122-23.]

- A November 19, 2001, prospectus supplement which disclosed "$8 million in investment banking fees" but did not: (1) identify whether

those fees were paid to Houlihan or the other investment bank involved in the transaction; or (2) disclose that the fee was contingent. [App. B124.]

Buth, Karch, Houlihan, and State Street advised employees that the ESOP was not paying more than fair market value for PDC's stock at $10 per share. [App. B086.] However, this valuation did not account for pension and postretirement debt and other material liabilities (collectively, the "Excluded Debt") on PDC's balance sheet that totaled $98.3 million as of December 31, 2001, just 52 days after the buyout. [App. B125-26.] The valuation also included a control premium[3] which added approximately $83.6 million in equity; however, this premium was not warranted since State Street agreed the CEO would retain control of Appvion/PDC. [App. B124-25.]

### C.     The Ongoing Valuations Overstated the Value of PDC's Stock.

After the buyout, PDC's stock was valued twice a year (as of June 30 and December 31) and these valuations set the price at which the ESOP would buy PDC stock with money—both as purchases using employee contributions and repurchases from employees who had diversified, retired, or left Appvion. [App. B126-27.]

---

[3] A "control premium" is "[a] premium paid for shares carrying the power to control a corporation." BLACK'S LAW DICTIONARY 1300 (9th ed. 2009).

As trustee, State Street was responsible for the valuations and for reporting to and working with Appvion's ESOP Committee. [App. B127-32, B383-86, B395-99.] State Street retained Willamette as its valuation advisor. [App. B127.] In 2004, the Willamette employees working on the valuations moved to Stout, and State Street retained Stout on the recommendation of Appvion's ESOP Committee. [App. B127-28.] Stout conducted the valuations from late 2004 through 2017. [App. B128.] In 2013, State Street stepped down as trustee and Reliance took over. [App. B103.] In 2014, Argent bought Reliance's ESOP business and employed the same employees in Argent's role as the ESOP's trustee. [App. B263, B270.]

The semi-annual valuations subtracted certain interest-bearing debt from Appvion's enterprise value. [App. B133-35.] But the valuations failed to subtract the Excluded Debt reported on PDC's audited balance sheet. [App. B134.] These debts were material to PDC's stock value. [App. B135-38, B147-50, B165-66.] By contrast, Stout *did* subtract $15.5 million of Appvion subsidiary BemroseBooth's retirement debt in two valuations. [App. B138-47.] This treatment of BemroseBooth's debt put the D&O Defendants and State Street on notice that the valuations should be subtracting such debt. [App. B140, 142, 145, 146.] Yet during the same time State Street and the ESOP Committee were subtracting *BemroseBooth's* retirement debt, *Appvion's* pension and postretirement debt rose

9

more than $90 million, from $64.3 million to $154.9 million, without any effort to account for it in PDC's stock valuations. [App. B140, B142, B145-46.]

The valuations also included an improper control premium which added material amounts (10-15%) to the calculation of shareholder equity and therefore inflated the price per share. [App. B152-57.]

The valuations, especially by 2008, relied on financial projections created by Appvion's management that were consistently and materially inflated, especially for the fifth projected year which made up a large part of the valuation. [App. B157-60.] Argent and (and before that, Reliance) employee Steve Martin admitted that Appvion had never met its projections during Argent's tenure as trustee. [App. B159, B265.] Some or all of the valuations were deficient for other reasons, including:

- failure to include all interest-bearing debt [App. B151-52, B258, B266, B275-77];

- use of inconsistent methodology [App. B160-62];

- failure to include a large enough discount for limited marketability [App. B162-63];

- improper use of a perpetuity model to capitalize a declining income stream [App. B163-64];

- use of inappropriate companies as valuation comparables [App. B164];

- inappropriate rounding of numbers up or down in a manner that inflated PDC's share value [App. B165]; and

- arithmetic errors [App. B165].

In addition, the June 2012 valuation had to be redone when it improperly built in value from a merger that fell through. [App. B160.] All of these flaws rendered the valuations overstated and unreliable. [*See* App. B165-67.]

Defendants authored numerous communications to employees and SEC filings that represented they were following a prudent process, selectively disclosed details about the valuations, and reaffirmed the stock price, while failing to disclose the actual valuations or the above-described defects. [App. B140-42, B144, B195-254, B386-393.]

### D.   Lyon Discovered PDC's Stock Valuations Were Overvalued.

In August 2017, Lyon was appointed as the sole member of the ESOP Committee. [App. B096.] As an independent fiduciary, Lyon's investigation revealed that the valuations—which had never been made public or released to the ESOP's employee participants ("Employee Participants")—overvalued PDC's stock value and misrepresented Appvion's financial condition. [*Id*.] He also discovered that Houlihan was not "independent" as represented. [*Id.*]

Appvion and PDC filed for bankruptcy in October 2017. [App. B177.] The Bankruptcy Court for the District of Delaware authorized Lyon to bring these claims on behalf of the ESOP. [App. B098.]

## II.  THE FIRST AMENDED COMPLAINT

Lyon filed the Complaint on November 26, 2018, and the First Amended Complaint ("FAC") on January 8, 2019. The FAC brought claims under ERISA §§ 404-406, 29 U.S.C. §§ 1104-1106 (Counts 1-5,7, 8, 15, Dkt. 77 ¶¶ 516-603, 614-636, 754-760); common law claims against Stout, Willamette, and Houlihan and the D&O Defendants (Counts 9-12, 16-19, *id.* ¶¶ 637-700, 761-825); and securities fraud (Counts 13-14, *id.* ¶¶ 701-753).

Defendants moved to dismiss, and on July 27, 2020, the district court dismissed the FAC's claims without prejudice. [App. A004-55.] The court found that all ERISA claims arising before November 26, 2012 were barred by ERISA's six-year statute of repose, § 1113, and that the claims were not tolled by that statute's "fraud or concealment" exception because the FAC failed to allege concealment separate from the underlying wrongdoing. [App. A019-23, A031-32, A037-039.] The district court applied Rule 9(b) to all ERISA claims against the D&O Defendants and dismissed the claims due to group pleading. [App. A024.] The court also dismissed the ERISA claims against the Trustee Defendants (Counts 1, 4, 7) primarily for group pleading. [App. A041.] The court dismissed the securities fraud

claims for failure to plead scienter. [App. A027, A048-49, 053.] And finally, the court found that the state law claims against the D&O Defendants, Stout, Willamette, and Houlihan were preempted. [App. A028-030, A032-033, A053-54.]

## III.    THE SECOND AMENDED COMPLAINT

On September 25, 2020, Lyon filed the Second Amended Complaint (the "SAC").[4] [Dkt. 191.] The SAC more clearly identified each defendant's role, which valuations they were involved in, and how they breached their fiduciary duties. [*Compare*, *e.g.*, Dkt. 77 ¶¶ 516-539 (Count 1) with App. B255-284 (Counts 1-3).] For example, the SEC and DOL filings were not referenced in the FAC, but the SAC added facts about those filings and alleged that they constituted breaches of fiduciary duty and served as acts of concealment. [App. B182-94, B318-20.] The SAC also added details about communications with employees regarding stock values and valuation processes and identified the authors of those communications, breaches of fiduciary duty and acts of concealment. [App. B195-254.] And the SAC plead significant detail about the treatment of BemroseBooth's pension liability and how that demonstrated concealment of the failure to subtract Appvion's overall pension

---

[4] The SAC did not replead claims found to be preempted because it would have been futile. *See Bastian v. Petren Resources Corp*., 892 F.2d 680 (7th Cir. 1990) (parties are not required to reassert dismissed claims to preserve them on appeal).

liability, when there was only a single reference to that issue in the FAC. [App. B430, B138-147.]

Defendants again moved to dismiss all claims, and in October 2021 the district court referred the case to a magistrate judge. [Dkt. 233.] On March 17, 2022, the magistrate judge issued a report and recommendation (the "Report") recommending dismissal of all but the breach of the duty of prudence and prohibited transaction claims against Argent. [App. B001-068]

The magistrate judge concluded "Lyon's entire theory of the case is that the Ds&Os committed fraud for over a decade" and applied Rule 9(b) to all aspects of the claims against the D&O Defendants—even to allegations of non-fraudulent conduct. [App. B014.] The judge then found the pleading was conclusory, the factual background had already been rejected in the FAC, and the scheme as a whole was implausible. [App. B014-15.] The Report did not identify facts that the SAC failed to plead with particularity. [*Id.*] However, the Report included a footnote acknowledging that the SAC was sufficient to provide "adequate notice of the claims against" "any singular defendant" and describing a well-pled claim against former Appvion CEO Richards:

> For what it's worth, I agree with Lyon that the second amended complaint is no longer inappropriately group-pled. I believe **any singular defendant has adequate notice of the allegations against themselves to satisfy the *Twombly* pleading standard.** For example, **Mark Richards is alleged to have breached his fiduciary duties of loyalty and prudence on June 30, 2014 when he approved, adopted,**

**and disseminated a PDC stock valuation at $17.55 despite his
knowledge that the stock price did not account for the sizeable
pension obligation.** SAC ¶¶ 816-28; 843. Furthermore, he did this for
his own financial benefit, allegedly. Id. **This is a short and plain
statement of an actionable claim against Richards. The SAC is full
of allegations like this**, and any defendant can understand the grounds
upon which they rest. **Lyon accuses Richards, based on a specific and
articulable course of conduct, of putting his financial interests in
front of the ESOP, to whom he owed a fiduciary duty.** This
allegation is **specific to Richards, and it is not alleged solely because
of his title as CEO**, or premised on a theory that he should have known
better because he was the CEO. **In this sense, Lyon has cured one
defect, the group pleading problem.**

[App. B016 n.6 (emphasis added).] Regardless, the magistrate judge still

recommended dismissal of all ERISA claims against the D&O Defendants. [*Id.*] He

also found that claims based on conduct before November 26, 2012, still failed to

plead acts of fraud or concealment separate from the underlying wrong. [App. B012-

13, B023-25, B038-40.]

The magistrate judge found that the SAC did state a claim against Argent, the

ESOP's final trustee, for breach of fiduciary duty and causing the ESOP to engage

in prohibited transactions. [App. B057-62.] However, the judge rejected the claims

against State Street and Reliance, finding, among other things, that the SAC failed

to plead new material factual allegations not in the FAC to establish imprudence.

[App. B040-42, B047-48.]

In recommending dismissal of the securities fraud claims, the magistrate judge

disregarded the new, detailed allegations about the D&O Defendants' scienter and

merely found "the SAC simply asserts the same exact factual background" as the FAC. [App. B020.] For the securities claims against Reliance and Stout, the judge again recommended dismissal for failure to plead motive. [App. B052-53, B063, B065-67.]

Lyon filed timely objections to the Report. [Dkts. 243-248.] Among other things, Lyon objected that the magistrate judge failed to consider the SAC's allegations as a whole and improperly applied Rule 9(b) to averments that are not based on fraud. [*Id.*] Further, the magistrate judge's footnote 6 plainly showed that the SAC stated claims. [*Id.*] The district court merely struck footnote 6 from the Report with no explanation and otherwise adopted the Report in full. [App. A002-003.]

Lyon moved for entry of final judgment under Rule 54(b), which the district court granted. [Dkt. 281.] This appeal timely followed.

## SUMMARY OF THE ARGUMENT

The district court dismissed Lyon's claims against former fiduciaries and advisors of the ESOP for failure to state a claim. This was erroneous and should be reversed.

First, the district court erroneously applied Rule 9(b) to all ERISA claims against the D&O Defendants, then dismissed those claims as implausible. The district court erred by failing to review the claims against the individual defendants instead of dismissing them as a whole and applying Rule 9(b) to all averments regardless of whether they relied on fraud. In addition, the district court dismissed the claims against the D&O Defendants as "conclusory" and claimed they merely tracked ERISA's language, which is the opposite of the detailed pleading in the SAC.

Second, the district court erroneously dismissed the ERISA claims against State Street and Reliance. The district court found that State Street's retention of a financial advisor was sufficient evidence to overcome the detailed allegations that the valuations were unreliable, which is contrary to precedent. For Reliance, the district court incorrectly assumed that it had considered and rejected the substance of the factual allegations in the FAC, then only analyzed two allegations that it considered "new" in isolation.

17

Third, the district court dismissed all claims for violations prior to November 26, 2012, as untimely, rejecting the fraud or concealment allegations in the SAC. The district court required allegations of concealment entirely separate from the underlying breaches of fiduciary duty, which is contrary to precedent.

Fourth, the district court erroneously rejected the securities fraud claims for failure to plead scienter.

Finally, the district court found that Lyon's state law claims were preempted. However, each of the state law claims is based on an independent legal duty and is therefore not preempted.

The district court's decision should be reversed as discussed herein.

**ARGUMENT**

## I.     APPELLATE STANDARDS OF REVIEW

This Court "review[s] de novo a district court's grant of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss," meaning the Court "take[s] a fresh look at the legal issues and do[es] not defer to the district court on close calls." *Cent. States, Se. & Sw. Areas Pension Fund v. Transervice Logistics, Inc.*, 56 F.4th 516, 524 (7th Cir. 2022). The Court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in favor of the plaintiff." *Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023). A complaint will survive a motion under Fed. R. Civ. P. 12(b)(6) if, after the court disregards any portions that are "no more than conclusions," it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## II.     LYON STATED BREACH OF FIDUCIARY DUTY, PROHIBITED TRANSACTIONS, AND CO-FIDUCIARY LIABILITY CLAIMS UNDER ERISA.

A plan fiduciary owes duties of loyalty and prudence under ERISA § 404. 29 U.S.C. § 1104(a)(1)(A)–(B). The duty of loyalty requires an ERISA fiduciary to "act solely in the interest of the participants and beneficiaries," with "the exclusive

purpose" of "providing benefits to participants and their beneficiaries." §
1104(a)(1)(A). The duty of prudence requires a fiduciary to act "with the care, skill,
prudence, and diligence under the circumstances then prevailing that a prudent
[person] acting in a like capacity and familiar with such matters would use in the
conduct of an enterprise of a like character and with like aims." § 1104(a)(1)(B).
These duties are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d
263, 272 n.8 (2d Cir. 1982).

ERISA § 406 supplements ERISA's "general fiduciary provisions by
prohibiting ERISA fiduciaries from causing a plan to enter into a variety of
transactions with a 'party in interest,'" including the plan sponsor itself (Appvion)
or major shareholders of the plan sponsor (PDC). *Fish v. GreatBanc Trust Co.*, 749
F.3d 671, 679-80 (7th Cir. 2014); 29 U.S.C. §§ 1106(a)(1)(A), 1002(14)(C), (H).
ERISA § 405 provides that a fiduciary can also be held liable for another fiduciary's
violation in certain circumstances. 29 U.S.C. § 1105(a). ERISA allows for an action
to enforce these obligations and seek appropriate relief. 29 U.S.C. § 1132(a)(2); *see
also* 29 U.S.C. § 1109(a) (fiduciary personally liable for breaches of fiduciary duty).

The district court erred in dismissing Lyon's ERISA claims against the D&O
Defendants, Reliance, and State Street. With respect to the D&O Defendants, first,
the court improperly applied Rule 9(b) to an overall "fraudulent scheme" rather than
to claims against individual D&O Defendants. Second, the court found the "how" of

the overall scheme to be implausible but failed to identify any fraud averment that fell short of Rule 9(b)'s particularity requirement. Third, the court improperly applied Rule 9(b) to all aspects of Lyon's ERISA claims, even to allegations of non-fraudulent conduct. Finally, Lyon stated plausible ERISA claims against these Defendants regardless of whether Rule 9(b) applies. With respect to State Street and Reliance, the court erred by failing to consider the facts alleged and failing to view the allegations in the light most favorable to plaintiff. The district court accordingly erred in dismissing Counts 1, 3-21, and 25-27.

### A.    The District Court Erroneously Applied Rule 9(b)'s Heightened Pleading Standard to an Overall "Fraudulent Scheme" But Failed to Analyze Individual Claims.

Two pleading standards are implicated by the district court's decision—the Rule 9(b) pleading standard for fraud and the Rule 8(a) plausibility standard.

Federal notice pleading requires only a short and plain statement showing that the pleader is entitled to relief. *See* Fed. R. Civ. P. 8(a). When a plaintiff alleges fraud, Rule 9(b)'s heightened pleading standard requires the complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To meet this standard, the plaintiff must allege the who, what, when, where, and how: the first paragraph of any newspaper story." *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (cleaned up).  This includes "the identity of the person making the misrepresentation, the time, place, and content of the

misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* (cleaned up). Rule 9(b) requires heightened pleading "because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011).

This heightened standard extends *only* to the particulars of the misleading statement itself. The other elements of fraud, such as intent, knowledge, and reliance, may be averred in general terms under the notice-pleading standard. *See* Fed. R. Civ. P. 9(b). Moreover, this Court has warned that "courts and litigants often erroneously take an overly rigid view of [Rule 9(b)'s] formulation" and that the precise details that must be included in a complaint "may vary on the facts of a given case." *Pirelli*, 631 F.3d at 442. Rule 9(b) goes only to whether a complaint contains well-pled facts; once the plaintiff meets Rule 9(b)'s standard, "the court must treat the pleaded facts as true and draw all reasonable inferences in favor of the plaintiff." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (cleaned up).

Rule 8(a) requires the well-pled facts of a complaint "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. To be "plausible," a claim for relief must be more than merely "conceivable." *Twombly*,

550 U.S. at 570. However, there is no "*probability* requirement at the pleading stage." *Id*. at 556 (emphasis added). As this Court explained,

> **Plausibility is not a synonym for probability in this context**, but it asks for more than a sheer possibility that a defendant has acted unlawfully. After *Twombly* and *Iqbal*, **a plaintiff seeking to survive a motion to dismiss must plead some facts that suggest a right to relief that is beyond the speculative level**. That is, while a plaintiff need not plead detailed factual allegations to survive a motion to dismiss, she still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action…

*W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (cleaned up) (emphasis added). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (cleaned up); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("[R]ule 12(b)(6) does not countenance… dismissals based on a judge's disbelief of a complaint's factual allegations."). This Court has interpreted the *Iqbal*/*Twombly* standard as requiring that "the plaintiff … give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *W. Bend,* 844 F.3d at 675–76 (citation omitted; emphases in original).

The district court concluded that Rule 9(b)'s heightened pleading standard applied to all of Lyon's ERISA claims against the D&O Defendants because "Lyon's entire theory of the case is that the Ds&Os committed fraud for over a decade." [App.

B014.] Even assuming *arguendo* that was correct (which it was not, as explained below), the district court erroneously applied Rule 9(b) in conjunction with Rule 8(a)'s plausibility standard to dismiss these claims.[5] The district court interpreted the SAC as pleading a unified 16-year fraud involving 24 defendants and assessed whether this was plausible:

> The biggest hole in Lyon's theory is that to perpetuate this 16-year fraud, the Ds&Os would have needed to have the participation, loyalty, silence, and dereliction of duty from several outside actors who had nothing to gain and everything to lose. As with almost any conspiracy, it's conceivable that it could have occurred, But a plaintiff must provide a plausible story explaining the "how," and the SAC does not.

[App. B015.] But this was the wrong plausibility inquiry. The relevant question for purposes of ERISA claims is not whether it is plausible that all of the Defendants engaged in a 16-year fraud, but rather, whether it is plausible that each of them breached their fiduciary duties or engaged in a prohibited transaction as alleged. These are very different inquiries.

For example, President Kennedy was assassinated by Lee Harvey Oswald. There have been numerous theories that Oswald did not act alone but was part of a

---

[5] The magistrate judge acknowledged the SAC was "no longer inappropriately group-pled" as to the D&O Defendants. [B016 n.6.] Although the district court struck this footnote in its final Order Adopting Magistrate Judge's Report and Recommendation [App. A002], the court did not identify group-pleading as the basis for dismissing ERISA claims against the D&O Defendants (nor is this an alternate reason for affirming the district court, as discussed below).

larger conspiracy. However, an inability to prove a larger conspiracy does not make it implausible that Oswald committed the assassination. Likewise, the purported implausibility of the overall fraudulent scheme in this case does not make it implausible that any single director, officer, or trustee breached a fiduciary duty or engaged in a prohibited transaction. These Defendants should not be shielded from liability for their individual ERISA violations simply because the district court concluded the larger fraud scheme lacked plausibility.

Moreover, the district court did not find that the SAC failed to plead the who, what, where, when, or how of any specific misrepresentation as part of an ERISA claim. The district court only took issue with the "how" of the overall fraudulent *scheme*, finding this to be implausible. [App. B015.] Indeed, it appears the district court interpreted Rule 9(b) as imposing not just a heightened pleading standard for fraud but a heightened plausibility standard as well. This was error. While Rule 9(b) requires that "the circumstances constituting fraud be stated with particularity, it does not require factual pleadings that demonstrate the *probability* of wrongdoing." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (cleaned up).

**B.      The District Court Erroneously Applied Rule 9(b) to All Aspects of Lyon's Breach of Fiduciary Duty Claims Against the D&O Defendants.**

The district court also erred by applying Rule 9(b) to all aspects of Lyon's breach of fiduciary duty claims against the D&O Defendants, even to allegations of non-fraudulent conduct.

Rule 9(b)'s heightened pleading standard applies to all "averments of fraud" regardless of whether those averments pertain to a fraud cause of action. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *see also Rogers v. Baxter Int'l, Inc.*, 417 F. Supp. 2d 974, 984 (N.D. Ill. 2006), *aff'd*, 521 F.3d 702 (7th Cir. 2008) ("While claims for breach of fiduciary duty under ERISA generally are not subject to heightened pleading standards, Rule 9(b) does apply where the plaintiff alleges that a defendant's breach of fiduciary duty took the form of a fraudulent act."). However, "Rule 9(b) is strictly construed; it applies to fraud and mistake *and nothing else*." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003) (emphasis added) (citing, *inter alia*, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (holding federal court may not impose pleading standard more stringent than Rule 8(a) in civil rights cases alleging municipal liability under 42 U.S.C. § 1983)).

When a claim contains allegations of both fraudulent and non-fraudulent conduct, Rule 9(b)'s heightened pleading standard applies only to the fraud

allegations and not to the complaint as a whole. *Kennedy*, 348 F.3d at 593 ("[I]f both fraudulent and nonfraudulent conduct violating the same statute or common law doctrine is alleged, only the first allegation can be dismissed under Rule 9(b)."); *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("[I]n a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).") (parentheses in original). "Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001). Rather, "[t]he proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated." *Id.*; *see also Kennedy*, 348 F.3d 584.

Even where the plaintiff alleges a unified course of fraudulent conduct, dismissal for failure to plead with particularity is appropriate only where the complaint "rel[ies] *entirely* on that course of conduct as the basis of a claim." *Vess*, 317 F.3d at 1103–04 (emphasis added); *see also Kennedy*, 348 F.3d at 593 ("[I]f . . . only a fraudulent violation is charged, failure to comply with Rule 9(b) requires dismissal of the entire charge.").

27

This makes sense considering Rule 9(b)'s purpose of protecting defendants from the "potential stigmatic injury that comes with alleging fraud." *Pirelli*, 631 F.3d at 442. However, "[t]o require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments …. serves no similar reputation-preserving function, and would impose a burden on plaintiffs not contemplated by the notice and pleading requirements of Rule 8(a)." *Vess*, 317 F.3d at 1104.

Lyon's breach of fiduciary duty allegations against the D&O Defendants do not all rely on fraud. For example, the magistrate judge outlined in his Footnote 6 specific, well-pleaded facts against former CEO Richards for breach of fiduciary duty that did not depend upon fraud. [App. B016 n.6.] "To state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (cleaned up). In Count 8, Lyon alleged that Richards was a plan fiduciary who owed duties of prudence and loyalty. [App. B314.]. He further alleged that Richards breached those duties by, among other things:

- "fail[ing] to value the [PDC] stock in good faith using a prudent process" and adopting stock prices he knew were inflated;

28

- "directing the ESOP Trustee to purchase PDC's stock …. for more than fair market value"; and

- "failing to monitor [ESOP Trustees] State Street, Reliance, and Argent in their determinations of the share value"; and

- acting to benefit his own financial interests rather than the ESOP's.

[App. B316-17, B321-22.][6] Lyon made similar non-fraud allegations that post-date November 26, 2012, against officers Ferree [App. B325-26], Arent [App. B876–884], and Gilligan [App. B346-49]. Lyon alleged that Outside Directors Carter, Seifert, Reardon, Murphy, and Suwyn breached their duty to monitor the ESOP Committee and ESOP Trustee. [App. B351-65.] Lyon alleged that Trustee Defendants State Street and Reliance breached their duty of loyalty in part by failing to adequately review stock valuations. None of these allegations involve fraud. And since the district court agreed the SAC states a claim against Argent, at a minimum Richards, Ferree, Arent, Gilligan, Carter, Seifert, Murphy, Reardon, and Suwyn can be held liable for their failure to monitor Argent during the time they overlapped as fiduciaries. [*See* App. B057–62]

---

[6] Lyon alleged these breaches caused the ESOP to lose "tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees." [App. B318.]

29

Lyon *also* alleged that Richards and the other D&O Defendants knowingly misrepresented PDC stock values in written communications to the Employee Participants, in "road shows," and in 10-K and 10-Q filings. [*See, e.g.*, App. B317-18.] As discussed below, these allegations were made with particularity. Even if they were not, Lyon still stated claims for breach of fiduciary duty based on well-pled, non-fraud allegations. These claims should go forward.

### C. The SAC States Breach of Fiduciary Duty Claims for Violations Within the Six Year Statute of Limitations.

#### 1. The SAC contains detailed and plausible allegations that the D&O Defendants breached their fiduciary duties.

In footnote 6 of his Report, the magistrate judge correctly acknowledged that Lyon had stated actionable and plausible claims against the D&O Defendants, using the claim against former Appvion CEO and ESOP Committee member Mark Richards as an example. [App. B016 n.6.] As the magistrate judge observed, "[t]his is a short and plain statement of an actionable claim against Richards" because it "accuses Richards, based on a specific and articulable course of conduct, of putting his financial interests in front of the ESOP, to whom he owed a fiduciary duty. This allegation is specific to Richards, and it is not alleged solely because of his title as CEO, or premised on a theory that he should have known better because he was the CEO." [*Id.*]

Even assuming Rule 9(b) applies to the misrepresentation aspect of this claim, it was met because Lyon specifically alleged the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff:

- **Identity:**  Mark Richards [App. B315.]

- **Time:**  February 5, 2013 [App. B250-51.]

- **Place:**  Written communication authored or approved by Richards [App. B250-51, B320.]

- **Content:**  PDC stock was valued at $17.55 a share as of December 30, 2012, an inflated value because (among other reasons) it excluded pension and postretirement debt [App. B250-51, B315.]

- **Method:**  By emailing the communication to the ESOP via its Employee Participants [App. B250-51, B315-16, B317.]

The SAC alleges similarly specific breach of fiduciary duty claims that accrued on or after November 26, 2012 against Defendants Ferree (Count 9 [App. B322-37]); Gilligan (Count 13 [App. B346-51]); Carter (Count 14 [App. B351-54]); Seifert (Count 15 [App. B354-57]); Reardon (Count 16 [App. B357-359a]); Murphy (Count 27 [App. B359a-63]); and Suwyn (Count 28 [App. B363-65]). For example, former CEO Gilligan ("who") is also alleged to have breached his fiduciary duties on July 17 and 18, 2017 ("when"), when he approved and adopted a PDC stock valuation at

31

$6.85 a share ("what"), then disseminated the valuation to the Employee Participants ("how") in a written communication ("where"), even though he knew the valuation was inflated for various reasons including failure to exclude pension/postretirement debt and other liabilities. [App. B347-49, B392.] Like Richards, Gilligan is alleged to have done this for his own financial benefit because he was motivated to increase the value of PDC stock so he could benefit from incentive compensation plans. [App. B374.]

Thus, it is demonstrably false that "most of Lyon's [claims against the D&O Defendants] simply track ERISA's language and conclude that each actor violated the law, based on a factual background that already came up short in the FAC." [App. B015.] In many instances, several officers or directors took the same action or approved and communicated the same misrepresentation. [*See, e.g.*, App. B250-51 (alleging that ESOP Committee Defendants Richards, Ferree, and Arent released the inflated December 31, 2012, stock valuation to Employee Participants)]. But that is because they served together on the ESOP committee or the Appvion Board of Directors, entities which act as a group. It does not equate to "group pleading," where all defendants are lumped together with no specificity as to "who was involved in what activity." *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). In short, the SAC states claims against the D&O Defendants based on conduct occurring on or after November 26, 2012, which are timely without regard to fraud or concealment.

### 2.    The SAC contains detailed and plausible allegations that the D&O Defendants engaged in prohibited transactions.

Prohibited transactions under § 406 include a "sale or exchange . . . of any property between the plan and a party in interest" or a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(A), (D).[7] No heightened pleading standard applies to a prohibited transaction claim—"it is enough to provide the context necessary to show a plausible claim for relief." *Allen*, 835 F.3d at 674.

The SAC pleads that the D&O Defendants caused the ESOP to purchase stock for more than fair market value, with reference to the specific transactions (by date). [App. B371-73, B416-27.] This is a prohibited transaction. *See Allen*, 835 F.3d at 675; *Walsh v. Vinoskey*, 19 F.4th 672, 678 (4th Cir. 2021). In addition, the SAC pleads that the ESOP Committee Defendants "caused" these transactions by directing the trustees to purchase PDC's stock using plan assets. [App. B372-73.] There is no legal basis for requiring that this claim be pled with particularity or for analyzing its plausibility as part of a fraud scheme. ERISA is a remedial statute, designed to protect participants and beneficiaries, and § 406 is part of that remedial

---

[7] 29 U.S.C. § 1108(e)(1) provides an exception if the transaction "is for adequate consideration." However, this is an affirmative defense. *Allen*, 835 F.3d at 675. A plaintiff need not plead the absence of adequate consideration, *id.*, although Lyon did. [App. B371-73.]

33

scheme—it recognizes that fiduciaries control all aspects of ERISA plan transactions and is designed to bar "transactions deemed 'likely to injure the pension plan.'" *Keach v. U.S. Trust Co.*, 419 F.3d 626, 635 (7th Cir. 2005) (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000)). "The transactions covered by Section 406(a)(1) are per se violations of ERISA regardless of the motivation which initiated the transaction, the prudence of the transaction, or the absence of any harm arising from the transaction." *Haley v. Tchrs. Ins. & Annuity Assoc. of Am.*, 377 F. Supp. 3d 250, 264 (S.D.N.Y. 2019) (cleaned up); *see also Chao v. Hall Holding Co.*, 285 F.3d 415, 434 (6th Cir. 2002) ("[A] violation of § 406 is a per se violation."). The district court therefore erred in dismissing Counts 21 and 27.

### 3.    The SAC contains detailed and plausible allegations that State Street and Reliance breached their fiduciary duties.

The SAC alleges that State Street and Reliance breached their fiduciary duties under ERISA § 404 based on their roles as ESOP Trustee. State Street held this role from the time the ESOP purchased Appvion until it resigned in 2013. Reliance was trustee from April 2013 until June 2014, when Reliance's ESOP business was purchased by Argent.

In dismissing the prudence-based breach of fiduciary duty claims[8] against State Street and Reliance, the district court assumed it had already ruled on the substance of these claims when it evaluated the FAC and found them lacking. [App. B040–41, B047–48.] The court concluded the SAC contained no new allegations regarding State Street and only two new allegations regarding Reliance, which it analyzed in isolation and rejected as supporting a plausible breach of fiduciary duty claim. [App. B041, B047, B049.]

But in dismissing the FAC claims against the Trustee Defendants, the court did not address their substance. Instead, it found the group-pled allegations against these defendants did not allow it to infer imprudence by each trustee:

> The FAC does not contain allegations from which the court can infer that any of the Trustee Defendants acted imprudently. **The FAC contains conclusory allegations against the Trustee Defendants as**

---

[8] In footnote 14 of his report, the magistrate judge stated he was not applying Rule 9(b) to the allegations of imprudence against State Street, but he was applying it to the loyalty and disclosure allegations. [App. B040.] The district court did not mention which standard it applied to the allegations against Reliance. However, in analyzing Argent's motion to dismiss, the district court found that the allegations against Argent did not sound in fraud, "unlike the allegations against the other trustees, which are inextricably intertwined with fraud allegations." [App. B056.] The district court also said it was applying a "limited plausibility standard" and a "lower pleading standard" in finding that the SAC states a claim against Argent. [App. B058, B060.] Based on these contradictory statements, it is unclear whether the district court applied either Rule 9(b) or a heightened plausibility standard to claims that State Street and Reliance breached their duty of prudence. If it did, its dismissal of those claims must be reversed. The breach of fiduciary duty claims against State Street and Reliance do not depend on fraud and are therefore not subject to Rule 9(b), much less a heightened plausibility standard.

**a group and fails to explain how each trustee engaged in conduct that would have been imprudent** at the time of the valuation **or how each trustee's reliance on a particular assessment was unreasonable**.

[App. A041 (emphasis added).] The district court never analyzed the substance of the claims against State Street or Reliance.

Further, in recommending dismissal of Lyon's central claims against State Street—that it acted imprudently in valuing PDC's stock—the district court improperly made the factual finding that because State Street hired a financial advisor (Stout), it acted prudently. This is contrary to established law. Where an ERISA fiduciary is responsible for setting the price of stock, the duties of loyalty and prudence require a fiduciary to follow a prudent process and appropriately investigate whether the ESOP and its participants are receiving "adequate consideration" for the assets of the Plan and the participants' accounts. *Keach*, 419 F.3d at 635-36. "[A]n independent assessment from a financial advisor or legal counsel is … is not a complete defense against a charge of imprudence." *Fish*, 749 F.3d at 680. (*quoting Keach*, 419 F.3d at 635). Hiring an advisor is "not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Fish*, 749 F.3d at 680 (*quoting Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983)). Similarly, with respect to Reliance the district court "question[ed] whether the allegation[s were] true,"

showing it failed to assume the facts were true and view them in the light most favorable to plaintiff. [App. B048.].

The SAC alleges that State Street and Reliance unreasonably relied on Stout's valuations and failed to follow a prudent process in adopting them. The district court erroneously ignored the SAC expanded allegations and improperly dismissed Counts 1 and 3.

### a.     The SAC plausibly alleged that State Street breached its fiduciary duties.

Count 3 of the SAC explains how State Street breached its fiduciary duties in connection with the 2001 Transaction and by relying on and approving Stout and Willamette's subsequent stock valuations through December 31, 2012. [App. B272-81.] Within the six-year statute of limitations, the SAC alleges that State Street breached its duties of prudence, loyalty, and disclosure by:

- adopting the July and December 2012 valuations despite knowing they did not subtract the Excluded Debt [App. B133-50, B165-66, B274-75];

- failing to require that these valuations deduct the Excluded Debt despite State Street's involvement in the December 31, 2007 valuation, which reduced Appvion's overall value by the amount of Appvion subsidiary BemroseBooth's unfunded pension liability, and the June 30, 2008

valuations, which valued BemroseBooth at zero in part because of its pension liability [App. B138-47, B274-75];

- allowing Stout to apply a control premium of 10% to these valuations, even though State Street lacked control of PDC and Appvion under the Security Holders Agreement that State Street signed.[9] [App. B124, B152-57, B277];

- failing to require that these valuations be based on accurate financial projections rather than ones it knew were inflated [App. B157-59, B274];

- adopting Stout's June 30, 2012, valuation, which had to be retracted because it inappropriately added value from a proposed merger that fell through soon after the valuation was issued [App. B070-73, B160, B174-76, B278];

- adopting Stout's July 16, 2012, valuation, which failed to subtract over $32 million from Appvion's revolving line of credit listed on its balance

_____

[9] Under the agreement, the Trustee only had the right to independently nominate or remove a minority of Board members through 2004. After January 1, 2005, the Trustee could only jointly nominate directors in conjunction with Appvion/PDC's CEO and could not independently nominate or remove directors. [App. B124-25.]

sheet even though the valuation purported to subtract all interest-bearing debt [App. B151].

Some of these allegations, such as the allegations that the valuations were based on inflated projections and failed to subtract the revolving line of credit, were alleged in the FAC. [Dkt. 77 ¶¶ 260, 269–74.] Others, however, were added or expanded. The FAC only briefly referenced BemroseBooth. [*Compare* App. B430 *with* App. B138-47.] The FAC contained no allegations about retracting the June 30, 2012, valuation. The SAC expanded significantly on the allegations demonstrating that the control premium had no basis and it more clearly identified which allegations related to State Street. [*Compare* App. B152-57 *with* App. B431-32.] The allegations that State Street knew or should have known about specific errors in the valuations it reviewed and approved were more than enough to allow the district court to infer that State Street employed an imprudent process. "A claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote v. New York Univ.*, 9 F.4th 95, 108 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) (cleaned up).

Rather than analyzing the SAC's allegations against State Street, the district court focused on the fact that State Street hired and relied upon an "independent" valuation firm (*i.e.*, Stout) and "followed the ESOP plan documents," both of which in the court's view made it "less plausible" that State Street acted imprudently. [App. B040.] But even assuming Stout was independent, which Lyon disputes [*see* App. B278], the fiduciary must still make "an independent inquiry" of an expert's advice, requiring him to "investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Keach*, 419 F.3d at 636-37 (cleaned up).

With respect to stock valuations, "the fiduciary is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." *Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996). "Adopting the alternative rule—that an independent appraisal is a complete defense to a charge of imprudence—would be foolish…" *Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996). . . . ." *Id*. The district court therefore erred in considering this as an overriding "factor[] …. mak[ing] it less plausible that [State Street] acted imprudently." [App. B040.] And whether State Street "followed the ESOP plan documents" is irrelevant since Lyon does not allege a violation of the

duty to act "in accordance with the documents and instruments governing the" ESOP. *See* 29 U.S.C. § 1104(a)(1)(D).

Additionally, the Fourth Circuit recently affirmed a finding of liability (after a multi-day bench trial) against a trustee who relied on valuations performed by Stout with very similar flaws. *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*, 919 F.3d 763 (4th Cir. 2019). The magistrate judge's ruling in this case that reliance on Stout's opinion – despite the many allegations that State Street failed to follow a prudent process – is inconsistent with the Seventh Circuit's established precedent and with the outcome in *Brundle*.

The district also erred in concluding with no explanation that allegations against State Street relating to the July 16, 2012, stock valuation fell outside the six-year statute of limitations proscribed by ERISA § 413(1) (discussed below). [*See* App. B040.]

Contributions to the plan made between July 16, 2012, and December 31, 2012, were held in trust by State Street, who then "approved the use the 16 July 2012 valuation to purchase shares from PDC and to repurchase shares from employees" at inflated prices. [App. B281, B416-27.] The date of the last action which constituted part of the breach of fiduciary duty was the use of that share price to purchase stock in December 2012. Moreover, the SAC alleges that State Street in many instances breached its duties by omission. [*See, e.g.*, App. B274 (failure to

41

scrutinize financial projections provided by Appvion management that Stout relied upon in valuing stock); App. B274 (failure to identify or address conflicts of interest created by executive compensation plans that allowed Appvion executives involved in preparing financial projections to benefit from increased stock prices); App. B274-75 (failure to require that valuations subtract Excluded Debt); App. B278 (failure to require that Stout was truly independent); App. B279 (failure to properly investigate Stout's methods for valuing PDC stock and adopting the valuations despite knowing they had substantial flaws resulting in significant overvaluation); App. B279 (failure to understand and question Stout's methodology); App. B279 (failure to document its oversight of Stout, the appraisal process, and its analysis and review of final valuations)]. In short, Lyon alleges there were red flags in the July 16, 2012, valuation (among others) that should have triggered greater scrutiny by State Street.

Those red flags continued to exist at least until December 2012, when State Street had a chance to cure its omissions by refusing to use the July 16, 2012, valuation to set the price for purchasing stock. *See Walsh v. Maine Oxy-Acetylene Supply Co.*, Case No. 2:20-CV-00326-NT, 2021 WL 2535942, at *5 (D. Me. June 21, 2021) (where parties entered into tolling agreement in October 2019, claims based on May 2013 valuation were timely under six-year statute of limitations where

valuation was used to purchase stock in October 2013). Under the plain language of § 1113, this aspect of Lyon's claim against State Street is timely.

### b.    The FAC plausibly alleged that Reliance breached its fiduciary duties.

Count 1 of the SAC explains how Reliance breached its fiduciary duties in connection with its use of the December 31, 2012, valuation, its approval of the June 30, 2013, and December 31, 2013, valuations, and its involvement in determining the June 30, 2014 stock price. Although the district court deemed its allegations "conclusory," the SAC added significant factual allegations about the valuations for which Reliance was responsible, their deficiencies and irregularities, and Reliance's failure to prudently review them. [App. B255-62.] Specifically, the SAC alleges Reliance breached its duties by:

- failing to determine share values in good faith using a prudent process [App. B257];

- adopting valuations that relied heavily on inflated financial projections which Reliance should have scrutinized and corrected because they greatly exceeded results [App. B157-59, B257];

- failing to identify and address conflicts of interest created by executive compensation plans that benefitted the very executives responsible for preparing Appvion's projections [App. B169-70, B257];

- failing to require that valuations subtract Excluded Debt [App. B133-50, B165, B258];

- failing to require that valuations include all interest-bearing debt [App. B258];

- allowing Stout to add a 10% control premium even though Reliance, as the shareholder supposedly acting for the ESOP, was a directed trustee and lacked the ability to control the Board of Directors under the Security Holder's Agreement [App. B152-57, B258-59];

- adopting the valuations despite Stout's practice of rounding numbers up or down in a manner that inflated share values [App. B259];

- failing to understand and question Stout's valuation methodology, including the companies chosen for the selected guideline approach and Stout's calculation of the weighted average cost of capital and use of multipliers [App. B259];

- failing to insist that the valuations appropriately consider the impact on discounted cash flow of Appvion's need to repurchase PDC stock [App. B259]; and

- failing to document in writing its oversight of appraisers, the appraisal process, and its analysis and review of final valuation reports [App. B260].

The district court erred by rejecting Lyon's allegations as "conclusory" and refusing to analyze their substance, even though they were more detailed than the FAC's allegations and no longer "group-pled." "Conclusory" means "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." BLACK'S at 329. Allegations that Reliance knew or should have known of specific errors in the valuations that it reviewed and approved state underlying facts from which the district court could infer that Reliance employed an imprudent process in reviewing the valuations. *See Sacerdote*, 9 F.4th at 108. As with State Street, it was impossible for Lyon to be more specific because he did not have the benefit of discovery.

44

With respect to the "two fresh factual allegations" the district court thought merited review, he erred in concluding they failed to support breach of fiduciary duty claims. The first was that Reliance approved valuations with rounding errors that inflated the value of PDC's stock. The district court analyzed this in isolation and concluded the deviations were too small to be material and were not "suggestive of imprudent oversight." [App. B049.] This was not only an inappropriate factual determination, it required expert opinion and cannot be resolved on a motion to dismiss. The district court attempted to distinguish a case that found a similar rounding error supported a breach of fiduciary duty claim, stating that "[i]n *Brundle*, the rounding error was just one practice among many that were suggestive of imprudence." [App. B048 (*citing Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A*., 241 F. Supp. 3d 610, 640 (E.D. Va. 2017), *aff'd*, 919 F.3d 763 (4th Cir. 2019).] But that was the very point of the rounding allegations here—taken as a whole, the many errors and irregularities show that Reliance was imprudent. In *Chao*, 285 F.3d at 433–34, the ESOP trustee's decision to use round numbers cost the ESOP less than $45,000, but this was still a factor that supported a summary judgment finding that the trustee breached her fiduciary duties. The district court's decision to view the rounding error allegation in isolation, and to draw reasonable inferences in Reliance's favor, was improper. *See Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019) (an ERISA "complaint should not

be parsed piece by piece to determine whether each allegation, in isolation, is plausible.") (cleaned up).

The second "fresh" allegation was "that Reliance failed to conduct a reasonable investigation into Stout's valuation process, complete with documentation and direct communication with the ESOP." [App. B047.] The district court concluded this allegation was not really new, and in that respect, it was correct: the premise of Lyon's case against Reliance has always been that it failed to follow a prudent process for reviewing the valuations. [*See* App. B047-48.] SAC ¶ 590, which the district court cited, explains the process that Reliance should have followed based on Department of Labor Guidance.[10] The preceding paragraphs explain the many irregularities in the valuations viewed as a whole, which demonstrate Reliance was not following a prudent process that would have detected them.

For example, with respect to the rounding and arithmetic errors, Reliance should have properly reviewed the valuations and noticed that "Stout's guideline company method analysis of Appvion's Thermal division overstates the average of the underlying components by over $2 million." [App. B259.] Reliance also should

---

[10] *See* Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions, June 2, 2014, available at: https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/enforcement/esop-agreement-appraisal-guidelines.pdf.

have investigated: (1) whether the financial projections used to value stock were reasonable given that Appvion consistently failed to meet those projections; (2) why the valuations were not subtracting over $100 million in balance sheet debt; and (3) why the valuations were applying an improper control premium. [App. B257-59.] These factual allegations demonstrate, as a whole, that reliance on Stout's valuations was not "reasonably justified under the circumstances." *See Keach*, 419 F.3d at 637.

The district court pointed to Lyon's allegation about a December 31, 2013, meeting between Reliance and Stout which it characterized as demonstrating that "Reliance discussed the [December 31, 2013] valuation methodology with [Stout] and kept minutes of a meeting approving the methodology." [App. B048; *see* App. B258.] According to the district court, the existence of these meeting minutes makes it "questionable" that Reliance acted imprudently. [App. B048.] But the meeting minutes simply note that "[p]ension liability is down due to market performance," while failing to explain why pension liability was not subtracted from the valuation. [App. B258; Dkt. 214-2.] Far from being evidence of proper oversight, the meeting minutes show that Reliance was aware of Appvion's pension liability but failed to require that it be subtracted from the valuation, as all debt must be.

Regardless, the district court inappropriately disregarded this allegation as already "found lacking" in the FAC, even though the court did not previously consider and reject this allegation. [App. B048.] The Reliance subcommittee

minutes were only referenced briefly in the FAC as part of the fraud claim against *Stout*. [App. B436.] The SAC added this as an allegation against Reliance to show Reliance knew about the pension liability, and also expanded the allegations regarding the pension liability. [App. B150, B165-66, B258.]

The magistrate judge also erroneously found that Reliance failed to remedy State Street's breaches of fiduciary duty. [App. B049-50.] The SAC alleges that Reliance had to review State Street's valuations in order to act prudently, including at least the 31 December 2012 valuation that Reliance used to purchase stock in mid-2013. [App. B261.] Prudent review of these valuations would have revealed the alleged fundamental deficiencies in the valuations. [App. B261-22, 273-79.] Reliance should have taken action to address the inflated stock price, such as bringing suit against State Street and other fiduciaries. *See Fernandez v. KM Indus. Holding Co*., 585 F.Supp. 2d 1177, 1184 (N.D. Cal. 2008) (trustee's actionable breaches of fiduciary duty occurred on the last day trustee could have brought a lawsuit against other fiduciaries for breaches).

Lyon was entitled to a thorough review of its actual allegations against Reliance with the facts viewed in the light most favorable to Lyon and all reasonable inferences drawn in his favor. The district court failed to do this. Because the allegations in Count I state a claim for breach of fiduciary duty against Reliance, the district court's dismissal of this claim should be reversed.

48

### D.    The SAC States Claims for Co-Fiduciary Liability.

Under ERISA § 405(a)(2), a fiduciary can be liable for another fiduciary's breach. 29 U.S.C. § 1105(a)(2). Liability under ERISA § 405(a)(2) only requires a plaintiff to "prove that the fiduciary failed to comply with its duties under ERISA, and thereby enabled a co-fiduciary to commit a breach." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F.2d 511, 581 (S.D. Tex. 2003) (cleaned up); *Free v. Briody*, 732 F.2d 1331, 1335-6 (7th Cir. 1984) (finding liability under § 405(a)(2)). ERISA § 405(a)(1) and (3) provide for co-fiduciary liability where the defendant has actual knowledge of a co-fiduciary's breach. *Ellis v. Rycenga Homes*, 484 F.Supp.2d 694, 712 (S.D. Mich. 2007); 29 U.S.C. § 1105(a)(1), (3).

The district court rejected Lyon's § 405 claims against the D&O Defendants for failure to plead actual knowledge. [App. B016-18.] This was erroneous. First, the SAC states claims against the D&O Defendants as discussed above and as demonstrated by footnote 6 in the Report, and they are therefore liable under § 405(a)(2) regardless of actual knowledge. [App. B016.] )

Second, the magistrate erroneously reasoned that the SAC did not plead "actual knowledge" because the facts alleged "require an inferential step between knowing about certain red flags, and 'actually knowing' that Argent was violating its duty of prudence." [App. B018.] However, "actual knowledge" is a state of mind

49

pled through factual allegations sufficient to allow a court to draw a reasonable inference of knowledge. *See Iqbal*, 556 U.S. at 683; *Cornielsen v. Infinium Capital Management, LLC*, 916 F.3d 589, 601-02 (7th Cir. 2019). The SAC had more than enough support for this inference. For example, Count 13 alleged:

- Gilligan attended ESOP Committee meetings where the valuations were discussed and approved. [App. B347, B383.]

- Gilligan knew the valuations did not subtract the Excluded Debt, which exceeded the shareholder's equity during his involvement. [App. B150, B165-66, B347-48.] That the pension liability was not subtracted in the valuations was discussed at a May 26, 2016, ESOP Committee meeting which Gilligan attended. [App. B348-49.]

- Gilligan was involved in preparing the projections, knew they were inflated, and knew the valuations were based on them. [App. B347-48, B395-99.]

These are specific, non-conclusory allegations that support a claim for Gilligan's breaches of fiduciary duty and an inference that he actually knew Argent was breaching its fiduciary duties. *See, e.g., Walsh*, 19 F.4th at 678-81) (affirming judgment after a bench trial that defendant had actual knowledge that stock price was greater than fair market value based on circumstantial evidence, including review of the appraisals, review of financial statements, and knowledge that the ESOP would not control the company); *Zavala v. Kruse-W., Inc.*, No. 119CV00239DADSKO, 2021 WL 5883125, at *11 (E.D. Cal. Dec. 13, 2021) (allegations that defendants were involved in preparing inaccurate financial projections and knew about the trustee's reliance on those projections pled actual

knowledge of a co-fiduciary's breach); *Ahrendsen v. Prudent Fiduciary Servs., LLC*, No. CV 21-2157, 2022 WL 294394, at *9 (E.D. Pa. Feb. 1, 2022) (allegations that defendant prepared the financial statements underlying the valuation and knew they excluded liabilities pled actual knowledge).

The district court rejected § 405(a)(2) liability against State Street and Reliance for failure to plead that they breached their fiduciary duties, which was erroneous as discussed above. [App. B044-46, B052.] The district court also found that the SAC did not plead actual knowledge, finding (incorrectly) that the claims were conclusory and had already been rejected by the district court in the FAC. [*Id.*] At a minimum, the facts alleged show that State Street and Reliance necessarily knew the financial projections formed the basis of the valuations, knew they were prepared by the ESOP Committee Defendants, knew that the ESOP Committee Defendants had conflicts of interest, and knew that the projections were consistently inflated, supports a finding of actual knowledge that the ESOP Committee Defendants were breaching their fiduciary duties. [App. B157-60, B274.] The facts relating to BemroseBooth further support a finding that State Street knew the valuations should be subtracting Appvion's pension liability. [App. B138-47, B274-75.] These are non-conclusory facts that allow an inference of actual knowledge.

The co-fiduciary liability claims should be allowed to move forward.

51

## III.  LYON'S ERISA CLAIMS FOR VIOLATIONS PREDATING NOVEMBER 26, 2012, ARE TIMELY.

The district court dismissed ERISA claims against the D&O Defendants and State Street based on violations before November 26, 2012, as untimely under ERISA's six-year statute of repose. *See* 29 U.S.C. § 1113 (ERISA § 413). This was error because these claims were tolled by § 413's "fraud or concealment" exception and Lyon brought his claims within six years of discovery.

### A.  ERISA's Statute of Repose Bars Claims Brought More than Six Years after the Breach or Violation Except in the Case of Fraud or Concealment.

ERISA §404, *et seq*., claims must be brought within the earlier of:

> (1) **Six years after (A) the date of the last action** which constituted a part of the breach or violation, or (B) in the case of an omission **the latest date on which the fiduciary could have cured the breach** or violation, or
>
> (2) **Three years after** the earliest date on which **the plaintiff had actual knowledge** of the breach or violation;
>
> **Except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery** of such breach or violation.

29 U.S.C. § 1113 (emphasis added).

Lyon had no "actual knowledge" of these claims until after he was appointed as sole member of the ESOP Committee in August 2017 and began an investigation. The six-year statute of limitations in § 413(1) therefore applies. However, Lyon's claims based on violations before November 26, 2012, fall within the "fraud or

52

concealment" exception. Fraud or concealment under § 413 incorporates the federal fraudulent concealment doctrine and "refers to steps taken by the defendant to hide the fact of the breach rather than to the underlying nature of plaintiffs' claim." *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990). "An ERISA fiduciary can delay a wronged beneficiary's discovery of his claim either by misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary never becomes aware of them (concealment)." *Id*.

Generally, "[c]oncealment by mere silence is not enough[;] …. [t]here must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *Wood v. Carpenter*, 101 U.S. 135, 143 (1879) (quoted in *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1094 (7th Cir. 1992)). This Circuit's law is clear that the fraud or concealment exception *does* apply to "underlying ERISA violations that are self-concealing." *Laskin v. Siegel*, 728 F.3d 731, 735 (7th Cir. 2013); *see also Martin*, 966 F.2d at 1095 ("We think that fraudulent concealment as incorporated in section 1113… **can include genuine acts of concealment committed in the course of the underlying wrong**.") (emphasis added).

**B.    The District Court Misinterpreted the Fraud or Concealment Exception as Requiring Conduct Separate from the Underlying Wrong.**

The district court misinterpreted the fraud or concealment exception as requiring conduct separate from the underlying wrong and erroneously found that Lyon's ERISA claims arising before November 12, 2012, were not tolled.

The district court characterized the "essence of the SAC" as being that "the Ds&Os fraudulently inflated PDC's stock price (the underlying fraud) and then published a series of company valuations over the years that essentially repeated that inflated price (the concealment)." [App. B012.] The district court said "[t]he problem with this reasoning (as the court's original dismissal order recognized) is that these two actions are part of the same fraud." [*Id.*] The district court contended "[i]t is the very nature of fraud that one expects it to be perpetuated and repeated; merely repeating or restating the same fraud is not a separate 'concealment' of that original fraud. That's why the caselaw requires something *more*—something additional to throw people off the scent." [*Id.*] The district court quoted this court as saying:

> [f]raudulent concealment … is distinct from fraud that is concealed…
> Otherwise the statute of limitations would not start to run in a fraud case
> until the fraud was exposed, even if the defendant had made no effort
> to conceal it beyond what is implicit in committing fraud….

[App. B013 (quoting *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 851 (7th Cir. 1996), *disapproved of on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)).]

However, the district court's selective quotations of *Wolin* omitted language clarifying that fraud or concealment *can* occur as part of the wrongdoing itself. The full quotation from *Wolin* states:

> Fraudulent concealment, however, is distinct from a fraud that is concealed. Otherwise the statute of limitations would not start to run in a fraud case until the fraud was exposed, even if the defendant had made no effort to conceal it beyond what is implicit in committing fraud ***and the plaintiff should have discovered the fraud long before its public exposure***.

*Wolin*, 83 F.3d at 851 (emphasis added). In other words, in some cases fraud alone will not toll the statute of limitations, but only if the fraud was such that the plaintiff could and should have discovered it.

Moreover, *Wolin* went on to note that *Martin* distinguished "between the original fraud and fraudulent concealment" and "within the category of fraudulent concealment between 'self-concealing' acts and acts of 'active concealment.'" *Id.* at 851–52 (quoting *Martin*, 966 F.2d at 1093–95). *Wolin* defined a self-concealing act as one "***committed during the course of the original fraud*** that has the effect of concealing the fraud from its victims," whereas "[a]ctive concealment refers to acts intended to conceal the original fraud that are distinct from that original fraud." *Wolin*, ,83 F.3d at 852 (emphasis added); *see also Martin*, ,966 F.2d at1095(rejecting

view that fraud or concealment exception does not encompass self-concealing acts and stating "fraudulent concealment as incorporated in section 1113 is not so limited, but *can include genuine acts of concealment committed in the course of the underlying wrong*.") (emphasis added).[11]

Thus, under *Martin* and *Wolin*, acts committed as part of the wrongdoing *can* constitute fraud or concealment for purposes of § 1113 if they prevent the victim from timely discovering that wrongdoing. For example, in *Hensiek v. Board of Directors of Casino Queen Holding Company, Inc.*, No. 3:20-CV-377-DWD, 2022 WL 263321 (S.D. Ill. Jan. 28, 2022), the plaintiffs alleged that a stock price was inflated due to unreliable and unrealistic projections, causing an ESOP to pay more than fair market value. *Id.* at *1. The ESOP transaction took place in 2012, but the plaintiffs did not learn of the breaches of fiduciary duty until 2019 when an annual report indicated the value of the shares had decreased by 95%. *Id.* at *2. The plaintiffs pointed to the following acts of fraud or concealment: (1) misrepresentations about the terms of the stock purchase transaction at company

---

[11] The district court made the same mistake when it selectively quoted this Court in *Martin* as saying that even self- concealing acts require some "misleading, deceptive or otherwise contrived action or scheme . . . that is designed to mask the existence of the cause of action." [App. A022 (quoting *Martin*, 966 F.2d at 1094 (cleaned up).] The full quote states that self-concealing acts require "some misleading, deceptive or otherwise contrived action or scheme, *in the course of committing the wrong*, that is designed to mask the existence of a cause of action." *Id.* (emphasis added).

meetings; (2) Form 5500s filed with the DOL that misrepresented the value of the stock; and (3) annual reports provided to ESOP participants. *Id.* at *2, 4. The court found these allegations pled fraud or concealment even though they were also part of the same fraud. *Id.* at *4.

Similarly, in *Enneking v. Schmidt Builders Supply Inc.*, 917 F.Supp. 2d 1200, 1208 (D. Kan. 2013), the plaintiffs alleged breach of fiduciary duty because the defendants induced them to agree to an ESOP while concealing, among other things, the true nature of the underlying transaction, the fiduciaries' conflicts of interest, and the criminal background of the company's CFO. *Id.* at 1203. The prospectus disclosed that the CFO had previously worked in public accounting but failed to mention his conviction for securities fraud and felony theft. *Id.* at 1208. Those allegations were "sufficient to show active concealment that would trigger the federal concealment rule," even though they were also part of the breach of fiduciary duty. *Id.*

The district court erred by requiring Lyon to "specially plead an action taken to conceal wrongdoing that is separate and apart from the underlying fiduciary breach" and rejecting allegations of self-concealing acts. [*See* App. B012, A022.]

## C.     Lyon's ERISA Claims Are Tolled by the Fraud or Concealment Exception.

Relying on its erroneous interpretation of fraud or concealment, the district court referenced its prior dismissal of the FAC claims as untimely and ordered the

same fate for the SAC because it "does not add any new, material factual allegations" against the D&O Defendants or State Street. [App. B012.] This was not true—the SAC added a significant number of allegations about Appvion's SEC filings, Form 5500s filed with the Department of Labor, communications to employees, the 2001 Transaction, and the November 2001 Prospectus update. Regardless, Lyon adequately alleged fraud or concealment even without these additional details.

### 1. The SAC alleged fraud or concealment in connection with the 2001 Transaction.

#### a. The breaches of fiduciary duty

Buth and Karch were fiduciaries in connection with the 2001 transaction as Directors and members of the ESOP Committee. [App. B284-85, B296-97.] State Street was a fiduciary in its role as ESOP Trustee. [App. B271.] The SAC alleges they breached their fiduciary duties as follows:

- Buth hired Houlihan to oversee the 2001 Transaction and agreed to pay Houlihan a 1% contingent fee if the ESOP transaction closed, creating an inherent conflict of interest, and Karch approved or ratified this action [App. B285, B297];

- Buth worked with conflicted Houlihan in negotiating the purchase price of the PDC stock acquisition and by granting Houlihan broad authority and discretion over communications with employees, selection of the ESOP team, and other ESOP-related matters [App. B286-87];

58

- Buth participated in the ESOP transaction while he was conflicted by his own contingent fee arrangement [App. B286-87];

- Buth engaged Houlihan to give a fairness opinion and to present that opinion to employees in both the prospectus and at road shows and Karch approved or ratified this action even though both knew Houlihan was conflicted [App. B287, B297];

- Buth juxtaposed Houlihan's fairness opinion with a discussion of management's conflict, without disclosing Houlihan's own conflict [App. B287];

- Karch was involved in drafting the July 23, 2001, prospectus which misleadingly described Buth's and Karch's own conflicts of interest while stating Houlihan believed the purchase price was nevertheless fair, even though it was for more than fair market value. Buth reviewed and approved the July 23, 2001, prospectus. [App. B288, B298];

- Buth presented Houlihan as independent in the July 25, 2001, letter and in the program for the August 2, 2001, road show. Karch approved or ratified these communications despite approving earlier communications informing employees that someone with a conflict of interest was not qualified to give a fairness opinion [App. B287-88, B297-98];

- Karch presented Houlihan's Paone as independent at the August 2, 2001, road show and Buth remained silent. [App. B287-88, B297];

- Buth represented to employees (with Karch present) at the August 2, 2001, road show that "[t]he prospectus has all the details for you to make a decision" and that the prospectus explained fees paid to advisors, even though the prospectus did not explain the amount and contingent nature of Houlihan's fees. [App. B288, B298];

- Karch and Buth were present at the August 2, 2001, road show when Paone falsely described the $810 million purchase price as "attractive" and a good deal and State Street's Driscoll represented that it was "a very good price." Buth similarly represented that the independent validation from Paone and Driscoll showed "[w]e got a good deal." [App. B288-89, B298];

- As members of the ESOP committee, Buth and Karch directed State Street to purchase PDC's stock even though they knew it was for more than fair market value [App. B289]; and

- As fiduciaries with the ability to remove State Street as ESOP trustee, Buth and Karch failed to effectively monitor State Street and ensure it was complying with its fiduciary obligations [App. B289].

### b.      The acts of fraud or concealment

Claims based on these Defendants' breaches of fiduciary duty are tolled due to fraud or concealment. Houlihan's fee arrangement was never disclosed—instead, the above representations about Houlihan's independence and the disclosure about senior management's conflicts of interest were partial, misleading disclosures which served to "divert further investigations" into Houlihan. *Enneking*, 917 F.Supp. 2d at 1208. These were acts of concealment by Buth, Karch, State Street, and Houlihan. [*See* App. B118, B282-83, B293-94, B302-03.] In addition, the November 19, 2001, prospectus update which referenced investment banking fees of $8 million while concealing they were contingent fees paid to Houlihan was direct concealment, especially Bear, Stearns was also identified as an investment banker for the deal. [App. B282-83, B293-94, B303.]

These above representations and omissions also concealed that: (1) the purchase price for Appvion was inflated and for more than fair market value; and (2) Buth, Karch, and State Street breached their fiduciary duties in connection with the transaction. The ESOP (through its Employee Participants) was therefore prevented from discovering Defendants' wrongdoing related to the 2001 transaction in time to file their claims within the statute of repose.

**2.** **The SAC alleged fraud or concealment between 2001 and 2012.**

      **a.** **The breaches of fiduciary duty by the D&O Defendants.**

The SAC alleges that during their respective tenures at Appvion, the D&O Defendants breached their fiduciary duties of prudence, loyalty, and disclosure between December 2001 and December 2012 as follows:

- The ESOP Committee Defendants approved, adopted, and disseminated PDC stock valuations to the ESOP and Employee Participants that they knew were artificially inflated. [App. B290, B299-300, B306, B311, B315-16, B323-24, B332, B338, B343, B347.]

- The ESOP Committee Defendants failed to make sure the ESOP received adequate consideration for the stock prices and failed to prudently value the stock's fair market value in good faith by, for example, ignoring material liabilities like the unfunded pension/postretirement debt. [App. B290-91, B300, B307, B311, B316-17, B324-25, B332-33, B338-39, B343-44, B347-49.]

- The ESOP Committee Defendants directed the ESOP Trustee to purchase PDC's stock at inflated prices. [App. B291, B300, B307, B312, B317, B325, B333, B339, B344.]

- The ESOP Committee Defendants failed to adequately monitor the Trustee Defendants in their determinations of share value. [App. B291, B301, B307, B312, B317, B325-26, B333-34, B339-40, B349, B352.]

- The Outside Director Defendants failed to adequately monitor the ESOP Committee and the ESOP Trustees in their determinations of share value. [App. B352, B355, B358, B360, B363-64, B368.]

- The Outside Director Defendants failed to demand that PDC stock valuations and Appvion financial statements be corrected and failed to terminate the ESOP Committee members and ESOP Trustee despite knowing that: (1) except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted from valuations; (2) there was no justification for including the control premium; (3) Appvion's projections were consistently inflated; and (4) Appvion's management was using inflated stock values in financial statements. [App. B352-53, B355-56, B358-59, B360-61, B364, B368-69.]

- The D&O Defendants put their own interests above the ESOP's because they had financial incentives to agree to higher stock prices. [*See, e.g.,* App. B291, B353, B356, B359, B362, B365, B369.]

- The ESOP Committee Defendants authored and approved misleading communications to the Employee Participants that presented inflated

stock prices and falsely reassured them that the stock valuations were correct while failing to disclose the full valuation. [App. B231-32, B301, B308, B312, B317-18, B326, B334, B340, B344, B349.]

- Buth, Karch, Parker, Richards, Ferree, and Gilligan approved and signed PDC's 10-K and 10-Q filings, which reported the inflated share prices and incorporated them into financial statements. [App. B292, B301, B308, B318, B325-26, B349, B352-53.]

- Karch and Ferree signed Form 5500s filed with the Department of Labor which reported the value of PDC's stock. [App. B193-94.]

**b.    The breaches of fiduciary duty by State Street**

With respect to State Street, the SAC alleges that the same breaches of fiduciary duty outlined above applied to earlier valuations. The SAC also alleges State Street breached its fiduciary duties of prudence, loyalty, and disclosure with respect to these earlier valuations by:

- failing to properly understand and question Willamette and Stout's valuation methods and adopting their valuations despite knowing they had significant flaws resulting in significant overvaluations [App. B279];

64

- failing to identify or put processes in place to address the conflict of interest from executive compensation plans that incentivized Appvion executives to increase share values [App. B168-70];

- failing to insist that the December 31, 2008, and June 30, 2009, valuations include all interest-bearing debt [App. B275-77];

- failing to ensure that Willamette and Stout were truly independent [App. B278];

- failing to properly understand and question Willamette and Stout's valuation methods and adopting their valuations despite knowing they had significant flaws resulting in significant overvaluations [App. B279];

- failing to require that Stout deduct the value of phantom stock held under the Non-Employee Director Deferred Compensation Agreement created in 2006 until its December 31, 2011, valuation [App. B279];

- allowing Stout to overvalue BemroseBooth and another Appvion Division, Performance Packaging [App. B171-73]; and

- failing to document in writing its oversight of appraisers, the appraisal process, and its analysis and review of the final valuation reports [App. B279].

### c.    The acts of fraud or concealment

Claims based on violations between 2001 and November 26, 2012, are tolled due to fraud or concealment as described in the SAC. These acts include:

- releasing inflated PDC stock prices, each of which concealed that every previous PDC stock price had been inflated [App. B178-79, B197-99, B201-02, B204-05, B207-08, B211-15, B218-25, B227-28, B230-32, B234-37, B243-52];

- releasing Appvion 10-Ks and 10-Qs that reported and confirmed inflated stock prices, concealing that previous stock prices had been inflated and that the ESOP fiduciaries breached their fiduciary duties [App. B178-79, B182-93, B201, B206-07, B212-13, B216, B221-22; B225, B233-34, B237-42, B244-45, B249-50, B253-54];

- releasing communications that reported inflated PDC stock prices and confirmed the stock was being property valued, concealing that previous stock prices had been inflated and that the ESOP fiduciaries were not following a prudent process [App. B178-82, B200, B202-06; B208-10, B215, B219-21, B232-33; B246];

- filing annual Form 5500s with the Department of Labor signed by Karch and Ferree, which attested to the value of PDC's stock and failed

to report any prohibited transactions, investigations, or corrective actions, and which reaffirmed the prior stock prices [App. B193-94.];

- sending communications to Employee Participants representing: that State Street, as ESOP trustee, had "control of the company;" that Appvion's executive's interests were aligned with the Employee Participants' interests; and that PDC stock was being properly valued, all of which concealed that the ESOP's November 9, 2001 purchase of PDC stock at $10 exceeded fair market value and that subsequent stock valuations had been fraudulently inflated [App. B195-97, B217.];

- emailing Employee Participants to disclose that BemroseBooth's poor performance and increased pension liabilities negatively affected the PDC stock price while concealing that valuations of Appvion/PDC failed to account for Appvion's own much larger liabilities [App. B228-29];[12] and

- publishing a book in 2007 quoting Karch as saying everything disclosed in the prospectus for the 2001 Transaction "was appropriate and in

---

[12] The SAC only brought claims against D&O Defendants who were either 1) involved in the 2001 Transaction; 2) involved in the BemroseBooth valuations; or 3) joined within the six-year statute of limitations.

compliance" and quoting Driscoll as saying State Street made sure that employees paid no more than fair market value [App. B226].

[*See also* App. B284, B295, B304, B309, B313, B319-20, B327-28, B335, B341, B345, B354, B357, B359a, B362-63, B367-68, B370.]

Each of these false and misleading representations and omissions fraudulently concealed that the PDC share price was inflated at the time of the 2001 Transaction and at all times thereafter, that the ESOP Committee Defendants were failing to monitor State Street in conducting valuations, that the Outside Director Defendants were failing to properly monitor the ESOP Committee and State Street, that these Defendants were failing to follow a proper process for reviewing the valuations, and that they were failing to insist that the stock value be adjusted to account for things like ESOP's lack of control and the Excluded Debt. And importantly, ***each communication containing inflated stock valuations constituted a separate fraudulent act that concealed each earlier inflated valuation***.

If each PDC stock valuation had not concealed the prior breaches of fiduciary duty, the Employee Participants would have learned that PDC's stock price was inflated at the time of the 2001 Transaction and thereafter. This would have notified the ESOP (through the Employee Participants) of the pattern of fraudulent stock inflation and the ESOP fiduciaries' ERISA violations. [App. B179-80.]

Whether these acts of concealment constitute part of the underlying wrongdoing is not determinative—they were "steps taken by wrongdoing fiduciaries to cover their tracks" and were acts of "fraud or concealment" under § 413. *See Martin*, 966 F.2d at 1095-96; *see also Laskin*, 728 F.3d at 735 ("An ERISA fiduciary commits fraud or concealment by … misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary does not becomes aware of them (concealment).") But even if the fraud or concealment exception required separate acts independent of the underlying wrongdoing, Lyon alleged such acts in the form of, *e.g.*, Appvion Form 5500s filed with the Department of Labor. The district court erred in dismissing all claims for conduct prior to November 26, 2012.

## IV.   LYON STATED CLAIMS FOR SECURITIES FRAUD.

The SAC stated the following claims for federal securities violations, based on actions within the five-year statute of repose: Reliance [Count 31, App. B375-81]; the D&O Defendants [Counts 33, 34 App. B382-408]; and Stout [Count 35, App. B408-15]. The district court erroneously dismissed these claims.

### A.   The SAC States a Claim Against the D&O Defendants.

The district court initially dismissed the securities fraud claims against the D&O Defendants (Richards, Ferree, Gilligan, and Arent) for lack of scienter, finding that the FAC relied too heavily on their roles as ESOP Committee members and

69

failed to prove that they knew or should have been aware that the valuations were inflated. [App. A027.] The SAC added detailed allegations about the information these D&O Defendants necessarily had access to, with reference to ESOP Committee meeting minutes (which identified who was present) showing where the (inflated) financial projections and their impact on the valuations were discussed. [App. B158-61, B383, B395-99.] It also alleged that Richards, Ferree, Gilligan, and Arent were involved in preparing the projections and facts showing that they were inflated. [App. B158-61, B089.] The SAC also included specific allegations that these Defendants were involved in the BemroseBooth valuations, and that the impact of Appvion's pension liabilities on the valuations were discussed at a May 26, 2016, ESOP Committee meeting. [App. B329-30, B348-49, B395.] Finally, the SAC alleges specific facts about the communications to employees about the stock prices, who authored the communications, and how these communications were incorrect. [App. B140-44, B195-254, B386-393.] These new facts directly addressed the deficiencies in the FAC and showed knowledge that the valuations were inflated.

The SAC also added allegations of motive explaining how the D&O Defendants profited or stood to profit from higher stock prices during the relevant time period. [App. B400-01.] Notably, the executive compensation plans discussed in the SAC were tied to PDC's stock price but not subject to the same withdrawal restrictions as the D&O Defendants' investments in the ESOP.

The district court failed to analyze these allegations, concluding that the SAC "simply reasserts the same exact factual background" as the FAC. [App. B020.] This finding is at odds with Lyon's detailed pleading in Count 33. The Court should allow this claim to go forward.

**B.     The SAC States a Claim for Control Person Liability.**

The SAC also pled control person liability against certain of the Outside Director Defendants. Because Lyon stated a claim for underlying violations, this claim (Count 34) should also go forward.

**C.     The District Court Erroneously Required Plaintiff to Plead Motive.**

Relying on *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007), the district court dismissed the securities fraud claims against Reliance and Stout for failure to plead motive. [App. B052-53, B065-67.]

However, the Supreme Court was clear in *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) (decided after *Tricontinental*) that a lack of pecuniary motive is not dispositive. "While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree … that the absence of a motive allegation is not fatal." *Id.* at 325. "A complaint passes muster under *Tellabs* only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Higginbotham v. Baxter Int'l, Inc.*,

71

495 F.3d 753, 757 (7th Cir. 2007) (cleaned up); *Cornielsen*, 916 F.3d at 600. The district court did not conduct that analysis, finding only that the fees Reliance and Stout were earning could not establish motive and therefore there could be no scienter. This was inconsistent with *Tellabs*. *See New Mexico State Investment Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011) (rejecting a separate scienter pleading standard for auditors).

The facts as a whole support an inference of scienter here. Reliance and Stout knew about many "red flags," including Appvion's repeated failure to hit its business projections. [App. B157-60, B376, B408.] Reliance and Stout also knew—both from the minimal documentary evidence that Lyon has access to and from their review of Appvion's financial statements—that Appvion had significant pension liability which was not being subtracted as part of the valuations. [App. B138-49, B165-66, B376, B409.] They also knew about the control premium since it was stated in the valuation report prepared by Stout. [App. B155-57, B376, B410.] And Stout expressly explained in its valuation report that it was not subtracting material portions of Appvion's interest-bearing debt. [App. B151-52, B409-10.] These and

the other facts pled in the SAC support an inference of scienter.[13] These claims should be allowed to go forward.

## V.    ERISA DOES NOT PREEMPT LYON'S STATE LAW CLAIMS.

Lyon brought the following state law claims which the district court found to be preempted under ERISA: breach of fiduciary duty against the D&O Defendants (Count 13 [App. B441-47]); fraud, negligent misrepresentation, and breach of fiduciary duty against Houlihan (Count 27 [App. B447-49], Count 28 [App. B450-51], Count 29 [App. B451-53]); and fraud and negligent misrepresentation against Stout (Count 10 [App. B433-37] and Count 12 [App. B438-40]).

A finding of ERISA preemption is reviewed *de novo*. *Halperin v. Richards*, 7 F.4th 534, 540 (7th Cir. 2021).[14] ERISA § 514 preempts state laws that "relate to any employee benefit plan" described under ERISA, including statutes and common law torts. 29 U.S.C. § 1144. The Supreme Court has "observed repeatedly that this broadly worded provision is 'clearly expansive.'" *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001). However, the Supreme Court has also "cautioned against an 'uncritical

---

[13] Because Stout's motion to dismiss addressed the substance of the claims against it, Lyon was forced to retain expert witnesses who supported Lyon's argument that Stout knowingly violated accepted valuation practices. [Dkts. 214-4, 214-5, 214-6].

[14] *Halperin* was an action brought by the trustees of the Appvion Liquidating Trust against certain of the D&O Defendants, Argent, and Stout relating to the collapse of Appvion. The trial court found that ERISA preempted those claims and the Seventh Circuit reversed as to the D&O Defendants.

literalism' that would make pre-emption turn on 'infinite connections.'" *Id*. at 147; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).

There is a an "assumption that historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Travelers*, 514 U.S. at 654-55; *Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 775 (7th Cir. 2002). With this presumption in mind, determining whether a state law is preempted requires analysis of "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as the nature of the effect of the state law on ERISA plans." *California Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997) (cleaned up); *Halperin*, 7 F.4th at 541. Under this rubric, state laws "relate to" an ERISA plan if they have "a connection with or reference to such a plan." *Egelhoff*, 532 U.S. at 146; *Halperin*, 7 F.4th at 541. This includes state statutes or claims that, while not "facially tied to ERISA, ""govern[] … a central matter of plan administration' or ' interfere[] with nationally uniform plan administration.'"" *Halperin*, 7 F.4th at 541 (*quoting Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016)).

## A.  The State Law Claim against the D&O Defendants is Not Preempted.

The D&O Defendants served dual roles as corporate and ERISA fiduciaries.

*See Halperin*, 7 F.4th at 540.

The district court found that the common law claim for breach of fiduciary duty was preempted because it only sought redress for injury to the ESOP through the recovery of plan benefits. [App. A029.] However, this claim was brought on behalf of the ESOP as the sole shareholder of PDC and it sought recovery for damages to the share value based on actions that do not give rise to a claim under ERISA. [App. B442.]

In *Halperin*, the Court considered whether the creditors' committee's claims against certain of the D&O Defendants were preempted and concluded that they were not because the D&O Defendants owed parallel state law duties to the corporation. *Halperin*, 7 F.4th at 544 ("[W]hat we find most important is that ERISA is written to invite, and certainly to tolerate, these specific parallel and independent duties—the directors and officers' fiduciary duties to the corporation.").

The Court first asked whether the plaintiffs in *Halperin* could have brought claims under ERISA, and concluded they could not have. *Id.* at 545. While the answer to that question is different here, it should not change the result – the fact that the shareholder is an ESOP does not convert its state law claims into ERISA claims. *See Hoeppner v. Jess Howard Elec. Co.*, 150 Ohio App. 3d 216, 225 (2002) ("We conclude that the mere fact that the minority shareholder is an ERISA plan does not convert plaintiffs' breach-of-fiduciary-duty claim premised upon state

corporate law into a preempted ERISA claim."); *Housman v. Albright*, 368 Ill. App. 3d 214, 223-24 (2006) (claims by ESOP participants under common law breach of corporate fiduciary duty were not preempted).

In *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1458-59, 1468 (5th Cir. 1986), which this Court approved of in *Halperin*, the Fifth Circuit found similar claims brought by an employee profit sharing trust not preempted, even though the trust also brought ERISA claims in the same case. *Id.* at 1456, 1458-59, 1468 (5th Cir. 1986). As the Fifth Circuit explained,

> **The state law and ERISA duties are parallel but independent: as director, the individual owes a duty, defined by state law, to the corporation's shareholders**, including the plan; as fiduciary, the individual owes a duty, defined by ERISA, to the plan and its beneficiaries**. Thus, the state law does not affect relations between the ERISA fiduciary and the plan** or plan beneficiaries as such; **it affects them in their separate capacities as corporate director and shareholder**. (emphasis added)

*Sommers* concluded that "the state common law of corporate fiduciary duty, as applied in this case, affects benefit plans in too tenuous, remote, and peripheral a manner to warrant a finding that it 'relate[s] to' the plans." *Id.* at 1470. For the same reasons described in *Sommers* and *Halperin*, Lyon's claim against the D&O Defendants in their role as directors and officers of PDC is not preempted.

### B.     The State Law Claims against Houlihan Are Not Preempted.

The district court found that the state law claims against Houlihan were

preempted because they "relate to the ESOP, an ERISA-governed plan." [App. A032.] Lyon also brought ERISA claims in the alternative, but the district court found that Houlihan was not an ERISA fiduciary. [App. B025-30.] The district court also found that the $8.1 million fee paid to Houlihan did not constitute plan assets under 29 C.F.R. § 25.3-101. [App. B025-32.]

Houlihan was retained by PDC, which was itself not an ERISA fiduciary. Houlihan then gave investment advice to the Employee Participants. [App. B118-20, B122-23.] However, the mere fact that the plaintiff is an ERISA plan does not mean the claim "relates to" ERISA within the meaning of § 514(a), 29 U.S.C. § 1144(a). *See, e.g., LeBlanc v. Cahill*, 153 F.3d 134, 147-48 (4th Cir. 1998) (common law fraud claim by trustees of a pension fund against third party investment advisors were not preempted); *see also Morstein v. Nat'l Ins. Services, Inc.*, 93 F.3d 715 (11th Cir. 1996) (claim by a plan participant against a non-fiduciary insurance agent was not preempted.).

Lyon also brought alternative ERISA claims, but the district court found that Houlihan was not an ERISA fiduciary and that the $8.1 million fee paid to Houlihan was not paid out of plan assets under 29 C.F.R. § 2510.3-101. [App. B025-32.] Since Lyon does not have a remedy under ERISA, this action is not an alternative enforcement mechanism. *See Halperin*, 7 F.4th at 545.

The claim against Houlihan also does not "interfere with how Congress

intended ERISA's fiduciary duties to operate." *Id.; LeBlanc*, 153 at 148 ("The fact that the Pension Fund is subject to ERISA is of no consequence to its common law fraud claim against the Appellees . . . the Pension Fund is simply in the role of an investor allegedly wronged."). These claims are not preempted.

## C.    The State Law Claims Against Stout Are Not Preempted.

In *Halperin*, this Court found that the creditors' claims (in the shoes of the corporation) against Stout were preempted due to Stout's role as Argent's contractor. This finding does not control here.

Unlike the aiding and abetting claims at issue in *Halperin*, Lyon's claims are based on Stout's independent legal duties which do not depend on its status as Argent's service provider. *See Citizen's State Bank v. Timm, Schmidt & Co., S.C.*, 335 N.W.2d 361, 384-87 (Wis. 1983) (finding accountants owe duties to foreseeable third parties). These types of garden-variety tort claims against service providers do not implicate ERISA's preemption provisions. *Geller v. County Line Auto Sales, In*c., 86 F.3d 18, 23 (2d Cir. 1996) ("The plan was only the context in which this garden variety fraud occurred."); *Biondi*, 303 F.3d at 779-80 (citing *Geller* with approval); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003) ("[C]ourts routinely find that garden-variety state-law malpractice or negligence claims against non-fiduciary plan advisors, such as accountants, attorneys, and consultants, are not preempted."); *see also Airports Co., Inc. v. Custom Ben. Services of Austin, Inc.*, 28

F.3d 1062, 1066 (10th Cir. 1994) (negligence and common law fraud claims against benefit plan consultant not preempted); *In re Enron*, 284 F.2d at 647("Nearly every court addressing the issue has held that ERISA does not preempt state-law professional negligence."). This cuts against a finding of preemption. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) ("In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), ***and where no other independent legal duty is implicated*** by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).") (emphasis added).

A Sixth Circuit panel has found similar claims not preempted, noting that "courts, including our own, have consistently declined to hold that state law claims against non-fiduciary professional services providers constitute impermissible attempts to enforce responsibilities governed by federal law." *Kloots v. American Express Tax and Business Services, Inc.*, 233 Fed. Appx. 485, 488 (6th Cir. 2007). The claims against the valuation firm did not involve duties imposed by ERISA, nor did they require evaluation of whether the defendant had violated the terms of ERISA or the ERISA-governed plan. *Id*. at 489. Rather, the source of their obligations were their professional responsibilities, which were "entirely distinct from the ESOP or ERISA and thus do not intrude upon ERISA's exclusive enforcement scheme." *Id.*; *see also Enneking v. Schmidt Builders Supply, Inc.*, 875

F.Supp. 2d 1274, 1288-89 (D. Kan. 2012) (finding state law negligence claims against valuation firm not preempted); *Enneking*, 917 F.Supp. 2d at 1213 (finding fraud claims against valuation firm not preempted).

The state law claims against Stout are not preempted and should be allowed to go forward.

## **CONCLUSION**

For these reasons, the Court should reverse and remand for trial Lyon's ERISA, federal securities fraud, and state law claims.

RESPECTFULLY SUBMITTED this 17th day of May, 2023.

/s/     Jennifer B. Anderson
L. Richard Williams
Jennifer B. Anderson
Abigail M. Terhune
BEUS GILBERT McGRODER PLLC
701 North 44th Street
Phoenix, Arizona 85008-6504
Telephone:  (480) 429-3000
Facsimile:   (480) 429-3100
*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document does not comply with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 17,531 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 2303 with Times New Roman font in 14-point type.

/s/     Jennifer B. Anderson

## <u>CERTFICATE OF SERVICE</u>

I hereby certify that on May 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/     Jennifer B. Anderson

No. 23-1073

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| APPVION, INC. RETIREMENT SAVINGS AND EMPLOYEE STOCK OWNERSHIP PLAN, by and through Grant Lyon in his capacity as the ESOP Administrative Committee of Appvion, Inc., | Appeal from the United States District Court for the Eastern District of Wisconsin |
| *Plaintiff-Appellant*, | Civil Action No. 1:18-cv-01861 |
| v. | The Honorable William C. Griesbach |
| DOUGLAS P. BUTH, et al., | |
| *Defendants-Appellants*. | |

**CIRCUIT RULE 30(A) APPENDIX TO APPELLANT'S OPENING BRIEF**

## <u>CIRCUIT RULE 30(D) CERTIFICATION</u>

The undersigned counsel for Plaintiff-Appellant Appvion, Inc. Retirement

Savings and Employee Stock Ownership Plan, by and through Grant Lyon in his

capacity as the ESOP Administrative Committee of Appvion, Inc., certifies that,

pursuant to Circuit Rule 30(d), the following Appendix includes all materials

required by Circuit Rule 30(a).

RESPECTFULLY SUBMITTED this 17th day of May, 2023.

/s/    Jennifer B. Anderson
L. Richard Williams
Jennifer B. Anderson
Abigail M. Terhune
BEUS GILBERT McGRODER PLLC
701 North 44th Street
Phoenix, Arizona 85008-6504
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

Judgment in a Civil Case, Dec. 16, 2022 [Dkt. 282] ..........................................A001

Order Adopting Magistrate Judge's Report and
Recommendation, Sept. 6, 2022 [Dkt. 262] .......................................................A002

Decision and Order, July 27, 2020 [Dkt. 186]....................................................A004

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

### EASTERN DISTRICT OF WISCONSIN

APPVION INC. RETIREMENT SAVINGS
AND EMPLOYEE STOCK OWNERSHIP PLAN,
by and through Grant Lyon in his capacity as the
ESOP Administrative Committee of Appvion Inc.,

          Plaintiff,

                **JUDGMENT IN A CIVIL CASE**

      v.               Case No. 18-C-1861

DOUGLAS P. BUTH, et al.,

          Defendants.

☐    **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒    **Decision by Court.** This action came before the Court for consideration.

      **IT IS HEREBY ORDERED AND ADJUDGED** that Plaintiff's claims against Defendants Douglas P. Buth, Paul J. Karch, Mark Richards, Tom Ferree, Rick Fantini, Dale E. Parker, Angela Tyczkowski, Kerry Arent, Kent Willetts, Susan Scherbel, Ronald Pace, Stephen Carter, Kathi Seifert, Andrew Reardon, Terry Murphy, Mark Suwyn, Kevin Gilligan, Houlihan Lokey Capital Inc., Houlihan Lokey Financial Advisors Inc., State Street Bank & Trust Company, Reliance Trust Company, Scott D. Levine, Aziz El-Tahch, Stout Risius Ross LLC, and Stout Risius Ross Inc. are DISMISED with prejudice.

            Approved:  s/ William C. Griesbach
                         WILLIAM C. GRIESBACH
                         United States District Judge

      Dated:  December 16, 2022

                         GINA M. COLLETTI
                         Clerk of Court

                         s/ Kyle W. Frederickson
                         (By) Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

APPVION INC. RETIREMENT SAVINGS AND
EMPLOYEE STOCK OWNERSHIP PLAN,
by and through Grant Lyon in his capacity as the
ESOP Administrative Committee of Appvion Inc.,

          Plaintiff,

      v.                                        Case No. 18-C-1861

DOUGLAS P. BUTH, et al.,

          Defendants.

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On March 17, 2022, Magistrate Judge Stephen C. Dries recommended that I grant the motions to dismiss filed by the former Appvion Inc. Director and Officer Defendants; State Street Bank and Trust Company; Reliance Trust Company; Houlihan Lokey Capital Inc. and Houlihan Lokey Financial Advisors Inc.; and Stout Risius Ross Inc., Stout Risius Ross LLC, Aziz El-Tahch, and Scott Levine. Magistrate Judge Dries also recommended that I partially grant Argent Trust Company's motion to dismiss. Plaintiff and Argent filed timely objections to the recommendation pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b)(2). Therefore, this Court must conduct a de novo review. Having reviewed the recommendation, the objections, responses to the objections, and replies in support of the objections, I overrule the objections and adopt the Report and Recommendation with the exception of footnote 6 on page 16.

**IT IS THEREFORE ORDERED** that Magistrate Judge Dries' report and recommendation (Dkt. No. 235) is **ADOPTED** as qualified.

**IT IS FURTHER ORDERED** that, for the reasons stated in the recommendation, the former Appvion Inc. Director and Officer Defendants' motion to dismiss (Dkt. No. 192); State Street Bank and Trust Company's motion to dismiss (Dkt. No. 194); Reliance Trust Company's motion to dismiss (Dkt. No. 195); Houlihan Lokey Capital Inc. and Houlihan Lokey Financial Advisors Inc.'s motion to dismiss (Dkt. No. 200); and Stout Risius Ross Inc., Stout Risius Ross LLC, Aziz El-Tahch, and Scott Levine's motion to dismiss (Dkt. No. 202) are **GRANTED**. These defendants are dismissed from this action.

**IT IS FURTHER ORDERED** that Argent Trust Company's motion to dismiss (Dkt. No. 198) is **GRANTED-IN-PART** and **DENIED-IN-PART**. All that remains are Counts 2 and 24 against Argent. The Clerk is directed to set the matter for a Rule 16 telephonic scheduling conference.

Dated at Green Bay, Wisconsin this 6th day of September, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

APPVION, INC. RETIREMENT SAVINGS
AND EMPLOYEE STOCK OWNERSHIP
PLAN, by and through Grant Lyon in his
capacity as the ESOP Administrative
Committee of Appvion,

                    Plaintiff,

          v.                                              Case No. 18-C-1861

DOUGLAS P. BUTH, et al.,

                    Defendants.

## DECISION AND ORDER

In 2001, Appleton Papers, Inc., a Wisconsin-based paper products company, which was owned at that time by a French conglomerate, Arjo Wiggins Appleton (AWA), was sold as part of an Employee Stock Ownership Plan, or ESOP, to Paperweight Development Corp. (PDC) for $810 million. The purchase was funded by Appleton Paper employees' $106 million contribution from their 401(k) retirement accounts. Under the terms of a newly amended Retirement Savings and Employee Stock Ownership Plan, the ESOP trustee used the employee contributions to purchase 100% of the shares of PDC's common stock. PDC, in turn used the funds from that purchase, together with other financing, to purchase Appleton Papers. Upon completion of the transaction, employees continued to make contributions of their retirement savings to purchase PDC stock, thereby increasing their equitable interest in Appleton Papers. Appleton Papers later changed its name to Appvion, Inc., the name used to refer to the company hereinafter. In October 2017, some 16 years later, Appvion filed for bankruptcy, making the stock of its parent company, PDC, worthless. This lawsuit followed.

Grant Lyon commenced this action in his capacity as the sole member of Appvion's

Employee Stock Ownership Plan Administrative Committee (the ESOP Committee) on behalf of

the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (ESOP).    The

complaint asserts claims for violations of the Employee Retirement Income Security Act (ERISA),

as well as federal securities fraud and various state law claims.  It alleges that the defendants played

various roles in fraudulently inducing Appvion's employees to adopt the ESOP as part of their

retirement plan and then, over the following sixteen years, artificially inflating the value of stock

owned by the ESOP, resulting in losses to the ESOP.  Altogether, the Amended Complaint asserts

19 counts against 8 entities and 51 individuals, including their spouses.  The defendants include

17 former officers and directors of Appvion, some of whom also served at various times over the

years as members of the ESOP Committee; Houlihan Lokey Capital, Inc. (f/k/a Houlihan Lokey

Howard & Zukin Capital, Inc.), and Houlihan Lokey Howard & Zukin Financial Advisors

(collectively, Houlihan), who were engaged by PDC to advise PDC on the 2001 Transaction; Louis

Paone, Houlihan's managing director in 2001; State Street Bank and Trust Company, a nationally

chartered trust company which served as the trustee of the ESOP from 2001 until 2013; State Street

employees Kelly Driscoll and Sydney Marzeotti (collectively, the State Street Defendants);

Reliance Trust Company, which replaced State Street as the trustee for the ESOP in 2013; Argent

Trust Company, N.A., which replaced Reliance as the trustee for the ESOP in 2014, Howard

Kaplan, Stephen Martin, and David Williams (collectively, the Individual Trustee Defendants and,

along with the State Street Defendants, Argent, and Reliance, the Trustee Defendants); Willamette

Management Associates, Inc., which provided valuations of Appvion stock during the period from

2001 to 2004; Stout Risius Ross, Inc. and Stout Risius Ross, LLC (collectively, SRR), which

provided Appvion stock valuations after 2004; Scott Levine, Aziz El-Tahch, and Robert Socol

(collectively with SRR, the SRR Defendants); the spouses of each individually-named defendant;

2

and yet to be identified defendants (Does 1–50, ABC Corporations 1–5, DEF Partnerships 1–5, GHI Limited Partnerships 1–5, and JKL Limited Liability Companies 1–5). The court has jurisdiction over the ERISA claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

On February 28, 2019, the defendants filed eight motions to dismiss. The court approved the parties' stipulation to extend the briefing period, and briefing was not complete until June 20, 2019. Once the motions were fully briefed, the parties requested oral argument on the motions on July 26, 2019, and the court scheduled argument. The court's trial calendar twice postponed oral argument, resulting in the motions remaining undecided. On January 8, 2020, the court scheduled oral argument on the motions for April 2, 2020 but advised the parties on March 13, 2020 that the hearing scheduled for April 2, 2020 was removed from the court calendar in light of the COVID-19 pandemic. Although the court indicated an intent to issue a tentative ruling and allow the parties to comment in lieu of oral argument, having carefully considered the thorough briefing on the issues and the lengthy delay that has already occurred, the court has decided to issue its decision. For the reasons that follow, the motions to dismiss will be granted.

## LEGAL STANDARD

A motion to dismiss tests the sufficiency of the complaint to state a claim upon which relief can be granted. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990); *see* Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and draw all inferences in the light most favorable to the non-moving party. *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir. 1997); *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir. 1991). Rule 8 mandates that a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's short and plain statement must "give the defendant fair notice of

3

what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a plaintiff is not required to plead detailed factual allegations, it must plead "more than labels and conclusions." *Id.* A simple, "formulaic recitation of the elements of a cause of action will not do." *Id.* A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

Fraud-based claims must meet a heightened pleading standard. Fed. R. Civ. P. 9(b). This heightened pleading standard requires plaintiffs to "provide the who, what, when, where, and how" of the alleged fraud. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotations omitted). A heightened pleading standard in fraud cases is justified because "public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual) . . . because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it, . . . and because charges of fraud (and also mistake, the other charge that Rule 9(b) requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (internal citations omitted).

In addition, "[e]xacting pleading requirements are among the control measures Congress included in the PSLRA [Private Securities Litigation Reform Act of 1995]." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 184, 194 & n.12 (1976)).

## ALLEGATIONS OF THE AMENDED COMPLAINT

On February 12, 2001, AWA signed a letter of intent to sell Appvion to PDC for $843,000,000. AWA also agreed to pay Appvion CEO Douglas Buth and other Appvion executives bonuses, consisting of a value-related completion bonus and loyalty payments, contingent on the parties completing the sale in 2001. The completion bonus created a bonus pool of up to $10 million depending on the final sale price. The executives would not receive a completion bonus if the sale price was at or below $700 million. "According to the prospectus, the sales incentive was ultimately $2.46 million, with 40% of it allocated to Buth and the rest to be distributed to other employees at Buth's discretion." First Amended Complaint (FAC), Dkt. No. 77, at ¶ 138. The executives would also receive loyalty bonuses if the sale price exceeded $759,403,000.

> Each individual who would receive a Loyalty Payment agreed to defer 30% of the payment for between 5 and 10 years. Under the Deferred Compensation Plan, the value of the deferred portion of this payment was tied to the increase in the value of stock. According to the prospectus, the loyalty payments ultimately totaled $4.1 million, with $1.2 million of it deferred.

*Id.* Prior to the closing, the bonus payments were to be recorded as obligations of Appvion.

Buth retained Houlihan to develop a plan for the employee buyout. In the February 14, 2001 engagement letter, Buth stated that Houlihan was to act as PDC's "exclusive financial advisor with respect to the possible acquisition . . . by a to-be-formed Employee Stock Ownership Plan." *Id.* at ¶ 141. The letter also stated that Houlihan would receive a transaction fee at closing equal to "1.0% of the 'Aggregate Consideration' paid for the stock of the Company with respect to an ESOP Acquisition." *Id.* at ¶ 142. An addendum to the letter set forth two phases of work that Houlihan was to complete, including corporate due diligence, transaction value parameters, ESOP transaction model construction, financing assessment and capital tranche sources and terms, management deferred compensation and option/stock rollovers, and management bonus

5

participation as an ongoing investment tool.  Houlihan was also required to assist management in negotiations regarding the purchase of PDC, advise management on the selection of the ESOP team, advise on the structure of management performance warrants as part of bonus/incentive plans, prepare materials to be presented to employees, and assist in the documentation of transaction terms.  *Id.* at ¶ 143.  Copies of these letters were not distributed to the ESOP or the Employee Participants.  "The plan developed by Houlihan was to use at least $100 million from the employees' 401(k) retirement plans to fund a portion of the buyout, with the rest of the sale price coming from bank debt, bonds and seller financing."  *Id.* at ¶ 145.  As of July 2001, the Appvion Retirement Savings Plan 401(k)s totaled approximately $155 million.

In anticipation of the buyout, Appvion's retirement savings plan was amended and restated as of January 1, 2001, and renamed the "[Appvion] Retirement Savings and Employee Stock Ownership Plan."  *Id.* at ¶ 163.  The amended plan added an ESOP component and retained the traditional non-ESOP component.  *Id.*  Under the ESOP Plan, Employee Participants could make a one-time irrevocable election in 2001 to transfer a portion of their non-ESOP accounts to an ESOP account.  The ESOP account funds would then be invested in PDC stock.  The ESOP would be the sole shareholder of PDC.  The shares owned by the ESOP would be allocated to the accounts of the Employee Participants, who were the beneficial owners of PDC.  Under the ESOP Plan, share repurchase obligations would be funded from employee contributions to the ESOP, and "[i]f net repurchases exceeded contributions to the ESOP, repurchases were funded through a loan from [Appvion] to PDC, which PDC loaned to the ESOP."  *Id.* at ¶ 168.  "Withdrawals from a participant's ESOP account were limited to statutory diversification, additional diversification, participant loans, retirement, disability, death, termination of employment and hardship distributions."  *Id.* at ¶ 170.  Sales or purchases of PDC stock were required to be at fair market value.

6

The ESOP Plan also authorized the creation of the ESOP Committee, which would be made up of at least three members who were appointed by Appvion's Board of Directors. The ESOP Committee was "the named fiduciary with respect to the financial management of the ESOP and the control or management of the assets of the Plan." *Id.* at ¶ 174. The ESOP Committee had the following powers and responsibilities:

- to establish and carry out, or cause to be established and carried out by those persons (including without limitation, any investment manager or trustee) to whom responsibility or authority therefor has been allocated or delegated in accordance with this ESOP Plan or the Trust Agreement, funding and investment policies and methods consistent with the objectives of the ESOP Plan and the requirements of ERISA.

- to appoint a trustee or trustees to hold the assets of the ESOP Plan, and who, upon acceptance of being appointed, shall have authority and discretion to manage and control the assets of the ESOP Plan, except to the extent that the authority to manage, acquire or dispose of assets of the ESOP Plan is delegated to one or more investment managers pursuant to paragraph (3) below; and

- to appoint an investment manager or managers, as defined in Section 3(38) of ERISA, to manage (including the power to acquire, invest and dispose of) any assets of the ESOP Plan.

*Id.* at ¶ 175. The ESOP Committee also had the right to delegate its responsibilities under the ESOP to third parties.

The ESOP trustees appointed by the ESOP Committee, pursuant to agreements with the trustees, were required to retain an independent appraiser to value the PDC stock. The ESOP trustees were also responsible for reviewing the valuation completed by the independent appraiser and finalizing the valuation. The ESOP trustees were believed to have met with Appvion and PDC's Boards of Directors to report on the ESOP. The first ESOP trustee, State Street, was appointed on June 1, 2001. *Id.* at ¶ 179. The independent appraisers retained by the trustees—initially Willamette, who served from 2001 until June 30, 2004, followed by SRR from December

7

31, 2004 through 2017—used the guideline company method and the discounted cash flow method to value the PDC stock.  *Id.* at ¶¶ 218–20.

In addition to appointing the members of the ESOP Committee under the ESOP Plan, Appvion and PDC's Boards of Directors were responsible for selecting a chairman and secretary for the ESOP Committee.  PDC's Board of Directors also had the following responsibilities under the ESOP Plan document:

- Discretion for determining the percentage of matching contributions to the ESOP as well as whether matching contributions to the non-ESOP Component or the ESOP Component would be in the form of cash or company stock.

- The power to amend the ESOP Plan Document. Starting in approximately 2008, the Board delegated the authority to make non-material amendments to the ESOP Plan to the ESOP Committee.

*Id.* at ¶ 194.  A March 19, 2001 employee newsletter emphasized the Board of Directors' fiduciary role in managing the company.  *Id.* at ¶ 198.  In response to the question "How do we know the board of directors will make good decisions for us?" the following answers were provided:

- The board of directors has a fiduciary obligation to the company's shareholders. That is, they have a legal responsibility to ensure that the shareholder interests are served.

- In an ESOP company, the board has a legal obligation to the ESOP trustee as the shareholder.

- The ESOP trustee has a fiduciary obligation to act in the best interests of plan participants.

- The plan participants are the company's beneficial shareholders. Thus, in ESOP companies, there are two entities charged with acting in the best interests of the participant shareholders, the trustee and the board of directors.

*Id.* at ¶ 199.  A March 26, 2001 newsletter stated the entities that would issue ESOP fairness opinions would have "[n]o conflicts of interest and/or fee arrangements based on contingencies, both of which would impair the independence of the financial advisor."  *Id.* at ¶ 148.

8

Appvion's management circulated a prospectus dated July 23, 2001, to employees to assist their evaluation as to whether to participate in the ESOP.  The prospectus included the following statements:

- Paperweight Development's financial advisor, Houlihan, and the CEO team believe that the purchase price as negotiated is fair to the buyers.

- Houlihan has rendered its preliminary opinion to Paperweight Development's board of directors that the purchase price that Paperweight Development is paying for us in the acquisition is fair, from a financial point of view, to the ESOP, as the sole shareholder of Paperweight Development. Houlihan's preliminary fairness opinion was based on a number of facts and assumptions, including financial information through the end of April 1, 2001.  Its preliminary opinion was rendered to the board of directors of Paperweight Development and may not be relied upon by any other person.  Houlihan has been asked to render a fairness opinion to the Board of Directors of Paperweight Development effective as of the closing of the transaction to the effect described above.

*Id.* at ¶ 153.  "The Prospectus did not disclose that Houlihan's fees were contingent on the deal closing or that they were structured as a percentage of the purchase price."  *Id.* at ¶ 154.  But the prospectus did indicate that there were risks involved in investing in the ESOP.  *See* Dkt. No. 106-1 at 2 ("Investing in the ESOP involves risks.  Please refer to the discussion under the heading 'Risk Factors' beginning on page 14."); *id.* at 18 ("Investing in the Paperweight Development common stock through ownership of the ESOP interests involves a high degree of risk.  The occurrence of any one or more of the following cold materially adversely affect or business and operating results and the value of your investment in the ESOP."); *id.* at 18–26 (describing risks related to the business and industry and risks relating to the offering).

On July 20, 2001, Houlihan and Buth executed another retainer agreement that engaged Houlihan to "render an opinion as to the fairness to the Shareholder of the Company, from a financial point of view of the consideration to be paid by the Company . . . in connection with the Transaction and that such consideration is not more than the fair market value of [Appvion]."  FAC

9

at ¶ 147.  Houlihan charged $100,000 for the fairness opinion, which was credited toward its 1%

contingent fee.

In a letter to employees dated July 25, 2001, Buth stated that the ESOP buyout offered

employees "the potential for extraordinary rewards for initial investors and greater control of our

company's future" and that "during the past few months we have made every effort to educate you

about employee stock ownership."  *Id.* at ¶ 155.  Buth also stated employees would receive

"independent validation of the deal" from Lou Paone of Houlihan and Kelly Driscoll of State

Street, the ESOP trustee at the time.

Appvion executives, along with Driscoll of State Street, Paone of Houlihan, Rick Braun of

Willamette, and others, held a series of meetings referred to as "road shows" to present the buyout

to Appvion's employees.  At these road shows, "employees were told that the buyout was

necessary or the company would be sold to an equity firm and be sold off for scrap, or that an

equity firm would bleed the company dry and run it into the ground."  *Id.* at ¶ 159.  During a road

show in August 2001, Paul Karch, Appvion's general counsel, stated that Houlihan's Paone was

"going to provide an independent view and validation" of the buyout transaction.  *Id.* at ¶ 414.

The transaction closed on November 9, 2001, and the purchase price was later adjusted to

$810,000,000.  State Street retained Willamette to issue a valuation opinion at the time of the 2001

Transaction.  The initial share price was set at $10.

On November 9, 2001, "the [Appvion] Employee Stock Ownership Trust, through State

Street as trustee, entered into a Security Holders Agreement with PDC."  *Id.* at ¶ 209.  Under

§ 1.2(a) of that agreement, State Street and PDC agreed to jointly nominate the seven members of

Appvion's Board of Directors who could only be removed by mutual agreement of the trustee and

the CEO.  No director could be elected or removed without CEO approval.  Under § 2.2 of the

agreement, PDC and Appvion were authorized to engage in acquisitions of other companies for

10

less than $100 million without the trustee's permission.  The terms of the agreement were not disclosed in the prospectus and were not released until November 19, 2001.

On December 31, 2001, State Street, acting as the ESOP trustee, began conducting the required semi-annual valuations of PDC stock with Willamette retained as the independent appraiser.  Willamette employees Scott Levine, who served as the principal individual handling Appvion's account, Aziz El-Tahch, and Robert Socol left Willamette for SRR, and SRR subsequently replaced Willamette as the appraiser.  In March 2013, State Street stepped down as the ESOP Trustee, and Appvion retained Reliance to serve as the trustee effective April 1, 2013. In 2014, Reliance sold its ESOP business unit to Argent, who took over as trustee effective July 1, 2014.  The ESOP Committee later voted for Argent to continue to be the trustee in May 2015. Appvion designated Argent as a discretionary trustee in a May 2015 engagement letter and an amended trust agreement effective August 3, 2015.  After each valuation, Appvion released the share price to the ESOP and its participants with a brief explanation of the share price.  Appvion did not disclose the valuation process used in reaching the PDC stock price, however.  Beginning in January 2008, the minutes of the ESOP Committee show that SRR and the Trustee Defendants presented the valuations to the ESOP Committee after each valuation.

The Boards of Directors for Appvion and PDC also viewed the stock valuations and oversaw PDC and the company's operations through an Audit Committee and a Compensation Committee.  The Audit Committee reviewed the audited financial statements and was tasked with "provid[ing] assistance to the Board of Directors in fulfilling its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of [PDC's] financial reports."  *Id.* at ¶ 327.

As part of the 2001 Transaction, Appvion management represented that the fourteen members of the executive team would put 100% of their 401(k) plans into the ESOP and,

11

"[i]mmediately after the 2001 Transaction, the named executive officers reported holding 4.2% of the shares in the ESOP." *Id.* at ¶ 343.  After the 2001 Transaction, however, Appvion's executives "began leaving the company and receiving distributions of their ESOP accounts for a combined gain of over $7.2 million." *Id.* at ¶ 344.  Appvion CEO Buth retired in 2005 and gained over $850,000 on his investments in the ESOP Component of the Plan.  Rick Fantini, Vice President of Operations, also left in 2005 and gained over $577,000 in his investments in the ESOP.  By November 2006, only one member of the original executive team remained at the company.  This employee left the company in 2007 and gained over $300,000 from his investments in the ESOP.  By December 2006, top executives held only 1.59% of the ESOP shares, and by December 2010, that number was reduced to 0.93%.

Appvion continued to implement incentive programs to reward its executives and directors following the 2001 Transaction.  These programs included the following:

**Long-Term Incentive Plan (LTIP)** - Allowed the Compensation Committee to award a number of phantom stock units equal to 3% of a total stockholders' equity in the Company each year that vested over 3 years and expired after 10 or upon leaving the company.  When the rights to the phantom stock are exercised, a participant would receive a cash bonus equal to the increase in the value of the stock from the date of issue until the exercise date.

**Deferred Compensation Plan and The Executive Nonqualified "Excess" Plan** - These plans allowed for the deferral of all or a portion of a person's salary and/or bonus and provided for matching contributions.

**The Non-Employee Director Deferred Compensation Plan** - Established in 2006, it awarded non-employee members of the Board of Directors with phantom stock units.  "The value of the stock awarded under this plan was to be paid in five equal annual cash installments following a director's conclusion of service on the board of directors, based on the stock valuation as of the payment date." *Id.* at ¶ 364.

**The Long-Term Restricted Stock Unit** - Began in 2010, it awarded management employees with future cash payments based on the full fair market value of Appvion common stock.

12

*See id.* at ¶¶ 353–75.  Lyon alleges that these plans, combined with the allegedly over-inflated stock value, resulted in excessive compensation being paid to executives and management when compared to company performance and the true value of the PDC stock.

From 2001 through 2017, various communications regarding the ESOP were sent to Employee Participants, explaining the information the independent appraiser would consider when determining Appvion's fair market value, the role that the trustees played in reviewing the independent appraiser's valuation, and Appvion's performance as a company that accounted for changes in the stock price.  *See id.* at ¶¶ 417–81.  Appvion continued to hold bi-annual road shows to present the share price to its employees and to discuss the company's performance.

On October 1, 2017, Appvion and some of its subsidiaries filed for Chapter 11 Bankruptcy. On August 14, 2018, the Bankruptcy Court for the District of Delaware issued a Conformation Order stating the order did not "operate as a waiver or release or otherwise impair in any respect . . . any claim held by the ESOP, the ESOP Committee or its members, or ESOP Participants."  *Id.* at ¶ 408.

The Board of Directors appointed Grant Lyon as the sole member of the ESOP Committee effective August 9, 2017, in conjunction with an amendment to the ESOP that allowed the ESOP Committee to consist of one member.  The Bankruptcy Court's order "confirmed that Grant Lyon, in his capacity as an ESOP Committee Member, has standing to prosecute claims on behalf of the ESOP Plan and the Employee Participants."  *Id.*  After his appointment, Lyon conducted an investigation into the valuations and alleges that the following deficiencies, among others, *see* ¶¶ 246–318, resulted in the overstatement of the PDC stock's fair market value and Appvion and the ESOP overpaying for repurchased PDC stock:

- SRR failed to account for certain known liabilities, including unfunded pension and post-retirement liabilities.

13

- SRR relied heavily on projections of future cash flow created by Appvion's management, even though the appraisers, the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants knew that Appvion consistently missed these projections.

- SRR changed the methodology of their valuations to compensate for periods of low earnings.

- SRR used the perpetuity model to capitalize a declining income stream, overstating the value of PDC stock.

- SRR improperly included a control premium that inflated the valuations.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

- SRR failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- SRR failed to appropriately consider the impact on the discounted cash flow of the need to repurchase PDC stock.

- SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- They failed to account for market indicia of value by, for example, failing to consider the market discount to the value of Appvion's debt.

- The appraisals failed to stress test Appvion's projections.

*Id.* at ¶ 241. Although Lyon did not have access to Willamette's valuation reports, upon information and belief, Lyon asserts that those valuations contained the same or similar flaws.

Lyon filed his initial complaint on November 26, 2018, and the FAC on January 8, 2019. Thereafter, the defendants filed their motions to dismiss.

14

## ANALYSIS

### A.    The Spouses of the Individually Named Defendants

The FAC names as a defendant the spouse of each individually named defendant.  The FAC contains no factual allegations against the individual defendants' spouses, other than alleging that they are married to a defendant, and does not assert any of the FAC's nineteen causes of action against them.  Lyon asserts that the spouses were included "as nominal defendants for collections purposes based on the belief that the spouse defendants may be in possession of funds or property derived from the violations alleged in the FAC."  Pl.'s Resp. Br., Dkt. No. 130, at 100.

"A 'nominal defendant' is a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of litigation."  *S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991).  "Because the nominal defendant is a 'trustee, agent, or depositary,' who has possession of the funds which are the subject of litigation, he must often be joined purely as a means of facilitating collection."  *Id.* (citations omitted).  "A nominal defendant is not a real party in interest, however, because he has no interest in the subject matter litigated. His relation to the suit is merely incidental and 'it is of no moment [to him] whether the one or the other side in [the] controversy succeed[s].'"  *Id.* (citing *Bacon v. Rives*, 106 U.S. 99, 104 (1882)).  Due to "the non-interested status of the nominal defendant, there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established."  *Id.* (citing *Farmers' Bank v. Hayes*, 58 F.2d 34, 36 (6th Cir. 1932)).

The spouse defendants will be dismissed from this matter because they are not nominal defendants.  The FAC merely alleges the spouses' marital relationship to the individually named defendants and is devoid of any allegations that they are trustees, agents, or depositories or that they possess ill-gotten profits.  *See id.* at n.11 ("A court can obtain equitable relief from a non-

15

party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them."). Although Lyon asserts that ERISA and the Wisconsin Marital Property Act allow for the recovery of marital assets, absent any allegations that the spouses participated in the wrongdoing or are holding specifically traceable proceeds of the wrongdoing, it would be improper for the spouses to remain as defendants in this action. The defendants' motions to dismiss will therefore be granted with respect to the spouses of the individually named defendants.

**B.    The Director and Committee Member Defendants**

The FAC alleges a number of ERISA-based claims against the former Board of Directors and Committee Member Defendants: breach of fiduciary duty and breach of the duty to monitor against the Committee Member Defendants (Count II); breach of fiduciary duty against the Board of Directors Defendants (Count III); engagement in prohibited transactions (Count IV); violations of ERISA § 410 and breach of fiduciary duty (Count VI); and co-fiduciary liability against the Director and Committee Member Defendants (Count VII). The FAC also asserts a federal securities fraud claim against certain Director and Committee Member Defendants (Count XIV) as well as Wisconsin state law claims of securities fraud (Count XIII) and breach of fiduciary duty (Count XVI). The Director and Committee Member Defendants seek to dismiss these claims in their entirety.

**1.    ERISA Claims (Counts II, III, IV, VI, VII)**

**a.    The ERISA claims based on conduct that occurred prior to November 26, 2012, are barred by ERISA's six-year statute of repose**

The Director and Committee Member Defendants maintain that Lyon cannot assert ERISA claims against them based on any alleged conduct occurring before November 26, 2012, because those claims are barred by ERISA's six-year statute of repose, 29 U.S.C. § 1113. An ERISA claim

16

arising from a fiduciary's breach of any responsibility, duty, or obligation is time barred after the earlier of

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.

29 U.S.C. § 1113. In the case of fraud or concealment, ERISA provides that an action may be commenced no later than six years after the date of discovery of the breach or violation. *Id.* The defendants contend that, because the initial complaint was filed on November 26, 2018, Lyon's ERISA claims based on any acts or omissions occurring before November 26, 2012, are barred by the statute of repose. Lyon contends that the statute of repose period is tolled under § 1113's fraud or concealment exception because the Director and Committee Member Defendants have engaged in a pattern of fraud or concealment since 2001.

"An ERISA fiduciary commits fraud or concealment by delaying a wronged beneficiary's discovery of his claim either by misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary does not become aware of them (concealment)." *Laskin v. Siegel*, 728 F.3d 731, 735 (7th Cir. 2013) (citation omitted). The plaintiff bears the burden of establishing that the fraud or concealment exception applies by showing "some act on the part of the defendant designed to avoid detection." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1093–94 (7th Cir. 1992). Such acts include "actual concealment—*i.e.*, 'some trick or contrivance intended to exclude suspicion and prevent injury,'" *id.* at 1095, and "underlying ERISA violations that are self-concealing," *Laskin*, 728 F.3d at 735. Fraudulent concealment, like all fraud claims, must be plead with particularity in accordance with

Rule 9(b) of the Federal Rules of Civil Procedure. *See Fiene v. V & J Foods, Inc.*, 962 F. Supp. 1172, 1183–84 (E.D. Wis. 1997).

In this case, Lyon has failed to allege that the Director and Committee Member Defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing. With respect to the 2001 Transaction, Lyon alleges that the Director and Committee Member Defendants persuaded employees to invest in the ESOP without advising them that the stock was overvalued and that the defendants approved communications that justified the stock valuations, but intentionally omitted certain factors that resulted in the stock's overvaluation. Lyon claims that Buth, Karch, Parker, and Fantini breached their fiduciary duties by concealing that Houlihan had a conflict of interest in light of the fact that its "fees were contingent on the deal closing or that they were structured as a percentage of the purchase price" and representing that Houlihan would provide an independent fairness opinion. FAC at ¶ 154. To support his contention that the defendants took affirmative acts to conceal these breaches, Lyon asserts that Houlihan's fee arrangement was never disclosed to the employees, that Karch represented at road shows that Houlihan's Paone was independent and Buth and others failed to correct him, and that the prospectus drafted by Houlihan, Buth, Karch, Parker, and State Street did not disclose Houlihan's contingent fee, even though a prior communication to employees stated that a conflict of interest would disqualify an advisor from giving a fairness opinion. Pl.'s Resp. Br., Dkt. No. 130, at 33–34.

After the 2001 Transaction, Lyon claims the Director and Committee Member Defendants released fraudulently inflated PDC stock prices to the ESOP and the Employee Participants, failed to determine the fair market value of the stock in good faith, and put their own interests above the interests of the Employee Participants. He contends that the acts of fraud and concealment include the valuations themselves, because they were not disclosed, the inflated stock prices, and various

18

misleading statements to employees regarding the valuation process, the duties of care being exercised by the defendants, and the content of the valuation reports. *Id.* at 34–35.

Lyon's claims against the Director and Committee Member Defendants do not come within the fraud or concealment exception. Lyon fails to allege facts from which the court can infer that each Director and Committee Member Defendant "engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing." *Martin*, 966 F.2d at 1093. Lyon contends that the defendants' conduct may be considered a self-concealing act or an affirmative failure to disclose. But even self-concealing acts require some "misleading, deceptive, or otherwise contrived act or scheme" designed to "mask the existence of a cause of action." *Id.* at 1094. "[F]raud claims do not receive the benefit of ERISA's six-year statute of limitations simply because they are fraud claims. There must be actual concealment . . . ." *Id.* at 1905. Concealment must occur not only in the course of the fraud itself but must also consist of "steps taken by wrongdoing fiduciaries to cover their tracks." *Id.* (quoting *Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1221 (7th Cir. 1990)). As the Seventh Circuit has recognized, "[f]raudulent concealment . . . is distinct from fraud that is concealed. . . . Otherwise the statute of limitations would not start to run in a fraud case until the fraud was exposed, even if the defendant had made no effort to conceal it beyond what is implicit in committing fraud and the plaintiff should have discovered the fraud long before its public exposure." *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 851 (7th Cir. 1996), *disapproved of on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) (citations omitted). To hold otherwise would render the statute of repose's fraud and concealment exception meaningless.

Lyon's allegations of fraud or concealment are neither separate nor independent from the underlying wrongdoing. The acts and omissions alleged, without more, are not the kinds of "affirmative acts" of fraud or concealment that trigger the exception. In addition, Lyon fails to

19

allege with any specificity the "steps taken" by each Director and Committee Member Defendant to render the fraud or concealment exception applicable. Consequently, Counts II, III, IV, VI, and VII are barred by 29 U.S.C. § 1113's six-year statute of repose to the extent those claims are based on conduct that occurred before November 26, 2012. Because there are no allegations in the FAC related to the actions of Buth, Karch, Fantini, Parker, Tyzckowski, Scherbel, and Pace that occurred after November 26, 2012, they will be dismissed as defendants.

> **b.      The FAC fails to state ERISA claims against the Director and Committee Member Defendants for actions taken after November 26, 2012**

The Director and Committee Member Defendants assert that the ERISA claims based on conduct that occurred after November 26, 2012, should also be dismissed because the FAC fails to allege with particularity any wrongful conduct these defendants committed. They argue that the FAC constitutes improper group pleading because it only outlines "each defendant's position and contends that their positions tie them to the alleged fraud." Defs.' Br., Dkt. No. 106, at 29.

"In order to state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)). As an initial matter, the parties dispute whether these claims are subject to the pleading requirements of Rule 8(a) or Rule 9(b). "While claims for breach of fiduciary duty under ERISA generally are not subject to heightened pleading standards, Rule 9(b) does apply where the plaintiff alleges that a defendant's breach of fiduciary duty took the form of a fraudulent act." *Rogers v. Baxter Int'l, Inc.*, 417 F. Supp. 2d 974, 984 (N.D. Ill. 2006), *aff'd*, 521 F.3d 702 (7th Cir. 2008). Because Lyon claims that the Director and Committee Defendants breached their fiduciary duty through their fraudulent acts, the court will apply Rule 9(b)'s heightened pleading requirements.

20

Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). A plaintiff satisfies the heightened pleading requirements of Rule 9(b) by alleging "the who, what, when, where, and how" of the fraud." *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (citations omitted). When a plaintiff sues multiple defendants, the general rule is that the plaintiff must "'inform each defendant of the nature of his alleged participation in the fraud.'" *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). The Seventh Circuit has repeatedly "rejected complaints that have 'lumped together' multiple defendants." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2011) (quoting *Vicom*, 20 F.3d at 778).

Lyon's claims must be dismissed because the FAC's allegations fall short of the heightened pleading standards required by Rule 9(b). Lyon's complaint makes general allegations against all of the Director and Committee Member Defendants, asserting that the defendants were connected to or engaged in fraudulent misconduct based on their role as a director or committee member. Lyon does not allege what each specific defendant did and how each defendant's alleged misconduct violated ERISA. The conclusory group pleading allegations that the defendants uniformly violated their fiduciary duties do not provide fair notice to each individual defendant concerning his or her participation in the fraud. The FAC's allegations are insufficient to state claims against the Director and Committee Member defendants. Accordingly, the Director and Committee Member Defendants' motion to dismiss will be granted with respect to Counts II, III, IV, VI, and VII as they relate to events that occurred after November 26, 2012.

## 2. The FAC fails to state a federal securities fraud claim (Count XIV)

The FAC asserts a federal securities fraud claim against the following Director and Committee Member Defendants: Richards, Ferree, Arent, Gilligan, Carter, Murphy, Reardon,

Suwyn, and Seifert.  The FAC asserts that former Committee Member Defendants Richards, Ferree, Arent, and Gilligan committed securities fraud when they "directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered the Prior Committee Defendants' statements misleading."  FAC at ¶ 740.  The FAC alleges, in particular, that these defendants falsely represented the value of PDC stock from December 2013 to June 2015, *id.* at ¶ 716, approved the release of communications that discussed and justified these stock prices, *id.* at ¶ 717, and "omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock," *id.* at ¶ 718.  The FAC alleges that these defendants omitted facts related to the deficiencies contained in the valuations performed by SRR and approved by the ESOP Trustees.  *See id.*  The FAC further alleges that Ferree and Gilligan engaged in similar conduct with respect to the valuations released between December 2015 and June 2017.  *Id.* at ¶¶ 719–21.

The FAC also alleges that, during this time period, Director Defendants Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan were responsible for monitoring Appvion's financial performance and appointing the Trustee Defendants and Committee Member Defendants. The FAC claims that the Director Defendants "knew or in the exercise of reasonable care could have known of the misrepresentations and omissions discussed above," *id.* at ¶ 744, and "did not act in good faith in connection with their supervision or monitoring of the Trustee Defendants and the Prior Committee Defendants."  *Id.* at ¶ 747.

"To state a claim for federal securities fraud, a complaint must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (quoting *Pugh v. Tribune Co.*, 521 F.3d

22

686, 693 (7th Cir. 2008)).  The Director and Committee Member Defendants contend that the federal securities fraud claim should be dismissed because the FAC fails to plead the necessary elements of a federal securities fraud claim.

Allegations of fraud are subject to heightened pleading requirements.  A party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  "To satisfy Rule 9(b)'s particularity standard, a complaint must 'state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Cornielsen*, 916 F.3d at 599 (quoting *Vicom*, 20 F.3d at 777 (internal quotation marks omitted)).  "A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)).

The PSLRA adds further requirements that must be satisfied to state a federal securities fraud claim.  The PSLRA requires that complaints alleging a claim of securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  The "required state of mind" refers to "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). The plaintiff "must create a strong inference of scienter with respect to each individual defendant." *Cornielsen*, 916 F.3d at 602 (citation omitted).  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 313.  In addition, any complaint alleging a material misstatement or omission must "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading." § 78u-4(b)(1).

23

In this case, the FAC fails to state a claim for securities fraud against Committee Defendants Richards, Ferree, Arent, and Gilligan because it does not sufficiently plead scienter. The FAC alleges that the Committee was responsible for reviewing the financial statements, preparing financial projections, and reviewing and approving the inflated valuations. Although Lyon asserts that former Committee Member Defendants Richards, Ferree, Arent, and Gilligan acted "intentionally and willfully," the FAC does not contain specific allegations suggesting that they knew the valuations were artificially inflated as alleged and, despite that fact, intended to release the prices to the Employee Participants for fraudulent purposes. The fact that Richards, Ferree, Arent, and Gilligan were members of the ESOP Committee does not relieve Lyon of his obligation to sufficiently plead scienter. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("[A] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). While the FAC explains that the valuations were objectively deficient, it does not allege that Richards, Ferree, Arent, and Gilligan should have been or were actually aware of these deficiencies. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false. The complaint documents the former but not the latter."). The FAC does not allege facts that support an inference of scienter. Therefore, the federal securities fraud claim against these defendants must be dismissed.

The federal securities fraud claim asserted against Director Defendants Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan fails as well. Lyon's claim against these defendants is based on a theory of "control persons" liability. Section 20(a) of the Securities Exchange Act of 1934 states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable . . . ." 15

24

U.S.C. § 78t(a). "[T]o state a claim under § 20(a), a plaintiff must adequately plead a primary violation of securities laws." *Pugh*, 521 F.3d at 693. Because Lyon has not adequately pled a federal securities fraud violation against the Committee Member Defendants, it follows that the FAC fails to state a claim against the Director Defendants. Accordingly, the Director and Committee Member Defendants' motion to dismiss will be granted with respect to Count XIV.

### 3.     State Law Claims (Counts XIII and XVI)

The FAC alleges that the Director and Committee Member Defendants violated the Wisconsin Uniform Securities Act (WUSA), Wis. Stat. § 551.501, *et seq.*, and that the Director and Committee Member Defendants breached their fiduciary duty under Wisconsin state law by paying Appvion management and directors excessive compensation, selling the Encapys unit of Appvion in 2015, and allowing the ESOP "to repeatedly purchase shares from the ESOP Plan and Employee Participants at a price above fair market value and repeatedly bought shares on behalf of the Employee Participants at a price above the shares [sic] fair market value." FAC at ¶ 783. The defendants assert that Lyon's state law claims are completely preempted by ERISA § 502(a).

ERISA's preemption clause provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Congress enacted ERISA to "provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). ERISA's "expansive pre-emption provisions . . . are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." *Id.* (citations and internal quotation marks omitted); *see also Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014) ("ERISA . . . may contain the broadest preemption clause of any federal statute and completely occupies the field of employees' health and welfare benefits . . . ."). A state law claim is completely preempted by ERISA "(1) 'if an individual, at some point in time, could have brought his claim

25

under' ERISA's expansive civil enforcement mechanism . . . and (2) 'where there is no other independent legal duty that is implicated by a defendant's actions.'"  *Studer v. Katherine Shaw Bethea Hosp.*, 867 F.3d 721, 724 (7th Cir. 2017) (quoting *Davila*, 542 U.S. at 210).

There is no dispute that Lyon's breach of fiduciary duty claim could have been brought under ERISA's civil enforcement provision.  Indeed, Lyon has brought such a claim, alleging that the Director and Committee Member defendants breached their fiduciary duties under ERISA. Instead, Lyon argues that the state law claim for corporate breach of fiduciary duty is not preempted because it is based on a legal duty independent from ERISA.  Citing *Sommers Drug Stores Co. Employee Profit Sharing Tr. v. Corrigan Enterprises, Inc.*, 793 F.2d 1456 (5th Cir. 1986), Lyon asserts that, even though the state law and ERISA duties are parallel, they are independent.  Pl.'s Resp. Br., Dkt. No. 130, at 77.  Lyon's claim does not implicate a legal duty independent of ERISA.  Although the breach of fiduciary duty claim is brought by Lyon on behalf of the ESOP as the sole shareholder of PDC rather than by the Employee Participants in their capacities as shareholders, Lyon only seeks redress for injury to the ESOP through the recovery of plan benefits.  *See* FAC at ¶ 1 (noting that Lyon "seeks to recover damages suffered by the ESOP Plan and ultimately by its employee participants").  In other words, Lyon is not pursuing damages arising from an independent legal duty between Appvion and the defendants; he only seeks to recover benefits under the plan, which is governed by ERISA.  In short, Lyon's claim for corporate breach of fiduciary duty does not implicate a legal duty independent of ERISA.  Count XVI is therefore completely preempted by ERISA and must be dismissed.

The defendants also assert that Lyon's claim for violations of the Wisconsin Uniform Securities Act (WUSA), Wis. Stat. § 551.501, *et seq.*, is preempted by ERISA.  Regardless of whether ERISA preempts this claim, the WUSA excludes claims based on ERISA-related

26

interests. Under the WUSA, it is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly,

> (1) To employ a device, scheme, or artifice to defraud.

> (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

> (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Wis. Stat. § 551.501. The WUSA specifically excludes from its definition of "security" "an interest in a contributory or noncontributory pension or welfare plan subject to the Employment Retirement Income Security Act of 1974." Wis. Stat. § 551.102(28)(c). Lyon asserts that the ESOP owns shares of PDC stock and does not have an interest in a pension plan like the Employee Participants do. Yet, the PDC stock, of which the ESOP is the sole shareholder, is to be allocated to the Employee Participants' accounts in accordance with their respective interests in the ESOP. Lyon's claim is related to ESOP interests that are subject to ERISA, and thus the WUSA does not apply here. Consequently, the FAC fails to state a claim for securities fraud under Wisconsin law, and the Director and Committee Member Defendants' motion to dismiss will be granted with respect to Count XIII.

## C.    The Houlihan Defendants

The FAC asserts a number of claims against the Houlihan Defendants, which consist of Houlihan Lokey Capital, Inc. and Houlihan Lokey Financial Advisors, Inc. (collectively, Houlihan), and Louis Paone, Houlihan's managing director in 2001. Houlihan acted as a financial advisor to PDC on the sale of the PDC stock to the ESOP in 2001. After the closing of the 2001 Transaction, Houlihan was not involved with any other event alleged in the FAC. Lyon alleges the following federal claims against these defendants: knowing participation in breaches of

27

fiduciary duty under ERISA (Count V) and violations of ERISA § 410 and breach of fiduciary duty (Counts VI and XV).  It also asserts Wisconsin state law claims of fraud (Count XVII), breach of fiduciary duty (XVIII), and negligent misrepresentation (Count XIX).

### 1.    The ERISA Claims

The Houlihan Defendants assert that the ERISA claims based on conduct occurring before November 26, 2012, are barred by ERISA's six-year statute of repose, 29 U.S.C. § 1113.  Lyon asserts that the statute of repose period is tolled by the fraud and concealment exception.  The FAC does not allege facts that support Lyon's contention that the Houlihan Defendants engaged in fraud or concealment to warrant application of § 1113's exception.  The FAC asserts that, "[i]n the fall of 2018, Lyon for the first time discovered that Houlihan was not 'independent' as had been fraudulently represented by Buth, Paul Karch and Mr. Paone, but in fact stood to gain a contingent fee of as much as 1% of the $810 million purchase price (over $8 million), but only if the ESOP transaction closed."  FAC at ¶ 48.  Lyon maintains that the Houlihan Defendants misrepresented their role and compensation to the ESOP and investors in the 2001 Transaction by failing to disclose that they would receive a contingent fee upon the closing of the 2001 Transaction, asserting at road shows that the sale was a good deal, and by not correcting others when they represented at road shows that the Houlihan Defendants were independent.

Though Lyon claims that the Houlihan Defendants hid their alleged conflicts from the ESOP and its investors, the FAC does not allege with specificity that the Houlihan Defendants misrepresented the significance of facts the ESOP Committee was aware of or hid facts so that the ESOP Committee could not become aware of them.  Indeed, the ESOP Committee knew about Houlihan's role and compensation at the time of the 2001 Transaction, and the ESOP investors were told that Houlihan acted as PDC's advisor, Houlihan prepared a fairness opinion solely for PDC's benefit, and the ESOP was represented by a trustee and its own advisor.  The FAC alleges

28

that Buth signed the February 14, 2001 and July 20, 2001 engagement letters on behalf of PDC whereby PDC engaged Houlihan and that members of the ESOP Committee were aware of Houlihan's role and compensation. FAC at ¶¶ 64, 69. In addition, the prospectus distributed to investors and employees advised that Houlihan served as a financial advisor to PDC and that Houlihan's fairness opinion was rendered to PDC's Board of Directors and may not be relied upon by any other person. *Id.* at ¶ 153. The FAC does not contain any allegations that the Houlihan Defendants engaged in "some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action." *Martin*, 966 F.2d at 1094. Plaintiff's ERISA claims against the Houlihan Defendants are therefore time barred and must be dismissed.

### 2.     State law claims (Counts XVII, XVIII, and XIX)

The Houlihan Defendants assert that ERISA preempts Plaintiff's state law claims. Conflict preemption under ERISA § 514(a) is an affirmative defense to a state law action. *See Rice v. Panchal*, 65 F.3d 637, 639 (7th Cir. 1995). The doctrine of conflict preemption provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." *Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 127 (7th Cir. 1992) (quoting 29 U.S.C. § 1144(a)). In this case, Lyon's state law claims are preempted because they relate to the ESOP, an ERISA-governed plan. Lyon alleges that the Houlihan Defendants improperly encouraged investors to move their retirement savings from 401(k) accounts into the ESOP. Lyon pled the state law claims in the alternative to the ERISA counts and acknowledged that the state law claims should be dismissed if the court decides the Houlihan Defendants are ERISA fiduciaries. Lyon's state law claims are related to an ERISA-governed plan and are preempted by ERISA. Therefore, these claims must be dismissed.

29

Although ERISA preemption mandates dismissal of the state law claims, these claims fail for the independent reason that the FAC fails to state claims upon which relief can be granted. Lyon claims the Houlihan Defendants breached their fiduciary duties under Wisconsin law when they failed to disclose Houlihan Lokey's arrangement with PDC. The Houlihan Defendants assert that Lyon has failed to allege that a fiduciary relationship existed between the Houlihan Defendants and the ESOP. The Wisconsin Supreme Court has recognized that a "fiduciary relationship arises from a formal commitment to act for the benefit of another (for example, a trustee) or from special circumstances from which the law will assume an obligation to act for another's benefit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis. 2d 127, 136, 377 N.W.2d 605 (1985). In this case, Lyon has not alleged that a formal agreement or commitment between the Houlihan Defendants and the ESOP created a fiduciary relationship or that there were special circumstances from which it can be assumed that a fiduciary obligation exists. Again, the Houlihan Defendants were retained by PDC to advise PDC, not the ESOP. The prospectus referred to Houlihan Lokey as PDC's "financial advisor" and disclosed that Houlihan Lokey's preliminary fairness opinion "was rendered to the board of directors of Paperweight Development and may not be relied upon by another person." Dkt. No. 106-1 at 95. In addition, the ESOP and the Employee Participants were represented by a trustee and a third-party appraiser whose sole purpose was to act on the ESOP's behalf. The FAC contains no allegations that there was a formal commitment or there were special circumstances present to support an inference that the Houlihan Defendants had a fiduciary duty to the ESOP. Consequently, Lyon has failed to state a claim of breach of fiduciary duty under Wisconsin law.

Lyon also alleges that the Houlihan Defendants made negligent and intentional misrepresentations. To state a claim for intentional misrepresentation or fraud, the plaintiff must allege:

(1) the defendant made a misrepresentation of fact; (2) the representation was untrue; (3) the defendant knew the representation was untrue or made it recklessly; (4) the representation was made with intent to deceive and induce the plaintiff to act upon it to the plaintiff's pecuniary damage; and (5) the plaintiff believed the representation to be true and relied on it.

*Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 70 n.38, 270 Wis. 2d 146, 677 N.W.2d 233 (citing Wis. JI—Civil 2401 (2002)). To state a claim of negligent misrepresentation under Wisconsin law, the plaintiff must allege that "(1) the defendant made a representation of fact; (2) the representation was untrue; (3) the defendant was negligent in making the representation; and (4) the plaintiff believed that the representation was true and relied on it." *Malzewski v. Rapkin*, 2006 WI App 183, ¶ 20, 296 Wis. 2d 98, 723 N.W.2d 156. The FAC fails to state a claim against the Houlihan Defendants for negligent or intentional misrepresentation because it does not identify any actionable statements made to the ESOP or omissions attributable to the Houlihan Defendants. Lyon's claims hinge on the fact that the Houlihan Defendants failed to disclose that they would receive a contingent fee upon the closing of the 2001 Transaction and that Paone asserted at road shows that the sale was a good deal. As an initial matter, "[a] statement is not a representation of fact if it expresses mere opinions on quality, value, authenticity or other matters of judgment." *Slane v. Emoto*, 582 F. Supp. 2d 1067, 1085 (W.D. Wis. 2008). Thus, Paone's qualitative statement does not constitute a statement of fact. In addition, to the extent Lyon asserts that employees and investors relied on Paone's silence at road shows where others represented that the Houlihan Defendants were independent, this contention does not support allegations of misrepresentation because Lyon cannot assert claims on behalf of the individual investors. Lyon has failed to state claims for intentional and negligent misrepresentation. In sum, Houlihan's motion to dismiss will be granted.

31

### D.     The Trustee Defendants

Lyon asserts claims against the State Street Bank and Trust Company, Reliance Trust Company, Argent Trust Company, and individual employees of these companies (Trustee Defendants).  The Trustee Defendants were appointed by the ESOP Committee as plan trustees. State Street was the first trustee, appointed in June 2001, and served in that role until March 2013. Reliance became the plan trustee effective April 1, 2013.  The State Street Defendants are comprised of State Street Bank and Trust Company,  Kelly Driscoll, and Sydney Marzeotti. Reliance subsequently sold its ESOP business unit to Argent in 2014.  The Reliance Defendants are comprised of Reliance Trust Company, who acted as the trustee from April 1, 2013, to June 30, 2014, David Williams, Howard Kaplan, and Stephen Martin.  Kaplan served as Senior Vice President of Reliance from 2000 to 2014, and Martin and Williams served as Vice Presidents of Reliance and later Argent.  The individual defendants filed a separate motion to dismiss.  The Argent Trust Company became the trustee in July 2014 and served in that capacity until November 2017.  As plan trustees, the Trustee Defendants were required to retain an independent appraiser to value the PDC stock and to review and finalize those valuations.

Lyon alleges the following claims against the Trustee Defendants: breach of fiduciary duty and breach of the duty to monitor (Counts I and VI), engagement in prohibited transactions (Count IV), and co-fiduciary liability (Count VII).  Lyon also alleges claims of Wisconsin securities fraud (Count XIII) and federal securities fraud (Count XIV) against Reliance, Argent, and the individual trustee defendants.

32

1.      **ERISA Claims**

      a.      **Kaplan, Martin, and Williams are not fiduciaries as defined by ERISA (Counts I, IV, VI, and VII)**

Lyon asserts a number of ERISA claims against Kaplan, Martin, and Williams.  These claims must be dismissed because these defendants are not fiduciaries as defined by ERISA.  A person is a fiduciary with respect to a plan to the extent

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A).  Courts have read the terms "discretionary authority," "discretionary control," and "discretionary responsibility" as "speaking to actual decision-making power rather than to the influence that a professional may have over the decisions made by the plan trustees she advises."  *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991) (collecting cases).  In this case, the FAC does not contain allegations that Kaplan, Martin, and Williams exercised or were capable of exercising the type of discretionary control that is required in order to hold an individual liable as a fiduciary for his actions.  Although these defendants may have worked as senior-level executives at Reliance or Argent and were responsible for the oversight of the independent evaluator, the facts alleged in the FAC, without more, are insufficient to support a claim that Kaplan, Martin, and Williams exercised the discretionary authority required by § 3(21)(A).  *See Twombly*, 550 U.S. at 555 (holding that factual allegations "must be enough to raise a right to relief above the speculative level" and must "contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action." (quoting 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, at 235–

33

36 (3d ed. 2004) (alterations omitted))). Consequently, the individual trustee employee defendants' motion to dismiss is granted with respect to Counts I, IV, VI, and VII.

> **b.** **The ERISA claims against the State Street Defendants related to events that occurred prior to November 26, 2012, are barred by ERISA's six-year statute of repose (Counts I, IV, and VII)**

The State Street Defendants assert that the ERISA claims, as they relate to events occurring before November 26, 2012, are barred by ERISA's six-year statute of repose, 29 U.S.C. § 1113. Lyon contends that § 1113's fraud or concealment exception tolls the statute of repose period. Like his allegations against the Director and Committee Member Defendants, Lyon claims the State Street Defendants concealed Houlihan's conflict of interest and made misleading disclosures that Houlihan was independent. To support his assertions, Lyon claims that at least State Street, Houlihan, Buth, and Karch were involved in negotiating the purchase price of the ESOP buyout but concealed Houlihan's conflicts in doing so. He also asserts that State Street and others concealed the fact that Houlihan would receive a fee contingent on the ESOP closing, which disqualified it from giving the fairness opinion; that Karch represented at road shows that Houlihan's Paone was independent and that State Street's Driscoll and others failed to correct him; that the prospectus drafted by Houlihan, Buth, Karch, Parker, and State Street did not disclose Houlihan's contingent fee; and that State Street and others glossed over the risks of moving retirement funds from a 401(k) fund to an ESOP. Pl.'s Resp. Br., Dkt. No. 130, at 33–34.

The FAC does not allege facts that support Lyon's contention that the State Street Defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing or prevent Lyon from discovering the facts relevant to his claims. Even if the State Street Defendants knew of a purported conflict, mere silence is not enough to constitute concealment under the exception, and the FAC contains no allegations that the State Street Defendants took affirmative acts to conceal their alleged wrongdoing. *Martin*, 966 F.2d at 1094.

34

The FAC does not allege that the State Street Defendants made any representations concerning Houlihan's contingent fee, had any role in drafting the prospectus, or had a motive to conceal Houlihan's contingent fee. In short, Lyon has failed to allege facts from which the court can infer that the State Street Defendants engaged in a course of conduct designed to conceal the alleged breaches of fiduciary duty with respect to Houlihan's purported conflict.

Lyon also asserts that the State Street Defendants released fraudulently inflated PDC stock prices to the ESOP and the Employee Participants and concealed material valuation irregularities, including the omission of pension and post-retirement liabilities. Although the FAC alleges that the State Street Defendants released the stock prices to the ESOP and the Employee Participants, it does not allege with specificity that the State Street Defendants took any acts to conceal their alleged wrongdoing. Lyon's contention that the State Street Defendants engaged in fraud or concealment is not distinct from the alleged ERISA violations. That is, Lyon has not alleged that the State Street Defendants engaged in acts separate from the substantive breach which aimed to conceal the underlying breach. Again, concealment must occur not only in the course of the fraud itself but must also consist of "steps taken by wrongdoing fiduciaries to cover their tracks." *Id.* at 1095. And although the State Street Defendants collected fees for their services, receiving payment for services rendered does not establish intent or a motive to commit fraud. *See Grove Holding Corp. v. First Wis. Nat'l Bank of Sheboygan*, 803 F. Supp. 1486, 1502 (E.D. Wis. 1992) ("Although [the defendant auditor] apparently received a fee for its services, this is not sufficient to support an inference of scienter.").

Finally, Lyon asserts that statements Driscoll made in a September 2003 Appvion newsletter distributed to employees support fraudulent concealment. In the newsletter, Driscoll described the stock valuation process and stated, among other things, that:

35

- State Street hired Willamette Management Associates "to assist us with our responsibilities for overseeing the plan's investment in PDC stock and for determining the appropriate value for the stock." FAC at ¶ 445.

- State Street's "oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance." *Id.*

- Throughout the oversight process "State Street and Willamette build a greater understanding of Appleton's business operations, the basis for your company's financial projections, and the risks and likelihood of meeting those projections." *Id.*

Though Lyon contends that the State Street Defendants were deficient in their oversight and evaluation of the PDC stock, there is no indication that these statements were either false or made with an intent to deceive or to conceal any fraudulent behavior.

Lyon has failed to allege facts from which the court can infer that each State Street Defendant "engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing." *Martin*, 966 F.2d at 1093. Consequently, Counts I, IV, and VII are barred by 29 U.S.C. § 1113's six-year statute of repose, except to the extent those claims concern the December 2012 valuation. Because the FAC contains no specific allegations against Driscoll and Marzeotti related to events that occurred after November 26, 2012, these defendants will be dismissed.

   **c.  ERISA claims after November 26, 2012**

     **i.  ERISA claims against Reliance are not barred by 29 U.S.C. § 1113's three-year statute of limitations**

Reliance contends that Lyon's ERISA-based claims against it are barred by 28 U.S.C. § 1113's three-year statute of limitations, rather than the six-year statute of limitations, because the ESOP Administrative Committee had actual knowledge of the alleged behavior prior to Lyon's appointment as the sole member of the Committee in August 2017. "Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1176 (3d Cir. 1992). "'The application

36

of the three-year exception to the six-year default rule turns on the meaning of "actual knowledge," which must be distinguished from "constructive" knowledge or inquiry notice.'" *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 678 (7th Cir. 2014) (quoting *Martin*, 966 F.2d at 1086). The Seventh Circuit defines "actual knowledge" as "'knowledge of the essential facts of the transaction or conduct constituting the violation, with the caveat that it is not necessary for a potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its illegality.'" *Id.* at 679 (quoting *Rush v. Martin Petersen Co.*, 83 F.3d 894, 896 (7th Cir. 1996) (internal quotation marks and citations omitted)).

Reliance asserts that, even though Lyon did not discover the alleged violations until his appointment to the ESOP Administrative Committee, the Committee itself is the plaintiff in this case and its previous members had actual knowledge of the alleged wrongdoing. Since Lyon stands in the shoes of the Committee, such knowledge would be imputed to him. Reliance contends that determining whether the Committee had actual knowledge of alleged wrongdoing based solely on the current member's knowledge would allow for a situation where "an entire committee could know of alleged wrongdoing for years and then resign en mass to allow for the prosecution of an otherwise time-barred claim." Defs.' Reply Br., Dkt. No. 145 at 11. On the other hand, imputing actual knowledge from one party to another might "undermine one of the primary purposes of ERISA: To protect pension plans from looting by unscrupulous employers and their agents." *Landwehr v. DuPree*, 72 F.3d 726, 732–33 (9th Cir. 1995). The court need not resolve this issue, however, because, for the reasons stated below, the claims against Reliance fail.

### ii. The FAC fails to state a claim for breach of fiduciary duties against the Trustee Defendants (Count I)

Lyon alleges the Trustee Defendants breached their fiduciary duties in violation of ERISA § 404(a), §29 U.S.C. § 1104(a). "In order to state a claim for breach of fiduciary duty under

37

ERISA, the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'"  *Allen*, 835 F.3d at 678 (quoting *Kenseth*, 610 F.3d at 464).

Lyon claims that the Trustee Defendants violated the duty of prudence when they failed to adequately review the deficient SRR assessment relied upon to value the PDC stock.  Lyon claims that the SRR assessment was deficient because it "failed to account for certain known liabilities, including unfunded pension and post-retirement liabilities," among other reasons.  FAC at ¶¶ 241, 246–318.  Because the Trustee Defendants valued the PDC stock based on SRR's assessment and did not correct for these alleged errors, Lyon asserts the ESOP purchased PDC stock at inflated prices.  The Trustee Defendants contend that Lyon failed to assert specific factual allegations regarding each trustee's processes in evaluating the PDC stock.  Citing *Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016), Lyon asserts that it is enough "to allege facts from which a factfinder could infer that the process was inadequate."  *Id.* at 678.  Indeed, the Seventh Circuit has recognized that "[a] district court errs in making the 'assumption that [the plaintiff] was required to describe directly the ways in which appellees breached their fiduciary duties'; rather, it is 'sufficient for a plaintiff to plead facts indirectly showing unlawful behavior.'"  *Id.* (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)).  But the FAC does not contain allegations from which the court can infer that any of the Trustee Defendants acted imprudently.  The FAC contains conclusory allegations against the Trustee Defendants as a group and fails to explain how each trustee engaged in conduct that would have been imprudent at the time of the valuation or how each trustee's reliance on a particular assessment was unreasonable.  In sum, Lyon has failed to state a claim of imprudence against the Trustee Defendants.

The FAC also fails to state a claim for the other alleged breaches of fiduciary duty against the Trustee Defendants.  Lyon contends that the Trustee Defendants "breached the duty of loyalty

when they put their own interests in receiving fees as the trustee ahead of the Employee Participants." Pl.'s Resp., Dkt. No. 130, at 53. A breach of the duty of loyalty exists when a fiduciary has "substantial conflicts of interest" and does not act "with an eye single to the interests of the participants and beneficiaries." *Chesemore v. Alliance Holdings Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012), *aff'd sub nom. Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016). The FAC fails to assert any action taken by the Trustee Defendants that was self-interested and resulted in a detriment to the Employee Participants. The Trustee Defendants received a fixed fee for their services, and the FAC does not allege that these defendants received an incentive to provide artificially inflated valuations. Further Lyon's assertion that the Trustee Defendants "put[] their interests of Appvion management in receiving bonuses and incentives ahead of the Employee Participants," Pl.'s Resp., Dkt. No. 130, at 53, is not supported by any factual allegations contained in the FAC.

The FAC also fails to state a claim for a breach of the duty to monitor against the Trustee Defendants. "It is well-settled that ERISA's duty to monitor applies only to a person or entity that has the power to appoint and remove an ERISA fiduciary." *Fish v. Greatbanc Tr. Co.*, No. 09 C 1668, 2016 WL 5923448, at *49 (N.D. Ill. Sept. 1, 2016) (citing *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011)). Lyon asserts that the "Trustee Defendants, together with the CEO, were jointly responsible for appointing the members of Appvion's Board of Directors (other than the CEO himself)," and were "required to exercise prudence in the selection, retention, and maintenance of Appvion's Board." *Id.* But, as alleged in the FAC, "after January 1, 2005, no director could be elected without CEO approval and no director could be removed without CEO approval." FAC at ¶ 212. Thus, the Trustee Defendants were limited in their ability to impact the composition of the Board, which effectively gave Appvion's management control. Because the

39

FAC alleges that the Trustee Defendants essentially had no appointment or removal powers, it has failed to state a claim for breach of the duty to monitor.

Lyon further asserts that the Trustee Defendants breached the duty to disclose when they failed to take affirmative steps to correct misrepresentations in the communications the employees received regarding the valuation process. But those communications were made by Appvion and the ESOP Committee, not the Trustee Defendants, and the Trustee Defendants were not required to continuously disclose information about Appvion's financial condition. *See Hill v. The Tribune Co.*, No. 05 C 2602, 2006 WL 2861016, at *20 (N.D. Ill. Sept. 29, 2006), *aff'd sub nom. Pugh*, 521 F.3d 686 ("For plans involving investment in the employer's stock, there is no general duty to continuously disclose information about the financial condition of the employer."); *Herrington v. Household Int'l., Inc.*, No. 02 C 8257, 2004 WL 719355, at *8 (N.D. Ill. Mar. 31, 2004) ("The disclosure standard urged by Plaintiffs in this case is too broad as it would require defendants to continuously gather and disclose nonpublic information bearing some relation to the plan sponsor's financial condition. Such a burdensome and unprecedented level of disclosure has not been approved by the Seventh Circuit . . . ."). Accordingly, the FAC fails to state a claim for beach of the duty to disclose.

Finally, Lyon's claim that the Trustee Defendants did not act in accordance with plan documents fails because Lyon did not identify specific provisions in the plan documents that he believes the Trustee Defendants did not follow. Consequently, the Trustee Defendants' motions to dismiss are granted with respect to Count I.

### iii.     The FAC fails to state a claim of co-fiduciary liability against the Trustee Defendants (Count VII)

Lyon alleges the Trustee Defendants are liable for the breaches of their co-fiduciaries.  A plan fiduciary shall be liable for a breach of the fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA § 405, 29 U.S.C. § 1105.  The FAC alleges that the Trustee Defendants violated § 405 because they failed to properly monitor Willamette and SRR to ensure the share prices they calculated were reasonably accurate and that their processes and information were reasonably reliable.  *See* FAC at ¶ 618.  But Lyon cannot assert a claim under § 405 against the Trustee Defendants on this basis as he concedes that Willamette and SRR are not ERISA fiduciaries.

Lyon also claims that the Trustee Defendants are liable for the breaches and violations of the Director and Committee Member Defendants because the Trustee Defendants were aware of their breaches and violations but made no effort to remedy them.  *Id.* at ¶ 619.  "It is well-established that actual knowledge by a fiduciary is required in order for co-fiduciary liability to attach under § 405(a)."  *Keach v. U.S. Tr. Co.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002) (citing *Donovan*, 716 F.2d at 1467 ("Section 405 does not impose vicarious liability—it requires actual knowledge by the co-fiduciary.")); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 712 (W.D. Mich. 2007) (collecting cases) ("Given the clarity of the statutory language in section 405, the courts hold that actual knowledge is required and that constructive knowledge will not do.").

41

Although the FAC contains a conclusory assertion that the Trustee Defendants knew of the Director and Committee Member Defendants' breaches and failed to remedy those breaches, it identifies no specific facts from which it can be inferred that the Trustee Defendants had actual knowledge of any breaches by the Director and Committee Member Defendants or knowingly participated or concealed an act or omission by those individuals that they knew to be a breach. "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). The FAC fails to state a claim against the Trustee Defendants for co-fiduciary liability under § 405. Accordingly, the Trustee Defendants' motions to dismiss will be granted with respect to Count VII.

### iv. The FAC fails to state a prohibited transaction claim (count IV)

Lyon alleges that the Trustee Defendants' December 2012 valuations constitute prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106. Section 406(a)(1) provides that a plan fiduciary shall not cause the plan to engage in a transaction if he knows or should know that the transaction constitutes a direct or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" or "acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a)." §§ 406(a)(1)(D), (E). "A person cannot 'cause' a prohibited transaction unless he or she 'exercise[s] discretionary authority or control' over whether the plan enters into the transaction." *Fish*, 2016 WL 5923448, at \*60 (quoting *Corrigan*, 883 F.2d at 352 ("The jury's finding that the defendants did not exercise discretionary authority or control over the trustees' decision to sell the trust stock is also a finding that they did not 'cause' the plan to enter into such a transaction.")).

The FAC asserts that the "Trustee Defendants were fiduciaries who caused the ESOP Plan to purchase the Prior Committee Defendants' and the Director Defendants' stock at artificially

high stock prices.  As such, the Trustee Defendants caused the ESOP Plan to engage in prohibited transactions . . . ."  FAC at ¶ 590.  But the Trustee Defendants' valuations did not cause or require the ESOP to engage in a transaction.  While the valuations by the Trustee Defendants may have been necessary for the transaction to occur, the FAC does not contain any allegations that the Trustee Defendants had discretionary authority to demand that the transaction take place.  Instead, the ESOP was ultimately responsible for purchasing stock from PDC or repurchasing shares at the price set by the Trustee Defendants as required by the Plan.  To the extent Lyon claims that the directors and former committee members received incentive payments, that claim is not actionable because the executive compensation-related transactions did not involve any Plan assets.  Accordingly, the FAC does not state a claim under § 406(a).

Lyon also claims the Trustee Defendants violated § 406(b).  Under § 406(b), a plan fiduciary shall not "deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." §§ 406(b)(1), (3).  The FAC does not allege that the Trustee Defendants dealt with the Plan's assets for their own interest or received any consideration from a party dealing with the Plan in connection with a transaction involving the Plan's assets.  The FAC does not state a claim under §§ 406(b)(1) or (3).  Consequently, the FAC fails to state a claim that the Trustee Defendants engaged in a prohibited transaction, and the Trustee Defendants' motions to dismiss will be granted with respect to Count IV.

>
> **v.     The indemnification provisions contained in the agreements between Appvion and the Trustee Defendants is permissible (Count VI)**

Lyon seeks a declaratory judgment that the indemnification provisions contained in the agreements between Appvion and the Trustee Defendants is void under ERISA § 410(a), 29 U.S.C. 1110(a).  Section 410(a) provides that any provision in an agreement which purports to relieve a

43

fiduciary from liability for any duty shall be void as against public policy. § 410(a). The Department of Labor has interpreted this section to allow indemnification agreements that leave the fiduciary "fully responsible and liable" for breaches of a fiduciary obligation and finds that any arrangement for indemnification of a plan fiduciary by a plan is void. *See* 29 C.F.R. § 2509.75-4. Lyon contends that any agreements requiring Appvion to indemnify the Trustee Defendants are void.

The indemnification provisions contained in the agreements between Appvion and the Trustee Defendants are entirely permissible, as each agreement was entered into between each Trustee Defendant and Appvion, not the Plan. Indemnification provisions are enforceable where the provision "permits recourse by the [indemnitor] in the case of a breach of a fiduciary obligation by such fiduciary." § 410(a). Each of the indemnification provisions provide that the indemnitor (Appvion) has no duty to indemnify the fiduciary (the respective Trustee Defendant) in instances where the fiduciary has breached its fiduciary duties. *See* State Street Indemnification Agreement, Dkt. No. 98-4 at 3–4; Amendment to State Street Trust Agreement, Dkt. No. 98-5, at 4; Reliance Trust Agreement, Dkt. No. 1115-1, at 15; Argent Trust Agreement, Dkt. No. 102-2 at 5. And a fiduciary can be indemnified where it succeeds in defending itself against breach of fiduciary duty claims. *See Packer Eng'g, Inc. v. Kratville*, 965 F.2d 174, 176 (7th Cir. 1992) ("How could anyone take seriously the proposition that ERISA forbids the indemnification of fiduciaries wrongly accused of misconduct, when ERISA itself allows a court to award fees to the prevailing side?"). In short, the indemnification provisions in the agreements between the Trustee Defendants and Appvion are permissible. Therefore, the Trustee Defendants' motions to dismiss are granted with respect to Count VI.

44

2.     **The FAC fails to state a federal securities fraud claim against Reliance, Argent, Kaplan, Martin, and Williams (Count XIV)**

Lyon asserts a federal securities fraud claim against Reliance, Argent, Kaplan, Martin, and Williams.  As noted previously, to state a federal securities fraud claim, "a complaint must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Cornielsen*, 916 F.3d at 598 (quoting *Pugh*, 521 F.3d at 693).  The plaintiff "must create a strong inference of scienter with respect to each individual defendant."  *Id.* at 602 (citation omitted).  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 313.  With respect to Reliance and Argent, the FAC fails to meet "the PSLRA's clear statutory prerequisites 'that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each fact or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind."'"  *Id.* at 600 (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363 (5th Cir. 2004)).  The FAC states that Reliance and Argent "directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered their statements misleading."  FAC at ¶¶ 735–36.  But Lyon does not identify the particular fraudulent or untrue statements each defendant made.  In addition, Lyon has not alleged facts from which the court can plausibly infer scienter.  The FAC fails to plead what Reliance or Argent stood to gain from their alleged actions, beyond the collection of fees associated with their work.  Standing alone, the court cannot plausibly infer that Reliance or Argent was motivated to deliberately engage in a scheme to commit fraud.  Consequently, the FAC fails to

45

state a claim for federal securities fraud against Reliance and Argent, and their motions to dismiss will be granted with respect to Count XIV.

As to Kaplan, Martin, and Williams, the FAC fails to state a claim for federal securities fraud against them because it does not sufficiently plead scienter.  "A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Cornielsen*, 916 F.3d at 599 (quoting *Sears*, 912 F.2d at 893).  Here, the FAC does not identify any actions by the individual trustee employee defendants, and instead relies on their positions with their employers as the basis for this claim.  Therefore, the individual trustee defendants' motion to dismiss is granted with respect to Count XIV.

### 3.    The FAC fails to plead a claim for securities fraud under Wisconsin law against Reliance, Argent, Kaplan, Martin, and Williams (Count XIII)

The FAC alleges that Reliance, Agent, Kaplan, Martin, and Williams violated the Wisconsin Uniform Securities Act (WUSA), Wis. Stat. § 551.501, *et seq.*  As explained previously, the WUSA does not apply to claims based on interests in a contributory or noncontributory pension or welfare plan subject to ERISA.  *See* Wis. Stat. § 551.102(28)(c).  Accordingly, Lyon's claim for securities fraud under Wisconsin law against these defendants will be dismissed.

### E.    The Independent Appraiser Defendants

The FAC asserts a number of claims against the Independent Appraiser Defendants, which consist of Willamette as well as SRR, Scott Levine, Aziz El-Tahch, and Robert Socol (the SRR Defendants).  These defendants were retained by the Trustee Defendants to conduct semi-annual valuations of the PDC stock.  Willamette served as the first independent appraiser for the ESOP, performing its first evaluation of the PDC stock in 2001 and its last in December 2004.  Levine, El-Tahch, and Socol all worked at Willamette before joining SRR in 2004.  The SRR Defendants evaluated the PDC stock from June 2005 through June 2017.  Lyon asserts the following claims

46

against the Appraiser Defendants: knowing participation in breaches of fiduciary duty under ERISA (Count VIII) as well as Wisconsin state law claims of fraud (Count IX) and negligent misrepresentation (Count XI).  Lyon also asserts a securities fraud claim under Wisconsin law (Count XIII) and a federal securities fraud claim (Count XIV) against the SRR Defendants.

### 1.    ERISA claims

#### a.    The ERISA claims against Willamette related to events that occurred prior to November 26, 2012 are barred by ERISA's six-year statute of repose (Count VIII)

The last action Lyon alleges against Willamette took place in 2004, the last date of any valuation performed by Willamette.  Willamette asserts that the ERISA claims against it are barred by ERISA's six-year statute of repose, 29 U.S.C. § 1113.  Lyon maintains that the statute of repose period is tolled by the fraud and concealment exception.  He alleges that Willamette's Rick Braun failed to correct a representation that Karch made in a road show presentation regarding Houlihan's independence; that Willamette and others concealed the fact that Houlihan was receiving a contingent fee; and that Willamette glossed over the risks of moving retirement funds from a 401(k) fund to an ESOP.  Pl.'s Resp. Br., Dkt. No. 130, at 33–34.

The FAC does not allege facts that support Lyon's assertion that Willamette engaged in fraud or concealment to warrant application of § 1113's exception.  Even if Willamette knew of a purported conflict with Houlihan, which the FAC does not allege, mere silence is not enough to constitute concealment under the exception.  *See Martin*, 966 F.2d at 1094.  In addition, while Lyon asserts that Willamette knowingly participated in a prohibited transaction by helping negotiate the price, helping set the initial share price, advising that the transaction was fair to the ESOP, and ultimately approving the transaction, Lyon's claims of fraud or concealment are not distinct from the ERISA violations.  In other words, Lyon has not alleged that Willamette engaged in acts separate from the substantive breach to conceal the underlying breach.  *See Wolin*, 83 F.3d

47

at 851–52.  Because Lyon has not alleged that Willamette "engaged in a course of conduct designed to conceal evidence of [its] alleged wrongdoing," *Martin*, 966 F.2d at 1093, Count VIII is barred by the statute of repose and will be dismissed.

> **b.    The FAC fails to plead a claim of knowing participation in a breach of fiduciary duty claim against the SRR Defendants (Count VIII)**

Lyon claims the SRR Defendants knowingly participated in breaches of fiduciary duty pursuant to ERISA § 502(a)(3).  In particular, he alleges that the SRR Defendants knew that the Trustee Defendants relied on their opinions in setting the fair market value of PDC stock and knew that the Trustee Defendants failed to conduct appropriate diligence and breached their fiduciary duties to the ESOP.  FAC at ¶ 624.  The SRR Defendants assert that a nonfiduciary's knowing participation in a fiduciary breach does not give rise to a § 502(a)(3) claim.  In *Mertens v. Hewitt Associates*, the Supreme Court noted, in dicta, that ERISA § 502(a)(3) does not provide a private cause of action against a nonfiduciary for knowing participation in a fiduciary's breach of duty under § 404.  508 U.S. 248, 253–54 (1993).  The Seventh Circuit subsequently affirmed the dismissal of a claim against a nonfiduciary for knowing participation in a breach of fiduciary duty in *Reich v. Continental Casualty Co.*, 33 F.3d 754 (7th Cir. 1994), observing that "[a] majority of the Supreme Court has made clear its view that Congress's omission to impose on nonfiduciaries a duty not to participate knowingly in an ERISA fiduciary's breach of fiduciary obligations was not inadvertent."  *Id.* at 757.

Citing *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000), Lyon contends that § 502(a)(3) allows equitable relief against nonfiduciaries who knowingly participate in breaches of fiduciary duty by plan fiduciaries.  In *Harris*, the Supreme Court addressed whether ERISA authorized a cause of action against a nonfiduciary for engaging in a transaction prohibited under ERISA § 406.  The Court concluded that ERISA did allow a claim

48

against a nonfiduciary party in interest who knowingly participated in a transaction prohibited under § 406.  *Id.* at 241.  Although the Court did not consider whether § 502(a)(3) authorizes a claim against a nonfiduciary for participating in a fiduciary breach under ERISA § 404, Lyon asserts that the case contains "broad language" that can support a claim for a nonfiduciary's knowing participation in breaches of fiduciary duties.  Pl.'s Resp. Br., Dkt. No. 130, at 64.

The Seventh Circuit has not yet addressed whether ERISA authorizes claims against a nonfiduciary for knowing participation of breaches of fiduciary duty following the Supreme Court's decision in *Harris*, but other circuit courts that have addressed the issue have continued to find that a nonfiduciary's knowing participation in a breach of fiduciary duty is not actionable under § 502(a)(3).  *See Renfro v. Unisys Corp.*, 671 F.3d 314, 325 (3d Cir. 2011) ("[W]e find *Mertens* persuasive and hold that 29 U.S.C. § 1132(a)(3) does not authorize suit against nonfiduciaries charged solely with participating in a fiduciary breach."); *Gervosa v. Savasta & Co.*, 329 F.3d 317, 322–23 (2d Cir. 2003) (holding that a cause of action against a nonfiduciary for knowing participation in a breach of fiduciary duty would be an impermissible judicially-created interstitial remedy under Supreme Court precedent); *Gordon v. Cigna Corp.*, 890 F.3d 463, 477 n.2 (4th Cir. 2018) (expressing doubt that a cause of action against a nonfiduciary for participation in a breach of fiduciary duties exists).  The court finds the reasoning of these cases persuasive and concludes that ERISA does not authorize a claim for knowing participation in a § 404 fiduciary breach.  Lyon's claim against the SRR Defendants is for a knowing participation in the Trustee Defendants' breach of fiduciary duty.  Because ERISA does not authorize this cause of action, Count VIII must be dismissed.

49

2.      **The FAC fails to state a claim for federal securities fraud against the SRR Defendants (Count XIV)**

Lyon asserts a federal securities fraud claim against the SRR Defendants.  As noted previously, to state a claim for federal securities fraud, "a complaint must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Cornielsen*, 916 F.3d at 598 (quoting *Pugh*, 521 F.3d at 693).  The FAC fails to plead scienter.  Lyon alleges that the SRR Defendants knew that the valuation analyses contained significant flaws and irregularities.  But these allegations are insufficient to infer scienter or an intent to deceive.  Absent specific allegations regarding an intent to deceive, the court cannot infer that the SRR Defendants intended to deceive the ESOP without receiving any benefit from the alleged deception.  The fact that the SRR Defendants received a fix fee in connection with SRR's services, without more, does not establish the requisite intent.  *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) ("Typically, an accountant's interest in fees, standing alone, will not suffice to establish fraudulent intent.").  Accordingly, the SRR Defendants' motion to dismiss will be granted with respect to Count XIV.

3.      **State Law Claims**

a.      **ERISA preempts the negligent misrepresentation and fraud claims (Counts IX and XI)**

The Appraiser Defendants assert that the state law claims of negligent misrepresentation and fraud are preempted by ERISA.  ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" created by any employer engaged in interstate commerce.  ERISA § 514(a), 29 U.S.C. § 1144(a); *see also Pohl*, 956 F.2d at 127.  In

50

this case, Lyon's state law claims against the Appraiser Defendants are preempted because they relate to the ESOP, an ERISA-governed plan.

Although Lyon asserts that his claims are akin to "garden variety" professional malpractice claims, he has not asserted professional malpractice claims against the Appraiser Defendants. Pl.'s Resp. Br., Dkt. No. 130, at 72. Instead, Lyon's claims are premised on "Defendants' breaches of fiduciary duties and fraudulent misrepresentations and omissions to the ESOP Plan." FAC at ¶ 2. Lyon alleges that the Appraiser Defendants made misrepresentations that induced the ESOP Plan and the Employee Participants to purchase shares of PDC stock and that the Appraiser Defendants intentionally or negligently overvalued the shares of PDC stock, causing the Plan to overpay for company stock. But the Appraiser Defendants' role as appraisers stems from the Plan. The FAC acknowledges that "[u]nder the Trust Documents, the Trustee Defendants were required to retain an 'Independent Appraiser,' as described by Section 401(a)(28)(C) of the Internal Revenue Code, to value PDC stock" and that the valuations were reviewed and finalized "in accordance with Section 3(18)(B) of ERISA, which requires the fair market value to be determined in good faith by the trustee." FAC at ¶ 186. It thus follows that the Appraiser Defendants' engagement arose out of the ERISA fiduciary obligations to have the Plan's stock holdings valued by an independent appraiser and that their conduct related directly to the Plan's administration. Lyon's claim, at its core, relates to an ESOP plan. Allowing these state law claims to proceed would create a cause of action that supplements what ERISA already provides. Therefore, Lyon's state law claims of negligent misrepresentation and fraud against the Appraiser Defendants are preempted by ERISA and must be dismissed.

   b.    **The FAC fails to state a claim for securities fraud under Wisconsin law against the SRR Defendants (Count XIII)**

The FAC alleges that the SRR Defendants violated the Wisconsin Uniform Securities Act (WUSA), Wis. Stat. § 551.501, *et seq.* As explained previously, the WUSA does not apply to claims based on interests in a contributory or noncontributory pension or welfare plan subject to ERISA.  *See* Wis. Stat. § 551.102(28)(c).  Accordingly, Lyon's claim for securities fraud under Wisconsin law will be dismissed.

## CONCLUSION

For these reasons, the former Director and Committee Member Defendants and the uninvolved spouses' motion to dismiss (Dkt. No. 105), the Houlihan Defendants' motion to dismiss (Dkt. No. 109), the State Street Defendants' motion to dismiss (Dkt. No. 96), Reliance's motion to dismiss (Dkt. No. 114), Argent's motion to dismiss (Dkt. No. 101), the Individual Trustee Defendants' motion to dismiss (Dkt. No. 112), Willamette's motion to dismiss (Dkt. No. 94), and the SRR Defendants' motion to dismiss (Dkt. No. 107) are **GRANTED**.  The FAC fails to state a claim upon which relief can be granted and will be dismissed for that reason pursuant to Federal Rule of Civil Procedure 12(b)(6).  The dismissal is without prejudice, however, and Lyon will be allowed thirty days from the date of this order in which to file an amended complaint curing the defects noted herein.  If no amended complaint is filed within the time allowed, the case will be dismissed.

**SO ORDERED** at Green Bay, Wisconsin this 27th day of July, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

52

# STATUTORY ADDENDUM

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78j

§ 78j. Manipulative and deceptive devices [Statutory
Text & Notes of Decisions subdivisions I to XI]

Currentness

<Notes of Decisions for 15 USCA § 78j are displayed in multiple documents.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

**(a)(1)** To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Paragraph (1) of this subsection shall not apply to security futures products.

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(c)(1)** To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of Title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q(a) of this title and sections 78i, 78*o*, 78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

## CREDIT(S)

(June 6, 1934, c. 404, Title I, § 10, 48 Stat. 891; Pub.L. 106-554, § 1(a)(5) [Title II, § 206(g), Title III, § 303(d)], Dec. 21, 2000, 114 Stat. 2763, 2763A-432, 2763A-454; Pub.L. 111-203, Title VII, § 762(d)(3), Title IX, §§ 929L(2), 984(a), July 21, 2010, 124 Stat. 1761, 1861, 1932.)

## Footnotes

1      So in original. Probably should be followed by a comma.

15 U.S.C.A. § 78j, 15 USCA § 78j
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 29. Labor
      Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
         Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
            Subtitle A. General Provisions

29 U.S.C.A. § 1002

§ 1002. Definitions

Effective: December 29, 2022
Currentness

For purposes of this subchapter:

**(1)** The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

**(2)(A)** Except as provided in subparagraph (B), the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--

   **(i)** provides retirement income to employees, or

   **(ii)** results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution.

**(B)** The Secretary may by regulation prescribe rules consistent with the standards and purposes of this chapter providing one or more exempt categories under which--

   **(i)** severance pay arrangements, and

   **(ii)** supplemental retirement income payments, under which the pension benefits of retirees or their beneficiaries are supplemented to take into account some portion or all of the increases in the cost of living (as determined by the Secretary of Labor) since retirement,

shall, for purposes of this subchapter, be treated as welfare plans rather than pension plans. In the case of any arrangement or payment a principal effect of which is the evasion of the standards or purposes of this chapter applicable to pension plans, such arrangement or payment shall be treated as a pension plan. An applicable voluntary early retirement incentive plan (as defined in section 457(e)(11)(D)(ii) of Title 26) making payments or supplements described in section 457(e)(11)(D)(i) of Title 26, and an applicable employment retention plan (as defined in section 457(f)(4)(C) of Title 26) making payments of benefits described in section 457(f)(4)(A) of Title 26, shall, for purposes of this subchapter, be treated as a welfare plan (and not a pension plan) with respect to such payments and supplements.

**(C)** A pooled employer plan shall be treated as--

   **(i)** a single employee pension benefit plan or single pension plan; and

   **(ii)** a plan to which section 1060(a) of this title applies.

**(3)** The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(4)** The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

**(5)** The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

**(6)** The term "employee" means any individual employed by an employer.

**(7)** The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

**(8)** The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.

**(9)** The term "person" means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.

**(10)** The term "State" includes any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, and the Canal Zone. The term "United States" when used in the geographic sense means the States and the Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act (43 U.S.C. 1331-1343).

**(11)** The term "commerce" means trade, traffic, commerce, transportation, or communication between any State and any place outside thereof.

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(12)** The term "industry or activity affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce, and includes any activity or industry "affecting commerce" within the meaning of the Labor Management Relations Act, 1947, or the Railway Labor Act.

**(13)** The term "Secretary" means the Secretary of Labor.

**(14)** The term "party in interest" means, as to an employee benefit plan--

**(A)** any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;

**(B)** a person providing services to such plan;

**(C)** an employer any of whose employees are covered by such plan;

**(D)** an employee organization any of whose members are covered by such plan;

**(E)** an owner, direct or indirect, of 50 percent or more of--

**(i)** the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation. [1]

**(ii)** the capital interest or the profits interest of a partnership, or

**(iii)** the beneficial interest of a trust or unincorporated enterprise,

which is an employer or an employee organization described in subparagraph (C) or (D);

**(F)** a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E);

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(G)** a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of--

**(i)** the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,

**(ii)** the capital interest or profits interest of such partnership, or

**(iii)** the beneficial interest of such trust or estate,

is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

**(H)** an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder directly or indirectly, of a person described in subparagraph (B), (C), (D), (E), or (G), or of the employee benefit plan; or

**(I)** a 10 percent or more (directly or indirectly in capital or profits) partner or joint venturer of a person described in subparagraph (B), (C), (D), (E), or (G).

The Secretary, after consultation and coordination with the Secretary of the Treasury, may by regulation prescribe a percentage lower than 50 percent for subparagraph (E) and (G) and lower than 10 percent for subparagraph (H) or (I). The Secretary may prescribe regulations for determining the ownership (direct or indirect) of profits and beneficial interests, and the manner in which indirect stockholdings are taken into account. Any person who is a party in interest with respect to a plan to which a trust described in section 501(c)(22) of Title 26 is permitted to make payments under section 1403 of this title shall be treated as a party in interest with respect to such trust.

**(15)** The term "relative" means a spouse, ancestor, lineal descendant, or spouse of a lineal descendant.

**(16)(A)** The term "administrator" means--

**(i)** the person specifically so designated by the terms of the instrument under which the plan is operated;

**(ii)** if an administrator is not so designated, the plan sponsor; or

**(iii)** in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

**(B)** The term "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan, or (iv) in the case of a pooled employer plan, the pooled plan provider.

**(17)** The term "separate account" means an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company.

**(18)** The term "adequate consideration" when used in part 4 of subtitle B means (A) in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange which is registered under section 78f of Title 15, or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.

**(19)** The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan. For purposes of this paragraph, a right to an accrued benefit

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

derived from employer contributions shall not be treated as forfeitable merely because the plan contains a provision described in section 1053(a)(3) of this title.

**(20)** The term "security" has the same meaning as such term has under section 77b(1) of Title 15.

**(21)(A)** Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

**(B)** If any money or other property of an employee benefit plan is invested in securities issued by an investment company registered under the Investment Company Act of 1940 such investment shall not by itself cause such investment company or such investment company's investment adviser or principal underwriter to be deemed to be a fiduciary or a party in interest as those terms are defined in this subchapter, except insofar as such investment company or its investment adviser or principal underwriter acts in connection with an employee benefit plan covering employees of the investment company, the investment adviser, or its principal underwriter. Nothing contained in this subparagraph shall limit the duties imposed on such investment company, investment adviser, or principal underwriter by any other law.

**(22)** The term "normal retirement benefit" means the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age. The normal retirement benefit shall be determined without regard to--

**(A)** medical benefits, and

**(B)** disability benefits not in excess of the qualified disability benefit.

For purposes of this paragraph, a qualified disability benefit is a disability benefit provided by a plan which does not exceed the benefit which would be provided for the participant if he separated from the service at normal retirement age. For purposes of this paragraph, the early retirement

benefit under a plan shall be determined without regard to any benefit under the plan which the Secretary of the Treasury finds to be a benefit described in section 1054(b)(1)(G) of this title.

**(23)** The term "accrued benefit" means--

   **(A)** in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age, or

   **(B)** in the case of a plan which is an individual account plan, the balance of the individual's account.

The accrued benefit of an employee shall not be less than the amount determined under section 1054(c)(2)(B) of this title with respect to the employee's accumulated contribution.

**(24)** The term "normal retirement age" means the earlier of--

   **(A)** the time a plan participant attains normal retirement age under the plan, or

   **(B)** the later of--

      **(i)** the time a plan participant attains age 65, or

      **(ii)** the 5th anniversary of the time a plan participant commenced participation in the plan.

**(25)** The term "vested liabilities" means the present value of the immediate or deferred benefits available at normal retirement age for participants and their beneficiaries which are nonforfeitable.

**(26)** The term "current value" means fair market value where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary (as defined in section 1102(a)(2) of this title) pursuant to the terms of the plan and in accordance with regulations of the Secretary, assuming an orderly liquidation at the time of such determination.

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(27)** The term "present value", with respect to a liability, means the value adjusted to reflect anticipated events. Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe.

**(28)** The term "normal service cost" or "normal cost" means the annual cost of future pension benefits and administrative expenses assigned, under an actuarial cost method, to years subsequent to a particular valuation date of a pension plan. The Secretary of the Treasury may prescribe regulations to carry out this paragraph.

**(29)** The term "accrued liability" means the excess of the present value, as of a particular valuation date of a pension plan, of the projected future benefit costs and administrative expenses for all plan participants and beneficiaries over the present value of future contributions for the normal cost of all applicable plan participants and beneficiaries. The Secretary of the Treasury may prescribe regulations to carry out this paragraph.

**(30)** The term "unfunded accrued liability" means the excess of the accrued liability, under an actuarial cost method which so provides, over the present value of the assets of a pension plan. The Secretary of the Treasury may prescribe regulations to carry out this paragraph.

**(31)** The term "advance funding actuarial cost method" or "actuarial cost method" means a recognized actuarial technique utilized for establishing the amount and incidence of the annual actuarial cost of pension plan benefits and expenses. Acceptable actuarial cost methods shall include the accrued benefit cost method (unit credit method), the entry age normal cost method, the individual level premium cost method, the aggregate cost method, the attained age normal cost method, and the frozen initial liability cost method. The terminal funding cost method and the current funding (pay-as-you-go) cost method are not acceptable actuarial cost methods. The Secretary of the Treasury shall issue regulations to further define acceptable actuarial cost methods.

**(32)** The term "governmental plan" means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing. The term "governmental plan" also includes any plan to which the Railroad Retirement Act of 1935, or 1937 applies, and which is financed by contributions required under that Act and any plan of an international organization which is exempt from taxation under the provisions of the International Organizations Immunities Act. The term "governmental plan" includes a plan which is established and maintained by an Indian tribal government (as defined in section 7701(a)(40) of Title 26), a subdivision of an

Indian tribal government (determined in accordance with section 7871(d) of Title 26), or an agency or instrumentality of either, and all of the participants of which are employees of such entity substantially all of whose services as such an employee are in the performance of essential governmental functions but not in the performance of commercial activities (whether or not an essential government function) [2]

**(33)(A)** The term "church plan" means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

**(B)** The term "church plan" does not include a plan--

**(i)** which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of Title 26), or

**(ii)** if less than substantially all of the individuals included in the plan are individuals described in subparagraph (A) or in clause (ii) of subparagraph (C) (or their beneficiaries).

**(C)** For purposes of this paragraph--

**(i)** A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

**(ii)** The term employee of a church or a convention or association of churches includes--

**(I)** a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

**(II)** an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches; and

**(III)** an individual described in clause (v).

**(iii)** A church or a convention or association of churches which is exempt from tax under section 501 of Title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

**(iv)** An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

**(v)** If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches, the church plan shall not fail to meet the requirements of this paragraph merely because the plan--

**(I)** retains the employee's accrued benefit or account for the payment of benefits to the employee or his beneficiaries pursuant to the terms of the plan; or

**(II)** receives contributions on the employee's behalf after the employee's separation from such service, but only for a period of 5 years after such separation, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7) of Title 26) at the time of such separation from service.

**(D)(i)** If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26 fails to meet one or more of the requirements of this paragraph and corrects its failure to meet

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

such requirements within the correction period, the plan shall be deemed to meet the requirements of this paragraph for the year in which the correction was made and for all prior years.

**(ii)** If a correction is not made within the correction period, the plan shall be deemed not to meet the requirements of this paragraph beginning with the date on which the earliest failure to meet one or more of such requirements occurred.

**(iii)** For purposes of this subparagraph, the term "correction period" means--

**(I)** the period ending 270 days after the date of mailing by the Secretary of the Treasury of a notice of default with respect to the plan's failure to meet one or more of the requirements of this paragraph; or

**(II)** any period set by a court of competent jurisdiction after a final determination that the plan fails to meet such requirements, or, if the court does not specify such period, any reasonable period determined by the Secretary of the Treasury on the basis of all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or

**(III)** any additional period which the Secretary of the Treasury determines is reasonable or necessary for the correction of the default,

whichever has the latest ending date.

**(34)** The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

**(35)** The term "defined benefit plan" means a pension plan other than an individual account plan; except that a pension plan which is not an individual account plan and which provides a benefit derived from employer contributions which is based partly on the balance of the separate account of a participant--

**(A)** for the purposes of section 1052 of this title, shall be treated as an individual account plan, and

**(B)** for the purposes of paragraph (23) of this section and section 1054 of this title, shall be treated as an individual account plan to the extent benefits are based upon the separate account of a participant and as a defined benefit plan with respect to the remaining portion of benefits under the plan.

**(36)** The term "excess benefit plan" means a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan.

**(37)(A)** The term "multiemployer plan" means a plan--

**(i)** to which more than one employer is required to contribute,

**(ii)** which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

**(iii)** which satisfies such other requirements as the Secretary may prescribe by regulation.

**(B)** For purposes of this paragraph, all trades or businesses (whether or not incorporated) which are under common control within the meaning of section 1301(b)(1) of this title are considered a single employer.

**(C)** Notwithstanding subparagraph (A), a plan is a multiemployer plan on and after its termination date if the plan was a multiemployer plan under this paragraph for the plan year preceding its termination date.

**(D)** For purposes of this subchapter, notwithstanding the preceding provisions of this paragraph, for any plan year which began before September 26, 1980, the term "multiemployer plan" means a plan described in this paragraph (37) as in effect immediately before such date.

**(E)** Within one year after September 26, 1980, a multiemployer plan may irrevocably elect, pursuant to procedures established by the corporation and subject to the provisions of sections 1453(b) and (c) of this title, that the plan shall not be treated as a multiemployer plan for all purposes under this chapter or the Internal Revenue Code of 1954 if for each of the last 3 plan years ending prior to the effective date of the Multiemployer Pension Plan Amendments Act of 1980--

**(i)** the plan was not a multiemployer plan because the plan was not a plan described in subparagraph (A)(iii) of this paragraph and section 414(f)(1)(C) of Title 26 (as such provisions were in effect on the day before September 26, 1980); and

**(ii)** the plan had been identified as a plan that was not a multiemployer plan in substantially all its filings with the corporation, the Secretary of Labor and the Secretary of the Treasury.

**(F)(i)** For purposes of this subchapter a qualified football coaches plan--

**(I)** shall be treated as a multiemployer plan to the extent not inconsistent with the purposes of this subparagraph; and

**(II)** notwithstanding section 401(k)(4)(B) of Title 26, may include a qualified cash and deferred arrangement.

**(ii)** For purposes of this subparagraph, the term "qualified football coaches plan" means any defined contribution plan which is established and maintained by an organization--

**(I)** which is described in section 501(c) of Title 26;

**(II)** the membership of which consists entirely of individuals who primarily coach football as full-time employees of 4-year colleges or universities described in section 170(b)(1)(A)(ii) of Title 26; and

Case: 23-1073     Document: 34     Filed: 05/17/2023     Pages: 270

**(III)** which was in existence on September 18, 1986.

**(G)(i)** Within 1 year after August 17, 2006--

**(I)** an election under subparagraph (E) may be revoked, pursuant to procedures prescribed by the Pension Benefit Guaranty Corporation, if, for each of the 3 plan years prior to August 17, 2006, the plan would have been a multiemployer plan but for the election under subparagraph (E), and

**(II)** a plan that meets the criteria in clauses (i) and (ii) of subparagraph (A) of this paragraph or that is described in clause (vi) may, pursuant to procedures prescribed by the Pension Benefit Guaranty Corporation, elect to be a multiemployer plan, if--

**(aa)** for each of the 3 plan years immediately preceding the first plan year for which the election under this paragraph is effective with respect to the plan, the plan has met those criteria or is so described,

**(bb)** substantially all of the plan's employer contributions for each of those plan years were made or required to be made by organizations that were exempt from tax under section 501 of Title 26, and

**(cc)** the plan was established prior to September 2, 1974.

**(ii)** An election under this subparagraph shall be effective for all purposes under this chapter and under Title 26, starting with any plan year beginning on or after January 1, 1999, and ending before January 1, 2008, as designated by the plan in the election made under clause (i)(II).

**(iii)** Once made, an election under this subparagraph shall be irrevocable, except that a plan described in clause (i)(II) shall cease to be a multiemployer plan as of the plan year beginning immediately after the first plan year for which the majority of its employer contributions were made or required to be made by organizations that were not exempt from tax under section 501 of Title 26.

**(iv)** The fact that a plan makes an election under clause (i)(II) does not imply that the plan was not a multiemployer plan prior to the date of the election or would not be a multiemployer plan without regard to the election.

**(v)(I)** No later than 30 days before an election is made under this subparagraph, the plan administrator shall provide notice of the pending election to each plan participant and beneficiary, each labor organization representing such participants or beneficiaries, and each employer that has an obligation to contribute to the plan, describing the principal differences between the guarantee programs under subchapter III and the benefit restrictions under this subchapter for single employer and multiemployer plans, along with such other information as the plan administrator chooses to include.

**(II)** Within 180 days after August 17, 2006, the Secretary shall prescribe a model notice under this clause.

**(III)** A plan administrator's failure to provide the notice required under this subparagraph shall be treated for purposes of section 1132(c)(2) of this title as a failure or refusal by the plan administrator to file the annual report required to be filed with the Secretary under section 1021(b)(1) of this title.

**(vi)** A plan is described in this clause if it is a plan sponsored by an organization which is described in section 501(c)(5) of Title 26 and exempt from tax under section 501(a) of such title and which was established in Chicago, Illinois, on August 12, 1881.

**(vii)** For purposes of this chapter and Title 26, a plan making an election under this subparagraph shall be treated as maintained pursuant to a collective bargaining agreement if a collective bargaining agreement, expressly or otherwise, provides for or permits employer contributions to the plan by one or more employers that are signatory to such agreement, or participation in the plan by one or more employees of an employer that is signatory to such agreement, regardless of whether the plan was created, established, or maintained for such employees by virtue of another document that is not a collective bargaining agreement.

**(38)** The term "investment manager" means any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title)--

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(A)** who has the power to manage, acquire, or dispose of any asset of a plan;

**(B)** who (i) is registered as an investment adviser under the Investment Advisers Act of 1940; (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act, is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary; (iii) is a bank, as defined in that Act; or (iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

**(C)** has acknowledged in writing that he is a fiduciary with respect to the plan.

**(39)** The terms "plan year" and "fiscal year of the plan" mean, with respect to a plan, the calendar, policy, or fiscal year on which the records of the plan are kept.

**(40)(A)** The term "multiple employer welfare arrangement" means an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries, except that such term does not include any such plan or other arrangement which is established or maintained--

**(i)** under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements,

**(ii)** by a rural electric cooperative, or

**(iii)** by a rural telephone cooperative association.

**(B)** For purposes of this paragraph--

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(i)** two or more trades or businesses, whether or not incorporated, shall be deemed a single employer if such trades or businesses are within the same control group,

**(ii)** the term "control group" means a group of trades or businesses under common control,

**(iii)** the determination of whether a trade or business is under "common control" with another trade or business shall be determined under regulations of the Secretary applying principles similar to the principles applied in determining whether employees of two or more trades or businesses are treated as employed by a single employer under section 1301(b) of this title, except that, for purposes of this paragraph, common control shall not be based on an interest of less than 25 percent,

**(iv)** the term "rural electric cooperative" means--

    **(I)** any organization which is exempt from tax under section 501(a) of Title 26 and which is engaged primarily in providing electric service on a mutual or cooperative basis, and

    **(II)** any organization described in paragraph (4) or (6) of section 501(c) of Title 26 which is exempt from tax under section 501(a) of Title 26 and at least 80 percent of the members of which are organizations described in subclause (I), and

**(v)** the term "rural telephone cooperative association" means an organization described in paragraph (4) or (6) of section 501(c) of Title 26 which is exempt from tax under section 501(a) of Title 26 and at least 80 percent of the members of which are organizations engaged primarily in providing telephone service to rural areas of the United States on a mutual, cooperative, or other basis.

**(41)** Single-employer plan

The term "single-employer plan" means an employee benefit plan other than a multiemployer plan.

**(42)** the [3] term "plan assets" means plan assets as defined by such regulations as the Secretary may prescribe, except that under such regulations the assets of any entity shall not be treated as

plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than 25 percent of the total value of each class of equity interest in the entity is held by benefit plan investors. For purposes of determinations pursuant to this paragraph, the value of any equity interest held by a person (other than such a benefit plan investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded for purposes of calculating the 25 percent threshold. An entity shall be considered to hold plan assets only to the extent of the percentage of the equity interest held by benefit plan investors. For purposes of this paragraph, the term "benefit plan investor" means an employee benefit plan subject to part 4, [4] any plan to which section 4975 of Title 26 applies, and any entity whose underlying assets include plan assets by reason of a plan's investment in such entity.

**(43) Pooled employer plan**

**(A) In general**

The term "pooled employer plan" means a plan--

**(i)** which is an individual account plan established or maintained for the purpose of providing benefits to the employees of 2 or more employers;

**(ii)** which is a plan described in section 401(a) of Title 26 which includes a trust exempt from tax under section 501(a) of Title 26, a plan that consists of annuity contracts described in section 403(b) of Title 26, or a plan that consists of individual retirement accounts described in section 408 of Title 26 (including by reason of subsection (c) thereof); and

**(iii)** the terms of which meet the requirements of subparagraph (B).

Such term shall not include a plan maintained by employers which have a common interest other than having adopted the plan, but such term shall include any plan (other than a plan excepted from the application of this subchapter by section 1003(b)(2) of this title) maintained for the benefit of the employees of more than 1 employer that consists of annuity contracts described in section 403(b) of Title 26 and that meets the requirements of subparagraph (B) of section 413(e)(1) of Title 26.

**(B) Requirements for plan terms**

The requirements of this subparagraph are met with respect to any plan if the terms of the plan--

**(i)** designate a pooled plan provider and provide that the pooled plan provider is a named fiduciary of the plan;

**(ii)** designate a named fiduciary (other than an employer in the plan) to be responsible for collecting contributions to the plan and require such fiduciary to implement written contribution collection procedures that are reasonable, diligent, and systematic;

**(iii)** provide that each employer in the plan retains fiduciary responsibility for--

**(I)** the selection and monitoring in accordance with section 1104(a) of this title of the person designated as the pooled plan provider and any other person who, in addition to the pooled plan provider, is designated as a named fiduciary of the plan; and

**(II)** to the extent not otherwise delegated to another fiduciary by the pooled plan provider and subject to the provisions of section 1104(c) of this title, the investment and management of the portion of the plan's assets attributable to the employees of the employer (or beneficiaries of such employees);

**(iv)** provide that employers in the plan, and participants and beneficiaries, are not subject to unreasonable restrictions, fees, or penalties with regard to ceasing participation, receipt of distributions, or otherwise transferring assets of the plan in accordance with section 1058 of this title or paragraph (44)(C)(i)(II); [5]

**(v)** require--

**(I)** the pooled plan provider to provide to employers in the plan any disclosures or other information which the Secretary may require, including any disclosures or other

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

information to facilitate the selection or any monitoring of the pooled plan provider by employers in the plan; and

**(II)** each employer in the plan to take such actions as the Secretary or the pooled plan provider determines are necessary to administer the plan or for the plan to meet any requirement applicable under this chapter or Title 26 to a plan described in section 401(a) of Title 26, a plan that consists of annuity contracts described in section 403(b) of Title 26, or to a plan that consists of individual retirement accounts described in section 408 of Title 26 (including by reason of subsection (c) thereof), whichever is applicable, including providing any disclosures or other information which the Secretary may require or which the pooled plan provider otherwise determines are necessary to administer the plan or to allow the plan to meet such requirements; and

**(vi)** provide that any disclosure or other information required to be provided under clause (v) may be provided in electronic form and will be designed to ensure only reasonable costs are imposed on pooled plan providers and employers in the plan.

**(C) Exceptions**

The term "pooled employer plan" does not include--

**(i)** a multiemployer plan; or

**(ii)** a plan established before December 20, 2019, unless the plan administrator elects that the plan will be treated as a pooled employer plan and the plan meets the requirements of this subchapter applicable to a pooled employer plan established on or after such date.

**(D) Treatment of employers as plan sponsors**

Except with respect to the administrative duties of the pooled plan provider described in paragraph (44)(A)(i), each employer in a pooled employer plan shall be treated as the plan sponsor with respect to the portion of the plan attributable to employees of such employer (or beneficiaries of such employees).

**(44) Pooled plan provider**

**(A) In general**

The term "pooled plan provider" means a person who--

**(i)** is designated by the terms of a pooled employer plan as a named fiduciary, as the plan administrator, and as the person responsible for the performance of all administrative duties (including conducting proper testing with respect to the plan and the employees of each employer in the plan) which are reasonably necessary to ensure that--

**(I)** the plan meets any requirement applicable under this chapter or Title 26 to a plan described in section 401(a) of Title 26, a plan that consists of annuity contracts described in section 403(b) of Title 26, or to a plan that consists of individual retirement accounts described in section 408 of Title 26 (including by reason of subsection (c) thereof), whichever is applicable; and

**(II)** each employer in the plan takes such actions as the Secretary or pooled plan provider determines are necessary for the plan to meet the requirements described in subclause (I), including providing the disclosures and information described in paragraph (43)(B)(v)(II);

**(ii)** registers as a pooled plan provider with the Secretary, and provides to the Secretary such other information as the Secretary may require, before beginning operations as a pooled plan provider;

**(iii)** acknowledges in writing that such person is a named fiduciary, and the plan administrator, with respect to the pooled employer plan; and

**(iv)** is responsible for ensuring that all persons who handle assets of, or who are fiduciaries of, the pooled employer plan are bonded in accordance with section 1112 of this title.

**(B) Audits, examinations and investigations**

The Secretary may perform audits, examinations, and investigations of pooled plan providers as may be necessary to enforce and carry out the purposes of this paragraph and paragraph (43).

### (C) Guidance

The Secretary shall issue such guidance as the Secretary determines appropriate to carry out this paragraph and paragraph (43), including guidance--

**(i)** to identify the administrative duties and other actions required to be performed by a pooled plan provider under either such paragraph; and

**(ii)** which requires in appropriate cases that if an employer in the plan fails to take the actions required under subparagraph (A)(i)(II)--

**(I)** the assets of the plan attributable to employees of such employer (or beneficiaries of such employees) are transferred to a plan maintained only by such employer (or its successor), to an eligible retirement plan as defined in section 402(c)(8)(B) of Title 26 for each individual whose account is transferred, or to any other arrangement that the Secretary determines is appropriate in such guidance; and

**(II)** such employer (and not the plan with respect to which the failure occurred or any other employer in such plan) shall, except to the extent provided in such guidance, be liable for any liabilities with respect to such plan attributable to employees of such employer (or beneficiaries of such employees).

The Secretary shall take into account under clause (ii) whether the failure of an employer or pooled plan provider to provide any disclosures or other information, or to take any other action, necessary to administer a plan or to allow a plan to meet requirements described in subparagraph (A)(i)(II) has continued over a period of time that demonstrates a lack of commitment to compliance. The Secretary may waive the requirements of subclause (ii)(I) in appropriate circumstances if the Secretary determines it is in the best interests of the employees of the employer referred to in such clause (and the beneficiaries of such employees) to retain the assets in the plan with respect to which the employer's failure occurred.

**(D) Good faith compliance with law before guidance**

An employer or pooled plan provider shall not be treated as failing to meet a requirement of guidance issued by the Secretary under subparagraph (C) if, before the issuance of such guidance, the employer or pooled plan provider complies in good faith with a reasonable interpretation of the provisions of this paragraph, or paragraph (43), to which such guidance relates.

**(E) Aggregation rules**

For purposes of this paragraph, in determining whether a person meets the requirements of this paragraph to be a pooled plan provider with respect to any plan, all persons who perform services for the plan and who are treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as one person.

**(45) Pension-linked emergency savings account**

The term "pension-linked emergency savings account" means a short-term savings account established and maintained as part of an individual account plan, in accordance with section 1193 of this title, on behalf of an eligible participant (as such term is defined in section 1193(b) of this title) that--

**(A)** is a designated Roth account (within the meaning of section 402A of Title 26) and accepts only participant contributions, as described in section 1193(d)(1)(A) of this title, which are designated Roth contributions subject to the rules of section 402A(e) of Title 26; and

**(B)** meets the requirements of part 8 of subtitle B.

## CREDIT(S)

(Pub.L. 93-406, Title I, § 3, Sept. 2, 1974, 88 Stat. 833; Pub.L. 96-364, Title III, §§ 302, 305, Title IV, §§ 407(a), 409, Sept. 26, 1980, 94 Stat. 1291, 1294, 1303, 1307; Pub.L. 97-473, Title III, § 302(a), Jan. 14, 1983, 96 Stat. 2612; Pub.L. 99-272, Title XI, § 11016(c)(1), Apr. 7, 1986, 100 Stat. 273; Pub.L. 99-509, Title IX, § 9203(b)(1), Oct. 21, 1986, 100 Stat. 1979; Pub.L. 99-514, Title XVIII, § 1879(u)(3), Oct. 22, 1986, 100 Stat. 2913; Pub.L. 100-202, § 136(a), Dec. 22, 1987, 101 Stat. 1329-441; Pub.L. 101-239, Title VII, §§ 7871(b)(2), 7881(m)(2)(D), 7891(a)(1), 7893(a),

7894(a)(1)(A), (2)(A), (3), (4), Dec. 19, 1989, 103 Stat. 2435, 2444, 2445, 2447, 2448; Pub.L. 101-508, Title XII, § 12002(b)(2)(C), Nov. 5, 1990, 104 Stat. 1388-566; Pub.L. 102-89, § 2, Aug. 14, 1991, 105 Stat. 446; Pub.L. 104-290, Title III, § 308(b)(1), Oct. 11, 1996, 110 Stat. 3440; Pub.L. 105-72, § 1(a), Nov. 10, 1997, 111 Stat. 1457; Pub.L. 109-280, Title VI, § 611(f), Title IX, §§ 905(a), 906(a)(2)(A), Title XI, §§ 1104(c), 1106(a), Aug. 17, 2006, 120 Stat. 972, 1050, 1051, 1060; Pub.L. 110-28, Title VI, § 6611(a)(1), (b)(1), May 25, 2007, 121 Stat. 179, 180; Pub.L. 110-458, Title I, § 111(c), Dec. 23, 2008, 122 Stat. 5113; Pub.L. 116-94, Div. O, Title I, § 101(b), (c)(1), (3), Dec. 20, 2019, 133 Stat. 3141, 3144; Pub.L. 117-328, Div. T, Title I, §§ 105(a), 106(d), 127(a), Dec. 29, 2022, 136 Stat. 5286, 5287, 5317.)

## Footnotes

1    So in original. The period probably should be a comma.

2    So in original. Probably should end with a period.

3    So in original. Probably should be "The".

4    So in original. Probably should be ''part 4 of subtitle B,''.

5    So in original. Probably should be "(44)(C)(ii)(I);".

29 U.S.C.A. § 1002, 29 USCA § 1002
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

United States Code Annotated
   Title 29. Labor
      Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
        Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
          Subtitle B. Regulatory Provisions
            Part 4. Fiduciary Responsibility (Refs & Annos)

29 U.S.C.A. § 1104

§ 1104. Fiduciary duties

Effective: December 29, 2022
Currentness

**(a) Prudent man standard of care**

**(1)** Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

  **(A)** for the exclusive purpose of:

    **(i)** providing benefits to participants and their beneficiaries; and

    **(ii)** defraying reasonable expenses of administering the plan;

  **(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

  **(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

**(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

**(2)** In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).

**(b) Indicia of ownership of assets outside jurisdiction of district courts**

Except as authorized by the Secretary by regulations, no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States.

**(c) Control over assets by participant or beneficiary**

**(1)(A)** In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)--

**(i)** such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and

**(ii)** no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control, except that this clause shall not apply in connection with such participant or beneficiary for any blackout period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary.

**(B)** If a person referred to in subparagraph (A)(ii) meets the requirements of this subchapter in connection with authorizing and implementing the blackout period, any person who is otherwise a fiduciary shall not be liable under this subchapter for any loss occurring during such period.

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(C)** For purposes of this paragraph, the term "blackout period" has the meaning given such term by section 1021(i)(7) of this title.

**(2)** In the case of a simple retirement account established pursuant to a qualified salary reduction arrangement under section 408(p) of Title 26, a participant or beneficiary shall, for purposes of paragraph (1), be treated as exercising control over the assets in the account upon the earliest of--

   **(A)** an affirmative election among investment options with respect to the initial investment of any contribution,

   **(B)** a rollover to any other simple retirement account or individual retirement plan, or

   **(C)** one year after the simple retirement account is established.

No reports, other than those required under section 1021(g) of this title, shall be required with respect to a simple retirement account established pursuant to such a qualified salary reduction arrangement.

**(3)** In the case of a pension plan which makes a transfer to an individual retirement account or annuity of a designated trustee or issuer under section 401(a)(31)(B) of Title 26, the participant or beneficiary shall, for purposes of paragraph (1), be treated as exercising control over the assets in the account or annuity upon--

   **(A)** the earlier of--

      **(i)** a rollover of all or a portion of the amount to another individual retirement account or annuity; or

      **(ii)** one year after the transfer is made; or

   **(B)** a transfer that is made in a manner consistent with guidance provided by the Secretary.

**(4)(A)** In any case in which a qualified change in investment options occurs in connection with an individual account plan, a participant or beneficiary shall not be treated for purposes of paragraph (1) as not exercising control over the assets in his account in connection with such change if the requirements of subparagraph (C) are met in connection with such change.

**(B)** For purposes of subparagraph (A), the term "qualified change in investment options" means, in connection with an individual account plan, a change in the investment options offered to the participant or beneficiary under the terms of the plan, under which--

   **(i)** the account of the participant or beneficiary is reallocated among one or more remaining or new investment options which are offered in lieu of one or more investment options offered immediately prior to the effective date of the change, and

   **(ii)** the stated characteristics of the remaining or new investment options provided under clause (i), including characteristics relating to risk and rate of return, are, as of immediately after the change, reasonably similar to those of the existing investment options as of immediately before the change.

**(C)** The requirements of this subparagraph are met in connection with a qualified change in investment options if--

   **(i)** at least 30 days and no more than 60 days prior to the effective date of the change, the plan administrator furnishes written notice of the change to the participants and beneficiaries, including information comparing the existing and new investment options and an explanation that, in the absence of affirmative investment instructions from the participant or beneficiary to the contrary, the account of the participant or beneficiary will be invested in the manner described in subparagraph (B),

   **(ii)** the participant or beneficiary has not provided to the plan administrator, in advance of the effective date of the change, affirmative investment instructions contrary to the change, and

   **(iii)** the investments under the plan of the participant or beneficiary as in effect immediately prior to the effective date of the change were the product of the exercise by such participant or beneficiary of control over the assets of the account within the meaning of paragraph (1).

**(5) Default investment arrangements**

**(A) In general**

For purposes of paragraph (1), a participant or beneficiary in an individual account plan meeting the notice requirements of subparagraph (B) shall be treated as exercising control over the assets in the account with respect to the amount of contributions and earnings which, in the absence of an investment election by the participant or beneficiary, are invested by the plan in accordance with regulations prescribed by the Secretary. The regulations under this subparagraph shall provide guidance on the appropriateness of designating default investments that include a mix of asset classes consistent with capital preservation or long-term capital appreciation, or a blend of both.

**(B) Notice requirements**

**(i) In general**

The requirements of this subparagraph are met if each participant or beneficiary--

**(I)** receives, within a reasonable period of time before each plan year, a notice explaining the employee's right under the plan to designate how contributions and earnings will be invested and explaining how, in the absence of any investment election by the participant or beneficiary, such contributions and earnings will be invested, and

**(II)** has a reasonable period of time after receipt of such notice and before the beginning of the plan year to make such designation.

**(ii) Form of notice**

The requirements of clauses (i) and (ii) of section 401(k)(12)(D) of Title 26 shall apply with respect to the notices described in this subparagraph.

**(6) Default investment arrangements for a pension-linked emergency savings account**

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

For purposes of paragraph (1), a participant in a pension-linked emergency savings account shall be treated as exercising control over the assets in the account with respect to the amount of contributions and earnings which are invested in accordance with section 1193(c)(1)(A)(iii) of this title.

**(d) Plan terminations**

**(1)** If, in connection with the termination of a pension plan which is a single-employer plan, there is an election to establish or maintain a qualified replacement plan, or to increase benefits, as provided under section 4980(d) of Title 26, a fiduciary shall discharge the fiduciary's duties under this subchapter and subchapter III in accordance with the following requirements:

  **(A)** In the case of a fiduciary of the terminated plan, any requirement--

  **(i)** under section 4980(d)(2)(B) of Title 26 with respect to the transfer of assets from the terminated plan to a qualified replacement plan, and

  **(ii)** under section 4980(d)(2)(B)(ii) or 4980(d)(3) of Title 26 with respect to any increase in benefits under the terminated plan.

  **(B)** In the case of a fiduciary of a qualified replacement plan, any requirement--

  **(i)** under section 4980(d)(2)(A) of Title 26 with respect to participation in the qualified replacement plan of active participants in the terminated plan,

  **(ii)** under section 4980(d)(2)(B) of Title 26 with respect to the receipt of assets from the terminated plan, and

  **(iii)** under section 4980(d)(2)(C) of Title 26 with respect to the allocation of assets to participants of the qualified replacement plan.

**(2)** For purposes of this subsection--

**(A)** any term used in this subsection which is also used in section 4980(d) of Title 26 shall have the same meaning as when used in such section, and

**(B)** any reference in this subsection to Title 26 shall be a reference to Title 26 as in effect immediately after the enactment of the Omnibus Budget Reconciliation Act of 1990.

## (e) Safe harbor for annuity selection

### (1) In general

With respect to the selection of an insurer for a guaranteed retirement income contract, the requirements of subsection (a)(1)(B) will be deemed to be satisfied if a fiduciary--

**(A)** engages in an objective, thorough, and analytical search for the purpose of identifying insurers from which to purchase such contracts;

**(B)** with respect to each insurer identified under subparagraph (A)--

**(i)** considers the financial capability of such insurer to satisfy its obligations under the guaranteed retirement income contract; and

**(ii)** considers the cost (including fees and commissions) of the guaranteed retirement income contract offered by the insurer in relation to the benefits and product features of the contract and administrative services to be provided under such contract; and

**(C)** on the basis of such consideration, concludes that--

**(i)** at the time of the selection, the insurer is financially capable of satisfying its obligations under the guaranteed retirement income contract; and

**(ii)** the relative cost of the selected guaranteed retirement income contract as described in subparagraph (B)(ii) is reasonable.

**(2) Financial capability of the insurer**

A fiduciary will be deemed to satisfy the requirements of paragraphs (1)(B)(i) and (1)(C)(i) if--

  **(A)** the fiduciary obtains written representations from the insurer that--

    **(i)** the insurer is licensed to offer guaranteed retirement income contracts;

    **(ii)** the insurer, at the time of selection and for each of the immediately preceding 7 plan years--

      **(I)** operates under a certificate of authority from the insurance commissioner of its domiciliary State which has not been revoked or suspended;

      **(II)** has filed audited financial statements in accordance with the laws of its domiciliary State under applicable statutory accounting principles;

      **(III)** maintains (and has maintained) reserves which satisfies all the statutory requirements of all States where the insurer does business; and

      **(IV)** is not operating under an order of supervision, rehabilitation, or liquidation;

    **(iii)** the insurer undergoes, at least every 5 years, a financial examination (within the meaning of the law of its domiciliary State) by the insurance commissioner of the domiciliary State (or representative, designee, or other party approved by such commissioner); and

    **(iv)** the insurer will notify the fiduciary of any change in circumstances occurring after the provision of the representations in clauses (i), (ii), and (iii) which would preclude

the insurer from making such representations at the time of issuance of the guaranteed retirement income contract; and

**(B)** after receiving such representations and as of the time of selection, the fiduciary has not received any notice described in subparagraph (A)(iv) and is in possession of no other information which would cause the fiduciary to question the representations provided.

## (3) No requirement to select lowest cost

Nothing in this subsection shall be construed to require a fiduciary to select the lowest cost contract. A fiduciary may consider the value of a contract, including features and benefits of the contract and attributes of the insurer (including, without limitation, the insurer's financial strength) in conjunction with the cost of the contract.

## (4) Time of selection

### (A) In general

For purposes of this subsection, the time of selection is--

**(i)** the time that the insurer and the contract are selected for distribution of benefits to a specific participant or beneficiary; or

**(ii)** if the fiduciary periodically reviews the continuing appropriateness of the conclusion described in paragraph (1)(C) with respect to a selected insurer, taking into account the considerations described in such paragraph, the time that the insurer and the contract are selected to provide benefits at future dates to participants or beneficiaries under the plan.

Nothing in the preceding sentence shall be construed to require the fiduciary to review the appropriateness of a selection after the purchase of a contract for a participant or beneficiary.

### (B) Periodic review

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

A fiduciary will be deemed to have conducted the periodic review described in subparagraph (A)(ii) if the fiduciary obtains the written representations described in clauses (i), (ii), and (iii) of paragraph (2)(A) from the insurer on an annual basis, unless the fiduciary receives any notice described in paragraph (2)(A)(iv) or otherwise becomes aware of facts that would cause the fiduciary to question such representations.

**(5) Limited liability**

A fiduciary which satisfies the requirements of this subsection shall not be liable following the distribution of any benefit, or the investment by or on behalf of a participant or beneficiary pursuant to the selected guaranteed retirement income contract, for any losses that may result to the participant or beneficiary due to an insurer's inability to satisfy its financial obligations under the terms of such contract.

**(6) Definitions**

For purposes of this subsection--

**(A) Insurer**

The term "insurer" means an insurance company, insurance service, or insurance organization, including affiliates of such companies.

**(B) Guaranteed retirement income contract**

The term "guaranteed retirement income contract" means an annuity contract for a fixed term or a contract (or provision or feature thereof) which provides guaranteed benefits annually (or more frequently) for at least the remainder of the life of the participant or the joint lives of the participant and the participant's designated beneficiary as part of an individual account plan.

**CREDIT(S)**

(Pub.L. 93-406, Title I, § 404, Sept. 2, 1974, 88 Stat. 877; Pub.L. 96-364, Title III, § 309, Sept. 26, 1980, 94 Stat. 1296; Pub.L. 101-508, Title XII, § 12002(b)(1), (2)(A), Nov. 5, 1990, 104 Stat. 1388-565, 1388-566; Pub.L. 104-188, Title I, § 1421(d)(2), Aug. 20, 1996, 110 Stat. 1799; Pub.L. 107-16, Title VI, § 657(c)(1), June 7, 2001, 115 Stat. 136; Pub.L. 107-147, Title IV, § 411(t), Mar. 9, 2002, 116 Stat. 51; Pub.L. 109-280, Title VI, §§ 621(a), 624(a), Aug. 17, 2006, 120 Stat. 978,

980; Pub.L. 110-458, Title I, § 106(d), Dec. 23, 2008, 122 Stat. 5107; Pub.L. 116-94, Div. O, Title II, § 204, Dec. 20, 2019, 133 Stat. 3165; Pub.L. 117-328, Div. T, Title I, § 127(d), Dec. 29, 2022, 136 Stat. 5324.)

29 U.S.C.A. § 1104, 29 USCA § 1104
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 29. Labor
    Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
      Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
        Subtitle B. Regulatory Provisions
          Part 4. Fiduciary Responsibility (Refs & Annos)

29 U.S.C.A. § 1105

§ 1105. Liability for breach of co-fiduciary

Currentness

**(a) Circumstances giving rise to liability**

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

**(1)** if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

**(2)** if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

**(3)** if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**(b) Assets held by two or more trustees**

**(1)** Except as otherwise provided in subsection (d) and in section 1103(a)(1) and (2) of this title, if the assets of a plan are held by two or more trustees--

**(A)** each shall use reasonable care to prevent a co-trustee from committing a breach; and

**(B)** they shall jointly manage and control the assets of the plan, except that nothing in this subparagraph (B) shall preclude any agreement, authorized by the trust instrument, allocating specific responsibilities, obligations, or duties among trustees, in which event a trustee to whom certain responsibilities, obligations, or duties have not been allocated shall not be liable by reason of this subparagraph (B) either individually or as a trustee for any loss resulting to the plan arising from the acts or omissions on the part of another trustee to whom such responsibilities, obligations, or duties have been allocated.

**(2)** Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) or any other provision of this part.

**(3)(A)** In the case of a plan the assets of which are held in more than one trust, a trustee shall not be liable under paragraph (1) except with respect to an act or omission of a trustee of a trust of which he is a trustee.

**(B)** No trustee shall be liable under this subsection for following instructions referred to in section 1103(a)(1) of this title.

**(c) Allocation of fiduciary responsibility; designated persons to carry out fiduciary responsibilities**

**(1)** The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

**(2)** If a plan expressly provides for a procedure described in paragraph (1), and pursuant to such procedure any fiduciary responsibility of a named fiduciary is allocated to any person, or a person is designated to carry out any such responsibility, then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility except to the extent that--

**(A)** the named fiduciary violated section 1104(a)(1) of this title--

    **(i)** with respect to such allocation or designation,

    **(ii)** with respect to the establishment or implementation of the procedure under paragraph (1), or

    **(iii)** in continuing the allocation or designation; or

**(B)** the named fiduciary would otherwise be liable in accordance with subsection (a).

**(3)** For purposes of this subsection, the term "trustee responsibility" means any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan, other than a power under the trust instrument of a named fiduciary to appoint an investment manager in accordance with section 1102(c)(3) of this title.

**(d) Investment managers**

**(1)** If an investment manager or managers have been appointed under section 1102(c)(3) of this title, then, notwithstanding subsections (a)(2) and (3) and subsection (b), no trustee shall be liable for the acts or omissions of such investment manager or managers, or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager.

**(2)** Nothing in this subsection shall relieve any trustee of any liability under this part for any act of such trustee.

**CREDIT(S)**

  (Pub.L. 93-406, Title I, § 405, Sept. 2, 1974, 88 Stat. 878.)

29 U.S.C.A. § 1105, 29 USCA § 1105

Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 29. Labor
    Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
      Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
        Subtitle B. Regulatory Provisions
          Part 4. Fiduciary Responsibility (Refs & Annos)

29 U.S.C.A. § 1106

§ 1106. Prohibited transactions

Currentness

**(a) Transactions between plan and party in interest**

Except as provided in section 1108 of this title:

**(1)** A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

**(A)** sale or exchange, or leasing, of any property between the plan and a party in interest;

**(B)** lending of money or other extension of credit between the plan and a party in interest;

**(C)** furnishing of goods, services, or facilities between the plan and a party in interest;

**(D)** transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

**(E)** acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

**(2)** No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

**(b) Transactions between plan and fiduciary**

A fiduciary with respect to a plan shall not--

    **(1)** deal with the assets of the plan in his own interest or for his own account,

    **(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

    **(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**(c) Transfer of real or personal property to plan by party in interest**

A transfer of real or personal property by a party in interest to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a party-in-interest placed on the property within the 10-year period ending on the date of the transfer.

## CREDIT(S)

(Pub.L. 93-406, Title I, § 406, Sept. 2, 1974, 88 Stat. 879.)

29 U.S.C.A. § 1106, 29 USCA § 1106
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 29. Labor
    Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
      Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
        Subtitle B. Regulatory Provisions
          Part 4. Fiduciary Responsibility (Refs & Annos)

29 U.S.C.A. § 1108

§ 1108. Exemptions from prohibited transactions

Effective: December 29, 2022
Currentness

**(a) Grant of exemptions**

The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by sections 1106 and 1107(a) of this title. Action under this subsection may be taken only after consultation and coordination with the Secretary of the Treasury. An exemption granted under this section shall not relieve a fiduciary from any other applicable provision of this chapter. The Secretary may not grant an exemption under this subsection unless he finds that such exemption is--

  **(1)** administratively feasible,

  **(2)** in the interests of the plan and of its participants and beneficiaries, and

  **(3)** protective of the rights of participants and beneficiaries of such plan.

Before granting an exemption under this subsection from section 1106(a) or 1107(a) of this title, the Secretary shall publish notice in the Federal Register of the pendency of the exemption, shall require that adequate notice be given to interested persons, and shall afford interested persons opportunity to present views. The Secretary may not grant an exemption under this subsection from section 1106(b) of this title unless he affords an opportunity for a hearing and makes a

determination on the record with respect to the findings required by paragraphs (1), (2), and (3) of this subsection.

**(b) Enumeration of transactions exempted from section 1106 prohibitions**

The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

**(1)** Any loans made by the plan to parties in interest who are participants or beneficiaries of the plan if such loans (A) are available to all such participants and beneficiaries on a reasonably equivalent basis, (B) are not made available to highly compensated employees (within the meaning of section 414(q) of Title 26) in an amount greater than the amount made available to other employees, (C) are made in accordance with specific provisions regarding such loans set forth in the plan, (D) bear a reasonable rate of interest, and (E) are adequately secured. A loan made by a plan shall not fail to meet the requirements of the preceding sentence by reason of a loan repayment suspension described under section 414(u)(4) of Title 26.

**(2)(A)** Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

**(B)(i)** No contract or arrangement for services between a covered plan and a covered service provider, and no extension or renewal of such a contract or arrangement, is reasonable within the meaning of this paragraph unless the requirements of this clause [3] are met.

**(ii)(I)** For purposes of this subparagraph:

**(aa)** The term "covered plan" means a group health plan as defined [4] section 1191b(a) of this title.

**(bb)** The term "covered service provider" means a service provider that enters into a contract or arrangement with the covered plan and reasonably expects $1,000 (or such amount as the Secretary may establish in regulations to account for inflation since December 27, 2020, as appropriate) or more in compensation, direct or indirect, to be received in connection with

Case: 23-1073      Document: 34      Filed: 05/17/2023      Pages: 270

providing one or more of the following services, pursuant to the contract or arrangement, regardless of whether such services will be performed, or such compensation received, by the covered service provider, an affiliate, or a subcontractor:

**(AA)** Brokerage services, for which the covered service provider, an affiliate, or a subcontractor reasonably expects to receive indirect compensation or direct compensation described in item (dd), provided to a covered plan with respect to selection of insurance products (including vision and dental), recordkeeping services, medical management vendor, benefits administration (including vision and dental), stop-loss insurance, pharmacy benefit management services, wellness services, transparency tools and vendors, group purchasing organization preferred vendor panels, disease management vendors and products, compliance services, employee assistance programs, or third party administration services.

**(BB)** Consulting, for which the covered service provider, an affiliate, or a subcontractor reasonably expects to receive indirect compensation or direct compensation described in item (dd), related to the development or implementation of plan design, insurance or insurance product selection (including vision and dental), recordkeeping, medical management, benefits administration selection (including vision and dental), stop-loss insurance, pharmacy benefit management services, wellness design and management services, transparency tools, group purchasing organization agreements and services, participation in and services from preferred vendor panels, disease management, compliance services, employee assistance programs, or third party administration services.

**(cc)** The term "affiliate", with respect to a covered service provider, means an entity that directly or indirectly (through one or more intermediaries) controls, is controlled by, or is under common control with, such provider, or is an officer, director, or employee of, or partner in, such provider.

**(dd)(AA)** The term "compensation" means anything of monetary value, but does not include non-monetary compensation valued at $250 (or such amount as the Secretary may establish in regulations to account for inflation since December 27, 2020, as appropriate) or less, in the aggregate, during the term of the contract or arrangement.

**(BB)** The term "direct compensation" means compensation received directly from a covered plan.

**(CC)** The term "indirect compensation" means compensation received from any source other than the covered plan, the plan sponsor, the covered service provider, or an affiliate. Compensation received from a subcontractor is indirect compensation, unless it is received in connection with services performed under a contract or arrangement with a subcontractor.

**(ee)** The term "responsible plan fiduciary" means a fiduciary with authority to cause the covered plan to enter into, or extend or renew, the contract or arrangement.

**(ff)** The term "subcontractor" means any person or entity (or an affiliate of such person or entity) that is not an affiliate of the covered service provider and that, pursuant to a contract or arrangement with the covered service provider or an affiliate, reasonably expects to receive $1,000 (or such amount as the Secretary may establish in regulations to account for inflation since December 27, 2020, as appropriate) or more in compensation for performing one or more services described in item (bb) under a contract or arrangement with the covered plan.

**(II)** For purposes of this subparagraph, a description of compensation or cost may be expressed as a monetary amount, formula, or a per capita charge for each enrollee or, if the compensation or cost cannot reasonably be expressed in such terms, by any other reasonable method, including a disclosure that additional compensation may be earned but may not be calculated at the time of contract if such a disclosure includes a description of the circumstances under which the additional compensation may be earned and a reasonable and good faith estimate if the covered service provider cannot otherwise readily describe compensation or cost and explains the methodology and assumptions used to prepare such estimate. Any such description shall contain sufficient information to permit evaluation of the reasonableness of the compensation or cost.

**(III)** No person or entity is a "covered service provider" within the meaning of subclause (I)(bb) solely on the basis of providing services as an affiliate or a subcontractor that is performing one or more of the services described in subitem (AA) or (BB) of such subclause under the contract or arrangement with the covered plan.

**(iii)** A covered service provider shall disclose to a responsible plan fiduciary, in writing, the following:

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(I)** A description of the services to be provided to the covered plan pursuant to the contract or arrangement.

**(II)** If applicable, a statement that the covered service provider, an affiliate, or a subcontractor will provide, or reasonably expects to provide, services pursuant to the contract or arrangement directly to the covered plan as a fiduciary (within the meaning of section 1002(21) of this title).

**(III)** A description of all direct compensation, either in the aggregate or by service, that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described in subclause (I).

**(IV)(aa)** A description of all indirect compensation that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described in subclause (I)--

   **(AA)** including compensation from a vendor to a brokerage firm based on a structure of incentives not solely related to the contract with the covered plan; and

   **(BB)** not including compensation received by an employee from an employer on account of work performed by the employee.

**(bb)** A description of the arrangement between the payer and the covered service provider, an affiliate, or a subcontractor, as applicable, pursuant to which such indirect compensation is paid.

**(cc)** Identification of the services for which the indirect compensation will be received, if applicable.

**(dd)** Identification of the payer of the indirect compensation.

**(V)** A description of any compensation that will be paid among the covered service provider, an affiliate, or a subcontractor, in connection with the services described in subclause (I) if

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

such compensation is set on a transaction basis (such as commissions, finder's fees, or other similar incentive compensation based on business placed or retained), including identification of the services for which such compensation will be paid and identification of the payers and recipients of such compensation (including the status of a payer or recipient as an affiliate or a subcontractor), regardless of whether such compensation also is disclosed pursuant to subclause (III) or (IV).

**(VI)** A description of any compensation that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with termination of the contract or arrangement, and how any prepaid amounts will be calculated and refunded upon such termination.

**(iv)** A covered service provider shall disclose to a responsible plan fiduciary, in writing a description of the manner in which the compensation described in clause (iii), as applicable, will be received.

**(v)(I)** A covered service provider shall disclose the information required under clauses (iii) and (iv) to the responsible plan fiduciary not later than the date that is reasonably in advance of the date on which the contract or arrangement is entered into, and extended or renewed.

**(II)** A covered service provider shall disclose any change to the information required under clause (iii) and (iv) as soon as practicable, but not later than 60 days from the date on which the covered service provider is informed of such change, unless such disclosure is precluded due to extraordinary circumstances beyond the covered service provider's control, in which case the information shall be disclosed as soon as practicable.

**(vi)(I)** Upon the written request of the responsible plan fiduciary or covered plan administrator, a covered service provider shall furnish any other information relating to the compensation received in connection with the contract or arrangement that is required for the covered plan to comply with the reporting and disclosure requirements under this chapter.

**(II)** The covered service provider shall disclose the information required under clause (iii)(I) reasonably in advance of the date upon which such responsible plan fiduciary or covered plan administrator states that it is required to comply with the applicable reporting or disclosure requirement, unless such disclosure is precluded due to extraordinary circumstances beyond the

covered service provider's control, in which case the information shall be disclosed as soon as practicable.

**(vii)** No contract or arrangement will fail to be reasonable under this subparagraph solely because the covered service provider, acting in good faith and with reasonable diligence, makes an error or omission in disclosing the information required pursuant to clause (iii) (or a change to such information disclosed pursuant to clause (v)(II)) or clause (vi), provided that the covered service provider discloses the correct information to the responsible plan fiduciary as soon as practicable, but not later than 30 days from the date on which the covered service provider knows of such error or omission.

**(viii)(I)** Pursuant to subsection (a), subparagraphs (C) and (D) of section 1106(a)(1) of this title shall not apply to a responsible plan fiduciary, notwithstanding any failure by a covered service provider to disclose information required under clause (iii), if the following conditions are met:

**(aa)** The responsible plan fiduciary did not know that the covered service provider failed or would fail to make required disclosures and reasonably believed that the covered service provider disclosed the information required to be disclosed.

**(bb)** The responsible plan fiduciary, upon discovering that the covered service provider failed to disclose the required information, requests in writing that the covered service provider furnish such information.

**(cc)** If the covered service provider fails to comply with a written request described in subclause (II) within 90 days of the request, the responsible plan fiduciary notifies the Secretary of the covered service provider's failure, in accordance with subclauses (II) and (III).

**(II)** A notice described in subclause (I)(cc) shall contain--

**(aa)** the name of the covered plan;

**(bb)** the plan number used for the annual report on the covered plan;

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(cc)** the plan sponsor's name, address, and employer identification number;

**(dd)** the name, address, and telephone number of the responsible plan fiduciary;

**(ee)** the name, address, phone number, and, if known, employer identification number of the covered service provider;

**(ff)** a description of the services provided to the covered plan;

**(gg)** a description of the information that the covered service provider failed to disclose;

**(hh)** the date on which such information was requested in writing from the covered service provider; and

**(ii)** a statement as to whether the covered service provider continues to provide services to the plan.

**(III)** A notice described in subclause (I)(cc) shall be filed with the Department not later than 30 days following the earlier of--

**(aa)** The covered service provider's refusal to furnish the information requested by the written request described in subclause (I)(bb); or

**(bb)** 90 days after the written request referred to in subclause (I)(cc) is made.

**(IV)** If the covered service provider fails to comply with the written request under subclause (I)(bb) within 90 days of such request, the responsible plan fiduciary shall determine whether to terminate or continue the contract or arrangement under section 1104 of this title. If the requested information relates to future services and is not disclosed promptly after the end of the 90-day period, the responsible plan fiduciary shall terminate the contract or arrangement as expeditiously as possible, consistent with such duty of prudence.

**(ix)** Nothing in this subparagraph shall be construed to supersede any provision of State law that governs disclosures by parties that provide the services described in this section, except to the extent that such law prevents the application of a requirement of this section.

**(3)** A loan to an employee stock ownership plan (as defined in section 1107(d)(6) of this title), if--

**(A)** such loan is primarily for the benefit of participants and beneficiaries of the plan, and

**(B)** such loan is at an interest rate which is not in excess of a reasonable rate.

If the plan gives collateral to a party in interest for such loan, such collateral may consist only of qualifying employer securities (as defined in section 1107(d)(5) of this title).

**(4)** The investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution supervised by the United States or a State, if such bank or other institution is a fiduciary of such plan and if--

**(A)** the plan covers only employees of such bank or other institution and employees of affiliates of such bank or other institution, or

**(B)** such investment is expressly authorized by a provision of the plan or by a fiduciary (other than such bank or institution or affiliate thereof) who is expressly empowered by the plan to so instruct the trustee with respect to such investment.

**(5)** Any contract for life insurance, health insurance, or annuities with one or more insurers which are qualified to do business in a State, if the plan pays no more than adequate consideration, and if each such insurer or insurers is--

**(A)** the employer maintaining the plan, or

**(B)** a party in interest which is wholly owned (directly or indirectly) by the employer maintaining the plan, or by any person which is a party in interest with respect to the plan,

but only if the total premiums and annuity considerations written by such insurers for life insurance, health insurance, or annuities for all plans (and their employers) with respect to which such insurers are parties in interest (not including premiums or annuity considerations written by the employer maintaining the plan) do not exceed 5 percent of the total premiums and annuity considerations written for all lines of insurance in that year by such insurers (not including premiums or annuity considerations written by the employer maintaining the plan).

**(6)** The providing of any ancillary service by a bank or similar financial institution supervised by the United States or a State, if such bank or other institution is a fiduciary of such plan, and if--

**(A)** such bank or similar financial institution has adopted adequate internal safeguards which assure that the providing of such ancillary service is consistent with sound banking and financial practice, as determined by Federal or State supervisory authority, and

**(B)** the extent to which such ancillary service is provided is subject to specific guidelines issued by such bank or similar financial institution (as determined by the Secretary after consultation with Federal and State supervisory authority), and adherence to such guidelines would reasonably preclude such bank or similar financial institution from providing such ancillary service (i) in an excessive or unreasonable manner, and (ii) in a manner that would be inconsistent with the best interests of participants and beneficiaries of employee benefit plans.

Such ancillary services shall not be provided at more than reasonable compensation.

**(7)** The exercise of a privilege to convert securities, to the extent provided in regulations of the Secretary, but only if the plan receives no less than adequate consideration pursuant to such conversion.

**(8)** Any transaction between a plan and (i) a common or collective trust fund or pooled investment fund maintained by a party in interest which is a bank or trust company supervised by a State or Federal agency or (ii) a pooled investment fund of an insurance company qualified to do business in a State, if--

**(A)** the transaction is a sale or purchase of an interest in the fund,

Case: 23-1073     Document: 34     Filed: 05/17/2023     Pages: 270

**(B)** the bank, trust company, or insurance company receives not more than reasonable compensation, and

**(C)** such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof) who has authority to manage and control the assets of the plan.

**(9)** The making by a fiduciary of a distribution of the assets of the plan in accordance with the terms of the plan if such assets are distributed in the same manner as provided under section 1344 of this title (relating to allocation of assets).

**(10)** Any transaction required or permitted under part 1 of subtitle E of subchapter III.

**(11)** A merger of multiemployer plans, or the transfer of assets or liabilities between multiemployer plans, determined by the Pension Benefit Guaranty Corporation to meet the requirements of section 1411 of this title.

**(12)** The sale by a plan to a party in interest on or after December 18, 1987, of any stock, if--

**(A)** the requirements of paragraphs (1) and (2) of subsection (e) are met with respect to such stock,

**(B)** on the later of the date on which the stock was acquired by the plan, or January 1, 1975, such stock constituted a qualifying employer security (as defined in section 1107(d)(5) of this title as then in effect), and

**(C)** such stock does not constitute a qualifying employer security (as defined in section 1107(d)(5) of this title as in effect at the time of the sale).

**(13)** Any transfer made before January 1, 2033, of excess pension assets from a defined benefit plan to a retiree health account in a qualified transfer permitted under section 420 of Title 26 (as in effect on December 29, 2022).

**(14)** Any transaction in connection with the provision of investment advice described in section 1002(21)(A)(ii) of this title to a participant or beneficiary of an individual account plan that permits such participant or beneficiary to direct the investment of assets in their individual account, if--

    **(A)** the transaction is--

        **(i)** the provision of the investment advice to the participant or beneficiary of the plan with respect to a security or other property available as an investment under the plan,

        **(ii)** the acquisition, holding, or sale of a security or other property available as an investment under the plan pursuant to the investment advice, or

        **(iii)** the direct or indirect receipt of fees or other compensation by the fiduciary adviser or an affiliate thereof (or any employee, agent, or registered representative of the fiduciary adviser or affiliate) in connection with the provision of the advice or in connection with an acquisition, holding, or sale of a security or other property available as an investment under the plan pursuant to the investment advice; and

    **(B)** the requirements of subsection (g) are met.

**(15)(A)** Any transaction involving the purchase or sale of securities, or other property (as determined by the Secretary), between a plan and a party in interest (other than a fiduciary described in section 1002(21)(A) of this title) with respect to a plan if--

    **(i)** the transaction involves a block trade,

    **(ii)** at the time of the transaction, the interest of the plan (together with the interests of any other plans maintained by the same plan sponsor), does not exceed 10 percent of the aggregate size of the block trade,

**(iii)** the terms of the transaction, including the price, are at least as favorable to the plan as an arm's length [1] transaction, and

**(iv)** the compensation associated with the purchase and sale is not greater than the compensation associated with an arm's length [1] transaction with an unrelated party.

**(B)** For purposes of this paragraph, the term "block trade" means any trade of at least 10,000 shares or with a market value of at least $200,000 which will be allocated across two or more unrelated client accounts of a fiduciary.

**(16)** Any transaction involving the purchase or sale of securities, or other property (as determined by the Secretary), between a plan and a party in interest if--

**(A)** the transaction is executed through an electronic communication network, alternative trading system, or similar execution system or trading venue subject to regulation and oversight by--

**(i)** the applicable Federal regulating entity, or

**(ii)** such foreign regulatory entity as the Secretary may determine by regulation,

**(B)** either--

**(i)** the transaction is effected pursuant to rules designed to match purchases and sales at the best price available through the execution system in accordance with applicable rules of the Securities and Exchange Commission or other relevant governmental authority, or

**(ii)** neither the execution system nor the parties to the transaction take into account the identity of the parties in the execution of trades,

**(C)** the price and compensation associated with the purchase and sale are not greater than the price and compensation associated with an arm's length [1] transaction with an unrelated party,

**(D)** if the party in interest has an ownership interest in the system or venue described in subparagraph (A), the system or venue has been authorized by the plan sponsor or other independent fiduciary for transactions described in this paragraph, and

**(E)** not less than 30 days prior to the initial transaction described in this paragraph executed through any system or venue described in subparagraph (A), a plan fiduciary is provided written or electronic notice of the execution of such transaction through such system or venue.

**(17)(A)** Transactions described in subparagraphs (A), (B), and (D) of section 1106(a)(1) of this title between a plan and a person that is a party in interest other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control with respect to the investment of the plan assets involved in the transaction or renders investment advice (within the meaning of section 1002(21)(A)(ii) of this title) with respect to those assets, solely by reason of providing services to the plan or solely by reason of a relationship to such a service provider described in subparagraph (F), (G), (H), or (I) of section 1002(14) of this title, or both, but only if in connection with such transaction the plan receives no less, nor pays no more, than adequate consideration.

**(B)** For purposes of this paragraph, the term "adequate consideration" means--

**(i)** in the case of a security for which there is a generally recognized market--

**(I)** the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934, taking into account factors such as the size of the transaction and marketability of the security, or

**(II)** if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of the party in interest, taking into account factors such as the size of the transaction and marketability of the security, and

**(ii)** in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by a fiduciary or fiduciaries in accordance with regulations prescribed by the Secretary.

## (18) Foreign exchange transactions

Any foreign exchange transactions, between a bank or broker-dealer (or any affiliate of either), and a plan (as defined in section 1002(3) of this title) with respect to which such bank or broker-dealer (or affiliate) is a trustee, custodian, fiduciary, or other party in interest, if--

**(A)** the transaction is in connection with the purchase, holding, or sale of securities or other investment assets (other than a foreign exchange transaction unrelated to any other investment in securities or other investment assets),

**(B)** at the time the foreign exchange transaction is entered into, the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's length [1] foreign exchange transactions between unrelated parties, or the terms afforded by the bank or broker-dealer (or any affiliate of either) in comparable arm's-length foreign exchange transactions involving unrelated parties,

**(C)** the exchange rate used by such bank or broker-dealer (or affiliate) for a particular foreign exchange transaction does not deviate by more than 3 percent from the interbank bid and asked rates for transactions of comparable size and maturity at the time of the transaction as displayed on an independent service that reports rates of exchange in the foreign currency market for such currency, and

**(D)** the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction.

## (19) Cross trading

Any transaction described in sections 1106(a)(1)(A) and 1106(b)(2) of this title involving the purchase and sale of a security between a plan and any other account managed by the same investment manager, if--

**(A)** the transaction is a purchase or sale, for no consideration other than cash payment against prompt delivery of a security for which market quotations are readily available,

**(B)** the transaction is effected at the independent current market price of the security (within the meaning of section 270.17a-7(b) of title 17, Code of Federal Regulations),

**(C)** no brokerage commission, fee (except for customary transfer fees, the fact of which is disclosed pursuant to subparagraph (D)), or other remuneration is paid in connection with the transaction,

**(D)** a fiduciary (other than the investment manager engaging in the cross-trades or any affiliate) for each plan participating in the transaction authorizes in advance of any cross-trades (in a document that is separate from any other written agreement of the parties) the investment manager to engage in cross trades at the investment manager's discretion, after such fiduciary has received disclosure regarding the conditions under which cross trades may take place (but only if such disclosure is separate from any other agreement or disclosure involving the asset management relationship), including the written policies and procedures of the investment manager described in subparagraph (H),

**(E)** each plan participating in the transaction has assets of at least $100,000,000, except that if the assets of a plan are invested in a master trust containing the assets of plans maintained by employers in the same controlled group (as defined in section 1107(d)(7) of this title), the master trust has assets of at least $100,000,000,

**(F)** the investment manager provides to the plan fiduciary who authorized cross trading under subparagraph (D) a quarterly report detailing all cross trades executed by the investment manager in which the plan participated during such quarter, including the following information, as applicable: (i) the identity of each security bought or sold; (ii) the number of shares or units traded; (iii) the parties involved in the cross-trade; and (iv) trade price and the method used to establish the trade price,

**(G)** the investment manager does not base its fee schedule on the plan's consent to cross trading, and no other service (other than the investment opportunities and cost savings available through a cross trade) is conditioned on the plan's consent to cross trading,

**(H)** the investment manager has adopted, and cross-trades are effected in accordance with, written cross-trading policies and procedures that are fair and equitable to all accounts participating in the cross-trading program, and that include a description of the manager's pricing policies and procedures, and the manager's policies and procedures for allocating cross trades in an objective manner among accounts participating in the cross-trading program, and

**(I)** the investment manager has designated an individual responsible for periodically reviewing such purchases and sales to ensure compliance with the written policies and procedures described in subparagraph (H), and following such review, the individual shall issue an annual written report no later than 90 days following the period to which it relates signed under penalty of perjury to the plan fiduciary who authorized cross trading under subparagraph (D) describing the steps performed during the course of the review, the level of compliance, and any specific instances of non-compliance.

The written report under subparagraph (I) shall also notify the plan fiduciary of the plan's right to terminate participation in the investment manager's cross-trading program at any time.

**(20)(A)** Except as provided in subparagraphs (B) and (C), a transaction described in section 1106(a) of this title in connection with the acquisition, holding, or disposition of any security or commodity, if the transaction is corrected before the end of the correction period.

**(B)** Subparagraph (A) does not apply to any transaction between a plan and a plan sponsor or its affiliates that involves the acquisition or sale of an employer security (as defined in section 1107(d)(1) of this title) or the acquisition, sale, or lease of employer real property (as defined in section 1107(d)(2) of this title).

**(C)** In the case of any fiduciary or other party in interest (or any other person knowingly participating in such transaction), subparagraph (A) does not apply to any transaction if, at the time the transaction occurs, such fiduciary or party in interest (or other person) knew (or reasonably should have known) that the transaction would (without regard to this paragraph) constitute a violation of section 1106(a) of this title.

**(D)** For purposes of this paragraph, the term "correction period" means, in connection with a fiduciary or party in interest (or other person knowingly participating in the transaction), the 14-

day period beginning on the date on which such fiduciary or party in interest (or other person) discovers, or reasonably should have discovered, that the transaction would (without regard to this paragraph) constitute a violation of section 1106(a) of this title.

**(E)** For purposes of this paragraph--

**(i)** The term "security" has the meaning given such term by section 475(c)(2) of Title 26 (without regard to subparagraph (F)(iii) and the last sentence thereof).

**(ii)** The term "commodity" has the meaning given such term by section 475(e)(2) of Title 26 (without regard to subparagraph (D)(iii) thereof).

**(iii)** The term "correct" means, with respect to a transaction--

**(I)** to undo the transaction to the extent possible and in any case to make good to the plan or affected account any losses resulting from the transaction, and

**(II)** to restore to the plan or affected account any profits made through the use of assets of the plan.

**(21)** The provision of a de minimis financial incentive described in section 401(k)(4)(A) or section 403(b)(12)(A) of Title 26.

**(c) Fiduciary benefits and compensation not prohibited by section 1106**

Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from--

**(1)** receiving any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries;

**(2)** receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except

that no person so serving who already receives full time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred; or

**(3)** serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

### (d) Owner-employees; family members; shareholder employees

**(1)** Section 1107(b) of this title and subsections (b), (c), and (e) of this section shall not apply to a transaction in which a plan directly or indirectly--

**(A)** lends any part of the corpus or income of the plan to,

**(B)** pays any compensation for personal services rendered to the plan to, or

**(C)** acquires for the plan any property from, or sells any property to,

any person who is with respect to the plan an owner-employee (as defined in section 401(c)(3) of Title 26), a member of the family (as defined in section 267(c)(4) of such title) of any such owner-employee, or any corporation in which any such owner-employee owns, directly or indirectly, 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation.

**(2)(A)** For purposes of paragraph (1), the following shall be treated as owner-employees:

**(i)** A shareholder-employee.

**(ii)** A participant or beneficiary of an individual retirement plan (as defined in section 7701(a)(37) of Title 26).

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(iii)** An employer or association of employees which establishes such an individual retirement plan under section 408(c) of such title.

**(B)** Paragraph (1)(C) shall not apply to a transaction which consists of a sale of employer securities to an employee stock ownership plan (as defined in section 1107(d)(6) of this title) by a shareholder-employee, a member of the family (as defined in section 267(c)(4) of such title) of any such owner-employee, or a corporation in which such a shareholder-employee owns stock representing a 50 percent or greater interest described in paragraph (1).

**(C)** For purposes of paragraph (1)(A), the term "owner-employee" shall only include a person described in clause (ii) or (iii) of subparagraph (A).

**(3)** For purposes of paragraph (2), the term "shareholder-employee" means an employee or officer of an S corporation (as defined in section 1361(a)(1) of such title) who owns (or is considered as owning within the meaning of section 318(a)(1) of such title) more than 5 percent of the outstanding stock of the corporation on any day during the taxable year of such corporation.

**(e) Acquisition or sale by plan of qualifying employer securities; acquisition, sale, or lease by plan of qualifying employer real property**

Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 1107(d)(5) of this title) or acquisition, sale or lease by a plan of qualifying employer real property (as defined in section 1107(d)(4) of this title)--

**(1)** if such acquisition, sale, or lease is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 1107(e)(1) of this title),

**(2)** if no commission is charged with respect thereto, and

**(3)** if--

**(A)** the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title), or

**(B)** in the case of an acquisition or lease of qualifying employer real property by a plan which is not an eligible individual account plan, or of an acquisition of qualifying employer securities by such a plan, the lease or acquisition is not prohibited by section 1107(a) of this title.

## (f) Applicability of statutory prohibitions to mergers or transfers

Section 1106(b)(2) of this title shall not apply to any merger or transfer described in subsection (b)(11).

## (g) Provision of investment advice to participant and beneficiaries

### (1) In general

The prohibitions provided in section 1106 of this title shall not apply to transactions described in subsection (b)(14) if the investment advice provided by a fiduciary adviser is provided under an eligible investment advice arrangement.

### (2) Eligible investment advice arrangement

For purposes of this subsection, the term "eligible investment advice arrangement" means an arrangement--

**(A)** which either--

**(i)** provides that any fees (including any commission or other compensation) received by the fiduciary adviser for investment advice or with respect to the sale, holding, or acquisition of any security or other property for purposes of investment of plan assets do not vary depending on the basis of any investment option selected, or

**(ii)** uses a computer model under an investment advice program meeting the requirements of paragraph (3) in connection with the provision of investment advice by a fiduciary adviser to a participant or beneficiary, and

**(B)** with respect to which the requirements of paragraph (4), (5), (6), (7), (8), and (9) are met.

### (3) Investment advice program using computer model

#### (A) In general

An investment advice program meets the requirements of this paragraph if the requirements of subparagraphs (B), (C), and (D) are met.

#### (B) Computer model

The requirements of this subparagraph are met if the investment advice provided under the investment advice program is provided pursuant to a computer model that--

**(i)** applies generally accepted investment theories that take into account the historic returns of different asset classes over defined periods of time,

**(ii)** utilizes relevant information about the participant, which may include age, life expectancy, retirement age, risk tolerance, other assets or sources of income, and preferences as to certain types of investments,

**(iii)** utilizes prescribed objective criteria to provide asset allocation portfolios comprised of investment options available under the plan,

**(iv)** operates in a manner that is not biased in favor of investments offered by the fiduciary adviser or a person with a material affiliation or contractual relationship with the fiduciary adviser, and

**(v)** takes into account all investment options under the plan in specifying how a participant's account balance should be invested and is not inappropriately weighted with respect to any investment option.

## (C) Certification

### (i) In general

The requirements of this subparagraph are met with respect to any investment advice program if an eligible investment expert certifies, prior to the utilization of the computer model and in accordance with rules prescribed by the Secretary, that the computer model meets the requirements of subparagraph (B).

### (ii) Renewal of certifications

If, as determined under regulations prescribed by the Secretary, there are material modifications to a computer model, the requirements of this subparagraph are met only if a certification described in clause (i) is obtained with respect to the computer model as so modified.

### (iii) Eligible investment expert

The term "eligible investment expert" means any person--

**(I)** which meets such requirements as the Secretary may provide, and

**(II)** does not bear any material affiliation or contractual relationship with any investment adviser or a related person thereof (or any employee, agent, or registered representative of the investment adviser or related person).

## (D) Exclusivity of recommendation

The requirements of this subparagraph are met with respect to any investment advice program if--

**(i)** the only investment advice provided under the program is the advice generated by the computer model described in subparagraph (B), and

**(ii)** any transaction described in subsection (b)(14)(A)(ii) occurs solely at the direction of the participant or beneficiary.

Nothing in the preceding sentence shall preclude the participant or beneficiary from requesting investment advice other than that described in subparagraph (A), but only if such request has not been solicited by any person connected with carrying out the arrangement.

**(4) Express authorization by separate fiduciary**

The requirements of this paragraph are met with respect to an arrangement if the arrangement is expressly authorized by a plan fiduciary other than the person offering the investment advice program, any person providing investment options under the plan, or any affiliate of either.

**(5) Annual audit**

The requirements of this paragraph are met if an independent auditor, who has appropriate technical training or experience and proficiency and so represents in writing--

**(A)** conducts an annual audit of the arrangement for compliance with the requirements of this subsection, and

**(B)** following completion of the annual audit, issues a written report to the fiduciary who authorized use of the arrangement which presents its specific findings regarding compliance of the arrangement with the requirements of this subsection.

For purposes of this paragraph, an auditor is considered independent if it is not related to the person offering the arrangement to the plan and is not related to any person providing investment options under the plan.

**(6) Disclosure**

The requirements of this paragraph are met if--

**(A)** the fiduciary adviser provides to a participant or a beneficiary before the initial provision of the investment advice with regard to any security or other property offered as an investment option, a written notification (which may consist of notification by means of electronic communication)--

**(i)** of the role of any party that has a material affiliation or contractual relationship with the fiduciary adviser in the development of the investment advice program and in the selection of investment options available under the plan,

**(ii)** of the past performance and historical rates of return of the investment options available under the plan,

**(iii)** of all fees or other compensation relating to the advice that the fiduciary adviser or any affiliate thereof is to receive (including compensation provided by any third party) in connection with the provision of the advice or in connection with the sale, acquisition, or holding of the security or other property,

**(iv)** of any material affiliation or contractual relationship of the fiduciary adviser or affiliates thereof in the security or other property,

**(v)** [2] the manner, and under what circumstances, any participant or beneficiary information provided under the arrangement will be used or disclosed,

**(vi)** of the types of services provided by the fiduciary adviser in connection with the provision of investment advice by the fiduciary adviser,

**(vii)** that the adviser is acting as a fiduciary of the plan in connection with the provision of the advice, and

**(viii)** that a recipient of the advice may separately arrange for the provision of advice by another adviser, that could have no material affiliation with and receive no fees or other compensation in connection with the security or other property, and

**(B)** at all times during the provision of advisory services to the participant or beneficiary, the fiduciary adviser--

**(i)** maintains the information described in subparagraph (A) in accurate form and in the manner described in paragraph (8),

**(ii)** provides, without charge, accurate information to the recipient of the advice no less frequently than annually,

**(iii)** provides, without charge, accurate information to the recipient of the advice upon request of the recipient, and

**(iv)** provides, without charge, accurate information to the recipient of the advice concerning any material change to the information required to be provided to the recipient of the advice at a time reasonably contemporaneous to the change in information.

## (7) Other conditions

The requirements of this paragraph are met if--

**(A)** the fiduciary adviser provides appropriate disclosure, in connection with the sale, acquisition, or holding of the security or other property, in accordance with all applicable securities laws,

**(B)** the sale, acquisition, or holding occurs solely at the direction of the recipient of the advice,

**(C)** the compensation received by the fiduciary adviser and affiliates thereof in connection with the sale, acquisition, or holding of the security or other property is reasonable, and

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(D)** the terms of the sale, acquisition, or holding of the security or other property are at least as favorable to the plan as an arm's length [1] transaction would be.

## (8) Standards for presentation of information

### (A) In general

The requirements of this paragraph are met if the notification required to be provided to participants and beneficiaries under paragraph (6)(A) is written in a clear and conspicuous manner and in a manner calculated to be understood by the average plan participant and is sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of the information required to be provided in the notification.

### (B) Model form for disclosure of fees and other compensation

The Secretary shall issue a model form for the disclosure of fees and other compensation required in paragraph (6)(A)(iii) which meets the requirements of subparagraph (A).

## (9) Maintenance for 6 years of evidence of compliance

The requirements of this paragraph are met if a fiduciary adviser who has provided advice referred to in paragraph (1) maintains, for a period of not less than 6 years after the provision of the advice, any records necessary for determining whether the requirements of the preceding provisions of this subsection and of subsection (b)(14) have been met. A transaction prohibited under section 1106 of this title shall not be considered to have occurred solely because the records are lost or destroyed prior to the end of the 6-year period due to circumstances beyond the control of the fiduciary adviser.

## (10) Exemption for plan sponsor and certain other fiduciaries

### (A) In general

Subject to subparagraph (B), a plan sponsor or other person who is a fiduciary (other than a fiduciary adviser) shall not be treated as failing to meet the requirements of this part solely by reason of the provision of investment advice referred to in section 1002(21)(A)(ii) of this

title (or solely by reason of contracting for or otherwise arranging for the provision of the advice), if--

**(i)** the advice is provided by a fiduciary adviser pursuant to an eligible investment advice arrangement between the plan sponsor or other fiduciary and the fiduciary adviser for the provision by the fiduciary adviser of investment advice referred to in such section,

**(ii)** the terms of the eligible investment advice arrangement require compliance by the fiduciary adviser with the requirements of this subsection, and

**(iii)** the terms of the eligible investment advice arrangement include a written acknowledgment by the fiduciary adviser that the fiduciary adviser is a fiduciary of the plan with respect to the provision of the advice.

**(B) Continued duty of prudent selection of adviser and periodic review**

Nothing in subparagraph (A) shall be construed to exempt a plan sponsor or other person who is a fiduciary from any requirement of this part for the prudent selection and periodic review of a fiduciary adviser with whom the plan sponsor or other person enters into an eligible investment advice arrangement for the provision of investment advice referred to in section 1002(21)(A)(ii) of this title. The plan sponsor or other person who is a fiduciary has no duty under this part to monitor the specific investment advice given by the fiduciary adviser to any particular recipient of the advice.

**(C) Availability of plan assets for payment for advice**

Nothing in this part shall be construed to preclude the use of plan assets to pay for reasonable expenses in providing investment advice referred to in section 1002(21)(A)(ii) of this title.

**(11) Definitions**

For purposes of this subsection and subsection (b)(14)--

**(A) Fiduciary adviser**

The term "fiduciary adviser" means, with respect to a plan, a person who is a fiduciary of the plan by reason of the provision of investment advice referred to in section 1002(21)(A)(ii) of this title by the person to a participant or beneficiary of the plan and who is--

**(i)** registered as an investment adviser under the Investment Advisers Act of 1940 (15 U.S.C. 80b-1 et seq.) or under the laws of the State in which the fiduciary maintains its principal office and place of business,

**(ii)** a bank or similar financial institution referred to in subsection (b)(4) or a savings association (as defined in section 1813(b)(1) of Title 12), but only if the advice is provided through a trust department of the bank or similar financial institution or savings association which is subject to periodic examination and review by Federal or State banking authorities,

**(iii)** an insurance company qualified to do business under the laws of a State,

**(iv)** a person registered as a broker or dealer under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.),

**(v)** an affiliate of a person described in any of clauses (i) through (iv), or

**(vi)** an employee, agent, or registered representative of a person described in clauses (i) through (v) who satisfies the requirements of applicable insurance, banking, and securities laws relating to the provision of the advice.

For purposes of this part, a person who develops the computer model described in paragraph (3)(B) or markets the investment advice program or computer model shall be treated as a person who is a fiduciary of the plan by reason of the provision of investment advice referred to in section 1002(21)(A)(ii) of this title to a participant or beneficiary and shall be treated as a fiduciary adviser for purposes of this subsection and subsection (b)(14), except that the Secretary may prescribe rules under which only 1 fiduciary adviser may elect to be treated as a fiduciary with respect to the plan.

**(B) Affiliate**

The term "affiliate" of another entity means an affiliated person of the entity (as defined in section 80a-2(a)(3) of Title 15).

### (C) Registered representative

The term "registered representative" of another entity means a person described in section 3(a)(18) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(18)) (substituting the entity for the broker or dealer referred to in such section) or a person described in section 202(a)(17) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-2(a)(17)) (substituting the entity for the investment adviser referred to in such section).

## (h) Provision of pharmacy benefit services

### (1) In general

Provided that all of the conditions described in paragraph (2) are met, the restrictions imposed by subsections (a), (b)(1), and (b)(2) of section 1106 of this title shall not apply to--

(A) the offering of pharmacy benefit services to a group health plan that is sponsored by an entity described in section 1002(37)(G)(vi) of this title or to any other group health plan that is sponsored by a regional council, local union, or other labor organization affiliated with such entity;

(B) the purchase of pharmacy benefit services by plan participants and beneficiaries of a group health plan that is sponsored by an entity described in section 1002(37)(G)(vi) of this title or of any other group health plan that is sponsored by a regional council, local union, or other labor organization affiliated with such entity; or

(C) the operation or implementation of pharmacy benefit services by an entity described in section 1002(37)(G)(vi) of this title or by any other group health plan that is sponsored by a regional council, local union, or other labor organization affiliated with such entity,

in any arrangement where such entity described in section 1002(37)(G)(vi) of this title or any related organization or subsidiary of such entity provides pharmacy benefit services that include prior authorization and appeals, a retail pharmacy network, pharmacy benefit

administration, mail order fulfillment, formulary support, manufacturer payments, audits, and specialty pharmacy and goods, to any such group health plan.

**(2) Conditions**

The conditions described in this paragraph are the following:

**(A)** The terms of the arrangement are at least as favorable to the group health plan as such group health plan could obtain in a similar arm's length arrangement with an unrelated third party.

**(B)** At least 50 percent of the providers participating in the pharmacy benefit services offered by the arrangement are unrelated to the contributing employers or any other party in interest with respect to the group health plan.

**(C)** The group health plan retains an independent fiduciary who will be responsible for monitoring the group health plan's consultants, contractors, subcontractors, and other service providers for purposes of pharmacy benefit services described in paragraph (1) offered by such entity or any of its related organizations or subsidiaries and monitors the transactions of such entity and any of its related organizations or subsidiaries to ensure that all conditions of this exemption are satisfied during each plan year.

**(D)** Any decisions regarding the provision of pharmacy benefit services described in paragraph (1) are made by the group health plan's independent fiduciary, based on objective standards developed by the independent fiduciary in reliance on information provided by the arrangement.

**(E)** The independent fiduciary of the group health plan provides an annual report to the Secretary and the congressional committees of jurisdiction attesting that the conditions described in subparagraphs (C) and (D) have been met for the applicable plan year, together with a statement that use of the arrangement's services are in the best interest of the participants and beneficiaries in the aggregate for that plan year compared to other similar arrangements the group health plan could have obtained in transactions with an unrelated third party.

**(F)** The arrangement is not designed to benefit any party in interest with respect to the group health plan.

### (3) Violations

In the event an entity described in section 1002(37)(G)(vi) of this title or any affiliate of such entity violates any of the conditions of such exemption, such exemption shall not apply with respect to such entity or affiliate and all enforcement and claims available under this chapter shall apply with respect to such entity or affiliate.

### (4) Rule of construction

Nothing in this subsection shall be construed to modify any obligation of a group health plan otherwise set forth in this chapter.

### (5) Group health plan

In this subsection, the term "group health plan" has the meaning given such term in section 1191b(a) of this title.

## CREDIT(S)

(Pub.L. 93-406, Title I, § 408, Sept. 2, 1974, 88 Stat. 883; Pub.L. 96-364, Title III, § 308, Sept. 26, 1980, 94 Stat. 1295; Pub.L. 97-354, § 5(a)(43), Oct. 19, 1982, 96 Stat. 1697; Pub.L. 99-514, Title XI, § 1114(b)(15)(B), Title XVIII, § 1898(i)(1), Oct. 22, 1986, 100 Stat. 2452, 2957; Pub.L. 101-239, Title VII, §§ 7881(l)(5), 7891(a), 7894(e)(4)(A), Dec. 19, 1989, 103 Stat. 2443, 2445, 2450; Pub.L. 101-508, Title XII, § 12012(b), Nov. 5, 1990, 104 Stat. 1388-571; Pub.L. 103-465, Title VII, § 731(c)(4)(C), Dec. 8, 1994, 108 Stat. 5004; Pub.L. 104-188, Title I, § 1704(n)(2), Aug. 20, 1996, 110 Stat. 1886; Pub.L. 105-34, Title XV, § 1506(b)(2), Aug. 5, 1997, 111 Stat. 1066; Pub.L. 106-170, Title V, § 535(a)(2)(C), Dec. 17, 1999, 113 Stat. 1934; Pub.L. 107-16, Title VI, § 612(b), June 7, 2001, 115 Stat. 100; Pub.L. 108-218, Title II, § 204(b)(3), Apr. 10, 2004, 118 Stat. 609; Pub.L. 108-357, Title VII, § 709(a)(3), Oct. 22, 2004, 118 Stat. 1551; Pub.L. 109-280, Title I, § 108(a)(11), formerly § 107(a)(11), Title VI, §§ 601(a)(1), (2), 611(a)(1), (c)(1), (d)(1), (e)(1), (g)(1), 612(a), Aug. 17, 2006, 120 Stat. 819, 952, 967, 968, 969, 971, 972, 975, renumbered Pub.L. 111-192, Title II, § 202(a), June 25, 2010, 124 Stat. 1297; Pub.L. 110-458, Title I, § 106(a)(1), (b)(1), Dec. 23, 2008, 122 Stat. 5106; Pub.L. 112-141, Div. D, Title II, § 40241(b), July 6, 2012, 126 Stat. 859; Pub.L. 114-41, Title II, § 2007(b), July 31, 2015, 129 Stat. 459; Pub.L. 116-94, Div. P,

Title XIII, § 1302(a), Dec. 20, 2019, 133 Stat. 3204; Pub.L. 116-260, Div. BB, Title II, § 202(a), Dec. 27, 2020, 134 Stat. 2894; Pub.L. 117-328, Div. T, Title I, § 113(d), Title VI, § 606(b)(3), Dec. 29, 2022, 136 Stat. 5296, 5397.)

## Footnotes

1     So in original. Probably should be ''arm's-length''.

2     So in original. The word ''of'' probably should appear.

3     So in original. Probably should be "this subparagraph".

4     So in original. Probably should be followed by "in".

29 U.S.C.A. § 1108, 29 USCA § 1108
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

End of Document     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 29. Labor
    Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
      Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
        Subtitle B. Regulatory Provisions
          Part 4. Fiduciary Responsibility (Refs & Annos)

29 U.S.C.A. § 1109

§ 1109. Liability for breach of fiduciary duty

Currentness

**(a)** Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

**(b)** No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

**CREDIT(S)**

(Pub.L. 93-406, Title I, § 409, Sept. 2, 1974, 88 Stat. 886.)

29 U.S.C.A. § 1109, 29 USCA § 1109
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    1

United States Code Annotated
   Title 29. Labor
      Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
        Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
          Subtitle B. Regulatory Provisions
            Part 4. Fiduciary Responsibility (Refs & Annos)

29 U.S.C.A. § 1113

§ 1113. Limitation of actions

Currentness

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

   **(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

   **(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

### CREDIT(S)

(Pub.L. 93-406, Title I, § 413, Sept. 2, 1974, 88 Stat. 889; Pub.L. 100-203, Title IX, § 9342(b), Dec. 22, 1987, 101 Stat. 1330-371; Pub.L. 101-239, Title VII, §§ 7881(j)(4), 7894(e)(5), Dec. 19, 1989, 103 Stat. 2443, 2450.)

29 U.S.C.A. § 1113, 29 USCA § 1113
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

Case: 23-1073      Document: 34      Filed: 05/17/2023      Pages: 270

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 29. Labor
      Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
         Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
            Subtitle B. Regulatory Provisions
               Part 5. Administration and Enforcement

29 U.S.C.A. § 1132

§ 1132. Civil enforcement [Statutory Text & Notes of Decisions subdivisions I to V]

Effective: December 29, 2022
Currentness

<Notes of Decisions for 29 USCA § 1132 are displayed in mulitple documents.>

**(a) Persons empowered to bring a civil action**

A civil action may be brought--

  **(1)** by a participant or beneficiary--

    **(A)** for the relief provided for in subsection (c) of this section, or

    **(B)** to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

  **(2)** by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

  **(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

**(4)** by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of section 1025(c) or 1032(a) of this title;

**(5)** except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;

**(6)** by the Secretary to collect any civil penalty under paragraph (2), (4), (5), (6), (7), (8), or (9) of subsection (c) or under subsection (i) or (l);

**(7)** by a State to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title);

**(8)** by the Secretary, or by an employer or other person referred to in section 1021(f)(1) of this title, (A) to enjoin any act or practice which violates subsection (f) of section 1021 of this title, or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection;

**(9)** in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title [1] or the terms of the plan, by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts;

**(10)** in the case of a multiemployer plan that has been certified by the actuary to be in endangered or critical status under section 1085 of this title, if the plan sponsor--

**(A)** has not adopted a funding improvement or rehabilitation plan under that section by the deadline established in such section, or

**(B)** fails to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section,

by an employer that has an obligation to contribute with respect to the multiemployer plan or an employee organization that represents active participants in the multiemployer plan, for an order compelling the plan sponsor to adopt a funding improvement or rehabilitation plan or to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section and the funding improvement or rehabilitation plan; or

**(11)** in the case of a multiemployer plan, by an employee representative, or any employer that has an obligation to contribute to the plan, (A) to enjoin any act or practice which violates subsection (k) of section 1021 of this title (or, in the case of an employer, subsection (l) of such section), or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection.

**(b) Plans qualified under Internal Revenue Code; maintenance of actions involving delinquent contributions**

**(1)** In the case of a plan which is qualified under section 401(a), 403(a), or 405(a) [2] of Title 26 (or with respect to which an application to so qualify has been filed and has not been finally determined) the Secretary may exercise his authority under subsection (a)(5) with respect to a violation of, or the enforcement of, parts 2 and 3 of this subtitle (relating to participation, vesting, and funding), only if--

**(A)** requested by the Secretary of the Treasury, or

**(B)** one or more participants, beneficiaries, or fiduciaries, of such plan request in writing (in such manner as the Secretary shall prescribe by regulation) that he exercise such authority on their behalf. In the case of such a request under this paragraph he may exercise such authority only if he determines that such violation affects, or such enforcement is necessary to protect, claims of participants or beneficiaries to benefits under the plan.

**(2)** The Secretary shall not initiate an action to enforce section 1145 of this title.

**(3)** Except as provided in subsections (c)(9) and (a)(6) (with respect to collecting civil penalties under subsection (c)(9)), the Secretary is not authorized to enforce under this part any requirement of part 7 against a health insurance issuer offering health insurance coverage in connection with a group health plan (as defined in section 1191b(a)(1) of this title). Nothing in this paragraph shall affect the authority of the Secretary to issue regulations to carry out such part.

**(c) Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form**

**(1)** Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title, section 1021(e)(1) of this title, section 1021(f) of this title,,[3] section 1025(a) of this title, or section 1032(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

**(2)** The Secretary may assess a civil penalty against any plan administrator of up to $1,000 a day from the date of such plan administrator's failure or refusal to file the annual report required to be filed with the Secretary under section 1021(b)(1) of this title. For purposes of this paragraph, an annual report that has been rejected under section 1024(a)(4) of this title for failure to provide material information shall not be treated as having been filed with the Secretary.

**(3)** Any employer maintaining a plan who fails to meet the notice requirement of section 1021(d) of this title with respect to any participant or beneficiary or who fails to meet the requirements of section 1021(e)(2) of this title with respect to any person or who fails to meet the requirements of section 1082(d)(12)(E)[2] of this title with respect to any person may in the court's discretion be liable to such participant or beneficiary or to such person in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems proper.

**(4)** The Secretary may assess a civil penalty of not more than $1,000 a day for each violation by any person of subsection (j), (k), or (l) of section 1021 of this title or section 1144(e)(3) of this title.

**(5)** The Secretary may assess a civil penalty against any person of up to $1,000 a day from the date of the person's failure or refusal to file the information required to be filed by such person with the Secretary under regulations prescribed pursuant to section 1021(g) of this title.

**(6)** If, within 30 days of a request by the Secretary to a plan administrator for documents under section 1024(a)(6) of this title, the plan administrator fails to furnish the material requested to the Secretary, the Secretary may assess a civil penalty against the plan administrator of up to $100 a day from the date of such failure (but in no event in excess of $1,000 per request). No penalty shall be imposed under this paragraph for any failure resulting from matters reasonably beyond the control of the plan administrator.

**(7)** The Secretary may assess a civil penalty against a plan administrator of up to $100 a day from the date of the plan administrator's failure or refusal to provide notice to participants and beneficiaries in accordance with subsection (i) or (m) of section 1021 of this title. For purposes of this paragraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

**(8)** The Secretary may assess against any plan sponsor of a multiemployer plan a civil penalty of not more than $1,100 per day--

**(A)** for each violation by such sponsor of the requirement under section 1085 of this title to adopt by the deadline established in that section a funding improvement plan or rehabilitation plan with respect to a multiemployer plan which is in endangered or critical status, or

**(B)** in the case of a plan in endangered status which is not in seriously endangered status, for failure by the plan to meet the applicable benchmarks under section 1085 of this title by the end of the funding improvement period with respect to the plan.

**(9)(A)** The Secretary may assess a civil penalty against any employer of up to $100 a day from the date of the employer's failure to meet the notice requirement of section 1181(f)(3)(B)(i)(I) of

this title. For purposes of this subparagraph, each violation with respect to any single employee shall be treated as a separate violation.

**(B)** The Secretary may assess a civil penalty against any plan administrator of up to $100 a day from the date of the plan administrator's failure to timely provide to any State the information required to be disclosed under section 1181(f)(3)(B)(ii) of this title. For purposes of this subparagraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

### (10) Secretarial enforcement authority relating to use of genetic information

#### (A) General rule

The Secretary may impose a penalty against any plan sponsor of a group health plan, or any health insurance issuer offering health insurance coverage in connection with the plan, for any failure by such sponsor or issuer to meet the requirements of subsection (a)(1)(F), (b)(3), (c), or (d) of section 1182 of this title or section 1181 or 1182(b)(1) of this title with respect to genetic information, in connection with the plan.

#### (B) Amount

##### (i) In general

The amount of the penalty imposed by subparagraph (A) shall be $100 for each day in the noncompliance period with respect to each participant or beneficiary to whom such failure relates.

##### (ii) Noncompliance period

For purposes of this paragraph, the term "noncompliance period" means, with respect to any failure, the period--

**(I)** beginning on the date such failure first occurs; and

Case: 23-1073     Document: 34     Filed: 05/17/2023     Pages: 270

**(II)** ending on the date the failure is corrected.

**(C) Minimum penalties where failure discovered**

Notwithstanding clauses (i) and (ii) of subparagraph (D):

**(i) In general**

In the case of 1 or more failures with respect to a participant or beneficiary--

**(I)** which are not corrected before the date on which the plan receives a notice from the Secretary of such violation; and

**(II)** which occurred or continued during the period involved;

the amount of penalty imposed by subparagraph (A) by reason of such failures with respect to such participant or beneficiary shall not be less than $2,500.

**(ii) Higher minimum penalty where violations are more than de minimis**

To the extent violations for which any person is liable under this paragraph for any year are more than de minimis, clause (i) shall be applied by substituting "$15,000" for "$2,500" with respect to such person.

**(D) Limitations**

**(i) Penalty not to apply where failure not discovered exercising reasonable diligence**

No penalty shall be imposed by subparagraph (A) on any failure during any period for which it is established to the satisfaction of the Secretary that the person otherwise liable for such penalty did not know, and exercising reasonable diligence would not have known, that such failure existed.

**(ii) Penalty not to apply to failures corrected within certain periods**

No penalty shall be imposed by subparagraph (A) on any failure if--

**(I)** such failure was due to reasonable cause and not to willful neglect; and

**(II)** such failure is corrected during the 30-day period beginning on the first date the person otherwise liable for such penalty knew, or exercising reasonable diligence would have known, that such failure existed.

**(iii) Overall limitation for unintentional failures**

In the case of failures which are due to reasonable cause and not to willful neglect, the penalty imposed by subparagraph (A) for failures shall not exceed the amount equal to the lesser of--

**(I)** 10 percent of the aggregate amount paid or incurred by the plan sponsor (or predecessor plan sponsor) during the preceding taxable year for group health plans; or

**(II)** $500,000.

**(E) Waiver by Secretary**

In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the penalty imposed by subparagraph (A) to the extent that the payment of such penalty would be excessive relative to the failure involved.

**(F) Definitions**

Terms used in this paragraph which are defined in section 1191b of this title shall have the meanings provided such terms in such section.

**(11)** The Secretary and the Secretary of Health and Human Services shall maintain such ongoing consultation as may be necessary and appropriate to coordinate enforcement under this subsection with enforcement under section 1320b-14(c)(8)[2] of Title 42.

**(12)** The Secretary may assess a civil penalty against any sponsor of a CSEC plan of up to $100 a day from the date of the plan sponsor's failure to comply with the requirements of section 1085a(j)(3) of this title to establish or update a funding restoration plan.

### (d) Status of employee benefit plan as entity

**(1)** An employee benefit plan may sue or be sued under this subchapter as an entity. Service of summons, subpena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan. In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process, service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service.

**(2)** Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

### (e) Jurisdiction

**(1)** Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.

**(2)** Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(f) Amount in controversy; citizenship of parties**

The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

**(g) Attorney's fees and costs; awards in actions involving delinquent contributions**

**(1)** In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

**(2)** In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--

   **(A)** the unpaid contributions,

   **(B)** interest on the unpaid contributions,

   **(C)** an amount equal to the greater of--

      **(i)** interest on the unpaid contributions, or

      **(ii)** liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

   **(D)** reasonable attorney's fees and costs of the action, to be paid by the defendant, and

   **(E)** such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

**(h) Service upon Secretary of Labor and Secretary of the Treasury**

A copy of the complaint in any action under this subchapter by a participant, beneficiary, or fiduciary (other than an action brought by one or more participants or beneficiaries under subsection (a)(1)(B) which is solely for the purpose of recovering benefits due such participants under the terms of the plan) shall be served upon the Secretary and the Secretary of the Treasury by certified mail. Either Secretary shall have the right in his discretion to intervene in any action, except that the Secretary of the Treasury may not intervene in any action under part 4 of this subtitle. If the Secretary brings an action under subsection (a) on behalf of a participant or beneficiary, he shall notify the Secretary of the Treasury.

**(i) Administrative assessment of civil penalty**

In the case of a transaction prohibited by section 1106 of this title by a party in interest with respect to a plan to which this part applies, the Secretary may assess a civil penalty against such party in interest. The amount of such penalty may not exceed 5 percent of the amount involved in each such transaction (as defined in section 4975(f)(4) of Title 26) for each year or part thereof during which the prohibited transaction continues, except that, if the transaction is not corrected (in such manner as the Secretary shall prescribe in regulations which shall be consistent with section 4975(f)(5) of Title 26) within 90 days after notice from the Secretary (or such longer period as the Secretary may permit), such penalty may be in an amount not more than 100 percent of the amount involved. This subsection shall not apply to a transaction with respect to a plan described in section 4975(e)(1) of Title 26.

**(j) Direction and control of litigation by Attorney General**

In all civil actions under this subchapter, attorneys appointed by the Secretary may represent the Secretary (except as provided in section 518(a) of Title 28), but all such litigation shall be subject to the direction and control of the Attorney General.

**(k) Jurisdiction of actions against the Secretary of Labor**

Suits by an administrator, fiduciary, participant, or beneficiary of an employee benefit plan to review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this chapter, or to compel him to take action required under this subchapter, may be brought in the district court of the United States for the district where the plan has its principal office, or in the United States District Court for the District of Columbia.

**(l) Civil penalties on violations by fiduciaries**

**(1)** In the case of--

   **(A)** any breach of fiduciary responsibility under (or other violation of) part 4 of this subtitle by a fiduciary, or

   **(B)** any knowing participation in such a breach or violation by any other person,

the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.

**(2)** For purposes of paragraph (1), the term "applicable recovery amount" means any amount which is recovered from a fiduciary or other person with respect to a breach or violation described in paragraph (1)--

   **(A)** pursuant to any settlement agreement with the Secretary, or

   **(B)** ordered by a court to be paid by such fiduciary or other person to a plan or its participants and beneficiaries in a judicial proceeding instituted by the Secretary under subsection (a)(2) or (a)(5).

**(3)** The Secretary may, in the Secretary's sole discretion, waive or reduce the penalty under paragraph (1) if the Secretary determines in writing that--

   **(A)** the fiduciary or other person acted reasonably and in good faith, or

**(B)** it is reasonable to expect that the fiduciary or other person will not be able to restore all losses to the plan (or to provide the relief ordered pursuant to subsection (a)(9)) without severe financial hardship unless such waiver or reduction is granted.

**(4)** The penalty imposed on a fiduciary or other person under this subsection with respect to any transaction shall be reduced by the amount of any penalty or tax imposed on such fiduciary or other person with respect to such transaction under subsection (i) of this section and section 4975 of Title 26.

**(m) Penalty for improper distribution**

In the case of a distribution to a pension plan participant or beneficiary in violation of section 1056(e) of this title by a plan fiduciary, the Secretary shall assess a penalty against such fiduciary in an amount equal to the value of the distribution. Such penalty shall not exceed $10,000 for each such distribution.

## CREDIT(S)

(Pub.L. 93-406, Title I, § 502, Sept. 2, 1974, 88 Stat. 891; Pub.L. 96-364, Title III, § 306(b), Sept. 26, 1980, 94 Stat. 1295; Pub.L. 99-272, Title X, § 10002(b), Apr. 7, 1986, 100 Stat. 231; Pub.L. 100-203, Title IX, §§ 9342(c), 9344, Dec. 22, 1987, 101 Stat. 1330-372, 1330-373; Pub.L. 101-239, Title II, § 2101(a), (b), Title VII, §§ 7881(b)(5)(B), (j)(2), (3), 7891(a)(1), 7894(f)(1), Dec. 19, 1989, 103 Stat. 2123, 2438, 2442, 2445, 2450; Pub.L. 101-508, Title XII, § 12012(d)(2), Nov. 5, 1990, 104 Stat.1388-573; Pub.L. 103-66, Title IV, § 4301(c)(1) to (3), Aug. 10, 1993, 107 Stat. 376; Pub.L. 103-401, §§ 2, 3, Oct. 22, 1994, 108 Stat. 4172; Pub.L. 103-465, Title VII, § 761(a)(9)(B)(ii), Dec. 8, 1994, 108 Stat. 5033; Pub.L. 104-191, Title I, § 101(b), (e)(2), Aug. 21, 1996, 110 Stat. 1951, 1952; Pub.L. 104-204, Title VI, § 603(b)(3)(E), Sept. 26, 1996, 110 Stat. 2938; Pub.L. 105-34, Title XV, § 1503(c)(2)(B), (d)(7), Aug. 5, 1997, 111 Stat. 1062; Pub.L. 107-204, Title III, § 306(b)(3), July 30, 2002, 116 Stat. 783; Pub.L. 108-218, Title I, §§ 102(d), 103(b), 104(a)(2), Apr. 10, 2004, 118 Stat. 602, 603, 606; Pub.L. 109-280, Title I, § 103(b)(2), Title II, § 202(b), (c), Title V, §§ 502(a)(2), (b)(2), 507(b), 508(a)(2)(C), Title IX, § 902(f)(2), Aug. 17, 2006, 120 Stat. 816, 884, 885, 940, 941, 949, 951, 1039; Pub.L. 110-233, Title I, § 101(e), May 21, 2008, 122 Stat. 886; Pub.L. 110-458, Title I, §§ 101(c)(1)(H), 102(b)(1)(H), (I), Dec. 23, 2008, 122 Stat. 5097, 5101; Pub.L. 111-3, Title III, § 311(b)(1)(E), Feb. 4, 2009, 123 Stat. 70; Pub.L. 113-97, Title I, § 102(b)(6), Apr. 7, 2014, 128 Stat. 1117; Pub.L. 113-235, Div. O, Title I, § 111(d), Dec. 16, 2014, 128 Stat. 2793; Pub.L. 117-328, Div. T, Title III, § 342(c), Dec. 29, 2022, 136 Stat. 5378.)

Case: 23-1073     Document: 34     Filed: 05/17/2023     Pages: 270

# Footnotes

1     So in original. Probably should be "subtitle".

2     See References in Text note set out under this section.

3     So in original.

29 U.S.C.A. § 1132, 29 USCA § 1132
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

---

     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   14

United States Code Annotated
  Title 29. Labor
    Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
      Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
        Subtitle B. Regulatory Provisions
          Part 5. Administration and Enforcement

29 U.S.C.A. § 1144

§ 1144. Other laws

Effective: August 17, 2006
Currentness

**(a) Supersedure; effective date**

Except as provided in subsection (b) of this section, the provisions of this subchapter and
subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to
any employee benefit plan described in section 1003(a) of this title and not exempt under section
1003(b) of this title. This section shall take effect on January 1, 1975.

**(b) Construction and application**

**(1)** This section shall not apply with respect to any cause of action which arose, or any act or
omission which occurred, before January 1, 1975.

**(2)(A)** Except as provided in subparagraph (B), nothing in this subchapter shall be construed to
exempt or relieve any person from any law of any State which regulates insurance, banking, or
securities.

**(B)** Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt
under section 1003(b) of this title (other than a plan established primarily for the purpose of
providing death benefits), nor any trust established under such a plan, shall be deemed to be an
insurance company or other insurer, bank, trust company, or investment company or to be engaged

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

**(3)** Nothing in this section shall be construed to prohibit use by the Secretary of services or facilities of a State agency as permitted under section 1136 of this title.

**(4)** Subsection (a) shall not apply to any generally applicable criminal law of a State.

**(5)(A)** Except as provided in subparagraph (B), subsection (a) shall not apply to the Hawaii Prepaid Health Care Act (Haw.Rev.Stat. §§ 393-1 through 393-51).

**(B)** Nothing in subparagraph (A) shall be construed to exempt from subsection (a)--

**(i)** any State tax law relating to employee benefit plans, or

**(ii)** any amendment of the Hawaii Prepaid Health Care Act enacted after September 2, 1974, to the extent it provides for more than the effective administration of such Act as in effect on such date.

**(C)** Notwithstanding subparagraph (A), parts 1 and 4 of this subtitle, and the preceding sections of this part to the extent they govern matters which are governed by the provisions of such parts 1 and 4, shall supersede the Hawaii Prepaid Health Care Act (as in effect on or after January 14, 1983), but the Secretary may enter into cooperative arrangements under this paragraph and section 1136 of this title with officials of the State of Hawaii to assist them in effectuating the policies of provisions of such Act which are superseded by such parts 1 and 4 and the preceding sections of this part.

**(6)(A)** Notwithstanding any other provision of this section--

**(i)** in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement and is fully insured (or which is a multiple employer welfare arrangement subject to an exemption under subparagraph (B)), any law of any State which regulates insurance may apply to such arrangement to the extent that such law provides--

**(I)** standards, requiring the maintenance of specified levels of reserves and specified levels of contributions, which any such plan, or any trust established under such a plan, must meet in order to be considered under such law able to pay benefits in full when due, and

**(II)** provisions to enforce such standards, and

**(ii)** in the case of any other employee welfare benefit plan which is a multiple employer welfare arrangement, in addition to this subchapter, any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter.

**(B)** The Secretary may, under regulations which may be prescribed by the Secretary, exempt from subparagraph (A)(ii), individually or by class, multiple employer welfare arrangements which are not fully insured. Any such exemption may be granted with respect to any arrangement or class of arrangements only if such arrangement or each arrangement which is a member of such class meets the requirements of section 1002(1) and section 1003 of this title necessary to be considered an employee welfare benefit plan to which this subchapter applies.

**(C)** Nothing in subparagraph (A) shall affect the manner or extent to which the provisions of this subchapter apply to an employee welfare benefit plan which is not a multiple employer welfare arrangement and which is a plan, fund, or program participating in, subscribing to, or otherwise using a multiple employer welfare arrangement to fund or administer benefits to such plan's participants and beneficiaries.

**(D)** For purposes of this paragraph, a multiple employer welfare arrangement shall be considered fully insured only if the terms of the arrangement provide for benefits the amount of all of which the Secretary determines are guaranteed under a contract, or policy of insurance, issued by an insurance company, insurance service, or insurance organization, qualified to conduct business in a State.

**(7)** Subsection (a) shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title), qualified medical child support orders (within the meaning of section 1169(a)(2)(A) of this title), and the provisions of law referred to in section 1169(a)(2)(B)(ii) of this title to the extent they apply to qualified medical child support orders.

Case: 23-1073    Document: 34    Filed: 05/17/2023    Pages: 270

**(8)** Subsection (a) of this section shall not be construed to preclude any State cause of action--

**(A)** with respect to which the State exercises its acquired rights under section 1169(b)(3) of this title with respect to a group health plan (as defined in section 1167(1) of this title), or

**(B)** for recoupment of payment with respect to items or services pursuant to a State plan for medical assistance approved under title XIX of the Social Security Act which would not have been payable if such acquired rights had been executed before payment with respect to such items or services by the group health plan.

**(9)** For additional provisions relating to group health plans, see section 1191 of this title.

**(c) Definitions**

For purposes of this section:

**(1)** The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

**(2)** The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

**(d) Alteration, amendment, modification, invalidation, impairment, or supersedure of any law of the United States prohibited**

Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

**(e) Automatic contribution arrangements**

**(1)** Notwithstanding any other provision of this section, this subchapter shall supersede any law of a State which would directly or indirectly prohibit or restrict the inclusion in any plan of an automatic contribution arrangement. The Secretary may prescribe regulations which would establish minimum standards that such an arrangement would be required to satisfy in order for this subsection to apply in the case of such arrangement.

**(2)** For purposes of this subsection, the term "automatic contribution arrangement" means an arrangement--

**(A)** under which a participant may elect to have the plan sponsor make payments as contributions under the plan on behalf of the participant, or to the participant directly in cash,

**(B)** under which a participant is treated as having elected to have the plan sponsor make such contributions in an amount equal to a uniform percentage of compensation provided under the plan until the participant specifically elects not to have such contributions made (or specifically elects to have such contributions made at a different percentage), and

**(C)** under which such contributions are invested in accordance with regulations prescribed by the Secretary under section 1104(c)(5) of this title.

**(3)(A)** The plan administrator of an automatic contribution arrangement shall, within a reasonable period before such plan year, provide to each participant to whom the arrangement applies for such plan year notice of the participant's rights and obligations under the arrangement which--

**(i)** is sufficiently accurate and comprehensive to apprise the participant of such rights and obligations, and

**(ii)** is written in a manner calculated to be understood by the average participant to whom the arrangement applies.

**(B)** A notice shall not be treated as meeting the requirements of subparagraph (A) with respect to a participant unless--

**(i)** the notice includes an explanation of the participant's right under the arrangement not to have elective contributions made on the participant's behalf (or to elect to have such contributions made at a different percentage),

**(ii)** the participant has a reasonable period of time, after receipt of the notice described in clause (i) and before the first elective contribution is made, to make such election, and

**(iii)** the notice explains how contributions made under the arrangement will be invested in the absence of any investment election by the participant.

## CREDIT(S)

(Pub.L. 93-406, Title I, § 514, Sept. 2, 1974, 88 Stat. 897; Pub.L. 97-473, Title III, §§ 301(a), 302(b), Jan. 14, 1983, 96 Stat. 2611, 2613; Pub.L. 98-397, Title I, § 104(b), Aug. 23, 1984, 98 Stat. 1436; Pub.L. 99-272, Title IX, § 9503(d)(1), Apr. 7, 1986, 100 Stat. 207; Pub.L. 101-239, Title VII, § 7894(f)(2)(A), (3)(A), Dec. 19, 1989, 103 Stat. 2450, 2451; Pub.L. 103-66, Title IV, § 4301(c)(4), Aug. 10, 1993, 107 Stat. 377; Pub.L. 104-191, Title I, § 101(f)(1), Aug. 21, 1996, 110 Stat. 1953; Pub.L. 104-204, Title VI, § 603(b)(3)(G), Sept. 26, 1996, 110 Stat. 2938; Pub.L. 105-200, Title IV, § 401(h)(2)(A)(i), (ii), July 16, 1998, 112 Stat. 668; Pub.L. 109-280, Title IX, § 902(f)(1), Aug. 17, 2006, 120 Stat. 1039.)

29 U.S.C.A. § 1144, 29 USCA § 1144
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 29. Labor
      Subtitle B. Regulations Relating to Labor
         Chapter XXV. Employee Benefits Security Administration, Department of Labor (Refs & Annos)
            Subchapter B. Definitions and Coverage Under the Employee Retirement Income Security Act of 1974
               Part 2510. Definition of Terms Used in Subchapters C, D, E, F, G, and L of this Chapter (Refs & Annos)

29 C.F.R. § 2510.3–101

§ 2510.3–101 Definition of "plan assets"—plan investments.

Currentness

(a) In general.

(1) This section describes what constitute assets of a plan with respect to a plan's investment in another entity for purposes of subtitle A, and parts 1 and 4 of subtitle B, of title I of the Act and section 4975 of the Internal Revenue Code. Paragraph (a)(2) of this section contains a general rule relating to plan investments. Paragraphs (b) through (f) of this section define certain terms that are used in the application of the general rule. Paragraph (g) of this section describes how the rules in this section are to be applied when a plan owns property jointly with others or where it acquires an equity interest whose value relates solely to identified assets of an issuer. Paragraph (h) of this section contains special rules relating to particular kinds of plan investments. Paragraph (i) describes the assets that a plan acquires when it purchases certain guaranteed mortgage certificates. Paragraph (j) of this section contains examples illustrating the operation of this section. The effective date of this section is set forth in paragraph (k) of this section.

(2) Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—

(i) The entity is an operating company, or

(ii) Equity participation in the entity by benefit plan investors is not significant.

Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.

(b) Equity interests and publicly-offered securities.

(1) The term equity interest means any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. A profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust are equity interests.

(2) A publicly-offered security is a security that is freely transferable, part of a class of securities that is widely held and either—

(i) Part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934, or

(ii) Sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days (or such later time as may be allowed by the Securities and Exchange Commission) after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred.

(3) For purposes of paragraph (b)(2) of this section, a class of securities is "widely-held" only if it is a class of securities that is owned by 100 or more investors independent of the issuer and of one another. A class of securities will not fail to be widely-held solely because subsequent to the initial offering the number of independent investors falls below 100 as a result of events beyond the control of the issuer.

Case: 23-1073     Document: 34     Filed: 05/17/2023     Pages: 270

(4) For purposes of paragraph (b)(2) of this section, whether a security is "freely transferable" is a factual question to be determined on the basis of all relevant facts and circumstances. If a security is part of an offering in which the minimum investment is $10,000 or less, however, the following factors ordinarily will not, alone or in combination, affect a finding that such securities are freely transferable:

(i) Any requirement that not less than a minimum number of shares or units of such security be transferred or assigned by any investor, provided that such requirement does not prevent transfer of all of the then remaining shares or units held by an investor;

(ii) Any prohibition against transfer or assignment of such security or rights in respect thereof to an ineligible or unsuitable investor;

(iii) Any restriction on, or prohibition against, any transfer or assignment which would either result in a termination or reclassification of the entity for Federal or state tax purposes or which would violate any state or Federal statute, regulation, court order, judicial decree, or rule of law;

(iv) Any requirement that reasonable transfer or administrative fees be paid in connection with a transfer or assignment;

(v) Any requirement that advance notice of a transfer or assignment be given to the entity and any requirement regarding execution of documentation evidencing such transfer or assignment (including documentation setting forth representations from either or both of the transferor or transferee as to compliance with any restriction or requirement described in this paragraph (b)(4) of this section or requiring compliance with the entity's governing instruments);

(vi) Any restriction on substitution of an assignee as a limited partner of a partnership, including a general partner consent requirement, provided that the economic benefits of ownership of the assignor may be transferred or assigned without regard to such restriction or consent (other than compliance with any other restriction described in this paragraph (b)(4)) of this section;

(vii) Any administrative procedure which establishes an effective date, or an event, such as the completion of the offering, prior to which a transfer or assignment will not be effective; and

(viii) Any limitation or restriction on transfer or assignment which is not created or imposed by the issuer or any person acting for or on behalf of such issuer.

(c) Operating company.

(1) An "operating company" is an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital. The term "operating company" includes an entity which is not described in the preceding sentence, but which is a "venture capital operating company" described in paragraph (d) or a "real estate operating company" described in paragraph (e).

(2) [Reserved]

(d) Venture capital operating company.

(1) An entity is a "venture capital operating company" for the period beginning on an initial valuation date described in paragraph (d)(5)(i) and ending on the last day of the first "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is not a venture capital operating company immediately before the determination) or for the 12 month period following the expiration of an "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is a venture capital operating company immediately before the determination) if—

(i) On such initial valuation date, or at any time within such annual valuation period, at least 50 percent of its assets (other than short-term investments pending long-term commitment or distribution to investors), valued at cost, are invested in venture capital investments described in paragraph (d)(3)(i) or derivative investments described in paragraph (d)(4); and

(ii) During such 12 month period (or during the period beginning on the initial valuation date and ending on the last day of the first annual valuation period), the entity, in the

ordinary course of its business, actually exercises management rights of the kind described in paragraph (d)(3)(ii) with respect to one or more of the operating companies in which it invests.

(2)(i) A venture capital operating company described in paragraph (d)(1) shall continue to be treated as a venture capital operating company during the "distribution period" described in paragraph (d)(2)(ii). An entity shall not be treated as a venture capital operating company at any time after the end of the distribution period.

(ii) The "distribution period" referred to in paragraph (d)(2)(i) begins on a date established by a venture capital operating company that occurs after the first date on which the venture capital operating company has distributed to investors the proceeds of at least 50 percent of the highest amount of its investments (other than short-term investments made pending long-term commitment or distribution to investors) outstanding at any time from the date it commenced business (determined on the basis of the cost of such investments) and ends on the earlier of—

(A) The date on which the company makes a "new portfolio investment", or

(B) The expiration of 10 years from the beginning of the distribution period.

(iii) For purposes of paragraph (d)(2)(ii)(A), a "new portfolio investment" is an investment other than—

(A) An investment in an entity in which the venture capital operating company had an outstanding venture capital investment at the beginning of the distribution period which has continued to be outstanding at all times during the distribution period, or

(B) A short-term investment pending long-term commitment or distribution to investors.

(3)(i) For purposes of this paragraph (d) a "venture capital investment" is an investment in an operating company (other than a venture capital operating company) as to which the investor has or obtains management rights.

(ii) The term "management rights" means contractual rights directly between the investor and an operating company to substantially participate in, or substantially influence the conduct of, the management of the operating company.

(4)(i) An investment is a "derivative investment" for purposes of this paragraph (d) if it is—

(A) A venture capital investment as to which the investor's management rights have ceased in connection with a public offering of securities of the operating company to which the investment relates, or

(B) An investment that is acquired by a venture capital operating company in the ordinary course of its business in exchange for an existing venture capital investment in connection with:

(1) A public offering of securities of the operating company to which the existing venture capital investment relates, or

(2) A merger or reorganization of the operating company to which the existing venture capital investment relates, provided that such merger or reorganization is made for independent business reasons unrelated to extinguishing management rights.

(ii) An investment ceases to be a derivative investment on the later of:

(A) 10 years from the date of the acquisition of the original venture capital investment to which the derivative investment relates, or

(B) 30 months from the date on which the investment becomes a derivative investment.

(5) For purposes of this paragraph (d) and paragraph (e)—

(i) An "initial valuation date" is the later of—

(A) Any date designated by the company within the 12 month period ending with the effective date of this section, or

(B) The first date on which an entity makes an investment that is not a short-term investment of funds pending long-term commitment.

(ii) An "annual valuation period" is a preestablished annual period, not exceeding 90 days in duration, which begins no later than the anniversary of an entity's initial valuation date. An annual valuation period, once established may not be changed except for good cause unrelated to a determination under this paragraph (d) or paragraph (e).

(e) Real estate operating company. An entity is a "real estate operating company" for the period beginning on an initial valuation date described in paragraph (d)(5)(i) and ending on the last day of the first "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is not a real estate operating company immediately before the determination) or for the 12 month period following the expiration of an annual valuation period described in paragraph (d)(5)(ii) (in the case of an entity that is a real estate operating company immediately before the determination) if:

(1) On such initial valuation date, or on any date within such annual valuation period, at least 50 percent of its assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested in real estate which is managed or developed and with respect to which such entity has the right to substantially participate directly in the management or development activities; and

(2) During such 12 month period (or during the period beginning on the initial valuation date and ending on the last day of the first annual valuation period) such entity in the ordinary course of its business is engaged directly in real estate management or development activities.

(f) Participation by benefit plan investors.

(1) Equity participation in an entity by benefit plan investors is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25 percent or

more of the value of any class of equity interests in the entity is held by benefit plan investors (as defined in paragraph (f)(2)). For purposes of determinations pursuant to this paragraph (f), the value of any equity interests held by a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded.

(2) A "benefit plan investor" is any of the following—

(i) Any employee benefit plan (as defined in section 3(3) of the Act), whether or not it is subject to the provisions of title I of the Act,

(ii) Any plan described in section 4975(e)(1) of the Internal Revenue Code,

(iii) Any entity whose underlying assets include plan assets by reason of a plan's investment in the entity.

(3) An "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. For purposes of this paragraph (f)(3), "control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(g) Joint ownership. For purposes of this section, where a plan jointly owns property with others, or where the value of a plan's equity interest in an entity relates solely to identified property of the entity, such property shall be treated as the sole property of a separate entity.

(h) Specific rules relating to plan investments. Notwithstanding any other provision of this section —

(1) Except where the entity is an investment company registered under the Investment Company Act of 1940, when a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity:

(i) A group trust which is exempt from taxation under section 501(a) of the Internal Revenue Code pursuant to the principles of Rev. Rul. 81–100, 1981–1 C.B. 326,

(ii) A common or collective trust fund of a bank,

(iii) A separate account of an insurance company, other than a separate account that is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited, to the plan and to any participant or beneficiary of the plan (including an annuitant) are not affected in any manner by the investment performance of the separate account.

(2) When a plan acquires or holds an interest in any entity (other than an insurance company licensed to do business in a State) which is established or maintained for the purpose of offering or providing any benefit described in section 3(1) or section 3(2) of the Act to participants or beneficiaries of the investing plan, its assets will include its investment and an undivided interest in the underlying assets of that entity.

(3) When a plan or a related group of plans owns all of the outstanding equity interests (other than director's qualifying shares) in an entity, its assets include those equity interests and all of the underlying assets of the entity. This paragraph (h)(3) does not apply, however, where all of the outstanding equity interests in an entity are qualifying employer securities described in section 407(d)(5) of the Act, owned by one or more eligible individual account plan(s) (as defined in section 407(d)(3) of the Act) maintained by the same employer, provided that substantially all of the participants in the plan(s) are, or have been, employed by the issuer of such securities or by members of a group of affiliated corporations (as determined under section 407(d)(7) of the Act) of which the issuer is a member.

(4) For purposes of paragraph (h)(3), a "related group" of employee benefit plans consists of every group of two or more employee benefit plans—

(i) Each of which receives 10 percent or more of its aggregate contributions from the same employer or from members of the same controlled group of corporations (as determined under section 1563(a) of the Internal Revenue Code, without regard to section 1563(a)(4) thereof); or

(ii) Each of which is either maintained by, or maintained pursuant to a collective bargaining agreement negotiated by, the same employee organization or affiliated employee organizations. For purposes of this paragraph, an "affiliate" of an employee organization means any person controlling, controlled by, or under common control with such organization, and includes any organization chartered by the same parent body, or governed by the same constitution and bylaws, or having the relation of parent and subordinate.

(i) Governmental mortgage pools.

(1) Where a plan acquires a guaranteed governmental mortgage pool certificate, as defined in paragraph (i)(2), the plan's assets include the certificate and all of its rights with respect to such certificate under applicable law, but do not, solely by reason of the plan's holding of such certificate, include any of the mortgages underlying such certificate.

(2) A "guaranteed governmental mortgage pool certificate" is a certificate backed by, or evidencing an interest in, specified mortgages or participation interests therein and with respect to which interest and principal payable pursuant to the certificate is guaranteed by the United States or an agency or instrumentality thereof. The term "guaranteed governmental mortgage pool certificate" includes a mortgage pool certificate with respect to which interest and principal payable pursuant to the certificate is guaranteed by:

(i) The Government National Mortgage Association;

(ii) The Federal Home Loan Mortgage Corporation; or

(iii) The Federal National Mortgage Association.

(j) Examples. The principles of this section are illustrated by the following examples:

(1) A plan, P, acquires debentures issued by a corporation, T, pursuant to a private offering. T is engaged primarily in investing and reinvesting in precious metals on behalf of its shareholders, all of which are benefit plan investors. By its terms, the debenture is convertible

to common stock of T at P's option. At the time of P's acquisition of the debentures, the conversion feature is incidental to T's obligation to pay interest and principal. Although T is not an operating company, P's assets do not include an interest in the underlying assets of T because P has not acquired an equity interest in T. However, if P exercises its option to convert the debentures to common stock, it will have acquired an equity interest in T at that time and (assuming that the common stock is not a publicly-offered security and that there has been no change in the composition of the other equity investors in T) P's assets would then include an undivided interest in the underlying assets of T.

(2) A plan, P, acquires a limited partnership interest in a limited partnership, U, which is established and maintained by A, a general partner in U. U has only one class of limited partnership interests. U is engaged in the business of investing and reinvesting in securities. Limited partnership interests in U are offered privately pursuant to an exemption from the registration requirements of the Securities Act of 1933. P acquires 15 percent of the value of all the outstanding limited partnership interests in U, and, at the time of P's investment, a governmental plan owns 15 percent of the value of those interests. U is not an operating company because it is engaged primarily in the investment of capital. In addition, equity participation by benefit plan investors is significant because immediately after P's investment such investors hold more than 25 percent of the limited partnership interests in U. Accordingly, P's assets include an undivided interest in the underlying assets of U, and A is a fiduciary of P with respect to such assets by reason of its discretionary authority and control over U's assets. Although the governmental plan's investment is taken into account for purposes of determining whether equity participation by benefit plan investors is significant, nothing in this section imposes fiduciary obligations on A with respect to that plan.

(3) Assume the same facts as in paragraph (j)(2), except that P acquires only 5 percent of the value of all the outstanding limited partnership interests in U, and that benefit plan investors in the aggregate hold only 10 percent of the value of the limited partnership interests in U. Under these facts, there is no significant equity participation by benefit plan investors in U, and, accordingly, P's assets include its limited partnership interest in U, but do not include any of the underlying assets of U. Thus, A would not be a fiduciary of P by reason of P's investment.

(4) Assume the same facts as in paragraph (j)(3) and that the aggregate value of the outstanding limited partnership interests in U is $10,000 (and that the value of the interests held by benefit plan investors is thus $1000). Also assume that an affiliate of A owns limited partnership interests in U having a value of $6500. The value of the limited partnership interests held by A's affiliate are disregarded for purposes of determining whether there is

significant equity participation in U by benefit plan investors. Thus, the percentage of the aggregate value of the limited partnership interests held by benefit plan investors in U for purposes of such a determination is approximately 28.6% ($1000/$3500). Therefore there is significant benefit plan investment in T.

(5) A plan, P, invests in a limited partnership, V, pursuant to a private offering. There is significant equity participation by benefit plan investors in V. V acquires equity positions in the companies in which it invests, and, in connection with these investments, V negotiates terms that give it the right to participate in or influence the management of those companies. Some of these investments are in publicly-offered securities and some are in securities acquired in private offerings. During its most recent valuation period, more than 50 percent of V's assets, valued at cost, consisted of investments with respect to which V obtained management rights of the kind described above. V's managers routinely consult informally with, and advise, the management of only one portfolio company with respect to which it has management rights, although it devotes substantial resources to its consultations with that company. With respect to the other portfolio companies, V relies on the managers of other entities to consult with and advise the companies' management. V is a venture capital operating company and therefore P has acquired its limited partnership investment, but has not acquired an interest in any of the underlying assets of V. Thus, none of the managers of V would be fiduciaries with respect to P solely by reason of its investment. In this situation, the mere fact that V does not participate in or influence the management of all its portfolio companies does not affect its characterization as a venture capital operating company.

(6) Assume the same facts as in paragraph (j)(5) and the following additional facts: V invests in debt securities as well as equity securities of its portfolio companies. In some cases V makes debt investments in companies in which it also has an equity investment; in other cases V only invests in debt instruments of the portfolio company. V's debt investments are acquired pursuant to private offerings and V negotiates covenants that give it the right to substantially participate in or to substantially influence the conduct of the management of the companies issuing the obligations. These covenants give V more significant rights with respect to the portfolio companies' management than the covenants ordinarily found in debt instruments of established, creditworthy companies that are purchased privately by institutional investors. V routinely consults with and advises the management of its portfolio companies. The mere fact that V's investments in portfolio companies are debt, rather than equity, will not cause V to fail to be a venture capital operating company, provided it actually obtains the right to substantially participate in or influence the conduct of the management of its portfolio companies and provided that in the ordinary course of its business it actually exercises those rights.

(7) A plan, P, invests (pursuant to a private offering) in a limited partnership, W, that is engaged primarily in investing and reinvesting assets in equity positions in real property. The properties acquired by W are subject to long-term leases under which substantially all management and maintenance activities with respect to the property are the responsibility of the lessee. W is not engaged in the management or development of real estate merely because it assumes the risks of ownership of income-producing real property, and W is not a real estate operating company. If there is significant equity participation in W by benefit plan investors, P will be considered to have acquired an undivided interest in each of the underlying assets of W.

(8) Assume the same facts as in paragraph (j)(7) except that W owns several shopping centers in which individual stores are leased for relatively short periods to various merchants (rather than owning properties subject to long-term leases under which substantially all management and maintenance activities are the responsibility of the lessee). W retains independent contractors to manage the shopping center properties. These independent contractors negotiate individual leases, maintain the common areas and conduct maintenance activities with respect to the properties. W has the responsibility to supervise and the authority to terminate the independent contractors. During its most recent valuation period more than 50 percent of W's assets, valued at cost, are invested in such properties. W is a real estate operating company. The fact that W does not have its own employees who engage in day-to-day management and development activities is only one factor in determining whether it is actively managing or developing real estate. Thus, P's assets include its interest in W, but do not include any of the underlying assets of W.

(9) A plan, P, acquires a limited partnership interest in X pursuant to a private offering. There is significant equity participation in X by benefit plan investors. X is engaged in the business of making "convertible loans" which are structured as follows: X lends a specified percentage of the cost of acquiring real property to a borrower who provides the remaining capital needed to make the acquisition. This loan is secured by a mortgage on the property. Under the terms of the loan, X is entitled to receive a fixed rate of interest payable out of the initial cash flow from the property and is also entitled to that portion of any additional cash flow which is equal to the percentage of the acquisition cost that is financed by its loan. Simultaneously with the making of the loan, the borrower also gives X an option to purchase an interest in the property for the original principal amount of the loan at the expiration of its initial term. X's percentage interest in the property, if it exercises this option, would be equal to the percentage of the acquisition cost of the property which is financed by its loan. The parties to the transaction contemplate that the option ordinarily will be exercised at the expiration of the loan term if the property has appreciated in value. X and the borrower also agree that, if

the option is exercised, they will form a limited partnership to hold the property. X negotiates loan terms which give it rights to substantially influence, or to substantially participate in, the management of the property which is acquired with the proceeds of the loan. These loan terms give X significantly greater rights to participate in the management of the property than it would obtain under a conventional mortgage loan. In addition, under the terms of the loan, X and the borrower ratably share any capital expenditures relating to the property. During its most recent valuation period, more than 50 percent of the value of X's assets valued at cost consisted of real estate investments of the kind described above. X, in the ordinary course of its business, routinely exercises its management rights and frequently consults with and advises the borrower and the property manager. Under these facts, X is a real estate operating company. Thus, P's assets include its interest in X, but do not include any of the underlying assets of X.

(10) In a private transaction, a plan, P, acquires a 30 percent participation in a debt instrument that is held by a bank. Since the value of the participation certificate relates solely to the debt instrument, that debt instrument is, under paragraph (g), treated as the sole asset of a separate entity. Equity participation in that entity by benefit plan investors is significant since the value of the plan's participation exceeds 25 percent of the value of the instrument. In addition, the hypothetical entity is not an operating company because it is primarily engaged in the investment of capital (i.e., holding the debt instrument). Thus, P's assets include the participation and an undivided interest in the debt instrument, and the bank is a fiduciary of P to the extent it has discretionary authority or control over the debt instrument.

(11) In a private transaction, a plan, P, acquires 30% of the value of a class of equity securities issued by an operating company, Y. These securities provide that dividends shall be paid solely out of earnings attributable to certain tracts of undeveloped land that are held by Y for investment. Under paragraph (g), the property is treated as the sole asset of a separate entity. Thus, even though Y is an operating company, the hypothetical entity whose sole assets are the undeveloped tracts of land is not an operating company. Accordingly, P is considered to have acquired an undivided interest in the tracts of land held by Y. Thus, Y would be a fiduciary of P to the extent it exercises discretionary authority or control over such property.

(12) A medical benefit plan, P, acquires a beneficial interest in a trust, Z, that is not an insurance company licensed to do business in a State. Under this arrangement, Z will provide the benefits to the participants and beneficiaries of P that are promised under the terms of the plan. Under paragraph (h)(2), P's assets include its beneficial interest in Z and an undivided interest in each of its underlying assets. Thus, persons with discretionary authority or control over the assets of Z would be fiduciaries of P.

(k) Effective date and transitional rules.

(1) In general, this section is effective for purposes of identifying the assets of a plan on or after March 13, 1987. Except as a defense, this section shall not apply to investments in an entity in existence on March 13, 1987, if no plan subject to title I of the Act or plan described in section 4975(e)(1) of the Code (other than a plan described in section 4975(g)(2) or (3)) acquires an interest in the entity from an issuer or underwriter at any time on or after March 13, 1987 except pursuant to a contract binding on the plan in effect on March 13, 1987 with an issuer or underwriter to acquire an interest in the entity.

(2) Notwithstanding paragraph (k)(1), this section shall not, except as a defense, apply to a real estate entity described in section 11018(a) of Pub.L. 99–272.

**Credits**
[51 FR 41280, Nov. 13, 1986; 51 FR 47226, Dec. 31, 1986]

SOURCE: 40 FR 34530, Aug. 15, 1975; 51 FR 41280, Nov. 13, 1986; 53 FR 17630, May 17, 1988; 68 FR 16400, April 3, 2003; 68 FR 17480, April 9, 2003; 69 FR 52125, Aug. 24, 2004; 78 FR 39894, July 2, 2013; 79 FR 51099, Aug. 27, 2014; 80 FR 41344, July 14, 2015; 81 FR 20997, April 8, 2016; 81 FR 59476, Aug. 30, 2016; 81 FR 92653, Dec. 20, 2016; 82 FR 16918, April 7, 2017; 83 FR 28961, June 21, 2018; 84 FR 29000, June 20, 2019; 84 FR 37543, July 31, 2019; 85 FR 72955, Nov. 16, 2020, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1002(1), 1002(2), 1002(3), 1002(5), 1002(16), 1002(21), 1002(37), 1002(38), 1002(40), 1002(42), 1002(43), 1002(44), 1031, and 1135; Secretary of Labor's Order No. 1–2011, 77 FR 1088 (Jan. 9, 2012); Sec. 2510.3–101 and 2510.3–102 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 5 App. (E.O. 12108, 44 FR 1065 (Jan. 3, 1979)) and 29 U.S.C. 1135 note. Sec. 2510.3–38 is also issued under sec. 1, Pub.L. 105–72, 111 Stat. 1457 (1997).

Notes of Decisions (19)

Current through May 12, 2023, 88 FR 30679.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.