No. 23-1073

# In the
# United States Court of Appeals
# For the Seventh Circuit

———————

APPVION, INC. RETIREMENT SAVINGS AND EMPLOYEE STOCK OWNERSHIP PLAN, by and through Grant Lyon in his capacity as the ESOP Administrative Committee of Appvion, Inc.,

*Plaintiff-Appellant*,

v.

DOUGLAS P. BUTH, et al.,

*Defendants-Appellees*.

———————

Appeal from the United States District Court for the
Eastern District of Wisconsin, Case No. 1:18-CV-01861
The Honorable William C. Griesbach, Judge Presiding.

———————

**BRIEF OF DEFENDANTS-APPELLEES STOUT RISIUS ROSS, LLC, STOUT RISIUS ROSS, INC., SCOTT LEVINE, AND AZIZ EL-TAHCH**

———————

Lars C. Golumbic
Kara P. Wheatley
Larry M. Blocho
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 857-0620

*Counsel for Defendants-Appellees Stout Risius Ross, LLC, Stout Risius Ross, Inc., Scott Levine, and Aziz El-Tahch*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1073

Short Caption: Appvion, Inc. Ret. Savs. Plan & ESOP v. Douglas P. Buth, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

⬜       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Appellees Stout Risius Ross, LLC (f/k/a Stout Risius Ross, Inc.) ("SRR"); Stout Risius Ross, Inc.; Scott Levine; and

 Aziz El-Tahch

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Groom Law Group, Chartered and Law Firm of Conway, Olejniczak & Jerry

(3)    If the party, amicus or intervenor is a corporation:

   i)       Identify all its parent corporations, if any; and

      Stout Risius Ross LLC is wholly owned by Stout Holdings I, Inc. and Stout Holdings II, Inc.

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       No public company owns any of the stock of Stout Holdings I, Inc., Stout Holdings II, Inc. or SRR

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Lars C. Golumbic            Date: 01/13/2023

Attorney's Printed Name:  Lars C. Golumbic

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✓    **No** ⬜

Address:  1701 Pennsylvania Ave. N.W., Washington D.C., 20006

Phone Number:  (202) 861-6615            Fax Number:  (202) 659-4503

E-Mail Address: lgolumbic@groom.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-1073_____

Short Caption: _Appvion, Inc. Ret. Savs. Plan & ESOP v. Douglas P. Buth, et al._____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

_Appellees Stout Risius Ross, LLC (f/k/a Stout Risius Ross, Inc.) ("SRR"); Stout Risius Ross, Inc.; Scott Levine; and_

_Aziz El-Tahch_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_Groom Law Group, Chartered and Law Firm of Conway, Olejniczak & Jerry_____

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        _Stout Risius Ross LLC is wholly owned by Stout Holdings I, Inc. and Stout Holdings II, Inc._____

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        _No public company owns any of the stock of Stout Holdings I, Inc., Stout Holdings II, Inc. or SRR_____

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

_____

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

_____

Attorney's Signature: _/s/ Kara P. Wheatley_____ Date: _01/13/2023_____

Attorney's Printed Name: _Kara P. Wheatley_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: _1701 Pennsylvania Ave. N.W., Washington D.C., 20006_____

_____

Phone Number: _(202) 861-6339_____ Fax Number: _(202) 659-4503_____

E-Mail Address: _kwheatley@groom.com_____

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1073</u>

Short Caption: <u>Appvion, Inc. Ret. Savs. Plan & ESOP v. Douglas P. Buth, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Appellees Stout Risius Ross, LLC (f/k/a Stout Risius Ross, Inc.) ("SRR"); Stout Risius Ross, Inc.; Scott Levine; and</u>

<u>Aziz El-Tahch</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Groom Law Group, Chartered and Law Firm of Conway, Olejniczak & Jerry</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>Stout Risius Ross LLC is wholly owned by Stout Holdings I, Inc. and Stout Holdings II, Inc.</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>No public company owns any of the stock of Stout Holdings I, Inc., Stout Holdings II, Inc. or SRR</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>/s/ Larry M. Blocho Jr.</u>      Date: <u>01/31/2023</u>

Attorney's Printed Name: <u>Larry M. Blocho Jr.</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>1701 Pennsylvania Ave. N.W., Washington D.C., 20006</u>

Phone Number: <u>(202) 861-6634</u>      Fax Number: <u>(202) 659-4503</u>

E-Mail Address: <u>lblocho@groom.com</u>

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel for Appellees Stout Risius Ross, LLC and Stout Risius Ross, Inc. (together, "Stout") states that Stout Holdings I, Inc. and Stout Holdings II, Inc. wholly own Stout Risius Ross, LLC, formerly known as Stout Risius Ross, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

JURISDICTIONAL STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES ....................................................................... 1

STATEMENT OF THE CASE ........................................................................... 2

   I.  Facts .......................................................................................................... 2

   II.  Procedural History ................................................................................ 10

      A.  The First Amended Complaint.................................................... 10

      B.  The Second Amended Complaint ................................................ 11

STANDARD OF REVIEW............................................................................... 12

SUMMARY OF ARGUMENT......................................................................... 13

ARGUMENT..................................................................................................... 16

   I.  The District Court Properly Dismissed the Federal Securities Fraud Claim
      Asserted Against the Stout Defendants ................................................... 16

      A.  The SAC Fails to Allege a Strong Inference of Scienter as to the Stout
         Defendants.................................................................................... 16

         1.  Lyon Admits That the Stout Defendants Did Not Have a Motive to
            Engage in the Alleged Fraud ............................................... 17

         2.  The SAC's Allegations Do Not Give Rise to a Strong Inference of
            Scienter ............................................................................... 18

         3.  The Supposed "Red Flags" in Stout's Valuation Reports Do Not Give
            Rise to a Strong Inference of Scienter ................................. 24

            a.  Stout Exercised its Professional Judgment Consistent With Industry
               Standards and ERISA When it Considered Third Party Evidence
               Regarding the Company's Value .................................... 26

            b.  Stout Exercised its Professional Judgment Consistent With Industry
               Standards When it Considered Financial Projections Prepared in the
               Ordinary Course ............................................................. 28

            c.  Stout Exercised its Professional Judgment Consistent With Industry
               Standards When it Accounted for the Company's Pension
               Liability ......................................................................... 30

i

B.   The SAC's Failure to Plead Reliance Also Warrants Dismissal of the Federal Securities Fraud Claim Against the Stout Defendants ....................................33

II.  The District Court Correctly Dismissed Lyon's State Law Fraud and Negligent Misrepresentation Claims .........................................................................36

   A.   Section 514 Preempts Lyon's Fraud and Negligent Misrepresentation Claims .....................................................................................................36

      1.  ERISA Section 514 is a "Powerful" Preemption Provision..................36

      2.  Lyon's Fraud and Negligent Misrepresentation Claims "Relate  To" the ESOP ..........................................................................................38

      3.  Allowing Lyon's Fraud and Negligent Misrepresentation Claims to Proceed Would Impermissibly Supplement ERISA's Enforcement Scheme ...........................................................................................42

   B.   The FAC Fails to State Claims for Fraud and Negligent Misrepresentation ................................................................................43

      1.  The Valuations Are Not Statements of Fact...........................................44

      2.  The FAC Fails to State a Claim for Fraud ............................................44

III. The District Court Properly Dismissed Lyon's Claims Against the Individual Stout Defendants ........................................................................................45

IV.  Lyon Abandoned His ERISA Section 502(a)(3) Claim ..........................................46

CONCLUSION ..........................................................................................................47

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)7) ...........................48

CERTIFICATE OF SERVICE ....................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                              **Page(s)**

*Aetna Health Inc. v. Davila,*
   542 U.S. 200 (2004) ..................................................................................... 36, 37

*Airports Co., Inc. v. Custom Benefits Servs. of Austin, Inc.,*
   28 F.3d 1062 (10th Cir. 1994) ........................................................................... 41

*Arndt v. AON Hewitt Benefit Payment Servs., LLC,*
   No. 15-C-750, 2015 WL 7313392 (E.D. Wis. Nov. 19, 2015) ...................................... 42

*Bank of Am. N.A. v. Knight,*
   725 F.3d 815 (7th Cir. 2013) ............................................................................. 45

*Beerly v. Dep't of Treasury,*
   768 F.2d 942) (7th Cir. 1985) ............................................................................ 26

*Cede & Co. v. Technicolor, Inc.,*
   No. Civ.A 7129, 2003 WL 23700218 (Del. Ch. July 9, 2004) ...................................... 28

*Consol. Papers, Inc. v. Dorr-Oliver, Inc.,*
   451 N.W.2d 456 (Wis. Ct. App. 1989) ................................................................. 44

*Cornielsen v. Infinium Cap. Mgmt., LLC,*
   916 F.3d 589 (7th Cir. 2019) ............................................................................. 16

*Dibble v. Quinn,*
   793 F.3d 803 (7th Cir. 2015) .......................................................................... 33, 43

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (7th Cir. 1990) .......................................................................... 17, 23

*Donovan v. Cunningham,*
   716 F.2d 1455 (5th Cir. 1983) ........................................................................... 26

*Fidel v. Farley,*
   392 F.3d 220 (6th Cir. 2004) .......................................................................... 14, 24

*Gable v. City of Chi.,*
   296 F.3d 531 (7th Cir. 2002) ............................................................................. 46

*Geller v. Cnty. Line Auto Sales, Inc.,*
   86 F.3d 18 (2d Cir. 1996) ................................................................................. 41

iii

*Gerosa v. Savasta & Co.*,
  329 F.3d 317 (2d Cir. 2003) ........................................................... 41

*Gilbert v. MPM Enters., Inc.*,
  709 A.2d 663 (Del. Ch. 1997) ........................................................ 28

*Gobeille v. Liberty Mutual Ins. Co.*,
  577 U.S. 312 (2016) ....................................................................... 37

*Halperin v. Richards*,
  No. 1:19-cv-01561-WCG, 2020 WL 5095309 (E.D. Wis. Aug. 28, 2020) .................... 9

*Halperin v. Richards*,
  7 F.4th 534 (7th Cir. 2021) ................................................... passim

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
  530 U.S. 238 (2000) ....................................................................... 42

*Henson v. CSC Credit Servs.*,
  29 F.3d 280 (7th Cir. 1994) ............................................................ 21

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .......................................................... 16

*Jones Motor Corp., Inc. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*,
  197 F.3d 1190 (7th Cir. 1999) ........................................................ 46

*Kaplan v. Shure Bros., Inc.*,
  153 F.3d 413 (7th Cir. 1998) ..................................................... 46, 47

*Kloots v. Am. Express Tax & Bus. Servs., Inc.*,
  233 F. App'x 485 (6th Cir. 2007) .................................................... 41

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ....................................................................... 36

*N.M. State Inv. Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011) ..................................................... 24, 25

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987) .................................................................... 37, 42

*Podraza v. Whiting*,
  790 F.3d 828 (8th Cir. 2015) .......................................................... 24

iv

*Porter v. DiBlasio*,
   93 F.3d 301 (7th Cir. 1996)...................................................................... 12

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008)...................................................................... 16

*Rendler v. Markos*,
   453 N.W.2d 202 (Wis. Ct. App. 1990) ...................................................... 44

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ...................................................................................... 37

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*
   *Inc.*, 552 U.S. 148 (2008) ............................................................... 14, 34, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................................. 16, 21

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
   475 F.3d 824 (7th Cir. 2007)...................................................................... 17

*Trs. of AFTRA Health Fund v. Biondi*,
   303 F.3d 765 (7th Cir. 2002)................................................................ 12, 40

*Van Den Heuvel v. AI Credit Corp.*,
   951 F. Supp. 2d 1064 (E.D. Wis. 2013)..................................................... 45

*Warner v. Benjamin*,
   62 N.W. 179 (Wis. 1895) ........................................................................... 43

*Wright v. Associated Ins. Cos.*,
   29 F.3d 1244 (7th Cir. 1994)........................................................................ 3

**Statutes**

15 U.S.C. § 78u-4 ............................................................................................ 16

26 U.S.C. § 401(a) ........................................................................................... 37

29 U.S.C. § 1001 ............................................................................................... 1

29 U.S.C. § 1104(a) ......................................................................................... 10

29 U.S.C. § 1132(a) ................................................................................... 40, 42

29 U.S.C. § 1144 ............................................................................................. 37

**Rules**

Fed. R. Civ. P. 8.................................................................................46

Fed. R. Civ. P. 12(b)(6) ........................................................................ 1

**Regulations**

Proposed Regulation Relating to the Definition of Adequate Consideration,
    53 Fed. Reg. 17,632 (May 17, 1988) ................................................27

**Other Authorities**

Compl., *Halperin v. Richards*,
    Adv., Proc. No. 18-50955 (Bankr. D. Del. Nov. 30, 2018) ............................................9

## JURISDICTIONAL STATEMENT

The Stout Defendants[1] agree that the Statement of Jurisdiction submitted by Plaintiff-Appellant, Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon in his capacity as the ESOP Administrative Committee of Appvion, Inc. ("Lyon"), is complete and correct, with one exception. The Stout Defendants disagree with the characterization of the facts described relating to the two claims that are pending against Argent Trust Company, N.A. ("Argent") in the District Court. *See* Opening Brief ("Op. Br.") at 1-2.

## STATEMENT OF THE ISSUES

1. Whether the District Court properly dismissed Lyon's federal securities fraud claim, Count 35 of the Second Amended Complaint, DE 191[2] ("Second Amended Complaint" or "SAC"), pursuant to Federal Rule of Civil Procedure 12(b)(6), where Lyon failed to plead a strong inference of scienter.

2. Whether the District Court properly dismissed Lyon's state law fraud and negligent misrepresentation claims, Counts 10 and 12 of the First Amended Complaint, DE 77 ("First Amended Complaint" or "FAC"), as preempted by the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*, where the claims directly relate to the administration of an ERISA-governed employee stock ownership plan.

---

[1] "Stout Defendants" refers to Stout Risius Ross, Inc., Stout Risius Ross, LLC, Scott Levine, and Aziz El-Tahch. "Stout" refers to the two Stout corporate entities together, and "Individual Stout Defendants" refers to Messrs. Levine and El-Tahch.

[2] Cites to "DE_" are to the docket entries of the record in the District Court.

3.      Even if not preempted, whether Lyon has pleaded state law fraud and negligent misrepresentation claims where the alleged misrepresentations at issue, Stout's valuations, were professional opinions and not statements of fact.

4.      Whether Lyon has alleged any claims for relief against the Individual Stout Defendants even though he has not asserted any specific allegations of wrongdoing against them.

5.      Even if Lyon has stated claims for relief against the Individual Stout Defendants, whether Lyon abandoned those claims by failing to reference them in his Opening Brief.

6.      Whether Lyon abandoned his ERISA section 502(a)(3) claim against the Stout Defendants by failing to challenge the District Court's dismissal of this cause of action.

## STATEMENT OF THE CASE

### I.     Facts

*The Appvion ESOP.*  Appvion, Inc. ("Appvion" or the "Company") sponsored for its employees the Appvion Retirement Savings and Employee Stock Ownership Plan (the "Plan" or the "ESOP"), an employee benefit pension plan governed by ERISA.  B116, SAC ¶ 98.[3]  The Appvion ESOP Administrative Committee (the "ESOP Committee") was the named fiduciary of the Plan, which operated as a tax-qualified retirement plan investing primarily in the stock of Appvion's parent company, Paperweight Development

---

[3]  Cites to "A_" are to Lyon's Circuit Rule 30(a) Appendix and cites to "B_" are to Lyon's Circuit Rule 30(b) Appendix.

Corporation ("PDC"). B105, SAC ¶ 71; SA3, SAC ¶ 165.[4] As an employee benefit plan, the ESOP provided Appvion's employees an ownership interest in the Company in the form of shares of Appvion stock. B116, SAC ¶¶ 97-99.

**Stout.** Stout is a leading financial advisory firm with one of the largest business valuation practices in the country.[5] Stout's ESOP and ERISA advisory services practice has provided ESOP services to every major institutional ESOP trustee in the United States.[6]

**Stout's Limited Role as the Independent Appraiser Engaged by the ESOP's Trustees.** The Company delegated to the ESOP's Trustee[7] certain fiduciary duties with respect to the Plan under ERISA. Those duties included determining on a semi-annual basis the share price of the Company stock held in the Plan based upon the valuation of an

---

[4] Cites to "SA" are to the Supplemental Appendix concurrently being filed with the brief of State Street Bank and Trust Company ("State Street"). The Supplemental Appendix includes a sample engagement agreement, SA49-54, and a sample valuation report, SA55-166. Both documents were attached as exhibits to the Stout Defendants' Motions to Dismiss. In his complaints, Lyon explicitly references, puts at issue, and/or incorporates Stout's engagement agreements and valuation reports. *See, e.g.*, B104, SAC ¶ 60; B133-65, SAC ¶¶ 197-287; DE 77, FAC ¶¶ 98-99, 218-19, 221-22, 235, 237, 241-318. Therefore, the engagement agreements and valuation reports were properly before the District Court as attachments to the Motions to Dismiss. *See Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). Lyon did not dispute this point below. *See* DE 224 Stout Defendants' Reply in Support of Mot. to Dismiss Second Am. Compl. ("Stout Reply in Support of MTD SAC") at 10; DE 141, Stout Defendants' Reply in Support of Mot. to Dismiss First Am. Compl. at 1 n.2.

[5] DE 204, Stout Defendants' Mot. to Dismiss Second Am. Compl. ("Stout MTD SAC"), at 2 (citing https://www.stout.com/en/services/valuation-advisory).

[6] *Id.* (citing Stout, ESOP & ERISA Advisory Services, https://www.stout.com/en/services/esop-erisa).

[7] State Street was the Trustee of the ESOP from 2001 through approximately March 31, 2013. B103, SAC ¶ 56. Reliance Trust Company ("Reliance") was the Trustee of the ESOP from April 1, 2003 to June 30, 2014. *Id.*, SAC ¶ 57. Thereafter, Argent became Trustee of the ESOP. *Id.*, SAC ¶ 58. State Street, Reliance, and Argent are collectively referred to herein as the "ESOP's Trustees" or the "Trustees."

independent appraiser, as required by the Internal Revenue Code. SA2-3, SAC ¶ 162. From 2001 to 2004, the ESOP's Trustee retained Willamette Management Associates, Inc. ("Willamette") to perform the valuations. B103, SAC ¶ 59. Beginning in 2004, the ESOP's Trustee retained Stout to conduct the valuations. B104, SAC ¶ 60.

The ESOP's Trustees contracted with Stout for a singular and discrete purpose: to assist the Trustee with its ERISA fiduciary obligations by providing the Trustee with a statutorily-required independent valuation of the Company's stock held by the ESOP. *See, e.g.*, SA49, Stout Engagement Agreement (6/20/2013) at 1. The valuations were "used for annual reporting and plan administration purposes by the Trustee." *Id.* That is, the ESOP's Trustee determined the share price to be used when shares were allocated to participant accounts or repurchased from participants. B128, SAC ¶ 161. So, while Stout would prepare the semi-annual valuation for the ESOP's Trustee, and, in doing so, provide a recommendation to the ESOP's Trustee as to the fair market value of Company stock, Stout did not have the legal authority to establish the stock's fair market value and, in turn, share price for purposes of Plan administration. That authority rested solely with the ESOP's Trustee. B128, SAC ¶¶ 160-61; SA2-3, SAC ¶¶ 162-64.

Stout's engagement agreements defined the limited nature of Stout's role. Each agreement provided that Stout would "report solely to the Trustee, notwithstanding that the Company w[ould] pay all fees for [Stout's] work." *See, e.g.*, SA49, Stout Engagement Agreement (6/20/2013) at 1. By signing the engagement agreements, Appvion expressly acknowledged that Stout could not successfully perform its services if it did not receive "accura[te] and complete[]" information from the Company. SA50, Stout Engagement

Agreement (6/20/2013), at 2.[8]  In exchange for these contractually-delineated services, Stout received a small fixed fee that amounted to an average of one-eighth of one percent (0.125%) of Stout's total revenue during the relevant time period–$50,000 for each semi-annual valuation or $100,000 annually.  SA50, Stout Engagement Agreement (6/20/2013), at 2.[9]  Stout's engagement agreements specifically stated that its compensation did not depend on the fair market value it placed on the Company's stock.  SA54, Stout Engagement Agreement (6/20/2013), at 6, Professional Terms, ¶ 12 ("[O]ur compensation is neither based upon nor contingent upon the conclusions we reach.").

Stout engaged in the process contemplated by its engagement agreements when it valued the Company's stock.  Among other things, when preparing its valuations, Stout considered its discussions with the Company's management team and its review of various sources of financial data, including the Company's audited financial statements, PDC's audited financial statements and filings with the United States Securities and Exchange Commission ("SEC"), the Company's internally-prepared financial statements and balance sheet, the Company's internally-prepared financial projections, and publicly available information and financial data on similar publicly traded companies.  *See, e.g.*, SA62,

---

[8] Stout's engagement agreements further provided that Stout took "no responsibility for the achievability of any expected, forecasted, projected or hypothetical results anticipated or assumed by the management of the Company[.]"  SA53, Stout Engagement Agreement (6/20/2013), at 5, Professional Terms, ¶ 5.

[9] The amount of this fee remained the same, except for three valuations for which Stout billed its fees hourly.  *See* DE 204-1, Stout MTD SAC, Ex. 1, Stout Engagement Agreements (6/12/2012, 1/17/2013, 6/30/2015).

12/31/2014 FMV at 3 (identifying the principal sources of information used by Stout in performing its analysis).

Stout provided its valuation services, and owed contractual duties, to the ESOP's Trustee. *See, e.g.*, SA49-54, Stout Engagement Agreement (6/20/2013). Stout did not provide services to or owe any duties—under ERISA or otherwise—to the Plan or the Company. *See id.* Indeed, Lyon does not allege that Stout had a contractual or even a fiduciary relationship with Appvion or any of its related entities, including PDC. Stout did not—nor did it have any obligation to—make any recommendation as to whether the Plan or any Plan participant should purchase or sell the Company's stock. Stout was not part of the Company's management team and it did not serve as a financial advisor to the Company.[10] Stout's sole job was to inform the ESOP's Trustee as to what Stout believed, based on its professional judgment, the Company's stock was worth at the date for each valuation.

***Stout's Valuations Reflected a Significant Decline in Value.*** Beginning in 2008, Stout's valuations reflected a substantial decline in the value of PDC stock:

---

[10] During the relevant time period, the Company engaged multiple financial advisors—including Jefferies LLC, Barclays Capital, and Boston Consulting Group—to assist it with exploring the sale of the Company in whole or in part and identifying potential cost reduction and revenue opportunities. SA62, 77, 12/31/2014 FMV at 3, 18 (identifying the Company's retention of Jefferies, LLC); DE 204-13, Stout MTD SAC, Ex. 13, 6/30/2017 FMV at 14, 16 (identifying the Company's retention of Barclays Capital and Boston Consulting Group).



*See* SA4-5, SAC at 66, Table 2.

***Contemporaneous Third-Party Data Indicated that the Company Had a Positive Equity Value.*** Stout's professional opinion that the value of PDC stock, as well as the Company's equity value, was declining did not mean that the Company was worthless. At the same time Stout was preparing its valuations, the Company, through its financial advisors, evaluated ways to restructure or recapitalize the Company, including selling the Company in whole or in part. Through this process, multiple third parties, including the Company's financial advisors and prospective purchasers, reviewed the same financial data that Stout reviewed for purposes of its valuations—including the Company's financial projections—and provided feedback on the Company's value. For example, the Company received multiple offers to buy the business that exceeded Stout's valuations.[11] During the

---

[11] In 2012 Hicks Equity Partners, LLC submitted a letter of intent to purchase Appvion's stock at a price of $22.00 per share, *see* SA73, 12/31/2014 FMV at 14—which reflected a significant premium over Stout's most recent valuation of the stock at $16.45 per share. *See* SA4-5, SAC at 66, Table 2. Further, in 2015, Sherman Capital Holdings, LLC purchased the Company's Encapsys business unit for $208 million—which reflected a significant premium over Stout's most recent valuation of that component of the business at $166 million. *See infra* at 26-27. Third-party offers to purchase the Company were described in Stout's valuation reports and are summarized in Exhibit 22 to the Stout Defendants' Motion to Dismiss the Second Amended Complaint, DE 204-22.

same time period, the Company's auditors consistently issued unqualified audit opinions that treated the Company as a going concern[12]; the Company refinanced its debt twice, B170, SAC ¶ 307; B276, SAC ¶ 658 (bullet 3); and Moody's rated the Company's publicly-available bonds in the B range and (for all but one year) assigned the Company liquidity ratings of SLG-2 ("good liquidity") or SGL-3 ("adequate liquidity").[13]  In accordance with its obligation to determine the fair market value of PDC's stock,[14] Stout considered this real word, third-party data when preparing its valuations.[15]  This third-party data suggested that the Company had a positive (though declining) equity value.  Stout's valuations

---

[12] *See* DE 204, Stout MTD SAC at 4 (citing PDC Form 10-K (Dec. 28, 2013), https://www.sec.gov/Archives/edgar/data/1166365/000156276214000063/c365-20131228x10k.htm).

[13] *See* DE 224-01, Stout Reply in Support of MTD SAC, Ex. 29 (listing Moody's credit and liquidity ratings for Appvion).  Moody's credit ratings are "forward-looking opinions of the relative credit risks of financial obligations," defined as "the risk that an entity may not meet its contractual financial obligations as they come due."  DE 224-02, Stout Reply in Support of MTD SAC, Ex. 30 at 5.  Moody's liquidity ratings are "opinions of an issuer's relative ability to generate cash." *Id.* at 28.

[14] The ESOP's Trustee retained Stout to determine the "Fair Market Value" of the Company's stock.  *See, e.g.*, SA49, Stout Engagement Agreement (6/20/2013), at 1.  Stout defined "Fair Market Value" to be "the price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties being able, as well as willing, to trade and being well-informed about the asset and the market for the asset," in accordance with Title I of ERISA and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18(b)(2)(i)).  SA49, Stout Engagement Agreement (6/20/2013) at 1; SA61, 12/31/2014 FMV at 2 ("Standard of Value").

[15] Certain of Stout's reports, for example, indicated that it considered information from third parties who provided feedback on the Company's value.  *See*, *e.g.*, SA62, 12/31/2014 FMV at 3 (Stout considered (i) Jefferies LLC's June 2013 and July 2014 Confidential Information Memoranda; (ii) Jefferies LLC's December 2014 presentation to the Company; (iii) Sherman Capital Holdings' letter of intent to purchase the Company; and (iv) Croda International's letter of intent to purchase the Encapsys business unit).

similarly suggested that the Company had very little equity value.  *See* SA4-5, SAC at 66, Table 2.

 ***Appvion's Bankruptcy and the Liquidating Trust's Lawsuit***.  The Company filed for bankruptcy in October 2017.  B177, SAC ¶ 335.  Shortly after Lyon filed his complaint, the co-trustees of the Appvion Liquidating Trust (the "Liquidating Trust") filed an adversary proceeding in the United States Bankruptcy Court for the District of Delaware. *See* Compl., *Halperin v. Richards*, Adv. Proc. No. 18-50955 (Bankr. D. Del. Nov. 30, 2018) (the "Delaware Action"), Adv. D.I. 1.  The Liquidating Trust's lawsuit was premised on the same factual predicate and theory of the case as Lyon's complaint—*i.e.*, that the Company's directors and officers, working in conjunction with Argent and Stout, fraudulently inflated the valuation of PDC's stock.  *See generally id.*

 The presiding judge transferred the non-bankruptcy claims to the Eastern District of Wisconsin.  Delaware Action, Adv. D.I. 113.  As to Stout, only one claim was transferred to the Eastern District of Wisconsin—a state law claim for aiding and abetting the directors' and officers' breaches of fiduciary duty.  *Id.*

 The Eastern District of Wisconsin granted the defendants' motions to dismiss, concluding that ERISA preempted all of the transferred state law claims.  *See* Decision and Order Granting Defendants' Motions to Dismiss, *Halperin v. Richards*, No. 1:19-cv-01561-WCG, 2020 WL 5095309 (E.D. Wis. Aug. 28, 2020).  The Liquidating Trust appealed the dismissal of the state law claims to this Court.

 This Court affirmed the Eastern District of Wisconsin's decision that the state law claims asserted against Argent and Stout were preempted by ERISA, reasoning that

"[c]orporation-law aiding and abetting liability against these defendants would interfere with the cornerstone of ERISA's fiduciary duties—the exclusive benefit rule in Section 404, 29 U.S.C. § 1104(a)(1)(A)." *Halperin v. Richards*, 7 F.4th 534, 539 (7th Cir. 2021). This Court specifically held that Stout's services were "central to plan administration" and thus "relate to" an ERISA plan. *Id.* at 554. Further, this Court held that the state law aiding and abetting claim was preempted because it impermissibly supplemented ERISA's remedial limits on claims against non-fiduciaries. *See id.* at 555.

## II.    Procedural History

### A. The First Amended Complaint

Lyon filed his First Amended Complaint on January 8, 2019.  DE 77.  As to the Stout Defendants, the FAC asserted a claim under ERISA section 502(a)(3), as well as claims for federal securities fraud, common law fraud, and negligent misrepresentation. B433-37, FAC ¶¶ 652-669; B438-40, FAC ¶¶ 685-700; DE 77, FAC ¶¶ 620-36.  The District Court dismissed the FAC in its entirety.  A004-055.

The District Court dismissed the federal securities fraud claim asserted against the Stout Defendants due to Lyon's failure to plead scienter:

> The FAC fails to plead scienter.  Lyon alleges that the SRR [Stout] Defendants knew that the valuation analyses contained significant flaws and irregularities.  But these allegations are insufficient to infer scienter or an intent to deceive.  Absent specific allegations regarding an intent to deceive, the court cannot infer that the SRR [Stout] Defendants intended to deceive the ESOP without receiving any benefit from the alleged deception.  The fact that the SRR [Stout] Defendants received a fix[ed] fee in connection with SRR's [Stout's] services, without more, does not establish the requisite intent.

A053.

The District Court dismissed Lyon's fraud and negligent misrepresentation claims as preempted by ERISA, finding that the Stout Defendants' role as the independent appraiser of PDC's stock "stem[med] from the Plan" and that their "conduct related directly to the Plan's administration." A054. The District Court additionally found that "[a]llowing these state law claims to proceed would create a cause of action that supplements what ERISA already provides." *Id.*

The District Court further held that the FAC failed to plead an ERISA section 502(a)(3) claim against the Stout Defendants. A051-52.

### B.  The Second Amended Complaint

The District Court granted Lyon leave to file an amended complaint. The SAC attempted to plead just one claim against the Stout Defendants—federal securities fraud.

In large part, Lyon's attempt to re-plead his claims fared no better.[16] The District Court dismissed Lyon's federal securities fraud claim against the Stout Defendants (again) due to his failure to plead scienter. B064-65. The District Court held that the SAC did not contain "any significant and new allegations" that would lead to a strong inference that the Stout Defendants acted for "fraud-based reasons":

> Lyon forcefully reasserts his position from the FAC—that SRR [the Stout Defendants] did a bad job of evaluating PDC's stock—but he does not include any significant and new allegations suggesting that they did so for fraud-based reasons. Lyon's answer to why SRR [the Stout Defendants] supposedly did this is the same as it was in the FAC: to earn fee and position itself to continue to earn fees. This rationale is not enough to support a claim under the rigid pleading standards.

---

[16] The District Court referred Defendants' motions to dismiss to the Magistrate Judge, who recommended that the bulk of Lyon's claims be dismissed. The District Court adopted the Magistrate Judge's Report and Recommendation with the exception of footnote 6. A002-03.

B067.

The District Court similarly dismissed the federal securities fraud claims asserted against the director and officer defendants (the "Directors and Officers"), Reliance, and Argent due to the SAC's failure to plead scienter. B020, B052-53, B063. Further, when dismissing certain of the claims asserted against the Directors and Officers, the District Court found that alleged fraud was "implausible on its face" because the fraud would have required cooperation from third parties "who had nothing to gain and everything to lose":

> Simply put, the sprawling and conspiratorial nature of the proposed fraud (the when and the how of the fraud) remains implausible on its face. . . . The biggest hole in Lyon's theory is that to perpetuate this 16-year fraud, the Ds&Os would have needed to have the participation, loyalty, silence, and dereliction of duty from several outside actors who had nothing to gain and everything to lose. As with almost any conspiracy, it's *conceivable* that it could have occurred. But a plaintiff must provide a plausible story explaining the 'how,' and the SAC does not.

B015.

## STANDARD OF REVIEW

The de novo standard applies to this Court's review of the District Court's dismissal of Lyon's federal securities fraud claim, Count 35 of the SAC, under Rule 12(b)(6). *See Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996).

The de novo standard also applies to this Court's review of the District Court's dismissal of Lyon's fraud and negligent misrepresentation claims, Counts 10 and 12 of the FAC, as preempted by ERISA. *See Trs. of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 772 (7th Cir. 2002).

## SUMMARY OF ARGUMENT

Lyon's sprawling complaints allege that dozens of defendants joined together to carry out a 17-year conspiracy to inflate the value of Appvion's stock prior to its bankruptcy.  At bottom, Lyon alleges fraud by hindsight and casts a wide net—in terms of the causes of action alleged and the individuals and entities identified as defendants—in a transparent attempt to find a scapegoat for the Company's financial demise.

Lyon alleges that the Stout Defendants' work sat at the center of the plot, even though the Stout Defendants were not financial advisors to the Company and were not involved in the management of the Company.  Despite Stout's limited role as the contractor hired by the ESOP's Trustee, Lyon claims that the Stout Defendants worked hand-in-glove with more than a dozen other entities and individuals with whom they had only cursory interactions in the course of their professional engagement to inflate the value of the Company's stock.  Lyon's theory of the case is built on his cherry-picked identification of purported "errors" in Stout's valuation opinions—but the "errors" were first identified by Lyon years after the Company filed for bankruptcy, merely amount to differences in professional judgment, and are contrary to contemporaneous data indicating that the Company had a positive equity value.  In sum, Lyon's theory of the case is patently implausible.

This Court should affirm the District Court's dismissal of the federal securities fraud against the Stout Defendants because the SAC fails to plead scienter.  Lyon admits that the Stout Defendants had no motive to engage in the purported fraudulent scheme.  Lyon claims that the purported "errors" in Stout's valuations support an inference of scienter,

but such a theory is exactly the type of "speculation and hindsight" that runs "counter to the PSLRA's mandates." *Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004) (overruled on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

Even if Lyon had pleaded a strong inference of scienter, his federal securities fraud claim fails for another reason that was fully briefed below—the SAC fails to plead the element of reliance. Lyon claims that Stout "knew" that its valuations would be disclosed to and relied upon by participants, but Lyon's allegations ignore the multiple intervening decisions that were made by the ESOP's fiduciaries before the stock prices that were used for ESOP purchases and redemptions were determined and communicated to the participants by the ESOP Committee. In essence, the SAC attempts to plead an aiding and abetting theory of liability against the Stout Defendants. The implied private right of action under Section 10(b), however, "does not extend to aiders and abettors." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008).

This Court should affirm the District Court's dismissal of Lyon's common law fraud and negligent misrepresentation claims because they are preempted by ERISA. This Court has already has addressed the preemption of state law claims relating to Stout's valuation work with regard to the Appvion ESOP. In *Halperin*, this Court analyzed the same factual predicate at issue here and held that Stout's valuation of the Appvion ESOP "relates to" the ERISA plan because, among other things, "Stout's services were central to plan administration." 7 F.4th at 554. As a result, Stout's conduct is exclusively governed by ERISA. Further, this Court held that allowing a state law claim for money damages to proceed would impermissibly conflict with ERISA's remedial scheme, which only

provides equitable relief again non-fiduciaries. *See id.* at 555. This Court's reasoning in *Halperin* controls here.

Even if not preempted, this Court should affirm the dismissal of Lyon's common law claims for another reason fully briefed below—Lyon's allegations fail to plausibly allege claims for relief. Stout's valuations are not are actionable as fraud and negligent misrepresentation because they are opinions and not statements of fact. Lyon's fraud claim also fails because he has not pleaded it with particularity and he has failed to allege that the Stout Defendants acted with requisite state of mind.

Lyon's claims against the Individual Stout Defendants should be dismissed for two additional reasons. First, Lyon fails to assert any specific allegations of wrongdoing on the part of the Individual Stout Defendants and therefore has failed to plausibly allege any claim for relief against them. Second, Lyon fails to make any arguments concerning the Individual Stout Defendants in his Opening Brief and thus has abandoned his claims against them.

Finally, this Court should affirm the District Court's dismissal of Lyon's ERISA section 502(a)(3) claim against the Stout Defendants. Lyon's Opening Brief does not reference the District Court's dismissal of this claim, let alone argue that such dismissal was in error. Lyon accordingly has abandoned this claim for relief.

## ARGUMENT

**I.    The District Court Properly Dismissed the Federal Securities Fraud Claim Asserted Against the Stout Defendants**

Count 35 of the SAC alleges that the Stout Defendants committed federal securities fraud.  *See* B406-413, SAC ¶¶ 1289-1313.  A plaintiff asserting a claim for federal securities fraud must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598-99 (7th Cir. 2019).  Lyon fails to plead two of these elements—scienter and reliance.

### A.  The SAC Fails to Allege a Strong Inference of Scienter as to the Stout Defendants

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, imposes "[e]xacting pleadings requirements," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), including, *inter alia*, that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(2).  To meet this standard, a plaintiff's allegations must give rise to a "powerful or cogent [] inference[,]" *Tellabs*, 551 U.S. at 323, that the defendant acted with "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).  A reasonable person must deem the inference of scienter to be "at least as compelling as any opposing inference one could draw from the facts alleged." *Higginbotham v. Baxter Int'l, Inc.*, 495

16

F.3d 753, 757 (7th Cir. 2007).  For the reasons explained below, the District Court correctly held that Lyon failed to meet this "rigid pleading standard[]."  B067.

### 1.  Lyon Admits That the Stout Defendants Did Not Have a Motive to Engage in the Alleged Fraud

The SAC attempts to allege motive on the part of other defendants to commit fraud, *see, e.g.*, B089, SAC ¶ 12 (identifying financial incentives for other defendants to engage in fraud), but asserts no cogent explanation as to why the Stout Defendants would risk their professional reputation and integrity to benefit the directors and officers of an entity that was not even their client.  Stout did not have a financial motive to commit fraud—it received a small, fixed fee for its services that did not change during the relevant time period.  *See supra* at 5.  As the District Court correctly recognized, an interest in fees, standing alone, is insufficient to allege a strong inference of scienter.  B067; A053.[17]

While Lyon argued below that "Stout inflated the valuations to protect against liability, curry favor with management, and protect its revenue," B066 (quoting DE 216 at 5), he makes no such argument on appeal.  *See* Op. Br. at 71-73.  Nor does Lyon even attempt to argue that the Stout Defendants had any motivation, financial or otherwise, to engage in the alleged fraud.[18]  *See id.*  Lyon thus admits that the District Court correctly

---

[17] *See also Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) ("Typically, an accountant's interest in fees, standing alone, will not suffice to establish fraudulent intent."); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work.  Fees for two years' audits could not approach the losses E&W would suffer from a perception that it would muffle a client's fraud.").

[18] Lyon claims that Stout was not "independent," Op. Br. at 40, but such an allegation is merely a different way of claiming that the Stout Defendants' continued interest in earning its fixed fee amounted to motive.  This is insufficient to allege scienter.  *See Tricontinental*, 475 F.3d at 841.

held that the SAC fails to allege "any plausible motivation" for the Stout Defendants to engage in the purported fraudulent scheme. B066-67.

### 2. The SAC's Allegations Do Not Give Rise to a Strong Inference of Scienter

Lyon argues that the District Court erred because it dismissed the federal securities fraud claim against the Stout Defendants solely due to the SAC's failure to plead motive, without considering the "entirety" of the SAC's allegations. *See* Op. Br. at 71-72. Lyon mischaracterizes the District Court's opinion and misstates the applicable legal standard. *See* Brief for Appellee Reliance Trust Co. Regardless, if anything, the "entirety" of the SAC's allegations give rise to the inference that the fraudulent scheme is utterly implausible.

The SAC alleges that a rotating cast of dozens of individuals and entities conspired at various times to prop up the Company for nearly two decades. It is inconceivable that the fraud was passed off like a baton among the various directors and officers who managed the Company, as well as the changing cast of ESOP Trustees and independent appraisers.[19]

---

[19] From the time the ESOP was created in 2001 until the Company filed for bankruptcy in 2017, there were multiple changes in Appvion's management. B099, SAC ¶¶ 38 (Buth served as CEO until 2005), 40 (Richards served as CEO from 2005-2015); B101, SAC ¶ 47 (Gilligan served as CEO from 2015-2017). Members of the ESOP Committee also changed over time, B099-101, SAC ¶¶ 41 (Feree, 2006-2017), 42 (Fantini, 2001-05), 43 (Parker, 2001-2006), 44 (Tyczkowski, 2006-2008), 45 (Arent, 2008-2015), 46 (Willetts 2008-2012) & 47 (Gilligan, 2016-2017), as did the outside directors of the Company, B101-102, SAC ¶¶ 48 (Scherbel, 2002-2011), 49 (Pace, 2003-2011), 50 (Carter, 2004-16), 51 (Seifert, 2004-2017), 52 (Reardon, 2007-2014), 53 (Murphy, 2007-2017) & 54 (Suwyn, 2011-2017). The trustee of the ESOP also changed. B103, SAC ¶¶ 56-58. Similarly, there were changes to the independent appraisers for the Trustees and their respective personnel. B103-04, SAC ¶¶ 59-60; *see also infra* at 23. The Company's auditor also changed over the years. B092, SAC ¶ 20 (fourth bullet) (PwC from 2001-14, RSM McGladrey 2015-16), as did its financial advisor, *see supra* n. 10.

Lyon's theory of the fraud is dependent on the participation of not only of the Stout Defendants, but all three of the ESOP's Trustees (State Street, Reliance, and Argent). Yet, Lyon admits that, like the Stout Defendants, the ESOP's Trustees did not have a motive to engage in the fraud. *See* Op. Br. at 71-72 (admitting that Reliance did not have a pecuniary motive to engage in the fraud); *see also* B053, B063 (finding the SAC failed to plead scienter as to Reliance and Argent). As the District Court correctly held, it is inconceivable that the purported fraud was joined by numerous third parties who had "nothing to gain and everything to lose." B015.

Further, apart from the rotating cast of valuation firms and Trustees, other third parties had access to and reviewed either Stout's reports or the financial information on which Stout's reports were based. These third parties also concluded that the Company's equity (and, in turn, its stock) had value. In particular:

- The Company engaged in several attempts to sell its assets. B174, SAC ¶ 319. Multiple third parties made offers to purchase Appvion for more than Stout's valuations. *See supra* n. 11; *see also infra* at 26-27.[20]

- The Company's auditors issued unqualified audit opinions during the relevant time period. *See supra* n. 12. If the auditors had any material doubt about the

---

[20] Lyon claims that the fact that Stout's had to "redo[]" its June 2012 valuation demonstrates that Stout's reports were "overstated and unreliable." Op. Br. at 11. Stout updated the June 2012 valuation, at the Trustee's request, when a proposed combination did not materialize. B175, SAC ¶ 326 ("After the transaction fell through, Appvion's ESOP Committee. . . order[ed] a special valuation of PDC's shares because 'the June 30 price no longer represented Fair Market Value.'"). Contrary to Lyon's argument, Stout's update to its June 2012 valuation demonstrates that Stout appropriately considered real world, third-party feedback on the Company's value when preparing its valuations. *See supra* n. 14 (definition of "Fair Market Value").

Company's status as a going concern, they would have issued qualified audit opinions.  The auditors, however, did not do so.[21]  This directly contradicts Lyon's allegation that the Company had a "negative equity" value.  B165-67, SAC ¶¶ 288 (Table 10), 289.[22]

- The Company refinanced its debt twice.  *See* B170, SAC ¶ 307; B275-76, SAC ¶ 658 (third bullet).  If the Company's lenders had any doubt about its status as a going concern, they would not have offered it financing.

- For almost all years, Moody's rated the Company's publicly-available bonds in the B range.  *See supra* n. 13.  While such a rating indicates that the debt is not risk free, it is not indicative of a company that has a "negative equity" value.  B167, SAC ¶ 289.  Further, with one exception, Moody's assigned liquidity ratings of SLG-2 ("good liquidity") or SGL-3 ("adequate liquidity") to the

---

[21] Conspicuously absent from Lyon's Opening Brief or the SAC is any reference to the ESOP's pending lawsuit against the Company's auditors, which alleges that the auditors misstated the Company's financial statements.  *See Appvion, Inc. Ret. Savings & Emp. Stock Ownership Plan v. PriceWaterhouseCoopers L.L.P.*, No. 2020-CV-559 (Outagamie Cnty. Wis. filed July 15, 2020).

[22] The purported fraud occurred in plain sight because the Company's financial information—including its audited and unaudited financial statements—was publicly available through its filings with the SEC.  B188, SAC ¶ 361 (alleging that the Company's 10-Ks and 10-Qs were publicly available on the SEC's website).  Indeed, Lyon alleges that the Directors and Officers committed fraud when making representations in the Company's publicly available SEC filings.  *See, e.g.*, Op. Br. at 11, 13, 30.  Moreover, the purported "merger that fell through," Op. Br. at 11, also was subject to scrutiny from the Company's financial advisors, its lawyers, and ESOP participants.  As previously discussed, in 2012, the Company considered a combination with another entity that would have resulted in the Company going public.  B174-75, SAC ¶¶ 320-26.  The related documentation was publicly filed with the SEC.  The public nature of the Company's financial information further underscores the implausibility of the SAC's allegations—no one, including the Stout Defendants, spotted the purported "fraud" even though the Company's financial information was out in the open and available for anyone to review.

Company, with the exception of one instance in 2005. *See supra* n. 13. Moody's credit ratings and liquidity analyses are directly at odds with Lyon's claims that the Company was worthless. Moody's based its ratings in part on financial information received from the Company.[23]

These **contemporaneous** indicators of the Company's value undermine Lyon's theory, which was hatched years later and with the benefit of hindsight.[24] If the Directors and Officers were manipulating the value of the Company, these third parties—who relied on the same financial information as Stout—must also have fallen victim to the same purported fraud or joined it. Neither inference is remotely plausible. While the absence of a motive allegation must be considered together with the entirety of the complaint, here such an analysis weighs heavily **against** a strong inference of scienter. *Tellabs*, 551 U.S. at 325.[25]

The implausibility of Stout's alleged role in the fraud is underscored by the limited nature of Stout's role as the independent appraiser engaged by the ESOP's Trustee. Lyon

---

[23] *See* DE 224, Stout Reply in Support of MTD SAC at 7 n.11 (citing Moody's Investors Service, *The Rating Process*, http://www.moodys.com/ratingsprocess/Ratings-Process/002001).

[24] All of this data may be considered by the Court because it is discussed in the valuation reports incorporated by reference into the SAC or is publicly available. *See supra* n. 4; *see also Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (a court may consider matters of public record on a motion to dismiss).

[25] The Stout Defendants expressly referenced this third-party evidence in its valuation reports and have cited it in multiple briefs filed in the District Court. Yet, Lyon has not once substantively responded to this evidence and his Opening Brief is silent on it (yet again). Lyon ignores the contemporaneous indicators that the Company was not worthless—but, at the same time, he acknowledges that the Company explored its sale (B174, SAC ¶ 319), admits that the Company sold Encapsys (B176-77, SAC ¶¶ 328-34), and points to the "merger that fell through," Op. Br. at 11. Lyon cannot have it both ways—the third party, contemporaneous feedback on the Company's value is either in or out. *See also infra* at 26-28.

claims that Stout worked hand-in-glove with the Company's management to inflate its value, but Stout only met with management periodically and did so almost exclusively in the context of (i) due diligence meetings in connection with Stout's preparation of valuations, as expressly contemplated by Stout's engagement agreements and (ii) ESOP Committee meetings where—at the request of the ESOP's Trustee—Stout simply described the process used to arrive at the valuations at the request of the ESOP's Trustee, *see, e.g.*, B407-08, SAC ¶ 1291. The Stout Defendants did not have any role, whatsoever, in the management of the Company—and it strains credulity for Lyon to allege that they had such a role. To the extent the Stout Defendants attended Board meetings, they did so at the request of their client, the ESOP's Trustee, within the scope of their engagement by the Trustee, to discuss the valuations. Because Stout was retained by the ESOP's Trustee, it is implausible that it had an intimate working relationship with the Company's management regarding the "ins" and "outs" of the Company's finances, and the SAC does not allege any facts that give rise to such an inference. *See id.* Indeed, the Company retained its own financial advisors and consultants. *See supra* n. 10.

Moreover, Stout's valuations reflected a substantial ***decline*** in the stock's value beginning as early as 2008—nearly a decade before the Company filed for bankruptcy. SA4-5, SAC at 66, Table 2. If the Stout Defendants were "in" on the fraudulent scheme to prop up the Company's value, it is implausible that Stout's valuations would have reflected a steady decline in the stock price—amounting to an approximately ***80 percent*** decline in value (or $26 per share)—in the nine years leading up to the Company's bankruptcy. *See id.* (12/31/2007 stock price: $33.41; 6/30/2017 stock price: $6.85).

The SAC's allegations are particularly implausible with regard to the Individual Stout Defendants. The SAC does not allege that the Individual Stout Defendants received any financial benefit from their work valuing the Company's stock, and, as a result, it is not plausible that they would have risked their professional reputations to join the alleged fraud.[26] It also is not plausible that Messrs. Levine and El-Tahch participated in the alleged fraud given their junior (or, in the case of Mr. El-Tahch, non-existent) roles at the time the scheme purportedly began. Rick Braun, who led the "whole team" for Willamette, DE 77, FAC ¶ 18, served as the lead engagement officer for Appvion at the time of the initial stock appraisal in 2001. B122, SAC ¶ 123; B133, SAC ¶ 198. Bob Socol subsequently took over as lead engagement officer of the Appvion assignment.[27] Several years later, Mr. Levine assumed that role.[28] At the time of the 2001 transaction, Mr. Levine reported to the senior principals assigned to the engagement and Mr. El-Tahch was not even employed by Willamette. B104, SAC ¶ 62 (admitting that Mr. El-Tahch's employment with Willamette began after the 2001 transaction). It is thus implausible that Messrs. Levine and El-Tahch hatched a plan to fraudulently inflate the valuations, let alone joined such an effort, when they had no financial incentive and lacked the authority to do so.

---

[26] *See DiLeo*, 901 F.2d at 629 ("[C]overing up fraud and imposing large damages on the partnership will bring a halt to the most promising career. E&W's partners shared none of the gain from any fraud . . . . It would have been irrational for any of them to have joined the cause with Continental.").

[27] *See* DE 204-2, Stout MTD SAC, Ex. 2, 12/31/2004 FMV at App'x A & App'x F (listing Socol as the lead engagement officer).

[28] *See* DE 204-7, Stout MTD SAC, Ex. 7, 6/30/2012 FMV at 118-20 (listing Socol as the lead engagement officer); DE 204-8, Stout MTD SAC, Ex. 8, 12/31/2012 FMV at 89-90 (listing Levine as the lead engagement officer).

In sum, the SAC's allegations underscore the facial implausibility of the Stout Defendants' participation in the purported fraud.

### 3. The Supposed "Red Flags" in Stout's Valuation Reports Do Not Give Rise to a Strong Inference of Scienter

The District Court correctly held Lyon's allegations regarding "red flags" in Stout's valuations also do not give rise to a strong inference of scienter.[29]  In the context of securities fraud claims against outside auditors, courts have held that allegations that "accounting errors alone cannot justify a finding of scienter," because doing so would "allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates."  *Fidel*, 392 F.3d at 231.  As Lyon's Opening Brief recognizes, "pleading sufficient facts to support a strong inference of scienter by an outside auditor is difficult because outsider auditors have more limited information than, for example, the company executives who oversee the audit."  *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011).  Further, "an auditor exercises complex and subjective professional judgments that courts are not ideally positioned to second guess."  *Id.* (internal quotation marks omitted).  As a result, allegations that an outside auditor conducted a "poor audit" are insufficient to plausibly allege a claim for relief.  *See id.*; *see also Podraza v. Whiting*, 790 F.3d 828, 838 (8th Cir. 2015) ("The fact that GAAP

---

[29] The District Court considered, and rejected, Lyon's argument that Stout's "errors" are sufficient to allege the element of scienter—twice.  A053 (holding that Lyon's allegations that the Stout Defendants "knew that the valuation analyses contained significant flaws and irregularities" were "insufficient to infer scienter or an intent to deceive"); B067 (holding that even if the Stout Defendants "did a bad job of evaluating [the Company's] stock," the SAC failed to assert any "significant and new allegations suggesting that they did so for fraud-based reasons").

[generally accepted accounting principles] violations are allegedly significant . . . is insufficient by itself to give rise to a strong inference of scienter.").

Lyon's allegations fail to give rise to a strong inference of scienter against the Stout Defendants for precisely these reasons. As previously discussed, Stout was engaged by the ESOP's Trustee—it was not a financial advisor to the Company. *See supra* at 6. Stout's engagement agreements made clear the limited nature of its engagement by the Trustee. Among other things, Stout expressly assumed that the Company was providing it with "accura[te] and complete[] information." SA50, Stout Engagement Agreement (6/20/2013) at 2. Further, Stout only met with the Company's management periodically and for the purposes contemplated by its engagement agreements. *See supra* at 22. Analogous to an auditor, Stout had "more limited information" than the Directors and Officers who managed the Company on a day-to-day basis. *N.M. State Inv. Council*, 641 F.3d at 1097.

Further, the purported "red flags" identified through Lyon's after-the-fact dissection of Stout's valuations do not give rise to an inference that, at the time Stout prepared its valuations, it was engaged in a scheme to inflate the valuations. The SAC carefully cherry-picks select aspects of the valuations and argues, with the benefit of hindsight, that Stout's valuations are so flawed that they must have been fraudulent. Lyon's narrative falls apart for two reasons. First, the purported "red flags" simply amount to subjective differences in professional judgment, akin to those exercised by an auditor. *See id.* at 1098. Indeed, as the District Court correctly recognized, "appraisals are inherently an imperfect science."

B049.[30]  Second, there are other aspects of Stout's valuations which are not referenced in the SAC and that support its valuation conclusions.  Lyon cannot pick and choose the portions of the valuations that, with the benefit of hindsight, support his theory of fraud—while ignoring the portions of Stout's valuations that demonstrate its conclusions were reasonable.

In sum, the allegations in the SAC and the documents incorporated therein demonstrate that, at the time the Stout Defendants prepared the valuations, they reasonably exercised their professional judgment consistent with generally accepted valuation practices.  The following three examples illustrate the highly selective and misleading nature of Lyon's allegations regarding the purported "errors" in Stout's valuations.

### a. Stout Exercised its Professional Judgment Consistent With Industry Standards and ERISA When it Considered Third Party Evidence Regarding the Company's Value

Contemporaneous third-party evidence demonstrates that the Company had a positive equity value.  *See supra* at 7-8, 19-21.  Stout correctly considered this data, which included offers to buy the Company in whole or in part, when preparing its valuations in accordance with industry standards and ERISA's requirements.  *See supra* n. 14 (definition of "Fair Market Value").

The most striking example of a contemporaneous market indicator of the Company's value is the 2015 sale of the Encapsys business unit, which a third party

---

[30] *See also Beerly v. Dep't of Treasury*, 768 F.2d 942, 947) (7th Cir. 1985) ("People estimate [stock] value differently[.]"); *Donovan v. Cunningham*, 716 F.2d 1455, 1473 (5th Cir. 1983) ("Appraisal of closely-held stock is a very inexact science[.]").

purchased for $208 million.   B177, SAC ¶ 331.   If Stout's methods were patently fraudulent, a reasonable person would expect that the analysis performed by the real-world, third-party buyer of Encapsys would have yielded a conclusion of value substantially lower than Stout's.   Yet, Stout's conclusions of Encapsys's enterprise value in the five years leading up to its sale fell far below its ultimate purchase price:

| Date | Stout's Enterprise Value for Encapsys | Difference from $208M Purchase Price |
|---|---|---|
| December 2014 | $166M | -$42M |
| June 2014 | $161M | -$47M |
| December 2013 | $150M | -$58M |
| June 2013 | $125M | -$83M |
| December 2012 | $121M | -$87M |
| June 2012 | $127M | -$81M |
| December 2011 | $133M | -$75M |
| June 2011 | $104M | -$104M |
| December 2010 | $85M | -$123M |
| June 2010 | $59M | -$149M |

*See* DE 224-4, Stout Reply in Support of MTD FAC, Ex. 32 (listing Encapsys valuations from Stout's valuation reports).

The only inference that can reasonably be drawn from the Encapsys sale is that Stout did not "knowingly violate[] accepted valuation practices."   Op. Br. at 73 n.13.   To the contrary, the Encapsys sale demonstrates that (i) that Stout's valuations of the Company were not upwardly biased and (ii) valuations firms and prospective purchasers may reasonably reach different valuation conclusions (*i.e.*, valuations are an inexact science).[31]

---

[31] For this reason, Stout employed multiple approaches when valuing the Company.   B136, SAC ¶ 204 (acknowledging that Stout employed the discounted cash flow method, which relies on projections of future earnings, and the guideline company method, which analyzes comparable companies to determine price multiples).   By employing both approaches, Stout followed a generally accepted valuation practice that amounts to a "cross-check" on its analysis.   *See* Proposed

Further, the SAC's failure to acknowledge the substantial difference between Stout's valuations of Encapsys and the purchase price paid for this business unit underscores the selective and self-serving lens through which Lyon has crafted his theory of the purported fraud.[32]

### b. Stout Exercised its Professional Judgment Consistent With Industry Standards When it Considered Financial Projections Prepared in the Ordinary Course

Lyon faults Stout for relying on the Company's financial projections, *see, e.g.*, Op. Br. at 10, 38, 72, but appraisers routinely rely on financial projections created by management when preparing valuations. That is because a company's management ordinarily is in the "best position to forecast [the company's] future." *Gilbert v. MPM Enters., Inc.*, 709 A.2d 663, 669 (Del. Ch. 1997), *aff'd* 731 A.2d 790 (Del. 1999).

Stout was justified in considering management's projections when preparing its valuations. As a threshold matter, Lyon does not allege that Appvion's management created the projections specifically for the purpose of Stout's valuations. As with any other company, Appvion's management prepared the projections to run the business. The projections, in turn, were also used by third parties for other purposes. Courts often treat such "ordinary course" projections as presumptively sound. *See Cede & Co. v. Technicolor, Inc.*, No. Civ.A 7129, 2003 WL 23700218, at *7 (Del. Ch. July 9, 2004)

---

Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632-01, 17,635 (proposed May 17, 1988) ("It is the Department's understanding that appraisers will often use different methodologies to cross-check their results.").

[32] The SAC expressly references the sale of Encapsys, B176-77, SAC ¶¶ 328-34, but does not acknowledge the significant difference between the purchase price paid by the third-party purchaser ($208 million) and Stout's most recent valuation of the business unit ($166 million).

("When management projections are made in the ordinary course of business, they are generally deemed reliable."), *aff'd in part*, *rev'd in part*, 884 A.2d 26 (Del. 2005).

Moreover, Stout's engagement agreements did not contemplate that Stout would independently verify whether the financial information that the Company provided to it was accurate. The engagement agreements made clear that Stout took "no responsibility for the achievability of any expected, forecasted, projected or hypothetical results anticipated or assumed by the management of the Company[.]" SA53, Stout Engagement Agreement (6/20/2013), at 5.

Further, Lyon's theory that the "inflated" projections resulted in inflated valuations is implausible for several reasons. *First*, the projections were just one piece of financial data that Stout considered when preparing its valuations, as is expressly indicated in Stout's reports. *See supra* at 5-6. It is implausible that the purported "inflation" of this single piece of financial data resulted in Stout overvaluing the Company's stock. *Second*, Lyon raises no specific issues with the projections in any given year, and only generally alleges that, with the benefit of hindsight, all of the Company's projections were "inflated" and Stout should have recognized the same for each and every year that it valued the Company. *Third*, Lyon fails to acknowledge that other third parties reviewed the same projections in the context of submitting offers to buy the Company in whole or in part. Either these third parties were fooled by the Company's projections or they, like Stout, understood that the projections should be appropriately considered when valuing the Company. Stout's valuation of Encapsys underscores this point. The only method that Stout used to value Encapsys was the discounted cash flow method, *see, e.g.*, SA108-11, 113, 12/31/2014

FMV at 49-52, 54, and as Lyon acknowledges, the "discounted cash flow method was based entirely on the[] projections[.]"  B158, SAC ¶ 264.  If Stout's valuations were "inflated" due to reliance on the Company's projections, the same should be true of its valuation of Encapsys.  Yet, Stout's conclusion of Encapsys's value was far below its purchase price.

### c. Stout Exercised its Professional Judgment Consistent With Industry Standards When it Accounted for the Company's Pension Liability

Lyon claims that Stout failed to deduct Appvion's pension obligation from the Company's enterprise value in an effort to conceal that "Appvion had no equity value." B095-96, SAC ¶ 26.  According to Lyon, Stout treated the pension obligation of a company that Appvion acquired, BemroseBooth, differently by subtracting it from the enterprise value.  B140, SAC ¶ 212.  This, Lyon alleges, is an "admission" that the Stout Defendants intentionally overstated the stock price.  B142, SAC ¶ 217.

Lyon's argument boils down to a difference in opinion regarding how Stout should have accounted for the Company's pension obligation when preparing its valuations. Although Stout did not deduct the pension obligation "dollar-for-dollar" from the Company's enterprise value, that does not mean that Stout did not account for it when valuing the Company.  Stout accounted for the pension obligation in other portions of its valuations.  *See* DE 204-21, Stout MTD SAC, Ex. 21 (summarizing references to Appvion's pension obligation in Stout's reports).  Stout's decision not to deduct the pension obligation from the enterprise value was informed by the volatile nature of pension obligation estimates.  Subtracting a company's pension obligation dollar-for-dollar from

its enterprise value can cause a company's equity value to fluctuate from one valuation to the next for reasons wholly unrelated to the economics of the underlying business.

Lyon cites an article by Willamette as proof-positive that pension obligations "must be" subtracted from a company's enterprise value. Op. Br. 47; B134-35, SAC ¶ 202.[33] The Willamette article is not definitive guidance on this topic—nor does Lyon allege that it is. B134-35, SAC ¶ 202. To the contrary, the Willamette article is a piece of professional marketing material, available on Willamette's website for any potential client to view, that was written more than a decade after the 2001 transaction. If there was a single, definitive industry standard for treating a pension obligation when valuing a company at the time the article was written (let alone a single, definitive industry standard for doing so at the time Stout issued its pre-2015 valuations), there would have been no need for Willamette to author an article advocating for its proposed approach.[34]

Moreover, when considered in whole, the article supports Stout's approach for treating Appvion's pension obligation. The article recognizes that pension obligation estimates can vary significantly based on current market conditions. *See* Willamette Article at 71. Further, the article states that an appraiser who deducts a pension obligation

---

[33] *See* Christopher W. Peifer, *Adjusting for Underfunded Pension and Postretirement Liabilities*, Business Valuation Insights (Summer 2015), https://willamette.com/insights_journal/15/summer_2015_8.pdf ("Willamette Article").

[34] Further, Lyon does not even follow the purported standard he endorses. The Willamette article instructs appraisers to deduct pension debt net of associated tax benefits from a company's enterprise value. B134, SAC ¶ 202 (quoting Willamette article). Lyon, however, claims that Appvion's pension obligation should have been deducted "dollar-for-dollar" from the Company's enterprise value, without netting out any tax benefits. *See, e.g.*, B140, SAC ¶ 213; B231, SAC ¶ 482.

from a company's enterprise value must adjust other portions of the valuation to avoid double-counting the liability. Relevant here, the article notes that the appraiser must adjust the company's income statement to remove the impact of historical and anticipated payments on available cash flows, as well as adjust the guideline companies' earnings in the same way. *See id.* at 70-71. Stout employed the inverse approach—instead of subtracting the pension obligation from the enterprise value and adjusting other portions of the valuations, Stout instead accounted for the impact of the pension obligation elsewhere in its valuations (*i.e.*, Stout did not make pension-related adjustments to the Company's cash flows or its analysis of the guideline companies).[35]

Further, Lyon's argument regarding Stout's treatment of the Company's pension is based on a fundamental misunderstanding of the difference between Appvion's ongoing obligation to fund its pension and BemroseBooth's agreement, following negotiations with its pension fund's trustee, to make annual payments to the pension fund to address its underfunded status. B319, SAC ¶ 210. These negotiated annual payments were separate and apart from BemroseBooth's ongoing obligation to make regular contributions to its pension. Stout deducted the fixed, discrete payment obligation arising from BemroseBooth's agreement with its pension fund trustee from the company's enterprise

---

[35] Lyon's assumption that Stout's valuations of the Company were higher than they would have been had Stout treated the pension obligation using the approach advocated for in the Willamette article is pure speculation. If Stout had followed the approach advocated for in the Willamette article (*i.e.*, deducting the pension debt net of associated tax benefits from the Company's enterprise value), it would have had to make pension-related adjustments to the Company's cash flows and its analysis of the guideline companies. It would be pure speculation—and hindsight quarterbacking—to guess what those adjustments would have been and how they would have impacted Stout's valuations.

value.  *Id.* ("'We subtracted $15.3 million to account for annual payments the Company is expected to make to fund BemroseBooth's underfunded pension obligation over the next five years. . . . [A]nnual installments of approximately $3.6 million are expected accounting for the resulting tax benefit.'") (quoting 12/31/2007 FMV).  Stout did not deduct BemroseBoth's ongoing obligation to make regular pension contributions from the company's enterprise value, just as it did not deduct Appvion's obligation to make regular pension contributions from its enterprise value.  Lyon's hindsight critique of Stout's treatment of the Company's pension obligation accordingly does not give rise to an inference that Stout acted with scienter.

* * *

For all of these reasons, the District Court correctly found that the SAC fails to plead scienter and its dismissal of Count 35 of the SAC should be affirmed.[36]

### B. The SAC's Failure to Plead Reliance Also Warrants Dismissal of the Federal Securities Fraud Claim Against the Stout Defendants

Lyon's federal securities fraud claim also fails as a matter of law for an alternate reason, which was fully briefed below—the SAC fails to plausibly allege reliance.  This

---

[36] Lyon's reference to the expert reports he submitted below, *see* Op. Br. at 73 n.13, is a red herring. The District Court did not consider Lyon's expert reports when granting the Stout Defendants' Motion to Dismiss.  B065.  Lyon did not object to this portion of the Magistrate Judge's Report and Recommendation.  *See* DE 260, Pl.'s Reply in Support of Objs. to the Magistrate's R & R Concerning Stout's MTD SAC at 8 ("Stout points out that Plaintiff did not object to the Magistrate's decision not to convert Stout's motion to dismiss into one for summary judgment. But Plaintiff did not disagree with the Magistrate on that.").  Lyon's Opening Brief also does not argue that the District Court's adoption of this portion of Magistrate Judge's Report and Recommendation was in error.

Court may affirm the District Court's dismissal on this ground alone.  *See Dibble v. Quinn*, 793 F.3d 803, 807 (7th Cir. 2015).

To state a federal securities fraud claim, a plaintiff must allege a "causal connection between a defendant's misrepresentation and a plaintiff's injury."  *Stoneridge Inv. Partners*, 552 U.S. at 159.  In *Stoneridge*, the Supreme Court affirmed the dismissal of a federal securities fraud claim brought by investors in a cable box television company, where the company allegedly engaged in a fraudulent scheme to inflate the revenue reported in its financial statements.  *Id.* at 154-55.  The company overpaid cable box suppliers, who returned the overpayment by purchasing advertising from the company. The fraudulent transactions allegedly enabled the cable television operator to "fool its auditor" into approving a financial statement showing, *inter alia*, that the company met its revenue projections.  *Id.* at 154.  The Supreme Court held that the suppliers' conduct was "too remote to satisfy the requirement of reliance" because "nothing [the suppliers] did made it necessary or inevitable for [the company] to record the transactions as it did."  *Id.* at 161.

The SAC's allegations similarly fail to allege reliance.  The SAC alleges that the Stout Defendants' (i) purported "[m]isrepresentations" and "omissions" in its reports and (ii) valuation conclusions as to the share price of Appvion stock amounted to federal securities fraud.  B406-13, SAC ¶¶ 1289-313.  Lyon, however, admits that "[t]he valuations were never disclosed to the Employee Owners."  SA5, SAC ¶ 192 ("The valuations were never disclosed to the Employee Owners or the public."); *see also* Op. Br. at 11 (admitting that the valuations "had never been made public or released to the ESOP's employee

participants"). Further, Lyon does not allege that Stout made any communications directly to participants regarding the stock's value. B129, SAC ¶ 167 (alleging that the ESOP Committee members "disseminated the stock price through communications to the Employee Owners that the ESOP Committee members authored"); *see also* Op. Br. at 30-32, 62 (admitting that the Directors and Officers disseminated stock valuations to participants).

Instead, Lyon admits that after Stout issued its reports, there were multiple intervening decisions that were made by the ESOP's fiduciaries before the stock prices that were used for ESOP purchases and redemptions were determined and communicated to the participants by the ESOP Committee. SA2-3, SAC ¶¶ 160-63; B129, SAC ¶ 167. Based upon the valuation it received, the ESOP's Trustee set the stock price that was used for the purchase and redemption of shares. SA2-3, SAC ¶¶ 161-62.[37] The Trustee then reported its conclusion of the stock's share price to the ESOP Committee, which, in turn, "received, reviewed, and approved" the Trustee's determination. B129, SAC ¶ 167. The ESOP Committee subsequently directed the Trustee to purchase PDC stock and "disseminated the stock price through communications to the Employee Owners that the ESOP Committee members authored, reviewed, and approved." *Id.* It was only after these decisions regarding the stock price by the ESOP's fiduciaries, and the communication of

---

[37] The Trustee could not simply rely on Stout's independent appraisal when setting the stock price. The Trustee was "required to investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice was reasonably justified under the circumstances." SA3, SAC ¶ 163.

the stock price by the ESOP Committee to the participants, that the participants engaged in the action that caused the alleged injury, *i.e.*, the decision to purchase or redeem shares.

At bottom, the SAC attempts to plead an aiding and abetting theory of liability against the Stout Defendants. The implied private right of action under Section 10(b), however, "does not extend to aiders and abettors." *Stoneridge*, 552 U.S. at 158. Thus, Lyon's allegation that the Stout Defendants "knew" their valuation opinions would be disclosed to and relied upon by the participants, B408, SAC ¶ 1292, is not only wrong (the ESOP Committee shared the stock prices set by the Trustee and the ESOP Committee with participants), it also is insufficient to plead a federal securities fraud claim.[38]

## II. The District Court Correctly Dismissed Lyon's State Law Fraud and Negligent Misrepresentation Claims[39]

### A. Section 514 Preempts Lyon's Fraud and Negligent Misrepresentation Claims

#### 1. ERISA Section 514 is a "Powerful" Preemption Provision

ERISA is a "comprehensive and reticulated statute." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993). In enacting ERISA, Congress sought to implement a "uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208 (2004). To that end, "ERISA includes expansive preemption provisions . . . which are intended to ensure that employee benefit plan regulation would be exclusively a federal

---

[38] Lyon's federal securities fraud claim also should be dismissed for failure to plausibly and particularly allege any material misstatement or omission by the Stout Defendants. *See* Brief for Appellee Reliance Trust Co.

[39] The FAC asserted Count 10 (Fraud) against the Stout Defendants and Count 12 (Negligent Misrepresentation) against Stout. B433-37, FAC ¶¶ 652-69; B438-41, FAC ¶¶ 685-760.

concern." *Id.* (internal quotation marks omitted); *see also Halperin*, 7 F.4th at 540 (describing ERISA section 514 as a "powerful preemption provision[]").

ERISA section 514 preempts "any and all State laws" that "relate to any employee benefit plan." 29 U.S.C. § 1144. A law "relates to" an ERISA plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). State laws that govern a "central matter of plan administration" or "interfere[] with nationally uniform plan administration" "relate to" an ERISA plan and therefore are preempted pursuant to section 514. *Gobeille v. Liberty Mutual Ins. Co.*, 577 U.S. 312, 319-20 (2016). In addition, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted" pursuant to section 514. *Davila*, 542 U.S. at 209; *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) (ERISA's "policy choices . . . would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.").

The District Court correctly held that ERISA preempts Lyon's fraud and negligent misrepresentation claims because (i) the Stout Defendants' valuations "related directly to Plan administration" and (ii) allowing the state law claims to proceed would impermissibly supplement ERISA's civil enforcement remedy. A054.

### 2. Lyon's Fraud and Negligent Misrepresentation Claims "Relate To" the ESOP

Stout's entire involvement with this matter is tied to the fiduciary obligations of the ESOP's Trustees, as set forth in the ERISA plan document, *see* DE 77, FAC ¶ 186, and the Internal Revenue Code, *see* 26 U.S.C. § 401(a)(28)(C), to have the ESOP's stock holdings valued by an independent appraiser. *See* DE 77, FAC ¶ 186. Consistent with their fiduciary obligations, the ESOP's Trustees engaged Stout to provide an independent valuation of PDC stock "[i]n accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")," which is predicated on the Department of Labor's proposed regulation defining "[f]air [m]arket [v]alue." *See, e.g.*, SA49, Stout Engagement Agreement (6/20/2013) at 1 (citing DOL Proposed Regulation Section 2510.3-18(b)(2)(i)). Both Stout's engagement letters and its reports expressly provided that its valuations were prepared for the ESOP's Trustees' work related to "plan administration." *See, e.g.*, SA49, Stout Engagement Agreement (6/20/2013) at 1 ("We understand our valuation analysis will be used for annual reporting and plan administration purposes by the Trustee[.]"); SA61, 12/31/2014 FMV at 2 ("The purpose of our analysis is to provide an independent opinion of the Fair Market Value of the common stock of Paperweight held by the ESOP as of the Valuation Date for ESOP administration purposes."). After Stout prepared the valuations, the Trustees reviewed and "finaliz[ed] the valuation[s] in accordance with Section 3(18)(B) of ERISA." *See* DE 77, FAC ¶ 186.

Given the clear delineation of an ERISA-governed relationship between Stout and the ESOP's Trustees, it is not surprising that Lyon does not allege that the Stout Defendants

did anything but prepare the semi-annual valuation for the ESOP's Trustees for ESOP administration purposes. Lyon alleges that Stout met with the Company's management, but such a process is expressly contemplated in Stout's engagement agreements. *See, e.g.*, SA50, Stout Engagement Agreement (6/20/2013) at 2. The Stout Defendants' interactions with the Company were limited to the narrow purpose of preparing Plan-required valuations of the ESOP's Trustees. In short, the Stout Defendants are alleged to have violated state laws when carrying out an ERISA Plan-required function that related directly to plan administration. Lyon's fraud and negligent misrepresentations claims are accordingly preempted by ERISA section 514 because they "relate to" an ERISA plan.

In *Halperin*, this Court analyzed the same factual predicate at issue here and held that Stout's valuation of the Appvion ESOP "relates to" the ERISA plan because:

- "Stout's [] involvement in the ESOP valuation stemmed solely from [the ESOP's Trustee's] duties," 7 F.4th at 553;

- Stout had a "limited single-hat ERISA role when aiding the ESOP valuation process as [the ESOP's Trustee's] contractor," *id.* at 554;

- The ESOP's Trustees hired Stout "to help perform core trustee functions," *id.*;

- In valuing the stock held by the ESOP, Stout performed a "central ERISA function[]," *id.*;

- "Stout's services were central to plan administration—preparing the independent valuation of the ESOP's holdings," *id.*; and

39

- Stout "perform[ed] [] core plan tasks." *Id.*

*Halperin* controls here. Lyon claims that *Halperin* is distinguishable because unlike the aiding and abetting claims brought by the Liquidating Trustees, his fraud and negligent misrepresentation claims are "based on Stout's independent legal duties which do not depend on its status as [the ESOP Trustee's] service provider." Op. Br. at 78. Tellingly, Lyon does not identify the "independent legal duties" that he claims are at issue here. *See id.* at 78-79. Nor does Lyon explain why Stout owed any duties to the Company, the Plan, or its participants outside of its "non-fiduciary obligations to beneficiaries when performing core ERISA functions"—which exclusively govern Stout's conduct. *Halperin*, 7 F.4th at 553. As this Court held in *Halperin*, "[a]lthough Stout is not a fiduciary under ERISA, it still had federal-law obligations under ERISA when serving as [the ESOP Trustee's] contractor," *i.e.*, "under ERISA, Stout must concern itself with [the ESOP Trustee's] and the director and officers' fiduciary duties to beneficiaries so as to not to participate knowingly in a [fiduciary breach]." *Id.* ERISA's provision governing the liability of non-fiduciaries for knowing participation in a breach of fiduciary duty, *i.e.*, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), accordingly is the exclusive source of Stout's obligations related to its valuation of the stock held by the ESOP. *See id.* at 553 n.3.[40]

The authority cited in Lyon's Opening Brief, *see* Op. Br. at 78-79, does not dictate a contrary result. As the District Court correctly observed, Lyon's claims are premised on

---

[40] Although Lyon asserted an ERISA section 502(a)(3) claim against the Stout Defendants in the FAC, he did not appeal the District Court's dismissal of this claim and accordingly has waived it. *See infra* at 46-47.

"breaches of fiduciary duty and fraudulent misrepresentation and omissions to the ESOP

Plan" and arise out of the ESOP Trustee's fiduciary obligations.  A054 (quoting DE 77,

FAC ¶ 2).  The ERISA plan is at the "core" of Lyon's claims.  *See id.*  As a result, cases

regarding the preemption of state law claims where the alleged fraud just so happened to

be committed in the "context" of an ERISA plan are inapposite.  *Cf. Trs. of AFTRA Health

Fund*, 303 F.3d at 781 (holding that "a plan participant's decision to commit fraud in the

context of an employee benefit plan does not immunize him from tort liability under state

law"); *Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18, 23 (2d Cir. 1996) (holding that a

state law fraud claim brought by trustees of a health plan against a participating employer

who fraudulently represented that a non-employee was eligible for membership was not

preempted because the "plan was only the context in which this garden variety fraud

occurred").

Lyon cites other cases holding that professional malpractice and breach of contract

claims are not preempted by ERISA, *see* Op. Br. at 78-81, but those cases are also

inapposite.   As the District Court observed, Lyon has not asserted a professional

malpractice or breach of contract action against the Stout Defendants.  A054.  Even if Lyon

had asserted such claims, they would be preempted for the reasons previously discussed.

The ERISA Plan was not incidental to the alleged fraudulent conduct—the alleged conduct

"stems from the Plan" and the ESOP's Trustees' fiduciary duties to administer the Plan

pursuant to its terms.[41]   A054.   In other words, the claims "relate to" an ERISA plan and therefore are preempted pursuant to ERISA section 514.

### 3. Allowing Lyon's Fraud and Negligent Misrepresentation Claims to Proceed Would Impermissibly Supplement ERISA's Enforcement Scheme

The District Court also correctly held that Lyon's fraud and negligent misrepresentation claims are preempted under ERISA section 514 for another reason that is not addressed in Lyon's Opening Brief—*i.e.*, allowing the claims to proceed would impermissibly supplement ERISA's reticulated enforcement scheme.   A054.   ERISA provides a specific cause of action against non-fiduciaries and specifies the remedy available for that cause of action.   ERISA allows participants, beneficiaries, and fiduciaries to obtain "appropriate equitable relief" from non-fiduciaries who knowingly participate in a fiduciary's violation of the statute.   *See* 29 U.S.C. § 1132(a)(3); *see also Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248-49 (2000).   In enacting this provision, Congress deliberately chose not to provide money damages as a remedy against non-fiduciaries.   *See Halperin*, 7 F.4th at 555 ("ERISA does not authorize suits for damages against non-fiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty.").

---

[41] In many of the cases cited by Lyon, the plaintiffs had a direct contractual relationship with the service provider defendants—a circumstance which is notably absent here.  *See, e.g.*, *Kloots v. Am. Express Tax & Bus. Servs., Inc.*, 233 F. App'x 485, 486, 488-89 (6th Cir. 2007) (holding that state law claims asserted by ESOP trustees against firm they hired to value stock were not preempted); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 319 (2d Cir. 2003) (holding that state law claims asserted by trustee of multi-employer defined benefit pension plan against actuary they hired to prepare plan's actuarial statements were not preempted); *Airports Co., Inc. v. Custom Benefits Servs. of Austin, Inc.*, 28 F.3d 1062, 1064 (10th Cir. 1994) (holding that state plan trustees filed suit against firm they hired to provide expert benefit plan consultation).

Lyon, however, seeks monetary damages for his fraud and negligent misrepresentation claims. *See* DE 77, FAC, Prayer for Relief, ¶ B. Lyon cannot circumvent ERISA's limitation on monetary damages by asserting state law claims. Courts have consistently held that state law claims that supplement ERISA's remedial scheme, *i.e.*, provide remedies that are not available under the statute, are preempted. *See Pilot Life Ins. Co.*, 481 U.S. at 54 (holding that litigants are not "free to obtain remedies under state law that Congress rejected in ERISA"); *see also Arndt v. AON Hewitt Benefit Payment Servs., LLC*, No. 15-C-750, 2015 WL 7313392, at *3 (E.D. Wis. Nov. 19, 2015) (holding that negligent misrepresentation claim was preempted where it would have subjected defendant "not just for what is recoverable under ERISA itself but under state law consequential damages theories as well"). For this reason, in *Halperin*, this Court held that the Liquidating Trust's aiding and abetting breach of fiduciary duty claim—for which the Liquidating Trust demanded an award of money damages—was preempted. *See* 7 F.4th at 553 (holding that "state-law liability for Stout could lead to a damages remedy that would arguably conflict with ERISA's remedial limits on claims against non-fiduciaries"). Lyon's fraud and negligent misrepresentation claims against the Stout Defendants are accordingly preempted for this additional reason.

### B. The FAC Fails to State Claims for Fraud and Negligent Misrepresentation

Even if Lyon's state law claims are not preempted, the District Court's dismissal of these claims should be affirmed for an alternative reason that was fully briefed below— *i.e.*, the FAC fails to state a claim for either cause of action. *See Dibble*, 793 F.3d at 807.

### 1.  The Valuations Are Not Statements of Fact

To be actionable as fraud or negligent misrepresentation, a statement "must be one relating to an existing fact or past event," not "[a] mere opinion, prediction, or promise of a future condition of things." *Warner v. Benjamin*, 62 N.W. 179, 180-81 (Wis. 1895).  "A representation is one of opinion if it expresses only the maker's judgment as to quality, value, authenticity, or other matters of judgment."  *Consol. Papers, Inc. v. Dorr-Oliver, Inc.*, 451 N.W.2d 456, 459 (Wis. Ct. App. 1989), *rev. denied*, 457 N.W.2d 323 (Wis. 1990).

Stout's valuations were professional opinions, as the FAC repeatedly alleges, *see* B434, FAC ¶ 658; B437, FAC ¶ 668; B439, FAC ¶ 691; B440, FAC ¶ 699; DE 77, FAC ¶ 731, and Stout's reports expressly indicate.[42]  Valuations necessarily require the appraiser to apply its judgment.  B049; *see also supra* n. 30.  That is exactly what the Stout Defendants did here.[43]  Stout's valuations accordingly are not actionable as fraud or negligent misrepresentation.

### 2.  The FAC Fails to State a Claim for Fraud

The FAC fails to state a claim for fraud for two additional reasons.  First, the FAC does not plead fraud with particularity.  The FAC recites a list of purported "flaws" in the valuations, *see* B434-37, FAC ¶¶ 659-66, but does not specify which of the purported "flaws" made which valuation false and why.  This is insufficient to state a fraud claim.

---

[42] *See, e.g.*, SA122, 12/31/2014 FMV at 63 ("[I]t is our Opinion that the Fair Market Value of the common stock of Appvion . . .  is reasonably stated in the amount of. . .  $11.00[.]").

[43] *See, e.g.*, SA49, Stout Engagement Agreement (6/20/2013) at 1 ("[W]e will use the approach or approaches that in our experience and judgment will provide the most supportable valuation.  After applying the appropriate valuation methodology or methodologies, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.").

*See Rendler v. Markos*, 453 N.W.2d 202, 205 (Wis. Ct. App. 1990) (holding that complaint's reference to an "entire prospectus . . . fail[ed] to identify which statements in the prospectus were false or in what regard they were false"); *see also* Appellee Reliance Trust Co.'s Answering Br.

Second, the FAC does not plausibly allege that Stout "intended to defraud and to induce another to act upon the misrepresentation," *Van Den Heuvel v. AI Credit Corp.*, 951 F. Supp. 2d 1064, 1073-74 (E.D. Wis. 2013), for the reasons previously discussed in connection with Lyon's failure to plead a strong inference of scienter in support of his federal securities fraud claim. *See supra* at 16-33. The District Court's dismissal of Lyon's fraud claim accordingly should be affirmed, even if this Court finds that it is not preempted.

## III. The District Court Properly Dismissed Lyon's Claims Against the Individual Stout Defendants

This Court should affirm the District Court's dismissal of Lyon's claims against the Individual Stout Defendants for two additional reasons. First, neither the FAC nor the SAC contain any specific allegations of wrongdoing on the part of the Individual Stout Defendants. Lyon's only allegations concerning the Individual Stout Defendants demonstrate that they performed their job duties as specified in Stout's engagement agreements and as they would have for any of Stout's other ESOP clients. *See*, *e.g.*, B236, SAC ¶¶ 500-01; B239, SAC ¶¶ 513-14; B240, SAC ¶ 519; B407-08, SAC ¶¶ 528, 531; B383-84, SAC ¶ 1237; B407-08, SAC, ¶ 1291 (alleging that the Individual Stout Defendants presented Stout's valuation reports to the ESOP Committee in the presence of the ESOP's Trustee). *See also* DE 77, FAC ¶¶ 101-03 (alleging that the Individual Stout

Defendants prepared the valuations of Company stock), *id.* ¶¶ 102, 233 (alleging that Mr. El-Tahch attended ESOP Committee meetings and roadshows), *id.* ¶¶ 92-93, 101-02, 233, 321, 325, 470, 473 (alleging that Mr. Levine presented during ESOP Committee meetings and roadshows).  Such allegations are insufficient under Federal Rule of Civil Procedure 8 to state a claim for relief against the Individual Stout Defendants.  *See Bank of Am. N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Liability is personal . . . Each defendant is entitled to know what he or she did that is asserted to be wrongful.").

Second, Lyon failed to even mention the Individual Stout Defendants in his Opening Brief, let alone develop any cogent arguments for why this Court should reverse the dismissal of his claims against them.  Lyon accordingly has waived his claims against the Individual Stout Defendants.  *See Gable v. City of Chi.*, 296 F.3d 531, 538 (7th Cir. 2002) (holding that "the plaintiffs have waived two of their arguments on appeal by not developing them in their opening brief"); *Jones Motor Corp., Inc. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1192 (7th Cir. 1999) (holding that an argument was "so little developed in the plaintiff's opening brief in this court that it must be deemed waived").

## IV.   Lyon Abandoned His ERISA Section 502(a)(3) Claim

In the FAC, Lyon asserted an ERISA section 502(a)(3) claim against the Stout Defendants.  *See* DE 77, FAC ¶¶ 620-36 (Count 8).  Lyon's Opening Brief makes no mention, whatsoever, of this claim.  *See, e.g.*, Op. Br. at 3 (not requesting review of the District Court's dismissal of the ERISA § 502(a)(3) claim against the Stout Defendants). By "failing to present argument with respect" to this claim, Lyon has "waived any

challenge to [its] dismissal." *Kaplan v. Shure Bros., Inc.*, 153 F.3d 413, 420 (7th Cir. 1998); *see also* Brief for Appellees Houlihan Lokey and Houlihan Lokey Financial Advisors.

## **CONCLUSION**

For the foregoing reasons, Stout respectfully requests that the Court affirm the judgment of the District Court as to the Stout Defendants.

Dated: August 4, 2023

Respectfully submitted,

*Lars C. Golumbic*
Lars C. Golumbic
Kara P. Wheatley
Larry M Blocho Jr.
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 857-0620
lgolumbic@groom.com
kwheatley@groom.com
lblocho@groom.com

*Counsel for Defendants-Appellees Stout Risius Ross, LLC, Stout Risius Ross, Inc., Scott Levine, and Aziz El-Tahch*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)7**

1. This complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,489 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 13-point Times New Roman font, with footnotes in 12-point Times New Roman font.

Dated: August 4, 2023                    Respectfully submitted,

*/s/ Lars C. Golumbic*
Lars C. Golumbic
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 857-0620
lgolumbic@groom.com

*Counsel for Defendants-Appellees Stout*
*Risius Ross, LLC, Stout Risius Ross, Inc.,*
*Scott Levine, and Aziz El-Tahch*

## CERTIFICATE OF SERVICE

The undersigned counsel for Defendants-Appellees Stout Risius Ross, LLC, Stout Risius Ross, Inc., Scott Levine, and Aziz El-Tahch hereby certifies that on August 4, 2023, he caused a digital version of the foregoing Brief of Defendants-Appellees Stout Risius Ross, LLC, Stout Risius Ross, Inc., Scott Levine, and Aziz El-Tahch to be served via the CM/ECF system on all counsel of record for this matter.


Dated: August 4, 2023

*/s/ Lars C. Golumbic*
Lars C. Golumbic
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 857-0620
lgolumbic@groom.com

*Counsel for Defendants-Appellees Stout Risius Ross, LLC, Stout Risius Ross, Inc., Scott Levine, and Aziz El-Tahch*